No. 25-14202

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————

RESTORE ROBOTICS REPAIRS LLC,

*Plaintiff-Appellant,*

v.

INTUITIVE SURGICAL INC.,

*Defendant-Appellee.*

————————

On Appeal from the United States District Court
for the Northern District of Florida,
No. 3:24-cv-444-MCR-ZCB
Hon. M. Casey Rodgers

————————

## OPENING BRIEF OF APPELLANT
## RESTORE ROBOTICS REPAIRS LLC

————————

Matthew D. Reade
Tiffany Pages-Sanchez
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
mreade@kellogghansen.com

*Counsel for Appellant Restore
Robotics Repairs LLC*

February 11, 2026

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................... vii

JURISDICTIONAL STATEMENT ....................................................... viii

INTRODUCTION ..................................................................................... 1

STATEMENT OF THE ISSUES .............................................................. 5

STATEMENT OF THE CASE ................................................................. 6

A.   Intuitive Monopolizes Surgical Robots and Compatible Instruments Called EndoWrists ....................................................... 6

B.   Restore First Challenges Intuitive's EndoWrist Monopoly ............ 8

    1.   Intuitive Blocks Restore From the Market For S/Si EndoWrists, so Restore Brings the S/Si Litigation ................ 8

    2.   The Court Excludes X/Xi EndoWrist Damages From the Case Because They Would Be Too "Speculative" Until Restore Could Decrypt the Use-Limiting Chip ........... 11

    3.   After Intuitive Settles the S/Si Litigation, Restore Ramps Up its Effort to Repair X/Xi EndoWrists and Becomes the First to Decrypt Intuitive's Use Limiter ........ 12

C.   Blocked From the X/Xi EndoWrist Market By Intuitive's Exclusionary Conduct, Restore Brings This Suit .......................... 12

D.   The District Court Dismisses Restore's Claims As Time-Barred Despite Intuitive's Ongoing Exclusionary Conduct .......... 18

SUMMARY OF ARGUMENT ................................................................ 21

STANDARD OF REVIEW ..................................................................... 25

i

ARGUMENT ....................................................................... 27

I.    Restore's Suit Is Timely Because Intuitive Kept Violating
      the Antitrust Laws During the Limitations Period ....................27

      A.    Binding Precedent Holds That Each New Exclusionary
            Act Restarts the Limitations Clock, and Intuitive Took
            *Thousands* of Exclusionary Acts............................................27

      B.    The District Court Erred By Disregarding Intuitive's
            Thousands of Exclusionary Acts............................................32

II.   Restore's Suit Is Timely Because Restore's Lost Profits Were
      Not Reasonably Provable Before It Decrypted the X/Xi
      EndoWrists' Use Limiter..............................................................43

      A.    Under *Zenith* and *Poster Exchange I*, Damages Do Not
            Accrue Until They Are Reasonably Provable ........................44

      B.    Restore's Damages Were Not Reasonably Provable
            Before It Could Decrypt Intuitive's Use Limiter.................46

III.  Restore's Request For Injunctive Relief Is Neither Moot Nor
      Barred by Laches ..........................................................................52

      A.    Laches Does Not Apply Because Restore Seeks Only
            Prospective Equitable Relief.................................................52

      B.    Promising Incomplete Voluntary Cessation Does Not
            Moot Restore's Equitable Claims..........................................54

IV.   The District Court Should Have Granted Leave To Amend.........55

CONCLUSION ...................................................................... 59

CERTIFICATE OF COMPLIANCE........................................... 60

CERTIFICATE OF SERVICE.................................................. 61

# TABLE OF AUTHORITIES

Page

**CASES**

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) ........................................................ 53

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) ....................................................... 4

*Brunswick Corp. v. Riegel Textile Corp.*,
752 F.2d 261 (7th Cir. 1984) .......................................................... 48

*Bryant v. Dupree*,
252 F.3d 1161 (11th Cir. 2001) .................................................. 25, 55

*Calderon v. Moore*,
518 U.S. 149 (1996) ...................................................................... 55

*Cohen v. Office Depot, Inc.*,
204 F.3d 1069 (11th Cir. 2000) ...................................................... 4

*Cook v. Bennett*,
792 F.3d 1294 (11th Cir. 2015) ..................................................... 25

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*,
114 F.4th 280 (4th Cir. 2024) ............................... 33, 34, 35, 37

*Duty Free Ams., Inc. v. Estee Lauder Cos.*,
2014 WL 1329359 (S.D. Fla. Mar. 31, 2014) ................................ 53

*Espey v. Wainwright*,
734 F.2d 748 (11th Cir. 1984) ....................................................... 55

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) ...................................................................... 55

*Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ...................................................................... 54

iii

*Garcia v. Chiquita Brands Int'l, Inc.,*
    48 F.4th 1202 (11th Cir. 2022)................................................55, 57

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
    392 U.S. 481 (1968) ..........................................17, 28, 41

*Hennegan v. Pacifico Creative Serv., Inc.,*
    787 F.2d 1299 (9th Cir. 1986) ...................................30, 40

*Hoopes v. Union Oil Co.,*
    374 F.2d 480 (9th Cir. 1967) ..........................................40

*Imperial Point Colonnades Condo., Inc. v. Mangurian,*
    549 F.2d 1029 (5th Cir. 1977) ...................................30, 31

*Klehr v. A.O. Smith Corp.,*
    521 U.S. 179 (1997) .......................................................47

*Maglana v. Celebrity Cruises Inc.,*
    136 F.4th 1032 (11th Cir. 2025)....................................25

*Midwestern Waffles, Inc. v. Waffle House, Inc.,*
    734 F.2d 705 (11th Cir. 1984) ...................................43, 56

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.,*
    198 F.3d 823 (11th Cir. 1999) .....................28, 30, 33, 41

*Oliver v. SD-3C LLC,*
    751 F.3d 1081 (9th Cir. 2014) ......................................49

*Peter Letterese & Assocs., Inc. v. World Inst. of
    Scientology Enters.*, 533 F.3d 1287 (11th Cir. 2008) .........25, 52, 53

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
    572 U.S. 663 (2014) .......................................................52

*Pilkington v. United Airlines,*
    112 F.3d 1532 (11th Cir. 1997) ....................................37

\*_Poster Exch., Inc. v. National Screen Serv. Corp._:
    517 F.2d 117 (5th Cir. 1975) ............................ 4, 21, 28, 29, 31, 32,
                                               33, 35–42, 44, 56

    456 F.2d 662 (5th Cir. 1972) ................................. 23, 43, 45–47, 52

\*_Samsung Elecs. Co. v. Panasonic Corp._,
    747 F.3d 1199 (9th Cir. 2014) ................................ 30, 31, 36, 38, 49

_SaurikIT, LLC v. Apple, Inc._,
    2023 WL 8946200 (9th Cir. Dec. 28, 2023) ............................ 35, 36

_Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc._,
    376 F.3d 1065 (11th Cir. 2004) ...................................................... 25

_St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co._,
    198 F.3d 815 (11th Cir. 1999) ................................................... 26, 55

_US Airways, Inc. v. Sabre Holdings Corp._,
    938 F.3d 43 (2d Cir. 2019) ............................................................ 30

\*_Zenith Radio Corp. v. Hazeltine Rsch., Inc._,
    401 U.S. 321 (1971) ............................... 2, 16, 21, 22, 27, 28, 31, 34,
                                               43, 45–48, 50–52

v

## STATUTES AND RULES

15 U.S.C.:

§ 1....................................................................viii, 14, 31

§ 2....................................................................viii, 14, 31

§ 15.............................................................................. viii

§ 15b...............................................................2, 27, 44

§ 26................................................................viii, 20

28 U.S.C.:

§ 1291............................................................................. viii

§ 1331............................................................................. viii

§ 1337............................................................................. viii

## OTHER MATERIALS

3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW:
AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR
APPLICATION (4th & 5th eds. 2025) .........................................50, 53

Robert E. George et al., *A Day in the Life of a Surgical
Instrument: The Cycle of Sterilization*, 5 ANNALS OF
SURGERY OPEN (2024).......................................................................7

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Restore Robotics Repairs LLC requests oral argument.  This appeal raises important, recurring questions of antitrust accrual—specifically, how the continuing-violation and speculative-damages doctrines apply to a monopolist's ongoing exclusionary conduct.

## JURISDICTIONAL STATEMENT

This appeal arises from an action for treble damages and injunctive relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1337.  On November 7, 2025, the court granted Defendant Intuitive Surgical, Inc.'s motion to dismiss and denied Restore's motion for leave to amend its complaint.  Dkt. 42 [App.295–313].  Restore timely appealed that final order on November 29, 2025.  Dkt. 43 [App.314].  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

**INTRODUCTION**

Intuitive Surgical makes the da Vinci surgical robot and compatible limited-use instruments called EndoWrists. Intuitive is a monopolist. It controls 99.9 percent of robot sales and installations. And for more than a decade, it sold 100 percent of EndoWrists. Then came Restore. Restore extends EndoWrists' life so that care providers need not buy new at Intuitive's inflated prices. Care providers can use those savings for staff, technology, and community services like indigent care.

But care providers cannot use Restore because Intuitive has locked it out of the EndoWrist market. Intuitive's contracts force customers to buy instruments only from Intuitive. Refuse, and Intuitive threatens to withhold essential robot service, instruments, and accessories. Because Intuitive owns the robot market and is the only original manufacturer of EndoWrists, care providers must comply or lose the benefits of robotic surgery for their patients.

In the four years before this September 2024 suit, Intuitive imposed thousands of exclusionary contracts, added new exclusionary terms, and enforced its contracts to block care providers from using Restore. Restore could not prove its damages until February 2024, when it achieved the

technical breakthrough necessary to enter the market. Intuitive's conduct delayed that breakthrough. But Restore now knows it would have entered by July 2020 had Intuitive competed fairly.

The district court dismissed those serious antitrust claims as untimely because it misunderstood established limitations doctrines. Although an antitrust plaintiff must sue for damages "within four years after the cause of action accrued," 15 U.S.C. § 15b, two doctrines extend that rule. Under the continuing-violation doctrine, each new harmful act restarts the four-year clock. Under the speculative-damages doctrine, a claim does not accrue until the plaintiff can prove its damages. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338–39 (1971). Either doctrine makes this suit timely: In the four years before this suit, Intuitive committed thousands of exclusionary acts, blocking Restore from more than half the market, and Restore could not prove its damages before its technical breakthrough in February 2024.

The district court dismissed Restore's claims anyway. It mischaracterized Intuitive's new contracts and other in-period acts as mere "consequences" of a single choice to forever exclude competition by contract. It treated Restore's allegation about when it would have

2

entered the market (July 2020) absent Intuitive's violations as an admission that Restore could have proved its damages then—years before its breakthrough revealed whether and when it could have entered the market.

The district court went further. Although Intuitive is *still violating the law*, and no one briefed the timeliness of Restore's claims for prospective injunctive relief, the court invoked laches and mootness to dismiss them, too. It mechanically applied the four-year statute of limitations—which the court acknowledged covers only damages claims—ignoring that laches does not bar claims for prospective relief. The court then declared Restore's equitable claims moot based on an informal "approval" letter that Intuitive sent to Restore after being sued. But the court never found that this incomplete relief, which did not touch the exclusionary contracts, made it "absolutely clear" that Intuitive would not violate the law again. The court then denied leave to amend, refusing to consider new allegations that cured the deficiencies it perceived or to give Restore a chance to correct them.

In seeking dismissal, Intuitive argued that because it has imposed exclusionary contracts for "far longer than four years," it can continue

forever without fearing antitrust liability.  Dkt. 25 at 15 [App.105].  The
district court agreed.  Dkt. 42 at 15–16 n.9.  Accepting that argument
contradicted binding caselaw and "improperly transform[ed] the
limitations statute from one of repose to one of continued immunity" for
"the continued invasion of a monopoly and exclusion from the market."
*Poster Exch., Inc. v. National Screen Serv. Corp.*, 517 F.2d 117, 127 (5th
Cir. 1975).[1]  This Court should reverse the dismissal.

---

[1] *See also Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.
1981) (en banc) (adopting as binding precedent the decisions of the Fifth
Circuit issued before October 1, 1981); *Cohen v. Office Depot, Inc.*, 204
F.3d 1069, 1072 (11th Cir. 2000) ("Of course, pre-split or 'Old Fifth'
decisions . . . are binding on us, and where two prior panel decisions
conflict we are bound to follow the oldest one.") (citation omitted).

## STATEMENT OF THE ISSUES

1.     Did the district court err in deeming Restore's damages claims time-barred, where Intuitive entered thousands of new exclusionary contracts, added new exclusionary terms, and enforced those contracts to exclude Restore from the market during the four-year limitations period?

2.     Did the district court err in deeming Restore's damages claims time-barred, where Restore could not prove its damages from exclusion until February 2024?

3.     Did the district court err in dismissing Restore's equitable claims on laches and mootness grounds, where Restore seeks only prospective relief and Intuitive's voluntary cessation was neither clear nor complete?

4.     Did the district court err in denying leave to amend as futile even though Restore could cure the complaint's purported deficiencies?

**STATEMENT OF THE CASE**

**A.    Intuitive Monopolizes Surgical Robots and Compatible Instruments Called EndoWrists**

Intuitive makes the da Vinci surgical robot and compatible instruments called EndoWrists.  Dkt. 21 ¶¶ 8–9 [App.50–51].  Surgeons use the da Vinci for millions of surgeries each year.  Dkt. 21 ¶¶ 10–11 [App.51].  Only Intuitive makes the da Vinci, and only Intuitive makes the original EndoWrists.  Dkt. 21 ¶ 16 [App.53].

Intuitive dominates the market.  It makes 99.9 percent of U.S. surgical-robot sales and installed systems.  *Id.*  In 2023, Intuitive sold 666 robots; its lone competitor sold one.  *Id.*  Because Intuitive has monopoly power in the surgical-robot market, it charges supracompetitive prices for the da Vinci.  *Id.*  Each da Vinci costs more than $1 million, and Intuitive's profit margins far exceed industry norms.  Dkt. 21 ¶¶ 13, 28 [App.52, App.57].

Despite the da Vinci's cost, most of Intuitive's profits come from selling EndoWrists at supracompetitive prices.  Dkt. 21 ¶¶ 14, 16 [App.52–53].  Typically, surgical instruments are safely sterilized and

6

reused hundreds of times.[2]  But Intuitive designs EndoWrists with a use-limiting chip so they stop working after as few as ten uses.  Dkt. 21 ¶¶ 51–52 [App.65–66].  These limits are arbitrary.  Intuitive bases them on no scientific study, no regulatory requirement, and no measure of the instruments' useful life.  Dkt. 21 ¶¶ 75–76 [App.75].  The limits serve one purpose:  forcing care providers to buy new EndoWrists at inflated prices.  Dkt. 21 ¶¶ 52, 70–71 [App.66, App.73–74].  In fact, when Intuitive raises the use limit for an EndoWrist, it hikes prices in tandem to preserve or increase its per-use profit.  Dkt. 21 ¶ 70 [App.73].

Intuitive has sold several da Vinci generations.  It no longer supports the older S/Si model.  Dkt. 21 ¶ 42 [App.62].  So nearly all of Intuitive's customers now use the da Vinci X/Xi or the da Vinci 5, which debuted in 2024.  Dkt. 21 ¶¶ 12, 15 [App.52].  S/Si EndoWrists do not work with those newer robots, which require X/Xi EndoWrists.  Dkt. 21 ¶¶ 15, 42 [App.52, App.62].  Beyond this incompatibility, S/Si and X/Xi EndoWrists are essentially identical—except that Intuitive encrypted

---

[2] *See, e.g.*, Robert E. George et al., *A Day in the Life of a Surgical Instrument: The Cycle of Sterilization*, 5 ANNALS OF SURGERY OPEN 3 (2024) (reporting estimates that a surgical instrument's lifespan is "300–900 cycles of sterilization").

the X/Xi EndoWrists' use-limiting chip.  Dkt. 21 ¶ 83 [App.79].  Without bypassing that encryption, no one can use an X/Xi EndoWrist past its programmed limit.  Dkt. 21 ¶¶ 83–84 [App.79–80].

## B.    Restore First Challenges Intuitive's EndoWrist Monopoly

Restore competes with Intuitive by giving EndoWrists a second life. Restore can either repair EndoWrists or remanufacture them under its own brand.  *See* Dkt. 21 ¶ 43 [App.62–63].  Only remanufacturing requires FDA clearance.  *Id.*  Under each approach, Restore would restore the EndoWrist to its original safety and efficacy, then reset its use limiter so it will work for another set of uses.  *Id.*  Restore's instruments cost much less than buying new, creating savings that care providers can redirect to hiring staff, buying new technology, or supporting community services.  Dkt. 21 ¶¶ 44, 69 [App.63, App.73].

### 1.    Intuitive Blocks Restore From the Market For S/Si EndoWrists, so Restore Brings the S/Si Litigation

Restore began repairing S/Si EndoWrists in July 2018.  Dkt. 21 ¶ 77 [App.76].  The FDA later cleared Restore to remanufacture them, finding that Restore's S/Si EndoWrists are "as safe and effective" as Intuitive's and "operate as originally intended" for a second set of uses.  Dkt. 21 ¶ 78 [App.76].

8

But Intuitive blocked Restore from the S/Si EndoWrist market by conditioning the da Vinci robot and essential service on buying S/Si EndoWrists only from Intuitive.  *See* Dkt. 21 ¶ 81 [App.77–78]; *Restore Robotics LLC v. Intuitive Surgical Inc.*, No. 5:19-cv-00055-MCR-MJF (N.D. Fla.) ("S/Si Litigation"), Dkt. 14 at 33–34.[3]  Intuitive's standard sales and lease contracts require customers to use EndoWrists only for Intuitive's prescribed "maximum number of uses"—or else lose access to the robot and service.  Dkt. 21 ¶ 57 [App.67–68].

That is no empty threat.  Intuitive tracks when instruments are used.  Dkt. 21 ¶ 59 [App. 68–69].  Whenever it detects a repaired or remanufactured instrument, Intuitive "sends a warning letter" to the customer.  Dkt. 21 ¶¶ 59–60 [App.69].  If the customer persists, Intuitive "terminate[s]" their agreement and withholds robot service, instruments, and accessories.  Dkt. 21 ¶¶ 60–61 [App.69–70].

In early 2019, Restore sued Intuitive for violating the federal antitrust laws.  *See* S/Si Litigation, Dkts. 1, 14.  Restore's complaint alleged an aftermarket for EndoWrist instruments that, by its terms, was

---

[3] This Court can take judicial notice of filings in the S/Si Litigation, which is referenced in Restore's complaint here.  *See Lozman v. City of Riviera Beach, Fla.*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013).

not limited to S/Si EndoWrists. *See generally* S/Si Litigation, Dkt. 1. After all, Restore intended to enter the market for X/Xi EndoWrists—a product with the same customer base (hospitals with robotic surgery programs) and virtually the same repair process as the prior generation. Dkt. 21 ¶ 80 [App.77].

So as the case trudged forward, Restore prepared to enter the X/Xi EndoWrist market. A few months after suing Intuitive, Restore entered a distribution agreement covering X/Xi EndoWrists and identified a partner to help prepare the regulatory filing necessary to remanufacture (and not just repair) X/Xi EndoWrists. Dkt. 21 ¶ 82 [App.78–79]. Restore also created technology allowing it to wirelessly calculate the remaining uses on an X/Xi EndoWrist without connecting it to the da Vinci and wasting a use. *Id.* But the key last step to enter the market—decrypting Intuitive's use limiter—would be "expensive and risky." Dkt. 21 ¶ 86 [App.80–81]. No one had ever done it. *Id.* And "so long as" Intuitive "strictly enforce[d] its contractual restrictions," spending "substantial resources" to enter the market would be "futile." Dkt. 21 ¶¶ 81, 84 [App.78, App.80].

10

### 2. The Court Excludes X/Xi EndoWrist Damages From the Case Because They Would Be Too "Speculative" Until Restore Could Decrypt the Use-Limiting Chip

After the court denied summary judgment, Intuitive moved to bar any evidence of Restore's "lost business related to X/Xi . . . instrument repairs." S/Si Litigation, Dkt. 218 at 3. The court granted that motion in December 2022. *Id.* It explained why to the parties at a hearing three months prior: "I don't see how [Restore] can take to a jury the speculative idea that you really want to be in [the X/Xi EndoWrist] business . . . and either (a) you haven't figured out a way to do it yet or (b) [you] figured out a way to do it a month before trial and nobody has had an opportunity to evaluate that technology." S/Si Litigation, Dkt. 185 at 34:13-25.

The district court also refused to compel discovery on Intuitive's "blocking technology" in the X/Xi EndoWrists. S/Si Litigation, Dkt. 192 at 2–3. It credited Intuitive's argument that Restore could not "assert a theory alleging harm to its contemplated (but currently non-existent) [X/Xi EndoWrist] business" without "the technological capability to circumvent the X/Xi use counter." *Id.*; *see also* Dkt. 35 ¶¶ 91–92 [App.213–214] (recounting this history).

11

### 3.    After Intuitive Settles the S/Si Litigation, Restore Ramps Up its Effort to Repair X/Xi EndoWrists and Becomes the First to Decrypt Intuitive's Use Limiter

On the eve of trial, Intuitive settled. Dkt. 21 ¶ 79 [App.76–77]. In exchange for dismissal, Intuitive agreed "for the first time" not to void warranties, withhold service, or "refuse to sell a robot, instruments, or accessories if a customer used EndoWrists remanufactured by Restore under clearance from the FDA." Dkt. 21 ¶ 85 [App.80]. The settlement was executed on January 23, 2023. *Id.*

A month later, seeing an opening, Restore restarted its effort to decrypt the use-limiting chip on the X/Xi EndoWrists. Dkt. 21 ¶ 86 [App.80]. Just over a year passed. Then, on February 29, 2024, Restore succeeded, becoming "the first and only" independent servicer able "to reset the pre-programmed usage limits on the [X/Xi] EndoWrist." Dkt. 21 ¶ 86 [App.81]. That breakthrough allowed Restore to start repairing X/Xi EndoWrists. *See* Dkt. 21 ¶ 88 [App.81]. In March 2025, Restore obtained FDA clearance to remanufacture X/Xi EndoWrists as well. Dkt. 21 ¶ 87 [App.81]; Dkt. 35 ¶ 95 [App.215].

### C.    Blocked From the X/Xi EndoWrist Market By Intuitive's Exclusionary Conduct, Restore Brings This Suit

But even after the settlement, Intuitive excluded Restore from the

X/Xi EndoWrist market, where Intuitive had a 100 percent share for more than a decade. Dkt. 21 ¶ 69 [App.73]. Though Intuitive quietly published a statement in March 2023 saying it would not punish its customers for using remanufactured EndoWrists, it did not change its contracts or approve any remanufactured instrument. Dkt. 21 ¶¶ 62–66 [App.70–72]; *see also* Dkt. 35 ¶ 59 [App.199]. Instead, Intuitive carefully avoided granting any approval and reminded its customers that if they repaired EndoWrists with an independent servicer, they could still lose the robot warranty, service, and access to instruments and accessories. Dkt. 21 ¶¶ 64–66 [App.71–72]; *see also* Dkt. 21 ¶ 57 [App.67–68] (explaining that Intuitive's contracts prohibit "repair, refurbishment, or reconditioning not approved by Intuitive"). Intuitive's cryptic statement "created confusion" among Restore's potential customers. Dkt. 21 ¶ 66 [App.72]. Even after the statement, they remained unwilling to buy from Restore because of their contracts with Intuitive. Dkt. 21 ¶ 90 [App.82].

1. ***Restore's allegations.*** In September 2024, less than seven months after entering the X/Xi EndoWrist market, Restore brought this suit for damages and injunctive relief. *See* Dkt. 1 [App.8–39] (original complaint); Dkt. 21 [App.46–87] (operative complaint). Its four claims—

13

monopolization, attempted monopolization, tying, and exclusive dealing—arise under Sections 1 and 2 of the Sherman Act.   Dkt. 21 ¶¶ 92–103 [App.83–85].

Having decrypted Intuitive's use limiter, Restore now knows that it would have entered the market faster and earlier absent Intuitive's exclusionary conduct.   Dkt. 21  ¶¶ 88–91  [App.81–83].   Specifically, Restore alleges that it would have started repairing X/Xi EndoWrists by July 2020 and remanufacturing them by January 2021.  *Id.*  Restore also alleges that Intuitive continues to exclude it from the market.  *Id.*  Every time Intuitive sells a da Vinci X, Xi, or 5, it imposes terms requiring customers to deal exclusively with Intuitive to repair or replace the compatible EndoWrists. Dkt. 21 ¶ 54 [App.67].  Intuitive bars customers from allowing third parties to "modify" or "alter" EndoWrists and from exceeding Intuitive's prescribed use limits.  Dkt. 21 ¶¶ 57–59 [App.67–69].  If a customer uses "X/Xi EndoWrists repaired or remanufactured by third parties," "Intuitive can withhold the necessary robot parts, robot service, and new X/Xi EndoWrists."   Dkt. 21 at 2 [App.47]; *see also* Dkt. 21 ¶ 61 [App.70].   Because those exclusionary terms remain and Intuitive still threatens to enforce them, customers "will still not buy"

14

Restore's X/Xi EndoWrists.  Dkt. 21 ¶¶ 89–90 [App.82].  They must buy them from Intuitive instead—at inflated prices.  Dkt. 21 ¶¶ 56, 69 [App.67, App.73].

Restore also alleges that Intuitive intensified its anticompetitive conduct in the four years before suit.  Between September 2020 and September 2024:

- Intuitive sold "thousands of da Vinci X and Xi robots" with its exclusionary terms and extended those terms to the da Vinci 5 when it launched in 2024.  Dkt. 21 ¶¶ 15, 55 [App.52, App.67].

- Intuitive added terms blocking Restore from collecting used EndoWrists—a necessary input—from customers.  *See* Dkt. 21 ¶ 67 [App.72].

- In March 2023, after settling the S/Si Litigation, Intuitive reminded its customers that using a repair service would breach their agreements, void service contracts, or cost them access to Intuitive's products and services.  *See* Dkt. 21 ¶¶ 63–64 [App.71–72].

Because of that conduct, care providers refuse to contract with Restore for X/Xi EndoWrists despite Restore's lower prices.  *See* Dkt. 21

¶¶ 44, 56 [App.63, App.67].   Many have "ended negotiations" with Restore after realizing that using Restore's service would violate their contracts with Intuitive.  Dkt. 21 ¶ 61 [App.70].  That risk persists, and Restore keeps losing sales, "so long as [Intuitive's] contractual restrictions remain in place."  *Id*.

**2.**   ***Intuitive's motion to dismiss; Restore's motion for leave to amend.***   After Intuitive moved to dismiss, *see* Dkt. 16, Restore amended once as of right, *see* Dkt. 21 [App.46–87] (the operative complaint).  Intuitive again moved to dismiss, arguing that the suit was time-barred because the statutory four-year clock started when Intuitive first imposed exclusionary terms—"far longer than four years" ago. Dkt. 25 at 4 [App.94].  Intuitive claimed it could no longer be challenged even though it continues to exclude Restore from the market.  *Id*.

Restore responded that "two fundamental tenets of antitrust law" save its claims.  Dkt. 27 at 4 [App.131].  *First*, "claims do not accrue until damages can be reasonably established" (the speculative-damages doctrine).  *Id*.; *see also* Dkt. 27 at 5 [App.132] (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971)).  *Second*, a claim accrues "each time that a plaintiff is injured by a 'continuing violation'"

16

of the antitrust laws.  Dkt. 27 at 6 [App.133] (quoting *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968)).  Restore stressed that Intuitive had not merely enforced old agreements but had entered "thousands" of new ones and "manipulate[d]" their terms to tighten its grip on the market.  Dkt. 27 at 7 [App.134].

Restore also sought leave to amend its complaint with new allegations about Intuitive's conduct during the limitations period.  *See* Dkt. 34 [App.159–175].  For example:

- More than 50 percent of all da Vinci robots in use were installed during the limitations period.  So Intuitive executed most of its exclusionary contracts, and blocked Restore from more than half the market, during that period.  Dkt. 35 ¶ 55 [App.197].

- Despite Restore's FDA clearance, Dkt. 35 ¶ 95 [App.215], customers will not buy its remanufactured X/Xi EndoWrists because of Intuitive's contract terms.  Dkt. 35 ¶ 69 [App.204].  Orlando Health and Panama City Surgery Center wanted remanufactured instruments but would not buy them from Restore without assurance that they "would not be violating" their Intuitive contracts.  Dkt. 35 ¶ 70 [App.204].  Without that

assurance, Orlando Health's chief supply chain officer said, Intuitive would "make my life a living hell." *Id.*

- In March 2025, after receiving FDA clearance for its remanufactured X/Xi EndoWrists, Restore sent Intuitive a letter asking it to remove its exclusionary terms. Intuitive did not. Dkt. 35 ¶¶ 70–72 [App.204–206]; Dkt. 35-2 [App.227–228]. Instead, it replied by offering, for the first time, an extracontractual "approval" for Restore's remanufacturing. Dkt. 35 ¶ 72 [App.205]; Dkt. 36-1 [App.277–278].

Intuitive opposed leave to amend. Dkt. 36 [App.229–264].

## D. The District Court Dismisses Restore's Claims As Time-Barred Despite Intuitive's Ongoing Exclusionary Conduct

Deeming Restore's suit time-barred, the district court dismissed the case and denied leave to amend. Dkt. 42 [App.312]. It found that Restore's claims accrued no later than July 2020—when Restore alleges it would have entered the X/Xi EndoWrist market absent Intuitive's conduct. Dkt. 42 at 8 [App.302]. So Restore filed its September 2024 complaint two months late, unless *Zenith*'s speculative-damages doctrine or the continuing-violation doctrine applied. Dkt. 42 at 9 [App.303].

The district court rejected both doctrines. *Id.* On continuing violations, it dismissed thousands of new exclusionary contracts as mere "inertial consequences" of a "decades-old" policy of exclusion that Intuitive "uniformly imposed across product generations." Dkt. 42 at 18 n.10 [App.312]; *see also* Dkt. 42 at 14–17 [App.308–311]. On speculative damages, the court acknowledged that Restore lacked the "technological capability to repair X/Xi EndoWrist instruments" until February 2024. Dkt. 42 at 11 [App.305]. But it deemed Restore's injury "specific and calculable" by July 2020 because Restore knew of the exclusionary contracts. Dkt. 42 at 12 [App.306]. Though the court acknowledged the speculative-damages exception would apply if "it was unclear" whether Restore "would suffer damages *at all*," Dkt. 42 at 10 [App.304], the court never addressed Restore's allegation that decrypting the use limiter carried a "significant risk of failure," which would have prevented Restore from entering the market at all. Dkt. 21 ¶ 84 [App.80].

In a footnote, the district court dismissed Restore's equitable claims on laches and mootness—issues that Intuitive never briefed. Dkt. 42 at 18–19 [App.312–313]; *see also* Dkt. 25 [App.91–126]. The district court acknowledged that "there is no limitations period for injunctive relief

19

claims under the Sherman Act." Dkt. 42 at 18 n.11 [App.312] (citing 15 U.S.C. § 26). But it applied laches anyway, assuming that "the same principles . . . animate" the limitations statute for antitrust damages and "the laches period." Dkt. 42 at 18–19 n.11 [App.312–313]. It then declared Restore's equitable claims moot after construing Intuitive's March 2025 letter to mean that Restore is "no longer excluded from the putative aftermarket." Dkt. 42 at 19 n.11 [App.313].

Restore timely appealed. Dkt. 43 at 1 [App.314].

20

## SUMMARY OF ARGUMENT

The district court dismissed Restore's antitrust case as time-barred even though Intuitive's exclusionary conduct persists and Restore could not have proved its damages until months before suit. That ruling misapplied two fundamental limitations doctrines, laches, and mootness to extinguish serious allegations of anticompetitive conduct that is harming healthcare providers across the country.

This Court should reverse.

**I.** Restore's claims are timely because Intuitive took thousands of exclusionary acts during the limitations period. Under the continuing-violation doctrine, each exclusionary act by a defendant restarts the four-year limitations clock. Here, Intuitive entered thousands of exclusionary contracts, added new exclusionary terms, and enforced its contracts to punish care providers for buying Restore's less costly products. Each of those acts restarted the clock. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *Poster Exch., Inc. v. National Screen Serv. Corp.*, 517 F.2d 117, 124–28 (5th Cir. 1975).

Those acts were not just "consequences" of pre-period conduct, as the district court wrongly thought. The best proof is that Intuitive's pre-

21

period conduct did not suffice to keep Restore out of the market. Rather, Intuitive executed *most* of the unlawful contracts, blocking Restore from more than half the market, in the four years before the suit. The district court had no basis to attribute that in-period foreclosure, which blocked Restore from thousands of customers, to pre-period conduct. Dismissing thousands of exclusionary acts as one pre-period policy, as the district court did, contradicts binding precedent and would immunize every defendant who violates the antitrust laws for more than four years.

II.    Restore's claims are timely also because its damages were speculative until February 2024, when Restore decrypted the use limiter in the X/Xi EndoWrists. Under the speculative-damages doctrine, the limitations clock does not start until the plaintiff's damages become reasonably provable. *Zenith*, 401 U.S. at 338–40; *Poster Exch., Inc. v. National Screen Serv. Corp.*, 456 F.2d 662, 666–68 (5th Cir. 1972). Before Restore's breakthrough, no one knew whether Intuitive's encryption could be bypassed, and Restore's decryption effort faced a significant risk of failure. Only after decrypting the use limiter could Restore show that it would have entered the market—repairing EndoWrists by July 2020 and remanufacturing them by January 2021—absent Intuitive's conduct.

The district court thought the speculative-damages doctrine did not apply because Restore's injury began in July 2020. That missed the point of the doctrine, which deferred accrual until Restore could prove its damages from that injury. In deciding whether Restore's claims were speculative, the district court here should have credited the S/Si court's judgment that Restore's X/Xi damages were a "speculative idea" until Restore could decrypt the use limiter. Disregarding the S/Si court's rulings let Intuitive have it both ways: successfully excluding X/Xi damages as speculative in the S/Si case, only to argue they are time-barred now because they were never speculative at all. Because Restore sued just months after its breakthrough made its damages provable, its claims are timely under the speculative-damages doctrine.

**III.** Restore's equitable claims are timely for the same reasons. But also, laches cannot bar a request for prospective relief. Even if it could, laches requires undue prejudice from unreasonable delay, and the district court never found that. Restore's equitable claims are live, too. The court declared them moot because Intuitive sent a letter to Restore saying that customers can use Restore's remanufactured EndoWrists. But promising incomplete cessation moots nothing. The court never

23

found it is "absolutely clear" that Intuitive cannot resume its misconduct; after all, Intuitive has refused to amend its exclusionary contracts and continues to impose them with every new robot sale.

**IV.**    The district court wrongly denied leave to amend as futile. Restore's proposed amendments undercut the dismissal's key premise— that Intuitive's conduct reflected a "final, permanent policy"—by showing that Intuitive has changed its tactics over time.  It is not "beyond doubt" that Restore's claims are time-barred.  Restore should have had a chance to amend.

## STANDARD OF REVIEW

This Court reviews "*de novo* a dismissal for failure to state a claim." *Maglana v. Celebrity Cruises Inc.*, 136 F.4th 1032, 1036 (11th Cir. 2025). The Court must "accept as true the facts alleged in the complaint and draw all reasonable inferences" in the plaintiff's favor. *Id.* at 1036–37 (cleaned up). "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low, and Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004). Dismissal with prejudice is appropriate only where it is "beyond doubt" that the plaintiff cannot state a plausible claim. *Id.*

Mootness determinations are reviewed *de novo*. *Cook v. Bennett*, 792 F.3d 1294, 1298 (11th Cir. 2015). "[W]hether laches is available as a defense . . . is a pure question of law," which this Court decides *de novo*. *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1319 n.38 (11th Cir. 2008).

This Court reviews for abuse of discretion a district court's denial of a motion to amend. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir.

2001) (per curiam).  But where, as here, a court denies leave as futile, *see*

Dkt. 42 at 18 [App.312], review is *de novo.  St. Charles Foods, Inc. v.*

*America's Favorite Chicken Co.*, 198 F.3d 815, 822 (11th Cir. 1999).

# ARGUMENT

## I. Restore's Suit Is Timely Because Intuitive Kept Violating the Antitrust Laws During the Limitations Period

Restore alleges that Intuitive broke the antitrust laws throughout the last four years. Those allegations make this suit timely. Under the continuing-violation doctrine, Restore may pursue its damages from at least September 2020—four years before filing. The district court said otherwise and declared Restore's case *entirely* time-barred. That ruling misapplied binding precedent. This Court should reverse.

### A. Binding Precedent Holds That Each New Exclusionary Act Restarts the Limitations Clock, and Intuitive Took *Thousands* of Exclusionary Acts

**1.** In antitrust cases, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *see also* 15 U.S.C. § 15b. The continuing-violation doctrine applies this rule to "a continuing conspiracy to violate the antitrust laws." *Zenith*, 401 U.S. at 338. Such a conspiracy does not start the clock just once, when it begins. *Id.* Instead, a new "cause of action accrues" "each time" the defendant harms the plaintiff. *Id.* Each accrual restarts the

27

limitations clock, letting the plaintiff recover its last four years of damage (plus any provable future damage).  *Id.* at 339.

It does not matter when the defendant's harmful conduct started—even if it was decades before the limitations period.  *See*, *e.g.*, *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 & n.15 (1968) (suit over 43-year-old exclusionary policy not time-barred; plaintiff entitled to limitations-period damages).  Nor does it matter whether the plaintiff is a buyer or an excluded rival.  *See Zenith*, 401 U.S. at 323 (excluded rival); *Poster Exch., Inc. v. National Screen Serv. Corp.*, 517 F.2d 117, 123–28 (5th Cir. 1975) (same); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) (consumer), *amended by*, 211 F.3d 1224 (11th Cir. 2000); *Hanover Shoe*, 392 U.S. at 484 (same).

What matters is whether the defendant committed an "act" during the four-year period that harmed the plaintiff.  And in *Poster Exchange*, this Court confirmed that a monopolist's ongoing exclusion of a rival is "a continuing series of acts upon which successive causes of action[ ] may accrue," not "a single act and invasion" that accrues just once.  517 F.2d at 124–25.  The Court warned that "any other result" would "improperly

transform the limitations statute from one of repose to one of continued immunity." *Id.* at 127. The statute's purpose is "to pull the blanket of peace over acts and events which have themselves already slept for the statutory period"—not "to immunize recent repetition or continuation of violations." *Id.*

What makes an act a continuing violation? *Poster Exchange* contrasted an "injurious act actually occurring during the limitations period," which restarts accrual, with "abatable but unabated inertial consequences of some pre-limitations action," which do not. *Id.* at 128. Because Poster, the plaintiff, had alleged a refusal to deal blocking its access to supplies, *id.* at 127, the court held that it could show a continuing violation by identifying "some act of the defendants during the limitations period foreclosing or interfering with its access to supplies." *Id.* at 128. "[A]ny specific act or word" would restart the clock. *Id.* at 129. But if the defendant had done nothing—a "mere absence of dealing"— Poster's claim would be time-barred. *Id.* at 128. The "critical" question, in other words, is whether the defendant acted to cause any part of the claimed foreclosure during the limitations period. *Id.* at 128–29. If so,

the suit is timely.  *Id.*; *see also id.* at 129 (asking whether the defendant was "antitrust pure or impure during the statutory period").

Entering an exclusionary agreement is an act that restarts accrual. *See, e.g.*, *Morton's Mkt.*, 198 F.3d at 828 (new claim accrues with each sale in a price-fixing conspiracy); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) ("the decision to enter the contract" is an "overt act" restarting accrual); *see also Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1300–01 (9th Cir. 1986) (payments to tour operators to direct business away from plaintiff, an excluded rival, restarted accrual).  So is broadening an exclusionary contract, as the district court agreed.  *See, e.g.*, *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203–04 (9th Cir. 2014) (extending pre-period exclusionary license to next-generation product restarted clock); Dkt. 42 at 18 n.10 [App.312].

Enforcing a contract also restarts accrual in these circumstances. *See*, *e.g.*, *Samsung*, 747 F.3d at 1204 (enforcing pre-period license during limitations period, even if its substance did not change, restarted accrual; the "decision to enforce the contract caused a new anti-competitive harm"); *cf. Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549

F.2d 1029, 1043–44 (5th Cir. 1977) (enforcing pre-limitations tying agreement restarted accrual). Courts "have repeatedly held that acts taken to enforce a contract . . . restart[ ] the statute of limitations." *Samsung*, 747 F.3d at 1203–04 (collecting cases). For example, when a defendant follows a pre-period agreement to exclude a rival by steering away potential clients, the rival's cause of action accrues "every time" the steering occurs. *Id.* at 1203.

**2.**     Like the defendants in *Zenith* and *Poster Exchange*, Intuitive stands accused of violating Sections 1 and 2 of the Sherman Act. *See Zenith*, 401 U.S. at 323; *Poster Exch.*, 517 F.2d at 119. And in the four years before this suit, Intuitive took thousands of acts to protect its illegal EndoWrist monopoly. It sold or leased "thousands of da Vinci X and Xi robots" with exclusionary contract terms. Dkt. 21 ¶ 55 [App.67]. It started selling the new da Vinci 5 with them, too. *Id.* It added *new* exclusionary terms to cut off Restore's access to used X/Xi EndoWrists. Dkt. 21 ¶ 67 [App.72]. And it enforced its contracts to stop care providers from dealing with Restore. *See* Dkt. 21 ¶¶ 61, 68 [App.69–70, App.73].

Those acts are continuing violations. Each inflicted new harm during the limitations period, because each excluded Restore from a part

31

of the market—a sale or a customer—that it could have won otherwise. *See, e.g.*, Dkt. 35 ¶ 70 [App.204] (recounting lost sales from Orlando Health and Panama City Surgery Center). If Intuitive had not entered or enforced its contracts in the four years before this suit, it could not have kept its monopoly, because *thousands* of buyers could have bought Restore's X/Xi EndoWrists who cannot buy them now. *See* Dkt. 21 ¶ 55 [App.67]. Restore thus complains of "the continued invasion of a monopoly and exclusion from the market," not the "inertial consequences" of a permanent, pre-period act. *Poster Exch.*, 517 F.2d at 127–28. Its claims are timely.

## B. The District Court Erred By Disregarding Intuitive's Thousands of Exclusionary Acts

The district court recast Intuitive's ongoing conduct as a single "unrelenting" "policy" of exclusion that began as early as 2014. Dkt. 42 at 14, 17–18 & n.10 [App.308, App.311–312]. It concluded that Restore's claims accrued just once—in July 2020, when Restore's exclusion began. Dkt. 42 at 8, 17 [App.302, App.311]. That analysis is wrong. It misreads Restore's complaint, contradicts binding circuit law, and wipes the continuing-violation doctrine out of existence.

1. Although Intuitive executed thousands of new exclusionary

32

contracts during the limitations period, the district court disregarded that fact because excluded rivals and buyers suffer different injuries. *See* Dkt. 42 at 14 n.7 [App.308]. While a buyer "is injured each time it must pay an anticompetitive price, . . . the same can't be said of a *competitor*— whose antitrust injury is its exclusion from the relevant market." *Id.* (quoting *CSX Transp., Inc. v. Norfolk S. Ry.*, 114 F.4th 280, 291 (4th Cir. 2024)). The premise is valid, but the conclusion does not follow here: Intuitive harms Restore each time it enters (or enforces) a contract that blocks Restore from winning a sale. *See Poster Exch.*, 517 F.2d at 128; *Morton's Mkt.*, 198 F.3d at 828 ("overt act in furtherance of the antitrust conspiracy"—here, to exclude a rival—restarts accrual).

True, an exclusionary act can affect two plaintiffs differently, which in turn can affect when their claims first accrue. *CSX* tackled this issue. *See* 114 F.4th at 291. CSX sued two railroads—Norfolk Southern and a joint venture owned by both parties—alleging that an excessive "switch rate" excluded it from a shipping market. *Id.* at 282–83. The joint venture's board had set the rate nine years earlier. *Id.* But CSX argued that its claims were timely because they accrued again "each day that the high price remain[ed] in place." *Id.* at 288. The Fourth Circuit disagreed:

Because CSX did not claim injury from paying the rate (like a buyer would), its injury did not accrue each day the rate was charged. *Id.* at 291. Indeed, an act does not restart the clock unless it hurts the plaintiff. *See Zenith*, 401 U.S. at 338 (stating that "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him"). CSX instead complained that the rate was so high as to exclude CSX from the market. *See* 114 F.4th at 290. So CSX's injury would accrue again, and the clock would restart, if the defendants reiterated the exclusionary rate in the four years before suit—but they did not. *See id.* at 289 ("mere silence or inaction . . . isn't enough to restart" the clock).

That antitrust claims can accrue at different times for different people does not mean that continuing violations restart the limitations period only for buyers, as the district court suggested here. *CSX* rejected that notion, carefully considering several in-period acts that could have reinjured CSX, restarting the clock. *E.g.*, *id.* at 291 n.9 (CSX's proposals to lower the switch rate did not restart accrual because CSX failed to "move them forward"). Binding circuit law rejects it, too. Both *Zenith* and *Poster Exchange* involved excluded rivals. And relying on *Zenith*, *Poster Exchange* held that an "alleged continuing conspiracy and

monopoly" should be treated "as a continuing series of acts upon which successive causes of action[ ] may accrue." 517 F.2d at 125. This Court concluded that Poster's case would be timely if the defendant reiterated its refusal to deal during the limitations period. *Id.* at 128–29. Here, by enforcing its exclusionary contracts and entering new ones, Intuitive has engaged in "some act . . . during the limitations period foreclosing" competition. *Id.* at 128. Each of those acts restarts the clock.

2.    The district court misapplied the "critical" distinction between an in-period act, which restarts accrual, and the consequences of a pre-period act, which do not. *Id.* There was no "mere absence of dealing," *id.*, or "silence or inaction" here. *CSX*, 114 F.4th at 289. Intuitive did not sit back and enjoy the fruits of its pre-period contracts—like Norfolk resting on a rate set nine years before suit. *See id.* Intuitive acted. It entered new contracts and added new terms, covering more than half the market, to keep its lone competitor, Restore, out. *See* Dkt. 21 ¶¶ 44, 55–56 [App.63, App.67]; Dkt. 35 ¶ 55 [App.197].

The district court should not have relied on *SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023)—a three-paragraph

unpublished Ninth Circuit opinion that drew a dissent.[4]  The *SaurikIT*

majority declined to apply the continuing-violation doctrine to contract

terms that Apple kept imposing during the limitations period, fearing

that allowing the plaintiff to recover its in-period damages "would vitiate

the purpose of the statute of limitations."  *Id.* at *1.  But *Poster Exchange*

rejected that argument root and branch:  The limitations statute exists

"simply to pull the blanket of peace over acts and events which have

themselves already slept for the statutory period," not to "forever"

immunize "unlawful conduct."  517 F.2d at 127.  To hold otherwise, the

Court warned, would "extend[ ] the statute beyond its purpose" and

"conflict[ ] with the policies of vigorous [antitrust] enforcement" through

"private actions."  *Id.* at 127–28.[5]  Limiting the plaintiff to its last four

years of damages would suffice as repose for "time-passed events."  *Id.* at

127.

---

[4] No published circuit opinion has adopted *SaurikIT* as precedent.

[5] *SaurikIT* also flouted the Ninth Circuit's own caselaw, which has
"repeatedly held that acts taken to enforce a contract" are "overt acts that
restart[ ] the statute of limitations."  *Samsung*, 747 F.3d at 1204.  The
dissent faulted the majority for disregarding allegations that Apple had
changed the offending contracts over time, because each change would
restart the clock.  *See* 2023 WL 8946200, at *2 (Desai, J., dissenting in
part).  Here, the district court made the same error.  *See infra* at 37–40.

The district court also invoked *Pilkington v. United Airlines*, 112 F.3d 1532 (11th Cir. 1997), where this Court deemed a civil RICO claim time-barred because the plaintiffs complained of "a mere 'reaffirmation of a previous act' that imposed 'the same injuries previously alleged to have been suffered' outside the limitations period." Dkt. 42 at 15 [App.309] (quoting *Pilkington*, 112 F.3d at 1537–38). But *Pilkington* addressed different facts. The plaintiffs were pilots harassed for working through a strike. *See Pilkington*, 112 F.3d at 1533. They sued under the civil RICO statute based on the defendants' *failure to act* under a pre-period contract obliging the defendants to protect them from harassment. *See id.* at 1533–34. Holding that RICO claim late tracks the settled rule, in antitrust cases, that passive inaction does not restart accrual. *See Poster Exch.*, 517 F.2d at 128 ("mere absence of dealing" does not restart accrual); *CSX*, 114 F.4th at 289 (same, for "mere silence or inaction").

**3.** Finally, the district court suggested that Intuitive's in-period acts would not restart the clock unless Intuitive had "broadened its exclusionary practices to further entrench its monopoly" or had adopted something "other than a final, permanent policy" of exclusion. Dkt. 42 at 18 n.10 [App.312]. Neither condition bars Restore's claims.

True, broadening an exclusionary practice restarts accrual. *See, e.g.*, *Samsung*, 747 F.3d at 1204 (expanding exclusionary license restarted accrual). And Intuitive *did* broaden its exclusionary conduct: It imposed new contract terms to block Restore from collecting used EndoWrists, the key input for its remanufactured products. *See* Dkt. 21 ¶ 67 [App.72]. It also extended its exclusionary terms to its sales contracts for the da Vinci 5, the next-generation robot that debuted in 2024. *See* Dkt. 21 ¶ 15 [App.52]. So Intuitive is no different than the *Samsung* defendants, who restarted the clock for the plaintiff by "extend[ing]" a pre-limitations license "to cover the second-generation" product. 747 F.3d at 1203. The district court ignored those facts; that error alone warrants reversal.

But also, the law does not require a plaintiff to plead broadening conduct to establish a continuing violation that restarts accrual. In this Court, "continuing" means what it says. In *Poster Exchange*, Poster claimed that the defendants were "interfering with [its] ability to supply itself." 517 F.2d at 125. Yet this Court did not require Poster to show worse or different misconduct on remand—just that Poster show "some act of the defendants during the limitations period foreclosing or

38

interfering with its access to supplies," the same wrong the defendants committed before. *Id.* at 128. Restore's complaint checks that box: Intuitive kept entering and enforcing exclusionary contracts to keep Restore out of the market.

Demanding that Restore point to something "other than a final, permanent policy" underscores the district court's mistake in treating Intuitive's ongoing conduct as one, permanent pre-period act. Dkt. 42 at 18 n.10 [App.312]. Intuitive's "exclusion of [Restore] from any participation" in the market was "perhaps unequivocal," *Poster Exch.*, 517 F.2d at 127—or "unrelenting," as the district court put it. Dkt. 42 at 14 [App.308]. But it did not "immediately" and "permanently destroy[ ]" Restore's business. *Poster Exch.*, 517 F.2d at 126. Nor was it "of necessity permanent." *Id.* at 127. Permanent means "permanent at initiation *without further acts*." *Id.* at 126 (emphasis added).

Excluding Restore from the market required further acts—new contracts, new enforcement, new terms—to lock up thousands of customers who would otherwise buy from Restore. *See* Dkt. 21 ¶¶ 55, 61 [App.67, App.69–70]. The district court was wrong to conclude that those thousands of acts "changed nothing about the competitive landscape."

Dkt. 42 at 16 [App.310]. Each time Intuitive enters or enforces a contract to block a customer from buying from Restore, that "specific act or word preclud[es]" Restore from competing for that customer's business, *Poster Exch.*, 517 F.2d at 128, creating "a cause of action for that damage that is not barred by the statute of limitations." *Hennegan*, 787 F.2d at 1300; *see also Hoopes v. Union Oil Co.*, 374 F.2d 480, 486 (9th Cir. 1967) (suit attacking pre-period exclusive dealing arrangement was not time-barred, where defendant tried enforcing the terms "until the complaint was filed").

4. The district court treated thousands of in-period acts to maintain an illegal monopoly as one pre-limitations policy inflicting one pre-period injury. *E.g.*, Dkt. 42 at 17–18 [App.311–312]. But as *Poster Exchange* recognized, 517 F.2d at 127–28, that approach would immunize continuing antitrust violations.

The district court tacitly acknowledged this problem. Even as it dismissed as "hyperbole" the concern (which this Court shared in *Poster Exchange*) that its ruling would block new entrants from challenging "a long-standing monopoly," Dkt. 42 at 15 n.9 [App.309], it made clear that its rule would apply generally to excluded rivals. *See* Dkt. 42 at 14–15 &

40

n.7 [App.308–309]. And although the court tried to shield direct purchasers, that rule's logic applies equally to them. If entering, enforcing, and strengthening exclusionary contracts during the limitations period is one time-barred act because Intuitive made its "original decision" to break the law earlier, Dkt. 42 at 17 [App.311], no plaintiff could recover for a continuing conspiracy that began more than four years ago.

Fix prices for twenty years? Time-barred—one price-fixing policy. *Contra Morton's Mkt.*, 198 F.3d at 828 (limitations-period damages available; "if plaintiffs purchased milk at a fixed price" during the period, a "cause of action would accrue with each purchase"). Force a buyer to lease machinery "at monopoly rates" for four decades? *Poster Exch.*, 517 F.2d at 126 (discussing *Hanover Shoe*, 392 U.S. at 502). No claim—one "unrelenting" exclusionary practice, Dkt. 42 at 14 [App.308], and the plaintiff did not sue when it started. *Contra Hanover Shoe*, 392 U.S. at 502 & n.15 ("[a]lthough Hanover could have sued" when the practice began, "it was equally entitled to sue" later "for the entire period permitted by the applicable statute of limitations").

Treating the first accrual as the only accrual, as the district court

41

did here, will produce arbitrary results where the timing of the plaintiff's first injury is disputed.  Here, for example, Restore says that its exclusion started in July 2020, when it would have started repairing X/Xi EndoWrists but for Intuitive's conduct.  Dkt. 21 ¶ 80 [App.77].  But Intuitive "disputes" that entry date; it argues that repairs require FDA approval, which Restore would not have had until 2021—well within the limitations period.  Dkt. 25 at 23 n.3 [App.113]; *see also* Dkt. 21 ¶ 88 [App.81] (alleging receipt of FDA clearance "as early as January 2021"). So even if the district court is right on the law and Intuitive is right on the facts, Restore timely filed its complaint.

The district court's accrual rule transforms that fact dispute into an all-or-nothing question for every dollar of damages Restore claims, including future damages.  But logically, whether Restore can recover damages from exclusion by a contract entered within the limitations period or after the suit—say, yesterday—should not turn on whether Restore first lost a sale in July 2020 or in 2021.  The continuing-violation doctrine avoids this anomaly by deeming each exclusionary act to restart the clock and allowing the factfinder to decide which acts count.  *See Poster Exch.*, 517 F.2d at 128 (remanding to find whether there was "a

specific act or word of refusal during the limitations period" restarting accrual); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 715 (11th Cir. 1984) (same).

The continuing-violation doctrine applies.  Restore's suit is timely.

## II. Restore's Suit Is Timely Because Restore's Lost Profits Were Not Reasonably Provable Before It Decrypted the X/Xi EndoWrists' Use Limiter

The statute of limitations does not run until future damages from the defendant's illegal conduct become "reasonably . . . prov[able]." *Poster Exch., Inc. v. National Screen Serv. Corp.*, 456 F.2d 662, 667 (5th Cir. 1972) ("*Poster Exch. I*"); *see also Zenith*, 401 U.S. at 339–40.  That speculative-damages doctrine applies here.  Restore's damages became provable in February 2024 when Restore decrypted Intuitive's use limiter in the X/Xi EndoWrists.  *See* Dkt. 21 ¶ 91 [App.82–83].  Only after decrypting the use limiter could Restore show that it could have entered the X/Xi EndoWrist market by July 2020 had Intuitive not made it futile to try entering then.  Dkt. 21 ¶ 88 [App.81].

The district court erred by fixing accrual in July 2020.  It failed to credit Restore's allegations and misapplied binding precedent.  Until Restore decrypted the chip in February 2024, it was "unknown" whether

anyone could.  Dkt. 21 ¶¶ 84, 91 [App.80, App.82–83].  Restore could not prove its damage from exclusion before then.  *Id.*  That is why, years after July 2020, the S/Si court barred Restore from seeking any X/Xi EndoWrist damages:  "I don't see how you can take to a jury the speculative idea that you really want to be in that business" but "haven't figured out a way to do it yet."  S/Si Litigation, Dkt. 185 at 34:13-25;[6] *see also* S/Si Litigation, Dkt. 218 at 3; Dkt. 21 ¶ 91 [App.82–83].  That ruling aligns with Restore's allegation here that its X/Xi damages were not provable until it decrypted the use limiter.

Under the speculative-damages doctrine, Restore's claims are timely.  This Court should reverse on this independent ground.  *See Poster Exch.*, 517 F.2d at 124.

### A.   Under *Zenith* and *Poster Exchange I*, Damages Do Not Accrue Until They Are Reasonably Provable

An antitrust plaintiff must sue "within four years after the cause of action accrued."  15 U.S.C. § 15b.  But even after the defendant wrongs the plaintiff, the limitations period does not start to run until the plaintiff

---

[6] As noted before, this Court can take judicial notice of filings in the S/Si Litigation.  *See Lozman*, 713 F.3d at 1075 n.9; *supra* 9 n.3.

can reasonably prove its future damages. *See Zenith*, 401 U.S. at 338–40; *Poster Exch. I*, 456 F.2d at 666–67.

This rule shields antitrust plaintiffs from an unfair catch-22. Sue too early, and damages are too speculative to prove. Sue later, and "damages that could not be proved within four years of the conduct from which they flowed" are "forever" lost. *Zenith*, 401 U.S. at 340. Rejecting this double bind as contrary to the antitrust laws' robust regime of private remedies, *Zenith* holds that "the cause of action" for speculative "future damages, if they ever occur, will accrue only on the date they are suffered." *Id.* at 339. That is, if the plaintiff could not "have recovered" its future damages "if it had brought suit for them" when the defendant acted, the plaintiff "must be permitted to recover them now." *Id.* at 340.

Applying this rule, *Zenith* allowed a plaintiff to recover damages from conduct that occurred nearly a decade before the plaintiff's suit. *Id.* at 342. The Court reasoned that the plaintiff could not have recovered those damages back then because the district court would have had to guess market conditions, competitive forces, and plaintiff's performance in a hypothetical free market "five to 10 years hence." *Id.*

This Court detailed the speculative-damages doctrine in *Poster Exchange I*. Future damages do not accrue until the plaintiff can "reasonably establish[ ]" their "existence and amount." 456 F.2d at 667. Even "acts which have long since taken place" are "'revived' as a basis for later damages" when the plaintiff cannot "earlier prove with requisite certainty the existence and amount of damages." *Id*. at 666–67. Courts must identify the "earliest reasonable time" at which damages could have been proved; that date fixes "the commencement of the limitations period." *Id*. at 668. From that point, the plaintiff has four years to sue. *See Zenith*, 401 U.S. at 339.

### B. Restore's Damages Were Not Reasonably Provable Before It Could Decrypt Intuitive's Use Limiter

The district court read the speculative-damages doctrine out of existence. In its view, the doctrine did not apply because Restore alleged that Intuitive began excluding it from the market by July 2020. But that misses the point. The speculative-damages doctrine defers accrual until Restore could prove damages from that July 2020 injury, and it could not do so until February 2024. So its suit months later was timely.

**1.** The district court believed that the speculative-damages exception cannot apply once a plaintiff suffers antitrust injury. Because

Restore was excluded from the market by July 2020, the district court found "nothing speculative" about its "competitive injury" at that time. Dkt. 42 at 11 [App.305]. But that logic nullifies the speculative-damages doctrine, because it would require any plaintiff who has suffered injury to sue within four years regardless of whether its damages are provable.

The speculative-damages doctrine rejects that premise. It does not ask whether the *injury* is speculative; it asks whether *future damages* from that injury are speculative. *Zenith* and *Poster Exchange* assume the plaintiff already suffered an injury. *See Zenith*, 401 U.S. at 341; *Poster Exch. I*, 456 F.2d at 666–68; *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190–91 (1997) (recognizing that although the "normal accrual rule" runs from "the point the act first causes injury," accrual is deferred when damages are "so 'speculative' or 'unprovable' at the time of a defendant's unlawful act (and plaintiff's initial injury)" that applying the normal rule "would have left the plaintiff without relief") (citation omitted). They then ask about damages—whether "the fact of their accrual is speculative or their amount and nature unprovable." *Zenith*, 401 U.S. at 339; *Poster Exch. I*, 456 F.2d at 667.

47

The district court cited *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir. 1984), *see* Dkt. 42 at 11 [App.305], but *Brunswick* confirms the rule:  When "future losses [are] so speculative at the time of exclusion that a judge or jury would not have been allowed to award damages for those losses at that time," a plaintiff "may and indeed must wait to sue."  752 F.2d at 271.

The district court treated July 2020 as a market-entry date Restore could have known then.  *See* Dkt. 42 at 12 [App.306] (citing Dkt. 21 ¶ 81 [App.78]).  But the district court should have asked whether Restore could have proved its post-July 2020 damages without speculation had it sued then.  *See Zenith*, 401 U.S. at 340.  The answer is no.  In July 2020, Restore did not know whether or when it could develop the decryption technology needed to enter the market.  Dkt. 21 ¶¶ 84, 88, 91 [App.80, App.81–83].  Only after decrypting the use limiter in February 2024 could Restore show that it would have entered the market by July 2020 absent Intuitive's conduct.  *See* Dkt. 21 ¶ 91 [App.82–83].

**2.**    The district court suggested that Restore could have proved its damages in July 2020, contrary to its allegations, because it is a "sophisticated and experienced industry player."  Dkt. 42 at 12 [App.306].

48

But sophistication does not make speculative damages provable. In *Samsung*, the Ninth Circuit applied the speculative-damages doctrine to antitrust claims by Samsung—the multibillion-dollar technology company. 747 F.3d at 1204–05. Because it was uncertain whether Samsung would enter the relevant market, its damages were "speculative at the time of the initial wrong." *Id.* at 1205. Its claim accrued once it entered—"once the harm crystallized." *Id.* at 1202, 1205.

The same is true here. The speculative-damages doctrine applies because "neither [Restore] nor [Intuitive] could have known for certain whether [Restore] would enter" the X/Xi EndoWrist market until it decrypted the use limiter. *Id.* at 1204–05; *see also Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086–87 (9th Cir. 2014) (plaintiffs' harm was "pure speculation" before market entry; plaintiffs "should not be penalized for failing to foresee earlier that they would enter the market . . . and would therefore be harmed by Defendants' conduct").

3.     The district court also required Restore to "allege that it was unclear whether it would suffer damages *at all* due to Intuitive's alleged conduct, not simply that the *degree* of harm to its business was

49

speculative." Dkt. 42 at 10 [App.304]. The district court thought Restore did not meet that standard.

But Restore did meet it. The complaint alleges that surmounting the X/Xi EndoWrist's use limits "required significant time and expense" and carried a "significant risk of failure." Dkt. 21 ¶¶ 83–86 [App.79–81]. Had Restore failed to decrypt the chip, it could not have repaired or remanufactured X/Xi EndoWrists and thus would not have suffered *any* damage from market exclusion. *See* Dkt. 21 ¶ 91 [App.82–83]; *see also* Dkt. 21 ¶ 84 [App.80] (before Restore succeeded, "it was unknown whether anyone would be able to bypass or override" the use limiter).

**4.** When applying the speculative-damages doctrine to "suits occurring more than four years after" injury, "the present judge must determine the point at which a hypothetical earlier judge would have held the plaintiff's claim to be too speculative." 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 320d (4th & 5th eds. 2025); *accord Zenith*, 401 U.S. at 340 (holding that if a court would have deemed the damages speculative before, the plaintiff "must be permitted to recover them now").

This Court need not guess. The S/Si court already found that point. In December 2022, more than two years after the district court's proposed July 2020 accrual date, the S/Si court barred Restore from presenting X/Xi EndoWrist damages at trial, because they remained a "speculative idea" until Restore could "figure[ ] out a way" to "be in that business." S/Si Litigation, Dkt. 185 at 34:13-25; *see also* S/Si Litigation, Dkt. 218 at 3. It refused to compel discovery into "blocking technology" in the X/Xi EndoWrists for the same reason, crediting Intuitive's argument that Restore could not claim damages to its "contemplated (but currently non-existent)" X/Xi business without showing that it could "circumvent the X/Xi use counter." S/Si Litigation, Dkt. 192 at 2–3.

Dismissing those rulings let Intuitive have it both ways. If the X/Xi damages were too speculative to pursue in the S/Si Litigation, as Intuitive successfully argued, then the limitations statute did not require Restore to seek those damages immediately or lose them "forever." *Zenith*, 401 U.S. at 340. Rather, even if Restore's injury happened just once, in July 2020, Restore could sue for all its damages within four years *after* decrypting the use limiter made its damages reasonably provable.

51

*Poster Exch. I*, 456 F.2d at 667. Restore sued mere months after that breakthrough, so its claims are timely. *See Zenith*, 401 U.S. at 339–40.

### III. Restore's Request For Injunctive Relief Is Neither Moot Nor Barred by Laches

#### A. Laches Does Not Apply Because Restore Seeks Only Prospective Equitable Relief

Restore does not seek to enjoin a merger or halt conduct that ended years ago. It seeks equitable relief to stop ongoing antitrust violations and restore competition. *See* Dkt. 21 at 40–41 [App.85–86]. The district court declared that relief barred by laches, Dkt. 42 at 18 n.11 [App.312], but it was wrong for at least two reasons.

*First*, laches does not bar "prospective relief." *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1321 (11th Cir. 2008). Though a plaintiff who "defer[s] suit" beyond the statute of limitations may "miss out on damages," the "right to prospective injunctive relief should, in most cases, remain unaltered." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 683 (2014). Only estoppel—requiring Intuitive to show that Restore duped it into detrimental reliance—could block prospective relief. *Peter Letterese*, 533 F.3d at 1321. But the district court made no such finding; nor could it. A "failure to sue seldom, if ever, implies approval" of continuing antitrust violations, and

that "approval cannot excuse continued illegality." AREEDA & HOVENKAMP ¶ 320g.

*Second*, laches requires "undue prejudice" from unreasonable delay. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1283 (11th Cir. 2015). The district court skipped that analysis. Instead, while conceding that "no limitations period" governs "injunctive relief claims under the Sherman Act," it borrowed the four-year *damages* statute to bar Restore's equitable claim. Dkt. 42 at 18 n.11 [App.312]. That reasoning fails. Filing within the statutory period creates a "strong presumption" against laches. *See, e.g.*, *Peter Letterese*, 533 F.3d at 1320. But the converse—that expiration of the damages period bars equitable relief—is not true.[7] This error warrants reversal.

---

[7] *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 2014 WL 1329359, at *14 (S.D. Fla. Mar. 31, 2014), *aff'd on other grounds*, 797 F.3d 1248 (11th Cir. 2015), does not support the district court's analysis, because it misread the treatise on which it relied. Professors Areeda and Hovenkamp wrote that some courts treat the four-year limitations period as "determinative" in equity actions after describing courts' reluctance to apply a laches period *shorter* than four years. *See id.* (quoting AREEDA & HOVENKAMP ¶ 320g). Later in the same section, the professors explain why laches does not justify withholding an injunction against current conduct. *See* AREEDA & HOVENKAMP ¶ 320g.

### B.    Promising Incomplete Voluntary Cessation Does Not Moot Restore's Equitable Claims

Months after being sued, Intuitive sent Restore a letter saying that customers can use Restore's remanufactured EndoWrists, but not repair service, without reprisal.  *See* Dkt. 35 ¶ 72 [App.205–06].  The district court said that this promise moots Restore's request for equitable relief. *See* Dkt. 42 at 18–19 n.11 [App.312–313].  It does not.

*First*, "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  The narrow exception applies only when it is "absolutely clear" that the conduct "could not reasonably be expected to recur."  *Id.* But the district court here never made that required finding, and Intuitive never even asserted mootness—let alone carried its "heavy burden" to prove it.  *Id.*; *see also* Dkt. 42 at 18–19 n.11 [App.312–313] (admitting that "[n]either Restore Robotics nor Intuitive explicitly discussed" mootness "in their briefing").

*Second*, Intuitive's letter provides incomplete relief.  It "approves" Restore's remanufactured EndoWrists but leaves intact the exclusionary contracts that still block customers from buying from Restore.  Dkt. 35

54

¶¶ 71–72 [App.205–206]; *see also* Dkt. 36-1 at 13 [App.277]; Dkt. 21 ¶ 90 [App.82]. An antitrust injunction must "redress the violations" and "restore competition." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972). Here, that relief could include striking Intuitive's exclusionary terms. Because more relief is available, the equitable claims are not moot. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996) (per curiam) ("[E]ven the availability of a partial remedy is sufficient to prevent a case from being moot.") (cleaned up).

## IV. The District Court Should Have Granted Leave To Amend

The district court denied leave to amend as futile—meaning it thought Restore would "necessarily fail" to state a claim. *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 822 (11th Cir. 1999). Reviewing that conclusion *de novo*, *see id.*, this Court should reverse. Restore's proposed amendment adds facts that cure the deficiencies the district court wrongly perceived, and it is not "beyond doubt" that any complaint would fail. *Garcia v. Chiquita Brands Int'l, Inc.*, 48 F.4th 1202, 1221 (11th Cir. 2022).[8]

---

[8] Even discretionary denials receive exacting scrutiny. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (per curiam); *see also Espey v. Wainwright*, 734 F.2d 748, 750 (11th Cir. 1984) (per curiam)

In deeming the case time-barred, the district court stressed that Restore "d[id] not allege" that Intuitive's "decades-old contract terms, uniformly imposed across product generations, was anything other than a final, permanent policy." Dkt. 42 at 18 & n.10 [App. 312]. Yet Restore's proposed complaint refutes that premise. It says that "Intuitive had no policy to authorize the use of remanufactured instruments" before its March 2023 statement. Dkt. 35 ¶¶ 63–65 [App.201–203]. It also alleges that last year, when Restore asked Intuitive to remove its exclusionary contract terms, Intuitive told Restore "for the first time" that it "approved" Restore's remanufacturing, but kept its contracts in place. Dkt. 35 ¶¶ 70–72 [App.204–206].

So, when pressed, Intuitive did not keep its "permanent policy" the same. It revisited it, modified it, yet *chose* to maintain the exclusionary contracts. Those allegations suggest that Intuitive's conduct was neither fixed nor final in July 2020. And especially because that question is fact-bound, Restore should have a chance to answer it. *Cf. Poster Exch.*, 517 F.2d at 128; *Midwestern Waffles*, 734 F.2d at 715.

---

(explaining that "discretion" in this context "may be a misleading term, for [R]ule 15(a) severely restricts the judge's freedom" and "direct[s] that leave to amend 'shall be freely given when justice so requires'").

56

Nor is it "beyond doubt" that any complaint would fail to state a claim. *Garcia*, 48 F.4th at 1221. The district court concluded, for example, that Restore is "no longer excluded from the putative aftermarket." Dkt. 42 at 18–19 n.11 [App.312–313] (claimed basis for mootness). Yet the record will show, and Restore can allege on remand, that it keeps losing sales today because of Intuitive's contracts. And in recent weeks, at least one potential customer reports that Intuitive added *new* exclusionary terms to their contract. *Cf.* Dkt. 42 at 18 n.10 [App.312] (suggesting the suit would be timely had it "allege[d] that Intuitive . . . broadened its exclusionary practices").

Almost a year has passed since Restore sought leave to amend. Even on the district court's incorrect view of the law, Restore may show its claims are timely. The district court should not have denied Restore the chance to address its concerns, especially the ones it raised for the first time in its dismissal order. *See* Dkt. 42 at 18–19 n.11 [App.312–313].

\*　　\*　　\*

In the four years before this suit, Intuitive imposed thousands of exclusionary contracts on captive customers to stop them from saving money by using Restore's X/Xi EndoWrists. Those contracts continue to block Restore from the market. And until February 2024, Restore did not know that it could have entered the market to offer Intuitive's customers a better deal. If this suit months later is untimely, there is little left of *Zenith* or *Poster Exchange*, and breaking the law for four years will become a license to break it forever.

## CONCLUSION

This Court should reverse the dismissal order.

Dated:  February 11, 2026

/s/ *Matthew D. Reade*

Matthew D. Reade
Tiffany Pages-Sanchez
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
mreade@kellogghansen.com

*Counsel for Appellant Restore
Robotics Repairs LLC*

59

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7) because, according to the word-processing system used to prepare it (Microsoft Word 365), it contains 11,098 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word 365 in a proportionally spaced typeface (Century Schoolbook, 14 point).

Dated:  February 11, 2026          /s/ *Matthew D. Reade*
                                                    Matthew D. Reade

60

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Matthew D. Reade*
Matthew D. Reade

61