# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

RESTORE ROBOTICS REPAIRS LLC,

*Plaintiff-Appellant*,

v.

INTUITIVE SURGICAL INC.,

*Defendant-Appellee*.

―――――――――――

On Appeal from the United States District Court
for the Northern District of Florida
No. 3:24-cv-444-MCR-ZCB
Hon. M. Casey Rodgers

―――――――――――

## APPENDIX OF APPELLANT
## RESTORE ROBOTICS REPAIRS LLC
## VOLUME I of II, pp. 1–228

―――――――――――

Matthew D. Reade
Tiffany Pages-Sanchez
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
mreade@kellogghansen.com

*Counsel for Appellant Restore
Robotics Repairs LLC*

February 12, 2026

# INDEX TO APPENDIX

| Date | Document | Docket Tab No. | Page |
|------|----------|----------------|------|
| **VOLUME I** | | | |
| N/A | Docket Sheet, *Restore Robotics Repairs LLC v. Intuitive Surgical Inc.*, No. 3:24-cv-00444-MCR-ZCB (N.D. Fla.) | A | 1 |
| 09/18/2024 | Restore's Original Complaint | 1 | 8 |
| 09/18/2024 | Exhibit 1 – Christopher P. Childers & Melinda Maggard-Gibbons, *Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery*, 320 J. Am. Med. Ass'n 835 (Aug. 28, 2018), Dkt. 1-1 | | 40 |
| 09/18/2024 | Exhibit 2 – Summons in a Civil Action, Dkt. 1-2 | | 43 |
| 12/27/2024 | Restore's First Amended Complaint | 21 | 46 |
| 12/27/2024 | Exhibit 1 – Christopher P. Childers & Melinda Maggard-Gibbons, *Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery*, 320 J. Am. Med. Ass'n 835 (Aug. 28, 2018), Dkt. 21-1 | | 88 |
| 01/31/2025 | Intuitive's Dispositive Motion to Dismiss Amended Complaint for Failure to State a Claim and Memorandum of Law | 25 | 91 |
| 02/14/2025 | Restore's Opposition to Intuitive's Motion to Dismiss First Amended Complaint | 27 | 127 |

| Date | Document | Docket Tab No. | Page |
|------|----------|----------------|------|
| 03/26/2025 | Intuitive's Reply Memorandum in Support of Its Dispositive Motion to Dismiss Amended Complaint for Failure to State a Claim | 33 | 148 |
| 04/07/2025 | Restore's Motion for Leave to Amend Complaint with Supporting Memorandum | 34 | 159 |
| 04/07/2025 | Restore's Second Amended Complaint | 35 | 176 |
| 04/07/2025 | Exhibit 1 – Christopher P. Childers & Melinda Maggard-Gibbons, *Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery*, 320 J. Am. Med. Ass'n 835 (Aug. 28, 2018), Dkt. 35-1 | | 223 |
| 04/07/2025 | Exhibit 2 – Letter from Clif Parker, CEO, Restore Robotics LLC, to David Rosa, President, Intuitive Surgical, Inc., dated March 21, 2025, Dkt. 35-2 | | 226 |
| **VOLUME II** | | | |
| 04/21/2025 | Intuitive's Memorandum in Opposition to Restore's Motion for Leave to File a Second Amended Complaint, Dkt. 36 | 36 | 229 |
| 04/21/2025 | Declaration of William B. Michael in Support of Intuitive's Opposition to Restore's Motion for Leave to File a Second Amended Complaint, Dkt. 36-1 | | 265 |

| Date | Document | Docket Tab No. | Page |
|---|---|---|---|
| 04/21/2025 | Exhibit A – Sales, License, and Service Agreement between Intuitive Surgical, Inc. and Valley Medical Center, dated August 31, 2018, Dkt. 36-1 | | 267 |
| 04/21/2025 | Exhibit B – Letter from David Rosa, President, Intuitive Surgical, Inc., to Clif Parker, CEO, Restore Robotics LLC, dated March 27, 2025, Dkt. 36-1 | | 276 |
| 04/21/2025 | Exhibit C – Excerpts of Transcript of Jury Trial Proceedings, *Surgical Instrument Serv. Co. v. Intuitive Surgical, Inc.*, No. C 21-03496 AMO (N.D. Cal. Jan. 22, 2025), Dkt. 36-1 | | 279 |
| 11/07/2025 | Order Granting Intuitive's Motion to Dismiss Restore's Second Amended Complaint | 42 | 295 |
| 11/29/2025 | Notice of Appeal | 43 | 314 |
| N/A | Certificate of Service | B | |

# TAB A

# U.S. District Court
## Northern District of Florida (Pensacola)
## CIVIL DOCKET FOR CASE #: 3:24–cv–00444–MCR–ZCB

RESTORE ROBOTICS REPAIRS LLC v. INTUITIVE
SURGICAL INC
Assigned to: JUDGE M CASEY RODGERS
Referred to: MAGISTRATE JUDGE ZACHARY C BOLITHO
Case in other court:  US COURT OF APPEALS ELEVENTH
CIRCUIT, 25–14202–J
Cause: 15:1 Antitrust Litigation

Date Filed: 09/18/2024
Date Terminated: 11/07/2025
Jury Demand: Plaintiff
Nature of Suit: 410 Anti–Trust
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **RESTORE ROBOTICS REPAIRS LLC** | represented by | **JEFFREY BERHOLD**<br>JEFFREY L BERHOLD PC – ATLANTA GA<br>1230 PEACHTREE STREET<br>SUITE 1050<br>ATLANTA, GA 30309<br>404–872–3800<br>Email: jeff@berhold.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **INTUITIVE SURGICAL INC** | represented by | **ANDREW DAVID LAZEROW**<br>COVINGTON & BURLING LLP – WASHINGTON DC<br>ONE CITY CENTER<br>850 TENTH ST NW<br>WASHINGTON, DC 20001<br>202–662–6000<br>Email: alazerow@cov.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **BRUCE DOUGLAS PARTINGTON**<br>CLARK PARTINGTON – PENSACOLA FL<br>125 E INTENDENCIA STREET<br>PENSACOLA, FL 32502<br>850–434–9200<br>Fax: 850–432–7340<br>Email: bpartington@clarkpartington.com<br>*ATTORNEY TO BE NOTICED* |
| | | **KENNETH A GALLO**<br>PAUL WEISS RIFKIND ET AL – WASHINGTON DC<br>2001 K STREET NW<br>SUITE 500<br>WASHINGTON, DC 20006–1047<br>202–223–7300<br>Email: kgallo@paulweiss.com<br>*ATTORNEY TO BE NOTICED* |
| | | **TREVOR A THOMPSON**<br>CLARK PARTINGTON – |

TALLAHASSEE FL
215 S MONROE STREET
SUITE 530
TALLAHASSEE, FL 32301
850–320–6827
Fax: 850–597–7591
Email: tthompson@clarkpartington.com
*ATTORNEY TO BE NOTICED*

**WILLIAM BALY MICHAEL**
PAUL WEISS RIFKIND ET AL – NEW
YORK NY
1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019–6064
212–373–3648
Email: wmichael@paulweiss.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/18/2024 | 1 | COMPLAINT against Intuitive Surgical, Inc. ( Filing fee $ 405 receipt number AFLNDC–9043780.), filed by RESTORE ROBOTICS REPAIRS LLC. (Attachments: # 1 Exhibit 1, # 2 Summons) (BERHOLD, JEFFREY) (Entered: 09/18/2024) |
| 09/18/2024 | 2 | CIVIL COVER SHEET. (BERHOLD, JEFFREY) (Entered: 09/18/2024) |
| 09/18/2024 | 3 | MOTION to Appear Pro Hac Vice by Jeffrey L. Berhold.( Filing fee $ 219 receipt number AFLNDC–9043951.) by RESTORE ROBOTICS REPAIRS LLC. (Attachments: # 1 Exhibit 1) (BERHOLD, JEFFREY) (Entered: 09/18/2024) |
| 09/18/2024 | 4 | NOTICE *of a Prior Case under Local Rule 5.6* by RESTORE ROBOTICS REPAIRS LLC (BERHOLD, JEFFREY) (Entered: 09/18/2024) |
| 09/18/2024 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 3 MOTION to Appear Pro Hac Vice by Jeffrey L. Berhold, 4 LOCAL RULE 5.6 NOTICE OF A PRIOR CASE. (jfj) (Entered: 09/18/2024) |
| 09/20/2024 | 5 | ORDER. The Motion for Admission Pro Hac Vice, ECF No. 3 , is GRANTED. Attorney Jeffrey L. Berhold is admitted pro hac vice to represent the Plaintiff, pursuant to Local Rule 11.1(C). Signed by JUDGE M CASEY RODGERS on 09/20/24. (jfj) (Entered: 09/20/2024) |
| 09/20/2024 | 6 | Summons Issued as to INTUITIVE SURGICAL INC. (jfj) (Entered: 09/20/2024) |
| 11/07/2024 | 7 | MOTION to Appear Pro Hac Vice( Filing fee $ 219 receipt number AFLNDC–9131124.) by INTUITIVE SURGICAL INC. (Attachments: # 1 DC Certificate of Good Standing) (LAZEROW, ANDREW) (Entered: 11/07/2024) |
| 11/07/2024 | 8 | STIPULATION *Joint Proposed Stipulation on Defendant's time to Answer, Move, or Otherwise respond to Complaint.* by INTUITIVE SURGICAL INC. (LAZEROW, ANDREW) (Entered: 11/07/2024) |
| 11/08/2024 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 7 MOTION to Appear Pro Hac Vice, 8 JOINT PROPOSED STIPULATION ON DEFENDANT'S TIME TO ANSWER, MOVE, OR OTHERWISE RESPOND TO COMPLAINT. (jfj) (Entered: 11/08/2024) |
| 11/12/2024 | 9 | ORDER. The Motion for Admission Pro Hac Vice, ECF No. 7 , is GRANTED. Attorney Andrew D. Lazerow is admitted pro hac vice to represent the Defendant, pursuant to Local Rule 11.1(C). Signed by JUDGE M CASEY RODGERS on 11/12/24. (jfj) (Entered: 11/12/2024) |
| 11/12/2024 | 10 | ORDER re 8 JOINT STIPULATION ON DEFENDANT'S TIME TO ANSWER, MOVE, OR OTHERWISE RESPOND TO THE COMPLAINT. The requested relief is GRANTED in part. Defendant's deadline to respond to Plaintiffs' Complaint is extended to December 9, 2024, and Plaintiff's deadline to file any response in |

| | | |
|---|---|---|
| | | opposition is extended to January 13, 2025. A party may not file a reply without leave of Court. See N.D. Fla. Loc. R. 7.1(I). Signed by JUDGE M CASEY RODGERS on 11/12/24. (INTUITIVE SURGICAL INC Answer due by **12/9/2024**. Internal deadline for referral to judge if response not filed earlier: **1/13/2025**).) (jfj) (Entered: 11/12/2024) |
| 11/12/2024 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 1 Complaint. (Please see proposed ISO.) (jfj) (Entered: 11/12/2024) |
| 11/13/2024 | 11 | INITIAL SCHEDULING ORDER: Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **11/27/2024**. Rule 26 Meeting Report due by **12/27/2024**. Discovery due by **5/12/2025**. Signed by JUDGE M CASEY RODGERS on 11/13/24. (jfj) (Entered: 11/13/2024) |
| 11/27/2024 | 12 | Corporate Disclosure Statement/Certificate of Interested Persons by RESTORE ROBOTICS REPAIRS LLC identifying Corporate Parent Parker Holding Group Inc. for RESTORE ROBOTICS REPAIRS LLC.. (BERHOLD, JEFFREY) (Entered: 11/27/2024) |
| 11/27/2024 | 13 | Corporate Disclosure Statement/Certificate of Interested Persons by INTUITIVE SURGICAL INC. (LAZEROW, ANDREW) (Entered: 11/27/2024) |
| 12/09/2024 | 14 | MOTION to Appear Pro Hac Vice by Kenneth A. Gallo.( Filing fee $ 219 receipt number AFLNDC–9174502.) by INTUITIVE SURGICAL INC. (Attachments: # 1 Exhibit 1 – NY Certificate of Good Standing, # 2 Exhibit 2 – DC Certificate of Good Standing) (GALLO, KENNETH) (Entered: 12/09/2024) |
| 12/09/2024 | 15 | MOTION to Appear Pro Hac Vice by William B. Michael.( Filing fee $ 219 receipt number AFLNDC–9174538.) by INTUITIVE SURGICAL INC. (Attachments: # 1 Exhibit 1 – NY Certificate of Good Standing) (MICHAEL, WILLIAM) (Entered: 12/09/2024) |
| 12/09/2024 | 16 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by INTUITIVE SURGICAL INC. (PARTINGTON, BRUCE) (Entered: 12/09/2024) |
| 12/09/2024 | 17 | AFFIDAVIT *DECLARATION OF ANDREW LAZEROW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM* by INTUITIVE SURGICAL INC. (PARTINGTON, BRUCE) (Entered: 12/09/2024) |
| 12/09/2024 | | Set Deadline re 16 DEFENDANT'S DISPOSITIVE MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM – Internal deadline for referral to judge if response not filed earlier: **12/23/2024**. (jfj) (Entered: 12/10/2024) |
| 12/10/2024 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 14 MOTION to Appear Pro Hac Vice by Kenneth A. Gallo, 15 MOTION to Appear Pro Hac Vice by William B. Michael. (jfj) (Entered: 12/10/2024) |
| 12/13/2024 | 18 | ORDER. The Motions for Admission Pro Hac Vice, ECF Nos. 14 and 15 , are GRANTED. Attorneys Kenneth A. Gallo and William B. Michael, are admitted pro hac vice to represent Defendant, pursuant to Local Rule 11.1(C). Signed by JUDGE M CASEY RODGERS on 12/13/2024. (alb) (Entered: 12/13/2024) |
| 12/20/2024 | 19 | STIPULATION re 11 Scheduling Order, *Joint Proposed Stipulation to Extend Time to File Rule 26(f) Report* by RESTORE ROBOTICS REPAIRS LLC. (BERHOLD, JEFFREY) (Entered: 12/20/2024) |
| 12/22/2024 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 19 JOINT [PROPOSED] STIPULATION TO EXTEND TIME TO FILE RULE 26(f) JOINT REPORT (ECF NO. 11 .) (alb) (Entered: 12/22/2024) |
| 12/23/2024 | 20 | ORDER granting 19 Joint Proposed Stipulation to Extend Time to File Rule 26(f) Joint Report, as requested. The deadline for filing the Rule 26 Report is extended to January 10, 2025. |

| | | |
|---|---|---|
| | | *s/M. Casey Rodgers*<br>United States District Judge<br><br>Signed December 23, 2024. (aow)<br><br>(Entered: 12/23/2024) |
| 12/23/2024 | | Set Deadlines/Hearings re 20 Order. Rule 26 Meeting Report due by **1/10/2025**. (alb) (Entered: 12/24/2024) |
| 12/27/2024 | | Please disregard: ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 17 AFFIDAVIT DECLARATION OF ANDREW LAZEROW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (No response filed.) (alb) Modified on 12/27/2024 *Based on docket entry 10 Response not due until 1/13/2025(alb). (Entered: 12/27/2024) |
| 12/27/2024 | 21 | FIRST AMENDED COMPLAINT against INTUITIVE SURGICAL INC, filed by RESTORE ROBOTICS REPAIRS LLC. (Attachments: # 1 Exhibit 1) (BERHOLD, JEFFREY) (Entered: 12/27/2024) |
| 01/08/2025 | 22 | Joint MOTION to Extend Time *with respect to responses to First Amended Complaint and filing of Joint Status Report, with Proposed Order* by INTUITIVE SURGICAL INC. (THOMPSON, TREVOR) (Entered: 01/08/2025) |
| 01/09/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 22 JOINT STIPULATION ON DEFENDANT'S TIME TO ANSWER, MOVE, OR OTHERWISE RESPOND TO FIRST AMENDED COMPLAINT (ECF NO. 21 ) AND TO FILE JOINT STATUS REPORT. (jfj) (Entered: 01/09/2025) |
| 01/10/2025 | 23 | ORDER re 22 JOINT STIPULATION ON DEFENDANT'S TIME TO ANSWER, MOVE, OR OTHERWISE RESPOND TO THE FIRST AMENDED COMPLAINT AND TO FILE JOINT STATUS REPORT. The requested relief is GRANTED. Defendant's deadline to respond to Plaintiffs' First Amended Complaint (ECF No. 21 ) is extended to January 31, 2025, and Plaintiff's deadline to file any response in opposition is extended to February 24, 2025. The parties' deadline to file the Rule 26 joint report is extended to January 31, 2025. Additionally, Defendants Motion to Dismiss (ECF No. 16 ) is DENIED as moot. See ECF No. 21 . Signed by JUDGE M CASEY RODGERS on 01/10/25. (Rule 26 Meeting Report due by **1/31/2025**. INTUITIVE SURGICAL INC Answer due by **1/31/2025**. Deadline for Plaintiff to file response in opposition : **2/24/2025**).) (jfj) (Entered: 01/10/2025) |
| 01/31/2025 | 24 | REPORT of Rule 26(f) Planning Meeting. (BERHOLD, JEFFREY) (Entered: 01/31/2025) |
| 01/31/2025 | 25 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by INTUITIVE SURGICAL INC. (LAZEROW, ANDREW) (Entered: 01/31/2025) |
| 01/31/2025 | 26 | MOTION to Stay *Discovery* by INTUITIVE SURGICAL INC. (Attachments: # 1 Exhibit A) (LAZEROW, ANDREW) (Entered: 01/31/2025) |
| 01/31/2025 | | Set Deadline re 25 MOTION TO DISMISS – Internal deadline for referral to judge if response not filed earlier: **2/14/2025**. (jfj) (Entered: 02/03/2025) |
| 01/31/2025 | | Set Deadline re 26 MOTION TO STAY DISCOVERY – Internal deadline for referral to judge if response not filed earlier: **2/14/2025**. (jfj) Modified hyperlink on 2/3/2025 (jfj). (Entered: 02/03/2025) |
| 02/03/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 24 Report of Rule 26(f) Planning Meeting. (jfj) (Entered: 02/03/2025) |
| 02/14/2025 | 27 | MEMORANDUM in Opposition re 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by RESTORE ROBOTICS REPAIRS LLC. (BERHOLD, JEFFREY) (Entered: 02/14/2025) |

| | | |
|---|---|---|
| 02/14/2025 | 28 | MEMORANDUM in Opposition re 26 MOTION to Stay *Discovery* filed by RESTORE ROBOTICS REPAIRS LLC. (BERHOLD, JEFFREY) (Entered: 02/14/2025) |
| 02/18/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, 27 Memorandum in Opposition to Motion. (jfj) (Entered: 02/18/2025) |
| 02/18/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 26 MOTION to Stay *Discovery*, 28 Memorandum in Opposition to Motion. (jfj) (Entered: 02/18/2025) |
| 02/24/2025 | 29 | ORDER. Intuitive's Motion to Stay, ECF No. 26 , is GRANTED. All proceedings in the case, including discovery and disclosure deadlines, are STAYED until the Court rules on the pending Motion to Dismiss. Signed by JUDGE M CASEY RODGERS on 02/24/25. (Case stayed.) (jfj) (Entered: 02/24/2025) |
| 02/25/2025 | 30 | MOTION for Leave to File *Reply Brief re 25 Motion to Dismiss the Amended Complaint* by INTUITIVE SURGICAL INC. (MICHAEL, WILLIAM) (Entered: 02/25/2025) |
| 02/25/2025 | | Set Deadline re 30 DEFENDANT'S MOTION FOR LEAVE TO FILE REPLY BRIEF – Internal deadline for referral to judge if response not filed earlier: **3/11/2025**. (jfj) (Entered: 02/26/2025) |
| 03/04/2025 | 31 | MEMORANDUM in Opposition re 30 MOTION for Leave to File *Reply Brief re 25 Motion to Dismiss the Amended Complaint* filed by RESTORE ROBOTICS REPAIRS LLC. (BERHOLD, JEFFREY) (Entered: 03/04/2025) |
| 03/05/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 31 PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO FILE REPLY BRIEF. (jfj) (Entered: 03/05/2025) |
| 03/19/2025 | 32 | ORDER re 30 MOTION for Leave to File Reply Brief. Plaintiff filed Opposition Brief on March 4, 2025 (D.E. 31 ). The motion is GRANTED as follows: Defendant's reply, limited to 2,000 pages in length, is due within 7 days. (Defendant's REPLY due by **3/26/2025**.) Signed by JUDGE M CASEY RODGERS on 3/19/2025. (mb) (Entered: 03/19/2025) |
| 03/26/2025 | 33 | REPLY to Response to Motion re 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by INTUITIVE SURGICAL INC. (MICHAEL, WILLIAM) (Entered: 03/26/2025) |
| 03/27/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 33 DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS DISPOSITIVE MOTION TO DISMISS AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM. (jfj) (Entered: 03/27/2025) |
| 04/07/2025 | 34 | MOTION to Amend/Correct 21 Amended Complaint by RESTORE ROBOTICS REPAIRS LLC. (BERHOLD, JEFFREY) (Entered: 04/07/2025) |
| 04/07/2025 | 35 | SECOND AMENDED COMPLAINT against INTUITIVE SURGICAL INC, filed by RESTORE ROBOTICS REPAIRS LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (BERHOLD, JEFFREY) (Entered: 04/07/2025) |
| 04/07/2025 | | Set Deadline re 34 PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT – Internal deadline for referral to judge if response not filed earlier: **4/21/2025**. (jfj) (Entered: 04/08/2025) |
| 04/08/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 34 PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT, 35 Second Amended Complaint. (jfj) (Entered: 04/08/2025) |
| 04/08/2025 | | Motion No Longer Referred: 34 MOTION to Amended Complaint. (jfj) (Entered: 04/08/2025) |

| | | |
|---|---|---|
| 04/21/2025 | 36 | MEMORANDUM in Opposition re 34 MOTION to Amend/Correct 21 Amended Complaint filed by INTUITIVE SURGICAL INC. (Attachments: # 1 Declaration of William B. Michael) (MICHAEL, WILLIAM) (Entered: 04/21/2025) |
| 04/22/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 34 MOTION FOR LEAVE TO AMEND COMPLAINT, 35 SECOND AMENDED COMPLAINT, 36 MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION. (jfj) (Entered: 04/22/2025) |
| 06/12/2025 | 37 | NOTICE *OF SUPPLEMENTAL AUTHORITY* by RESTORE ROBOTICS REPAIRS LLC re 34 MOTION to Amend/Correct 21 Amended Complaint , 27 Memorandum in Opposition to Motion (Attachments: # 1 Cited Authority) (BERHOLD, JEFFREY) (Entered: 06/12/2025) |
| 06/13/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 37 PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF ECF NO. 27 AND ECF NO. 34 . (jfj) (Entered: 06/13/2025) |
| 06/13/2025 | 38 | RESPONSE by INTUITIVE SURGICAL INC re 37 Notice (Other) by INTUITIVE SURGICAL INC. (MICHAEL, WILLIAM) (Entered: 06/13/2025) |
| 06/16/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 38 Response/Reply by INTUITIVE SURGICAL INC. (mah) (Entered: 06/16/2025) |
| 08/20/2025 | 39 | (**Please disregard,** wrong document attached. Document refiled at docket entry 40 .) NOTICE *OF SUPPLEMENTAL AUTHORITY* by RESTORE ROBOTICS REPAIRS LLC re 34 MOTION to Amend/Correct 21 Amended Complaint , 27 Memorandum in Opposition to Motion (Attachments: # 1 Cited Authority) (BERHOLD, JEFFREY) Modified on 8/20/2025 (alb). (Entered: 08/20/2025) |
| 08/20/2025 | 40 | NOTICE *OF SUPPLEMENTAL AUTHORITY* by RESTORE ROBOTICS REPAIRS LLC re 34 MOTION to Amend/Correct 21 Amended Complaint , 27 Memorandum in Opposition to Motion (Attachments: # 1 Cited Authority) (BERHOLD, JEFFREY) (Entered: 08/20/2025) |
| 08/20/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 40 PLAINTIFF'S SECOND NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF ECF NO. 27 AND ECF NO. 34 . (jfj) (Entered: 08/20/2025) |
| 08/21/2025 | 41 | RESPONSE by INTUITIVE SURGICAL INC re 40 Notice (Other) . (MICHAEL, WILLIAM) (Entered: 08/21/2025) |
| 08/22/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 41 DEFENDANT'S RESPONSE TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY. (jfj) (Entered: 08/22/2025) |
| 11/07/2025 | 42 | ORDER. Intuitive's motion to dismiss, ECF No. 25 , is therefore GRANTED, the Amended Complaint is DISMISSED, and Restore Robotics' motion for leave to file a Second Amended Complaint, ECF Nos. 34 & 35 , is DENIED as futile. The Clerk is directed to close the file. Signed by JUDGE M CASEY RODGERS on 11/07/25. (jfj) (Entered: 11/07/2025) |
| 11/29/2025 | 43 | NOTICE OF APPEAL as to 42 Order, by RESTORE ROBOTICS REPAIRS LLC. ( Filing fee $605 Receipt Number AFLNDC−9712626.) (BERHOLD, JEFFREY) (Entered: 11/29/2025) |
| 11/29/2025 | 44 | TRANSCRIPT REQUEST by RESTORE ROBOTICS REPAIRS LLC (BERHOLD, JEFFREY) (Entered: 11/29/2025) |
| 12/01/2025 | 45 | Appeal Instructions re: 43 Notice of Appeal: The Transcript Request Form is available on the Internet at https://www.flnd.uscourts.gov/form/eleventh−circuit−transcript−information−form **PLEASE NOTE** Separate forms must be filed for each court reporter in both the district court and the appeals court. (No hearings were held.) (jfj) (Entered: 12/01/2025) |

| 12/01/2025 | 46 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 43 Notice of Appeal. (jfj) (Entered: 12/01/2025) |
|---|---|---|
| 12/01/2025 | | Set Deadlines re 43 Notice of Appeal: Clerk to check status of Appeal on **2/27/2026**. Certificate of Readiness (FRAP 11) due by **12/15/2025**. (jfj) (Entered: 12/01/2025) |
| 12/02/2025 | 47 | USCA PROCEDURAL LETTER re: 43 NOTICE OF APPEAL as to 42 Order. USCA Appeal # 25–14202–J (jfj) (Entered: 12/03/2025) |
| 12/03/2025 | 48 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 43 Notice of Appeal, Appeal No. 25–14202–J. The entire record on appeal is available electronically. (jfj) (Entered: 12/03/2025) |

# TAB 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIRS LLC,

Plaintiff,

v.

INTUITIVE SURGICAL, INC.,

Defendant.

Civil Case No. 3:24-cv-444

JURY TRIAL DEMANDED

## **COMPLAINT**

Plaintiff Restore Robotics Repairs LLC ("Restore") hereby files its Complaint against Defendant Intuitive Surgical, Inc. for monopolizing and restraining trade in the nationwide market for service and replacement of X/Xi EndoWrist instruments for use with the Da Vinci X and Xi Surgical Systems ("X/Xi EndoWrist Market"). Plaintiff alleges the following upon personal knowledge as to its own acts and information and belief and investigation by counsel as to all other allegations.

For more than two decades, Intuitive has had a monopoly in the manufacture and sale of surgical robots for minimally-invasive soft-tissue surgery ("Surgical Robots"). During that time, Intuitive has maintained a market share of more than

1

**App.8**

99% of the sales and installed base for Surgical Robots in the United States. Intuitive is the sole manufacturer of Da Vinci X and Xi Surgical Systems and X/Xi EndoWrists. The Xi is the fourth generation of the Da Vinci Surgical System. Intuitive no longer supports the prior generation (da Vinci Si) with parts, service, or instruments. Intuitive is also the sole provider of service for the da Vinci X and Xi.

Intuitive uses its contracts for the sale and service of the robots to block and delay the entry of competitors into the service and replacement of the instruments for use with the robot. In contracts for the sale and lease of the Da Vinci Xi, Intuitive prohibits customers from using the Xi EndoWrists beyond the usage limits set by Intuitive. Intuitive contractually prohibits its customers from using X/Xi EndoWrists repaired or remanufactured by third parties as part of the sale or lease of the da Vinci X and Xi. The contracts provide that Intuitive can withhold the necessary robot parts, robot service, and new X/Xi EndoWrists to use the da Vinci Surgical System if the robot owner uses X/Xi EndoWrists repaired or remanufactured by third parties.

For roughly ten years, no one entered the X/Xi EndoWrist market to compete with Intuitive. It was unproven whether anyone willing to enter the market would be able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for additional cycles of uses on the robot. On or about February 29, 2024, Restore became the first and only independent service organization ("ISO") to achieve the technological capability to reset the pre-

2

**App.9**

programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments.

Restore brings this action for injury to its business repairing and remanufacturing X/Xi EndoWrists. If Intuitive had not imposed the contractual restrictions on da Vinci X and Xi users and vigorously enforced those terms, Restore would have sought and achieved the technological capability to reset the usage limits on the encrypted memory chip and entered the X/Xi EndoWrist market as early as July 2020. Restore also continues to suffer harm and the threat of future harm to its X/Xi EndoWrist business because Intuitive maintains contractual restrictions on the use of repaired or remanufactured X/Xi EndoWrists in its existing and new contracts for sale and lease of the Da Vinci X and Xi Surgical System.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Restore Robotics Repairs LLC ("Restore") is a Florida limited liability company with its principal address at 7543 Holley Circle, Panama City Beach, Florida. Restore services and remanufactures surgical instruments.

2.      Defendant Intuitive Surgical, Inc. ("Intuitive") is a Delaware corporation with its principal place of business at 1020 Kifer Road, Sunnyvale, California. Intuitive provides surgical robots, along with related parts, instruments, accessories, and services, to hospitals and surgical centers in Escambia County in the Pensacola Division of the Northern District of Florida and elsewhere. Intuitive

**App.10**

can be served with process through its registered agent C T Corporation System at 1200 South Pine Island Road, Plantation, FL 33324.

3.    Defendant is subject to the personal jurisdiction of this Court.

4.    This action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 22. The Defendant has been engaged in interstate commerce during all relevant times of the complaint.

5.    Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c)(2). The Defendant is transacting and carrying on business in this District.

## ROBOTIC SURGERY

6.    Intuitive's Chief Medical Officer has publicly described a "robotic revolution" in surgery. With traditional open surgery, the surgeon uses one large incision to perform a procedure. With laparoscopic surgery, the surgeon makes several small incisions and inserts small tools, including a video camera, to perform the procedure. Robotic surgery also uses several incisions for the insertion of small tools, including a magnified, high-definition 3D video camera. The surgeon sits at a console and uses hand controls to manipulate the instruments, which are attached to the system by robotic arms with joints.



7.    Robotic surgery has a variety of practical advantages over laparoscopic surgery:

- stereoscopic high-definition cameras for 3-D visibility

- additional arm for the surgeon to hold a third instrument

- wrist joints for expanded range of motion compared to human

- scalability to allow for small movements in the arms and instruments

- ergonomic console design to minimize surgeon fatigue.

**DA VINCI ROBOT**

8.    Intuitive specializes in the manufacture and sale of the da Vinci surgical system (image below).



5

9.    Intuitive sells all necessary instruments and accessories for the da Vinci robot system. Intuitive offers roughly eighty different instruments, including a variety of forceps, retractors, and scissors, under the EndoWrist brand. The da Vinci Surgical System is only cleared for use with EndoWrist instruments.

10.    The da Vinci robot system is generally used for minimally invasive soft tissue surgery for areas of the body between the pelvis and the neck – primarily in general surgery, gynecologic surgery, urologic surgery, cardiothoracic surgery, and head and neck surgery. The da Vinci robot system is indicated for adult and pediatric use.

11.    In its latest annual report, Intuitive estimated that surgeons using the da Vinci robot system completed roughly 2,286,000 surgical procedures of various types in hospitals throughout the world during the year ended December 31, 2023. The number of estimated annual surgical procedures nearly doubled in four years.

12.    As of June 30, 2024, Intuitive had an installed base of 5,385 da Vinci Surgical Systems in the U.S. Nearly all customers are currently using the da Vinci X or Xi, which works with the X/Xi EndoWrist instruments.

13.    In its most recent annual report, Intuitive acknowledged that "[t]he initial system sale into an account is a major capital equipment purchase by our customers and typically has a lengthy sales cycle." The average sales price is more than $1 million.

App.13

14.     For the calendar year 2023, Intuitive reported more than $3 billion in Instruments and Accessories Revenue in the United States. Intuitive is on pace for more than $3.5 billion in Instruments and Accessories Revenue in the United States for 2024.

15.     On March 14, 2024, Intuitive announced that it had received clearance from the FDA to market and sell the next generation of the robot – da Vinci 5 – in the United States. The existing X/Xi EndoWrists are compatible with – and cleared for use with – the da Vinci 5. At that time, Intuitive stated that "Da Vinci 5 will initially be available to a small number of customers in the U.S. who collaborated with Intuitive during the development period and those with mature robotic surgery programs. Intuitive will work with surgeons at these initial sites to generate additional data on the system's use before a wider commercial introduction."

## SURGICAL ROBOT MARKET

16.     Intuitive has monopoly power in the U.S. market for Surgical Robots ("U.S. Surgical Robot Market"). In the U.S. Surgical Robot Market, Intuitive is able to exclude competition and maintain prices for the da Vinci robot system at supracompetitive levels. For nearly 20 years, Intuitive was the only manufacturer of Surgical Robots in the United States. Intuitive currently has a 99.9% share in annual sales and installed base in the U.S. Surgical Robot Market. There is only one other manufacturer selling Surgical Robots in the U.S.: Asensus Surgical. Asensus placed

**App.14**

one (1) system in the United States in 2023. Intuitive placed 666 da Vinci systems in the United States in 2023.

17.    There is a relevant product market or submarket for surgical robots. Surgical robots have no practical substitute. Even though robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery, hospitals are expected to offer robotic surgery. Moreover, certain procedures, such as prostatectomies, are increasingly performed now by surgeons operating exclusively with surgical robots.

18.    Due to the unique attributes of surgical robots, many hospitals believe that robotic surgery leads to shorter hospital stays and greater patient satisfaction. Many surgeons strongly prefer robotic surgery and require it to work at a given hospital. As a result of perceptions about the reduced pain and scarring and increased safety and effectiveness associated with robotic surgery, many patients insist on robotic surgery and will travel to the closest hospital offering robotic surgery.

19.    There are distinct prices for surgical robots. The da Vinci Surgical System has an average sales price of more than $1 million. By comparison, a laparoscopic tower has an average sales price of roughly $100,000.

20.    There is a very low cross-elasticity of demand between robotic and laparoscopic surgery. The estimated cost per procedure of equipment, instruments, and service is $1,866 for robotic surgery versus less than $1,000 for laparoscopic

8

**App.15**

surgery. (Exhibit 1 (Christopher P. Childers and Melinda Maggard-Gibbons, Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery, 320 Journal of American Medical Association 835, 836 (August 28, 2018)).) In addition, the estimated cost per procedure of acquiring and servicing the surgical robot is an additional $1,701 for robotic surgery. Id. Nevertheless, the estimated procedure volume for robotic surgery increased from 136,000 in 2008 to 877,000 in 2017 for a compounded annual growth rate of 23%. Id.

21.    In response to much higher prices for the use of surgical robots, customers are <u>not</u> switching to use of laparoscopic equipment. Id. In fact, they are replacing their laparoscopic equipment with surgical robots at much higher prices. Id. In other words, customers in the surgical robot market strongly prefer surgical robots over laparoscopic surgery and are not sensitive to prices in the laparoscopic equipment market.

22.    The industry and the public recognize surgical robots as a separate economic entity. The financial and healthcare press refer specifically to the market for surgical robots and competition in surgical robots. There are several professional and trade associations focused on robotic surgery – *e.g.*, the Society for Robotic Surgery and the Clinical Robotic Surgery Association. Surgical robots have very peculiar characteristics. Supra at ¶¶ 6-7. In addition, surgical robots have very distinct prices.  Supra at ¶ 19. Intuitive and Asensus both specialize in surgical

9

**App.16**

robots. Surgeons specialize in robotic surgery. Robotic surgery requires specialized training and experience.

23.    Orthopedic robots are not part of the surgical robot market. Orthopedic robots are not a practical substitute for surgical robots. They are designed for assisting in removal of bone and aligning prosthetics for knee and hip replacement. They are not indicated for use in minimally invasive soft tissue surgery.

24.    There are significant barriers to entry into the surgical robot market. In fact, Restore is not aware of any new entrants into this lucrative market in the last seven (7) years at least.

25.    The Food and Drug Administration has a rigorous process for clearing any surgical robot for sale in the United States. New entrants require five to ten years and several hundred million dollars from design concept to regulatory clearance or approval by the FDA. The FDA is now reportedly requiring new entrants to obtain premarket approval, which is much more difficult than 510(k) premarket clearance. The relevant regulatory agencies must also approve any surgical robot for sale in the European Union and elsewhere outside the United States.

26.    Intuitive holds numerous patents blocking development of competing robot systems: "As of December 31, 2023, we owned more than 4,800 patents granted and still in force." Intuitive has multiple unexpired patents issued by the United States, covering each of the following features on its current models of the

da Vinci Surgical System for sale:  highly-magnified 3DHD vision, true depth perception, intuitive instrument controls, wristed instruments, and tremor reduction.

27.    The da Vinci Surgical System has been widely accepted in the United States. The da Vinci has been the subject of twenty years of clinical data and studies. Surgeons already have significant training and extensive experience invested in the da Vinci robot system. That specialized training often begins in fellowship programs. In addition, the large hospital systems with significant demand for robot surgery already have a sizable installed base of da Vinci robots. Intuitive secures agreements with customers that they will not purchase any competing robots from other manufacturers.

28.    As a result of its monopoly power in surgical robots, Intuitive is able to, and does, charge supracompetitive prices for its da Vinci robots. Intuitive has maintained gross margins of 66% to 72%, which far exceed median gross margins in the healthcare sector generally. Those gross margins are not explained by lagging or current research and development expenses, which pale in comparison. For the most recent calendar year 2023, Intuitive had a gross profit of $4.73 billion and research and development expenses of $999 million.

29.    For calendar year 2023, Intuitive had a net margin of 25%. By comparison, GE Healthcare Technologies, which is also a major manufacturer of

11

**App.18**

capital-intensive medical equipment like MRI and CT machines, had a net margin of 12% for the same time period.

## AFTERMARKETS: PARTS, SERVICE, AND INSTRUMENTS

30.    Intuitive has also used its monopoly power in the primary market for surgical robots to acquire and maintain monopoly power in the aftermarkets for servicing the da Vinci Surgical System and repairing and replacing EndoWrist instruments. Intuitive has monopolies in the primary market and the aftermarkets and is able to extract monopoly prices and profits from each of those markets by charging separate prices for the robot, the service, and the instruments.

31.    There is a relevant aftermarket for the service of da Vinci Surgical Systems in the United States. Intuitive represents that it is the "sole provider" of service for the da Vinci Surgical System. The standard sales contract prohibits third parties from repairing the robot. Intuitive has a market share of 100%. Intuitive is able to charge supracompetitive prices. Intuitive charges an hourly rate of $995 (including travel time) for repairs. In addition, Intuitive charges fees exceeding $100,000 to replace parts like the instrument or camera arm. Their service contracts have an average price of more than $100,000 per year.

32.    There are no practical substitutes to the specialized parts, equipment, and training required to service the da Vinci Surgical System.  Service requires access to a proprietary service laptop and toolkit owned and controlled by Intuitive.

**App.19**

The service laptop is necessary to remove warning messages from the screen on the system console and input the serial number for the system to recognize replacement parts like the robot arms. Intuitive does not provide third parties with access to the service laptop.

33.    Service requires access to proprietary parts like robot arm assemblies that are specially designed and built for the da Vinci robot system. There are no substitutes for most da Vinci robot parts. Intuitive only provides the parts with the service and only provides the service directly to customers.

34.    Intuitive does not disclose the performance specifications for the da Vinci Surgical System. Intuitive provides its field service engineers with the parts and toolkit, along with specialized training on the performance specifications for the da Vinci Surgical System, to maintain, troubleshoot, and repair the system.

35.    There is a relevant aftermarket for the repair and replacement of X/Xi EndoWrist instruments in the United States. There are no substitutes for X/Xi EndoWrist instruments. They are specially designed and built for the latest generation of the da Vinci Surgical System. Intuitive provides X/Xi EndoWrist instrument replacement to all customers inside the United States.

36.    The da Vinci robot service aftermarket and X/Xi EndoWrist instrument aftermarket are separate from the surgical robot market. Intuitive sets separate prices for each type of service and instrument separately from the original purchase price

**App.20**

for the system, and customers purchase the service and instruments a la carte on an ongoing basis throughout the lifecycle of the system. The prices for instruments are not fixed for the lifetime of the robot. Since Intuitive had and has monopoly power in the surgical robot market, Intuitive has not been, and is not, prevented from acting anticompetitively in the aftermarkets. The average system price does not respond to changes in service or instrument prices.

37.    In addition, Intuitive has an installed base of more than 5,000 da Vinci robot systems. Those customers purchased their robot in a monopolistic market and face significant switching costs. Surgical robot systems have an average sales price of more than $1 million. They customers take a massive risk in spending more than $1 million on a robot that is not supported by Intuitive. Their physicians have already been trained on the da Vinci robot system. Furthermore, no other manufacturer has anything approaching a critical mass of installed systems to provide timely field service. It is unclear whether competing systems will even be supported over the lifecycle of the robot.

38.    Even now, customers are unable to calculate lifecycle costs at the time of purchase because they have little or no information for projecting the costs of robot parts and service or instruments. Assuming the customer has a complete service agreement at a flat rate, it is still very difficult to project costs on a per use or life cycle basis. Major repairs are not included in the service agreements. In order

14

**App.21**

to forecast the cost per use, the customer would also need to know how often the robot will be used. In order to project the cost over the lifecycle, the customer must know how often the instruments will be used and replaced. Yet the customer typically cannot forecast demand for a surgical robot. Surgeons may have varying degrees of adaption to a surgical robot at a new location or for a new procedure. The product mix and usage costs vary dramatically by procedure. Competing hospitals may or may not acquire their own robots. The FDA may or may not add new indications for use of the robot system.

39.    The costs for instruments are also unpredictable. The customer cannot predict the timing for replacing instruments: Intuitive has complete control over the usage limits on the X/Xi EndoWrist instruments and has changed the usage limits unilaterally without notice. As the sole original manufacturer of EndoWrist instruments, Intuitive also has complete control over the prices for new EndoWrist instruments.

40.    If the customer is paying for service based on time and materials after the expiration of the service agreement, the customer also faces unpredictable repair costs. The need for repairs on the robot system is unpredictable. So is the price. Intuitive is the only manufacturer of the da Vinci robot parts. Intuitive does not publish the prices for da Vinci robot parts. There has never been a competitive market with multiple vendors able to provide anything resembling the full array or

15

**App.22**

parts or services. Intuitive also retains control of the decision to repair or replace a part. For example, a customer may face an unexpected cost of more than $100,000 to replace a da Vinci robot arm.

## X/XI ENDOWRIST INSTRUMENT AFTERMARKET

41.    Intuitive has monopoly power in the relevant market or submarket for the repair and replacement of X/Xi EndoWrist instruments ("X/Xi EndoWrist Market"). Intuitive is able to exclude competition and maintain prices for the repair and replacement of X/Xi EndoWrist instruments at supracompetitive levels: Intuitive is the only original manufacturer for the X/Xi EndoWrists, has a market share of 100%, and has prevented Restore and other ISOs from entering the market through its contractual restrictions. Intuitive makes, rather than takes, prices on instruments. Intuitive has maintained the exact same list prices and adhered to them for every customer in the United States for several years at a time. Intuitive is able to unilaterally set usage limits on the instruments because of its market power in the X/Xi EndoWrist Market.

42.    The X/Xi EndoWrist instruments are necessary to perform surgery with the da Vinci X or Xi and are only available new from Intuitive. The customers do not have the option of turning to the S/Si EndoWrist Market because the S/Si EndoWrists do not work on the da Vinci X or Xi and Intuitive has stopped sale of, and support for, the da Vinci Si.

16

**App.23**

43.    The X/Xi EndoWrist Market includes any ISO with the ability to reset the usage limits and enter the market by repairing X/Xi EndoWrists for hospitals directly or through distribution or selling or licensing the technology for distributors or hospitals to do it themselves. The FDA permits servicing of approved medical devices by hospitals and third parties. The ISO repairs instruments to meet their original intended use. Third-party service does not affect the safety and effectiveness of the instrument or affect the indications for use. The instrument is maintained at, or returned to, its original safety and effectiveness. Intuitive has never tested its instruments to failure.

44.     In fact, hospitals prefer to have the option of repairing their medical devices with third parties. ISOs are a recognized and accepted part of the healthcare industry for everything from powerful scanning machines to electrophysiology catheters mapping electrical signals inside the heart. For example, an ISO can capture 30% to 40% of the market if it is the only competitor, or 10% to 20% of the market if it is one of several competitors, besides the original manufacturer in providing intracardiac mapping catheters for use with a cardiac mapping system.

### BARRIERS TO ENTRY INTO X/XI ENDOWRIST MARKET

45.    There are significant barriers to entry into X/Xi EndoWrist Market. In fact, no one had achieved the technological capabilities to compete in the market for ten years.

17

**App.24**

46.     Intuitive does not face competition from original manufacturers of instruments that can be used with the da Vinci X or Xi. Intuitive holds numerous patents blocking development of competing instruments for use on the da Vinci robot system. In addition, the standard sales contract prohibits the use of any instruments besides the X/Xi EndoWrists designed by Intuitive. The Food and Drug Administration has a rigorous process for clearing any surgical robot instruments for sale in the United States. In order to work with the Da Vinci Surgical System, the EndoWrist instrument must have a serial number to be recognized by the machine.

47.     The encryption on the memory chip has also been a barrier to entry into the X/Xi EndoWrist Market. For more than a decade, no one was able to achieve the technological capability to enter the X/Xi EndoWrist market to compete with Intuitive. Intuitive installs an encrypted pre-programmed memory chip on the X/Xi EndoWrists to limit the number of uses for each instrument.

48.     Intuitive has explained that the da Vinci X and Xi were "upgraded to a wireless connection for the communication of the instrument, calibration, and use count information between the EndoWrist and the rest of the system to improve consistency in the communication channel[.] [T]his required the chip to be encrypted for security purposes to avoid remote tampering or other types of wireless attacks." Intuitive has taken the position that "the antitrust laws cannot be used to challenge product improvements" like the encryption of the chip on the X/Xi EndoWrists.

**App.25**

Restore has not alleged – and does not allege – that the encryption of the chip violates the antitrust laws.

49. The encryption is proprietary. There is only one manufacturer of the chip. It had been unproven whether anyone would be able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for one or more additional cycle of uses on the robot.

50. The memory chip prevents the instrument from being connected to the robot for more than a certain number of times regardless of whether the instrument is maintained at, or returned to, its original safety and effectiveness through service. The instruments do not display the number of remaining uses until there are no remaining uses. The robot will no longer engage with an instrument that has reached the usage limit. Intuitive itself can service the instrument and reset or replace the usage counter. It simply chooses not to do so.

51. Intuitive imposes additional barriers to entry through its contractual restrictions. Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System. For more than twenty years, Intuitive has operated on a business model of extracting monopoly rents through recurring revenue from instruments with limited uses. They maintained the same 10 use limits

**App.26**

for most instruments for almost two decades until Restore tried to enter the S/Si EndoWrist Market.

52.    The standard sales and lease contracts provide that the customer "purchases" any instruments for use with the robot system. The standard contract does not prohibit use of the system off label. Nevertheless, the standard contract requires that the customer only use the instruments for the maximum number of uses set forth in the instrument catalog. In addition, the standard contract requires that Intuitive must approve any repairs or service during or after that usage limit. Intuitive has never approved any third party to repair the instruments and has never set up a process for doing so.

## ANTICOMPETITIVE CONDUCT

53.    Intuitive contractually requires customers to deal exclusively with Intuitive for repairing or replacing their X/Xi EndoWrists. The standard sales contract prohibits the customer from using the instruments beyond the usage limits set by Intuitive, which includes any resetting of the usage limits by the customer or an ISO. The standard sales contract prohibits the customer from disassembling the instruments, which includes repairs of the instrument by the customer or an ISO during the lifecycle of the instrument.

54.    Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third

**App.27**

parties) to get da Vinci robot service. The standard sales contract removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third parties repair the instruments. In addition, any third-party service on the EndoWrist instruments voids Intuitive's one-year warranty on the entire da Vinci Surgical System.

55.    Intuitive remotely tracks the use of instruments by serial number. If Intuitive believes that the customer has been dealing with a third party for repairing or remanufacturing X/Xi EndoWrists, Intuitive has previously taken the position that it can refuse to provide new instruments or robot service and can cancel any lease for the robot itself. As a result, customers have previously lost the ability to use their robot, often with little or no notice, when Intuitive refused to deal with the customer due to violations of the contractual restrictions on repairing or remanufacturing the instruments with third parties. The customers continue to operate under that threat so long as those contractual restrictions remain in place.

56.    Upon information and belief, Intuitive has also added terms or conditions to its standard sales agreements prohibiting ISOs from collecting used instruments from the customers.

57.    Intuitive also informed at least one hospital consulting company that Intuitive will not cooperate with them if the consulting company or its clients deal with Restore.

**App.28**

## ANTICOMPETITIVE EFFECTS

58.    As a result of its exclusionary conduct, Intuitive has eliminated all competition in the X/Xi EndoWrist Market and has maintained a market share in the X/Xi EndoWrist Market of 100% for more than 10 years. By eliminating all competition, Intuitive is able to charge supracompetitive prices in the X/Xi EndoWrist Market.

59.    Intuitive has imposed usage limits on each instrument to extract consumer surplus, *i.e.*, monopoly profits, from its customers. Instead of simply buying the instruments, the customer is forced to pay a usage fee. Intuitive is charging a price that is independent, and far in excess, of the cost. When Intuitive has increased the number of uses on certain instruments, Intuitive has simply increased the price on those instruments to maintain or even increase their profit margins.

60.    Intuitive does not make up the difference to customers on supracompetitive prices in the X/Xi EndoWrist Market by charging subcompetitive prices on its surgical robots or its robot service. Intuitive has monopoly power in the primary market and the aftermarkets and is able to charge supracompetitive prices across all markets. For example, Intuitive did not raise its monopoly prices for the system itself after modestly reducing the price per use on some instruments through

22

**App.29**

the X/Xi Extended Use Program because Intuitive was already charging a monopoly price for the systems.

## THERE ARE NO PROCOMPETITIVE JUSTIFICATIONS

61.    There is no procompetitive justification for the usage limits. The usage limits are not necessary to protect the da Vinci or EndoWrist brand or preserve consumer demand in surgical robots generally or da Vinci specifically. The usage limits do not correspond with the wear and tear on the instrument, which varies widely depending on the type and length of procedure, the technique of the physician, and the complications with the patient. In fact, the FDA has previously cleared Restore to market and sell S/Si EndoWrists under its own label for a second cycle of uses based on performance testing demonstrating that they are as safe and effective as the new instruments.

62.    The physicians are simply left to their own devices, quite literally, because Intuitive does not disclose performance specifications to the public for the surgeon to have any manufacturer guidance for determining functionality and safety on the first or any subsequent use of the EndoWrist instrument. And Intuitive itself does not inspect every one of the hundreds of thousands of new instruments produced at its manufacturing plants.

63.    Intuitive could resolve any question regarding safety by disclosing performance specifications for the instruments, which would allow the surgeon to

**App.30**

assess the safety of the new, used, or repaired instrument, rather than simply blocking the surgeon from using repaired instruments. In fact, the instruments do not even display the number of uses for the device.

64.     The usage limits are not based on any regulatory requirements from the FDA. Intuitive's standard contracts and instrument catalogs do not refer to any regulatory requirements imposing usage limits. The FDA has never taken enforcement action against any independent third party for repairing EndoWrists and resetting their usage limits. Intuitive recently marketed and sold X/Xi EndoWrists under its Extended Use Program for nearly two years without any new clearance from the FDA.

65.     In addition, the usage limits do not appear to be based on any scientific determination of the useful life of the instruments. There does not appear to be any clinical data in the public domain to support the limits on usage for the EndoWrist instruments. (Ex. 1 at 836.)  For instance, there are no usage limits on the smaller reusable instruments for the Senhance System from Asensus Surgical. Nor are there usage limits on reusable instruments for open surgery or laparoscopic surgery.

**RESTORE PREVIOUSLY ENTERED THE S/SI ENDOWRIST MARKET**

66.     Restore has developed a process for repairing EndoWrist instruments and resetting the usage limit by replacing the programmed memory chip. After

previously licensing technology from a third party, Restore was able to repair S/Si EndoWrists with its own technology and process by July 2020.

67.     The FDA has determined that the technology is safe for repairing EndoWrists and resetting their usage limits: Performance testing demonstrated that Restore EndoWrists "are as safe and effective" as the predicate Intuitive S/Si EndoWrists. They "operate as originally intended" for an additional cycle of uses. The FDA has cleared Restore to remanufacture the S/Si EndoWrist under its own Iconocare label.

68.     On February 27, 2019, Restore filed an antitrust case for injury to its business repairing S/Si EndoWrists ("S/Si EndoWrist Litigation"). *Restore Robotics LLC, et. al v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55-TKW-MJF (N.D. Fl. filed February 27, 2019). At that time, Restore was unable to reset the usage count on the X/Xi EndoWrists and could not bring any claims for injury to business repairing X/Xi EndoWrists. Dkt. 1 (Complaint) ¶ 60. After settlement between the parties, the S/Si EndoWrist case was dismissed with prejudice on joint stipulation of the parties on January 27, 2023. Dkt. 225.

**RESTORE IS NOW ABLE TO ENTER THE X/XI ENDOWRIST MARKET**

69.     During the S/Si EndoWrist Litigation, Restore was not able to enter the X/Xi EndoWrist Market. The X/Xi EndoWrists are based on the S/Si EndoWrists. They have the same mechanical design. Restore has developed the processes and

25

tools (*e.g.*, instrument reader and cap removal) for repairing the X/Xi EndoWrists. But Intuitive switched to an encrypted memory chip on the X/Xi EndoWrists.

70.    Therefore, it was unknown whether anyone would be able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for any additional cycles of uses on the robot. Potential entry required significant time and expense with significant risk of failure to achieve the technological capability to reset the usage count on X/Xi EndoWrists. Restore did not attempt to acquire the ability to enter the X/Xi EndoWrist Market so long as Intuitive appeared to strictly enforce its contractual restrictions against repairing or remanufacturing its instruments.

71.    As part of the settlement agreement in the S/Si EndoWrist Litigation executed on January 23, 2023, Intuitive agreed that it would not prevent customers from using EndoWrists remanufactured by Restore under clearance from the FDA. Shortly thereafter, Intuitive issued a public statement: "Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA."

72.    On or about February 24, 2023, Restore started the process to evaluate options for trying to achieve the technological capability to reset the usage limits on

26

**App.33**

the X/Xi EndoWrists. On or about September 15, 2023, Restore launched the expensive and risky process to try to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for a one or more additional cycles of uses on the robot. On or about February 29, 2024, Restore became the first and only independent service organization ("ISO") to achieve the technological capability to reset the pre-programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments.

73.    On or about August 16, 2024, Restore completed testing to submit its first 510(k) to market and sell remanufactured X/Xi EndoWrists for one additional cycle of uses. On or about August 30, 2024, Restore submitted its application for clearance by the FDA to market and sell X/Xi EndoWrists remanufactured for a second cycle of uses.

74.    But for the enforcement of the contractual restrictions by Intuitive in its standard contracts for the sale and lease of the da Vinci Surgical System, Restore would have started the process to achieve the technological capability to reset the usage limits on the X/Xi EndoWrists as early as July 2019 and would have achieved that capability as early as July 2020. But for the anticompetitive conduct of Intuitive, Restore would have also sought and received clearance from the FDA to remanufacture X/Xi EndoWrists as early as January 2021.

**App.34**

75.    Due to the contractual restrictions, Restore continues to lose sales in the X/Xi EndoWrist Market. In fact, it is futile for Restore to offer to repair X/Xi EndoWrists and reset their usage limits because Intuitive continues to insist that it will enforce the various contractual restrictions against customers that repair their instruments with Restore. It is equally futile for Restore to sell or license the technology to hospitals or distributors for resetting the usage limits on X/Xi EndoWrists.

76.    In addition, Intuitive has never amended the language in the existing contracts for the da Vinci Surgical Systems to allow customers to use remanufactured instruments cleared by the FDA. Since Intuitive announced its position on remanufactured instruments on its website, customers have repeatedly informed Restore and its agents that they will still not buy remanufactured instruments from Restore because Intuitive has not changed the terms in their contracts. Moreover, Intuitive continues to incorporate the old terms and conditions into contracts with customers that traded in their older models of da Vinci Surgical System for the da Vinci X and Xi. Upon information and belief, Intuitive also uses the same or similar terms and conditions in contracts with new customers purchasing or leasing the da Vinci X and Xi and the da Vinci 5.

## COUNT ONE – MONOPOLIZATION

77.    The foregoing allegations are expressly incorporated.

28

**App.35**

78.    Intuitive has willfully acquired and maintained monopoly power in the domestic market for X/Xi EndoWrist instrument repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

79.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT TWO – ATTEMPTED MONOPOLIZATION

80.    The foregoing allegations are expressly incorporated.

81.    Intuitive has attempted to monopolize the domestic market for X/Xi EndoWrist instrument repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has the specific intent to monopolize the domestic market for X/Xi EndoWrist instrument repair and replacement by engaging in predatory conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

82.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT THREE – TYING

83.    The foregoing allegations are expressly incorporated.

**App.36**

84.    Intuitive has tied X/Xi EndoWrist instrument replacement to its surgical robots and robot service, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Intuitive has forced customers to purchase X/Xi EndoWrist instrument replacements to get the da Vinci surgical robot and da Vinci robot service. Intuitive has sufficient economic power in the domestic surgical robot market and the domestic da Vinci robot service market to coerce customer acceptance of X/Xi EndoWrist instrument replacement. The tying arrangements have had anticompetitive effects in the domestic aftermarket for X/Xi EndoWrist repair and replacement, which involves a not insubstantial amount of interstate commerce.

85.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT FOUR – EXCLUSIVE DEALING

86.    The foregoing allegations are expressly incorporated.

87.    Intuitive has entered agreements with its customers to provide X/Xi EndoWrist instrument repair and replacement on an exclusive basis that have foreclosed competition in substantially all of the domestic aftermarket for repair and replacement of X/Xi EndoWrist instruments and have resulted in higher prices and lower service in the domestic X/Xi EndoWrist repair and replacement aftermarket, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

30

**App.37**

88.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## PRAYER FOR RELIEF

Plaintiff respectfully asks that this Court:

(a)    conduct a jury trial of all claims and issues as to which there is a right to jury trial;

(b)    enter judgment awarding damages to Plaintiff in an amount to be determined, and trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a), on its federal antitrust claims;

(c)    enter injunctive relief in favor of Plaintiff to prevent the threat of loss or injury by violation of the antitrust laws as provided in Section 16 of the Clayton Act, 15 U.S.C. § 26;

(d)    award Plaintiff the cost of this suit, including a reasonable attorney's fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 16 of the Clayton Act, 15 U.S.C. § 26, on its federal antitrust claims; and

(e)    order such other and further relief as this Court deems proper and just.

31

**App.38**

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of its claims by jury to the extent authorized by law.

Respectfully submitted on September 18, 2024.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

* Pro Hac Vice Admission Pending

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.

32

**App.39**

# EXHIBIT 1

# Letters

RESEARCH LETTER

## Estimation of the Acquisition and Operating Costs for Robotic Surgery

Despite evidence questioning the clinical benefit,[1] the use of the robotic platform for surgical procedures is increasing.[2] No benchmark exists for the cost of acquiring and operating robotic systems, and previous cost evaluations have either omitted key expenses[1] or utilized billing records that do not itemize costs with sufficient granularity.[2] Because 1 company supplies most robotic technology, and all their revenue comes from system, service, and instrument sales, the minimum cost to hospitals can be estimated by examining the revenue in this company's financial statements. Establishing a cost benchmark can inform future cost-effectiveness evaluations.

**Methods** | The financial statements of Intuitive Surgical Inc (Form 10-K annual reports) from January 1999 to December 2017 were retrieved online.[3] The Form 10-K is an annual report required by the US Securities and Exchange Commission that provides a summary of a company's finances. Filings are independently audited and verified by the chief executive officer. Data were extracted and summarized for robot system sales, revenue sources (systems, service, instruments and accessories; rounded to the nearest $100 000) and approximate procedure volumes by specialty (gynecology, general surgery, urology). Procedure information is entered into the robotic platform for each case and is transmitted to the company. "Robot systems" refer to the sale or lease of the platform. "Service" refers to the maintenance and training con-

tract. "Instruments and accessories" include finite-lifetime parts, endoscopes, simulators, and supplies (eg, drapes). To hospitals, system revenue is an acquisition cost with service and instrument and accessory revenue as fixed and variable operating expenses, respectively.

**Results** | By the end of 2017, the company shipped 5770 robot systems; after accounting for trade-ins and returns, 4409 platforms were installed globally including 2862 (65%) in the United States (**Figure**, A). The estimated annual procedure volume increased from 136 000 in 2008 to 877 000 in 2017. In 2017, 644 000 procedures (73%) were performed in the United States (**Table**). From 2010 to 2017, general surgery procedure volume increased the fastest (10 000 to 246 000) followed by gynecology (123 000 to 252 000) and urology (85 000 to 118 000) (Figure, B).

Total revenue in 2017 was $3.1 billion, with $2.3 billion (73%) domestically (Table). In 2017, 52% of revenue was derived from instruments and accessories, 29% from robot systems, and 19% from service. Dividing the total spending on robotic technology by the total number of robotic procedures performed in 2017 yielded a cost per procedure of $3568, with $1866 for instruments and accessories, $1038 for robot systems, and $663 for the service contract.

**Discussion** | The robotic surgical procedure market is large and increasing; in 2017, hospitals paid the primary supplier more than $3 billion, equating to $3568 per procedure.

Before robotic surgery, total operating room costs for common general surgery procedures ranged from $3000 (cholecystectomy) to $7000 (pancreatectomy).[4] Instruments account

---

Figure. Robot System Shipments and Installations and Procedure Volume Data, 2010-2017





| A Robot systems shipped and installed | B Robotic surgical procedure volume |

Installed base indicates units shipped minus trade-ins and returns. Although the overall structure of each financial statement is similar, some individual data points were not reported for the entire study period. For example,

US procedure volume was introduced in 2010. To avoid introducing unsubstantiated assumptions, data are only presented when continuous elements are available for all years until 2017.

---

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Jeff Berhold on 05/02/2019

**App.41**

Letters

Table. Robot System Sales, Robotic Procedure Volume, and Revenue Data in 2017[a]

| Characteristic | Value |
|---|---|
| Robot System Sales, No.[b] | |
| Units shipped | |
|     Global | 684 |
|     United States | 417 |
|     Non-United States | 267 |
| Installed base | |
|     Global | 4409 |
|     United States | 2862 |
|     Non-United States | 1547 |
| Robotic Procedure Volume, No.[c] | |
| Global | 877 000 |
| United States[d] | 644 000 |
|     Gynecology | 252 000 |
|     General surgery | 246 000 |
|     Urology | 118 000 |
| Revenues, $ | |
| United States | 2 279 800 000 |
| Total revenue | 3 128 900 000 |
|     Robot systems | 910 200 000 |
|     Instrument and accessory[e] | 1 636 900 000 |
|     Service[f] | 581 800 000 |

[a] Except for the installed base, all values represent data for the period from January 1, 2017, to December 31, 2017. The installed base is data as of December 31, 2017, and reflects the total number of units shipped minus trade-ins and returns since company inception.

[b] Systems refer to the sale or lease of the platform.

[c] Procedure data are estimated by the company and ascertained through the platform's operative logs.

[d] Gynecology, general surgery, and urology data do not add to overall US data because of other, low-volume surgical procedures that are not itemized in the financial statements (eg, ear, nose, and throat; thoracic).

[e] Instruments and accessories include finite-lifetime parts, endoscopes, simulators, and disposable supplies (eg, staplers, drapes).

[f] Service refers to the maintenance and training contract.

for less than 20% of this cost[5] because they are relatively inexpensive. For example, the marginal cost of a reusable instrument set is less than a few hundred dollars per procedure and disposable instruments, although more expensive, still cost less than $1000 for common laparoscopic procedures.[6]

In this study, the instruments and accessories used in robotic surgery cost an average of $1866 per procedure. In part, this reflects a limitation imposed by the company because of specifications to not use most instruments for more than 10 procedures. To our knowledge, no clinical data support this limit. In addition, $1701 per procedure was dedicated to purchasing and maintaining the system, costs that are novel to robotic surgical procedures.

The primary limitation of this study is the ability to estimate only the hospital costs imposed by the manufacturer. Because robotic surgery increases operating room time,[1,2] and there are other hospital expenses such as staff training, infrastructure upgrades, and marketing, this study's estimate represents the lower bound for the total cost of this technology. Reductions in downstream expenses, such as reduced

length of stay, may offset these costs. However, especially in robotic vs laparoscopic comparisons, there are few data supporting this assertion.[1,2]

The continued use of the robotic platform in surgery requires demonstrating the superior clinical benefit of these devices while considering the full set of costs for these systems.

Christopher P. Childers, MD
Melinda Maggard-Gibbons, MD, MSHS

Author Affiliations: Department of Surgery, David Geffen School of Medicine at University of California, Los Angeles.

Accepted for Publication: June 11, 2018.

Corresponding Author: Christopher P. Childers, MD, Department of Surgery, David Geffen School of Medicine at University of California, Los Angeles (UCLA), Ronald Reagan UCLA Medical Center, 10833 Le Conte Ave, CHS 72-247, Los Angeles, CA 90095 (cchilders@mednet.ucla.edu).

Author Contributions: Dr Childers had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Concept and design:* Childers.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* Childers.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* Childers.
*Obtained funding:* Childers.
*Supervision:* Maggard-Gibbons.

Conflict of Interest Disclosures: All authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest.

Funding/Support: This work was funded by grant F32HS025079 from Agency for Healthcare Research and Quality (Dr Childers).

Role of the Funder/Sponsor: The funder had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

Reproducible Research Statement: All data used for this study are available on request from the corresponding author.

Additional Contributions: We thank Gerald Kominski, PhD (University of California, Los Angeles), for his invaluable economic assistance in preparing the manuscript, for which he was not compensated.

1. Jayne D, Pigazzi A, Marshall H, et al. Effect of robotic-assisted vs conventional laparoscopic surgery on risk of conversion to open laparotomy among patients undergoing resection for rectal cancer: the ROLARR randomized clinical trial. *JAMA.* 2017;318(16):1569-1580. doi:10.1001/jama.2017.7219

2. Jeong IG, Khandwala YS, Kim JH, et al. Association of robotic-assisted vs laparoscopic radical nephrectomy with perioperative outcomes and health care costs, 2003 to 2015. *JAMA.* 2017;318(16):1561-1568. doi:10.1001/jama.2017.14586

3. US Securities and Exchange Commission. EDGAR company filings. https://www.sec.gov/edgar/searchedgar/companysearch.html. Accessed February 22, 2018.

4. Stey AM, Brook RH, Needleman J, et al. Hospital costs by cost center of inpatient hospitalization for medicare patients undergoing major abdominal surgery. *J Am Coll Surg.* 2015;220(2):207-217.

5. Childers CP, Maggard-Gibbons M. Understanding costs of care in the operating room. *JAMA Surg.* 2018;153(4):e176233. doi:10.1001/jamasurg.2017.6233

6. Siu J, Hill AG, MacCormick AD. Systematic review of reusable versus disposable laparoscopic instruments: costs and safety. *ANZ J Surg.* 2017;87(1-2):28-33. doi:10.1111/ans.13856

## COMMENT & RESPONSE

### Sepsis as a Cause of Infectious Disease Mortality

To the Editor Dr el Bcheraoui and colleagues reported a decreasing trend over time and large geographical variability in mortality from infectious diseases in the United States

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Jeff Berhold on 05/02/2019

App.42

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Florida

| | |
|---|---|
| Restore Robotics Repairs LLC | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | )    Civil Action No. |
| Intuitive Surgical, Inc. | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Intuitive Surgical, Inc.
c/o C T Corporation System
1200 South Pine Island Road
Plantation, FL 33324

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Jeff Berhold
Jeffrey L. Berhold, P.C.
1230 Peachtree St., Suite 1050
Atlanta, GA 30309

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
*Signature of Clerk or Deputy Clerk*

**App.43**

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ __0.00__ .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                          *Server's signature*

                                 _____
                                          *Printed name and title*

                                 _____
                                          *Server's address*

Additional information regarding attempted service, etc:

**App.44**

Intentionally
Left Blank

TAB 21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIRS LLC,

Plaintiff,

v.                                            Case No. 3:24-cv-444-MCR-ZCB

INTUITIVE SURGICAL, INC.,                     JURY TRIAL DEMANDED

Defendant.

## FIRST AMENDED COMPLAINT

Pursuant to Fed. R. Civ. Proc. 15(a)(1)(B), Plaintiff Restore Robotics Repairs LLC ("Restore") hereby files its First Amended Complaint against Defendant Intuitive Surgical, Inc. for monopolizing and restraining trade in the nationwide market for service and replacement of X/Xi EndoWrist instruments for use with the Da Vinci X and Xi Surgical Systems ("X/Xi EndoWrist Market"). Plaintiff alleges the following upon personal knowledge as to its own acts and information and belief and investigation by counsel as to all other allegations.

For more than two decades, Intuitive has had a monopoly in the manufacture and sale of surgical robots for minimally-invasive soft-tissue surgery ("Surgical Robots"). During that time, Intuitive has maintained a market share of more than

1

**App.46**

99% of the sales and installed base for Surgical Robots in the United States. Intuitive is the sole manufacturer of Da Vinci X and Xi Surgical Systems and X/Xi EndoWrists. The Xi is the fourth generation of the Da Vinci Surgical System. Intuitive no longer supports the prior generation (da Vinci Si) with parts, service, or instruments. Intuitive is also the sole provider of service for the da Vinci X and Xi.

Intuitive uses its contracts for the sale and service of the robots to block and delay the entry of competitors into the service and replacement of the instruments for use with the robot. In contracts for the sale and lease of the Da Vinci Xi, Intuitive prohibits customers from using the Xi EndoWrists beyond the usage limits set by Intuitive. Intuitive contractually prohibits its customers from using X/Xi EndoWrists repaired or remanufactured by third parties as part of the sale or lease of the da Vinci X and Xi. The contracts provide that Intuitive can withhold the necessary robot parts, robot service, and new X/Xi EndoWrists to use the da Vinci Surgical System if the robot owner uses X/Xi EndoWrists repaired or remanufactured by third parties.

For roughly ten years, no one entered the X/Xi EndoWrist market to compete with Intuitive. It was unproven whether anyone willing to enter the market would be able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for additional cycles of uses on the robot. On or about February 29, 2024, Restore became the first and only independent service organization ("ISO") to achieve the technological capability to reset the pre-

2

**App.47**

programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments.

Restore brings this action for injury to its business repairing and remanufacturing X/Xi EndoWrists. If Intuitive had not imposed the contractual restrictions on da Vinci X and Xi users and vigorously enforced those terms, Restore would have sought and achieved the technological capability to reset the usage count on the encrypted memory chip and entered the X/Xi EndoWrist market as early as July 2020. Restore also continues to suffer harm and the threat of future harm to its X/Xi EndoWrist business because Intuitive maintains contractual restrictions on the use of repaired or remanufactured X/Xi EndoWrists in its existing and new contracts for sale and lease of the Da Vinci X and Xi Surgical System.

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Restore Robotics Repairs LLC ("Restore") is a Florida limited liability company with its principal address at 7543 Holley Circle, Panama City Beach, Florida. Restore is in the business of servicing robotic surgical instruments for hospitals for an additional cycle of uses and selling remanufactured robotic surgical instruments, directly and through distributors to hospitals, to use for an additional cycle of uses.

2.    Defendant Intuitive Surgical, Inc. ("Intuitive") is a Delaware corporation with its principal place of business at 1020 Kifer Road, Sunnyvale,

**App.48**

California. Intuitive provides surgical robots, along with related parts, instruments, accessories, and services, to hospitals and surgical centers in Escambia County in the Pensacola Division of the Northern District of Florida and elsewhere. Intuitive can be served with process through its registered agent C T Corporation System at 1200 South Pine Island Road, Plantation, FL 33324.

3.      Defendant is subject to the personal jurisdiction of this Court.

4.      This action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 22. The Defendant has been engaged in interstate commerce during all relevant times of the complaint.

5.      Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c)(2). The Defendant is transacting and carrying on business in this District.

**ROBOTIC SURGERY**

6.      Intuitive's Chief Medical Officer has publicly described a "robotic revolution" in surgery. With traditional open surgery, the surgeon uses one large incision to perform a procedure. With laparoscopic surgery, the surgeon makes several small incisions and inserts small tools, including a video camera, to perform the procedure. Robotic surgery also uses several incisions for the insertion of small tools, including a magnified, high-definition 3D video camera. The surgeon sits at a

4

**App.49**

console and uses hand controls to manipulate the instruments, which are attached to the system by robotic arms with joints.



7.    Robotic surgery has a variety of practical advantages over laparoscopic surgery:

-    stereoscopic high-definition cameras for 3-D visibility

-    additional arm for the surgeon to hold a third instrument

-    wrist joints for expanded range of motion compared to human

-    scalability to allow for small movements in the arms and instruments

-    ergonomic console design to minimize surgeon fatigue.

**DA VINCI ROBOT**

8.    Intuitive specializes in the manufacture and sale of the da Vinci surgical system (image below).

5

**App.50**



9.    Intuitive sells all necessary instruments and accessories for the da Vinci robot system. Intuitive offers roughly eighty different instruments, including a variety of forceps, retractors, and scissors, under the EndoWrist brand. The da Vinci Surgical System is only cleared for use with EndoWrist instruments.

10.    The da Vinci robot system is generally used for minimally invasive soft tissue surgery for areas of the body between the pelvis and the neck – primarily in general surgery, gynecologic surgery, urologic surgery, cardiothoracic surgery, and head and neck surgery. The da Vinci robot system is indicated for adult and pediatric use.

11.    In its latest annual report, Intuitive estimated that surgeons using the da Vinci robot system completed roughly 2,286,000 surgical procedures of various types in hospitals throughout the world during the year ended December 31, 2023. The number of estimated annual surgical procedures nearly doubled in four years.

6

**App.51**

12.     As of September 30, 2024, Intuitive had an installed base of 5,627 da Vinci Surgical Systems in the U.S. Nearly all customers are currently using the da Vinci X or Xi, which works with the X/Xi EndoWrist instruments.

13.     In its most recent annual report, Intuitive acknowledged that "[t]he initial system sale into an account is a major capital equipment purchase by our customers and typically has a lengthy sales cycle." The average sales price is more than $1 million.

14.     For the calendar year 2023, Intuitive reported more than $3 billion in Instruments and Accessories Revenue in the United States. Intuitive is on pace for more than $3.5 billion in Instruments and Accessories Revenue in the United States for 2024.

15.     On March 14, 2024, Intuitive announced that it had received clearance from the FDA to market and sell the next generation of the robot – da Vinci 5 – in the United States. The existing X/Xi EndoWrists are compatible with – and cleared for use with – the da Vinci 5. At that time, Intuitive stated that "Da Vinci 5 will initially be available to a small number of customers in the U.S. who collaborated with Intuitive during the development period and those with mature robotic surgery programs. Intuitive will work with surgeons at these initial sites to generate additional data on the system's use before a wider commercial introduction."

**App.52**

**SURGICAL ROBOT MARKET**

16.    Intuitive has monopoly power in the U.S. market for Surgical Robots ("U.S. Surgical Robot Market"). In the U.S. Surgical Robot Market, Intuitive is able to exclude competition and maintain prices for the da Vinci robot system at supracompetitive levels. For nearly 20 years, Intuitive was the only manufacturer of Surgical Robots in the United States. Intuitive currently has a 99.9% share in annual sales and installed base in the U.S. Surgical Robot Market. There is only one other manufacturer selling Surgical Robots in the U.S.: Asensus Surgical. Asensus placed one (1) system in the United States in 2023. Intuitive placed 666 da Vinci systems in the United States in 2023.

17.    There is a relevant product market or submarket for surgical robots. Surgical robots have no practical substitute. Even though robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery, hospitals are expected to offer robotic surgery. Moreover, certain procedures, such as prostatectomies, are increasingly performed now by surgeons operating exclusively with surgical robots.

18.    Due to the unique attributes of surgical robots, many hospitals believe that robotic surgery leads to shorter hospital stays and greater patient satisfaction. Many surgeons strongly prefer robotic surgery and require it to work at a given hospital. As a result of perceptions about the reduced pain and scarring and increased

8

safety and effectiveness associated with robotic surgery, many patients insist on robotic surgery and will travel to the closest hospital offering robotic surgery.

19.    There are distinct prices for surgical robots. The da Vinci Surgical System has an average sales price of more than $1 million. By comparison, a laparoscopic tower has an average sales price of roughly $100,000.

20.    There is a very low cross-elasticity of demand between robotic and laparoscopic surgery. The estimated cost per procedure of equipment, instruments, and service is $1,866 for robotic surgery versus less than $1,000 for laparoscopic surgery. (Exhibit 1 (Christopher P. Childers and Melinda Maggard-Gibbons, Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery, 320 Journal of American Medical Association 835, 836 (August 28, 2018)).) In addition, the estimated cost per procedure of acquiring and servicing the surgical robot is an additional $1,701 for robotic surgery. Id. Nevertheless, the estimated procedure volume for robotic surgery increased from 136,000 in 2008 to 877,000 in 2017 for a compounded annual growth rate of 23%. Id.

21.    In response to much higher prices for the use of surgical robots, customers are not switching to use of laparoscopic equipment. Id. In fact, they are replacing their laparoscopic equipment with surgical robots at much higher prices. Id. In other words, customers in the surgical robot market strongly prefer surgical

robots over laparoscopic surgery and are not sensitive to prices in the laparoscopic equipment market.

22.    The industry and the public recognize surgical robots as a separate economic entity. The financial and healthcare press refer specifically to the market for surgical robots and competition in surgical robots. There are several professional and trade associations focused on robotic surgery – *e.g.*, the Society for Robotic Surgery and the Clinical Robotic Surgery Association. Surgical robots have very peculiar characteristics. Supra at ¶¶ 6-7. In addition, surgical robots have very distinct prices.   Supra at ¶ 19. Intuitive and Asensus both specialize in surgical robots. Surgeons specialize in robotic surgery. Robotic surgery requires specialized training and experience.

23.    Orthopedic robots are not part of the surgical robot market. Orthopedic robots are not a practical substitute for surgical robots. They are designed for assisting in removal of bone and aligning prosthetics for knee and hip replacement. They are not indicated for use in minimally invasive soft tissue surgery.

24.    There are significant barriers to entry into the surgical robot market. In fact, Restore is not aware of any new entrants into this lucrative market in the last seven (7) years at least.

25.    The Food and Drug Administration has a rigorous process for clearing any surgical robot for sale in the United States. New entrants require five to ten years

**App.55**

and several hundred million dollars from design concept to regulatory clearance or approval by the FDA. The FDA is now reportedly requiring new entrants to obtain premarket approval, which is much more difficult than 510(k) premarket clearance. The relevant regulatory agencies must also approve any surgical robot for sale in the European Union and elsewhere outside the United States.

26.     Intuitive holds numerous patents blocking development of competing robot systems: "As of December 31, 2023, we owned more than 4,800 patents granted and still in force." Intuitive has multiple unexpired patents issued by the United States, covering each of the following features on its current models of the da Vinci Surgical System for sale:   highly-magnified 3DHD vision, true depth perception, intuitive instrument controls, wristed instruments, and tremor reduction.

27.     The da Vinci Surgical System has been widely accepted in the United States. The da Vinci has been the subject of twenty years of clinical data and studies. Surgeons already have significant training and extensive experience invested in the da Vinci robot system. That specialized training often begins in fellowship programs. In addition, the large hospital systems with significant demand for robot surgery already have a sizable installed base of da Vinci robots. Intuitive secures agreements with customers that they will not purchase any competing robots from other manufacturers.

11

**App.56**

28.    As a result of its monopoly power in surgical robots, Intuitive is able to, and does, charge supracompetitive prices for its da Vinci robots. Intuitive has maintained gross margins of 66% to 72%, which far exceed median gross margins in the healthcare sector generally. Those gross margins are not explained by lagging or current research and development expenses, which pale in comparison. For the most recent calendar year 2023, Intuitive had a gross profit of $4.73 billion and research and development expenses of $999 million.

29.    For calendar year 2023, Intuitive had a net margin of 25%. By comparison, GE Healthcare Technologies, which is also a major manufacturer of capital-intensive medical equipment like MRI and CT machines, had a net margin of 12% for the same time period.

### AFTERMARKETS: PARTS, SERVICE, AND INSTRUMENTS

30.    Intuitive has also used its monopoly power in the primary market for surgical robots to acquire and maintain monopoly power in the aftermarkets for servicing the da Vinci Surgical System and repairing and replacing EndoWrist instruments. Intuitive has monopolies in the primary market and the aftermarkets and is able to extract monopoly prices and profits from each of those markets by charging separate prices for the robot, the service, and the instruments.[1]

---

[1] Even if the aftermarkets were more broadly defined to include all brands of surgical robots, *i.e.*, Intuitive and Asensus, Intuitive has market shares of 99.9% for surgical

31.    There is a relevant aftermarket for the service of da Vinci Surgical Systems in the United States. Intuitive represents that it is the "sole provider" of service for the da Vinci Surgical System. The standard sales contract prohibits third parties from repairing the robot. Intuitive has a market share of 100%. Intuitive is able to charge supracompetitive prices. Intuitive charges an hourly rate of $995 (including travel time) for repairs. In addition, Intuitive charges fees exceeding $100,000 to replace parts like the instrument or camera arm. Their service contracts have an average price of more than $100,000 per year.

32.    There are no practical substitutes for the specialized parts, equipment, and training required to service the da Vinci Surgical System.  Service requires access to a proprietary service laptop and toolkit owned and controlled by Intuitive. The service laptop is necessary to remove warning messages from the screen on the system console and input the serial number for the system to recognize replacement parts like the robot arms. Intuitive does not provide third parties with access to the service laptop.

33.    Service requires access to proprietary parts like robot arm assemblies that are specially designed and built for the da Vinci robot system. There are no

---

robot service and surgical robot instruments with the same barriers to entry into the aftermarkets and the same ability to charge inflated prices and exclude competition in the aftermarkets described below at ¶¶ 31-53.

**App.58**

substitutes for most da Vinci robot parts. Intuitive only provides the parts with the service and only provides the service directly to customers.

34.    Intuitive does not disclose the performance specifications for the da Vinci Surgical System. Intuitive provides its field service engineers with the parts and toolkit, along with specialized training on the performance specifications for the da Vinci Surgical System, to maintain, troubleshoot, and repair the system.

35.    There is a relevant aftermarket for the repair and replacement of X/Xi EndoWrist instruments in the United States. There are no substitutes for X/Xi EndoWrist instruments. They are specially designed and built for the latest generation of the da Vinci Surgical System. Intuitive provides X/Xi EndoWrist instrument replacement to all customers inside the United States.

36.    The da Vinci robot service aftermarket and X/Xi EndoWrist instrument aftermarket are separate from the surgical robot market. Intuitive sets separate prices for each type of service and instrument separately from the original purchase price for the system, and customers purchase the service and instruments a la carte on an ongoing basis throughout the lifecycle of the system. The prices for instruments are not fixed for the lifetime of the robot. Since Intuitive had and has monopoly power in the surgical robot market, Intuitive has not been, and is not, prevented from acting anticompetitively in the aftermarkets. The average system price does not respond to changes in service or instrument prices.

14

**App.59**

37.    In addition, Intuitive has an installed base of more than 5,600 da Vinci robot systems. Those customers purchased their robot in a monopolistic market and face significant switching costs. Surgical robot systems have an average sales price of more than $1 million. The customer takes a massive risk in spending more than $1 million on a robot that is not supported by Intuitive. Their physicians have already been trained on the da Vinci robot system. Furthermore, no other manufacturer has anything approaching a critical mass of installed systems to provide timely field service. It is unclear whether competing systems will even be supported over the lifecycle of the robot.

38.    Even now, customers are unable to calculate lifecycle costs at the time of purchase because they have little or no information for projecting the costs of robot parts and service or instruments. Assuming the customer has a complete service agreement at a flat rate, it is still very difficult to project costs on a per use or life cycle basis. Major repairs are not included in the service agreements. In order to forecast the cost per use, the customer would also need to know how often the robot will be used. In order to project the cost over the lifecycle, the customer must know how often the instruments will be used and replaced. Yet the customer typically cannot forecast demand for a surgical robot. Surgeons may have varying degrees of adaption to a surgical robot at a new location or for a new procedure. The product mix and usage costs vary dramatically by procedure. Competing hospitals

15

**App.60**

may or may not acquire their own robots. The FDA may or may not add new indications for use of the robot system.

39.    The costs for instruments are also unpredictable. The customer cannot predict the timing for replacing instruments: Intuitive has complete control over the usage limits on the X/Xi EndoWrist instruments and has changed the usage limits unilaterally without notice. As the sole original manufacturer of EndoWrist instruments, Intuitive also has complete control over the prices for new EndoWrist instruments.

40.    If the customer is paying for service based on time and materials after the expiration of the service agreement, the customer also faces unpredictable repair costs. The need for repairs on the robot system is unpredictable. So is the price. Intuitive is the only manufacturer of the da Vinci robot parts. Intuitive does not publish the prices for da Vinci robot parts. There has never been a competitive market with multiple vendors able to provide anything resembling the full array or parts or services. Intuitive also retains control of the decision to repair or replace a part. For example, a customer may face an unexpected cost of more than $100,000 to replace a da Vinci robot arm.

## X/XI ENDOWRIST INSTRUMENT AFTERMARKET

41.    Intuitive has monopoly power in the relevant market or submarket for the repair and replacement of X/Xi EndoWrist instruments ("X/Xi EndoWrist

Market"). Intuitive is able to exclude competition and maintain prices for the repair and replacement of X/Xi EndoWrist instruments at supracompetitive levels: Intuitive is the only original manufacturer for the X/Xi EndoWrists, has a market share of 100%, and has prevented Restore and other ISOs from entering the market through its contractual restrictions. Intuitive makes, rather than takes, prices on instruments. Intuitive has maintained the exact same list prices and adhered to them for every customer in the United States for several years at a time. Intuitive is able to unilaterally set usage limits on the instruments because of its market power in the X/Xi EndoWrist Market.

42.    The X/Xi EndoWrist instruments are necessary to perform surgery with the da Vinci X or Xi and are only available new from Intuitive. The customers do not have the option of turning to the S/Si EndoWrist Market because the S/Si EndoWrists do not work on the da Vinci X or Xi and Intuitive has stopped sale of, and support for, the da Vinci Si.

43.    The X/Xi EndoWrist Market includes any ISO with the ability to reset the usage count and enter the market by repairing X/Xi EndoWrists for hospitals directly or through distribution or selling or licensing the technology for distributors or hospitals to do it themselves. The FDA permits servicing of approved medical devices by hospitals and third parties. The ISO repairs instruments to meet their original intended use. Third-party service does not affect the safety and effectiveness

**App.62**

of the instrument or affect the indications for use. The instrument is maintained at, or returned to, its original safety and effectiveness. Intuitive has never tested its instruments to failure. As an alternative to servicing a hospital's instrument for a second cycle of uses, or licensing or selling the technology to the hospital, an ISO can also obtain regulatory clearance from the FDA through a 510(k) clearance to market and sell the "remanufactured" instrument for a second cycle of uses for sale under its own brand name.

44.    In fact, hospitals prefer to have the option of servicing their medical devices with third parties to enhance patient safety and reduce healthcare costs. The device has already been shown to be safe and effective without any manufacturing defect in its first cycle of uses. The service typically has significantly lower cost than the purchase of a new device. ISOs are a recognized and accepted part of the healthcare industry for everything from powerful scanning machines to electrophysiology catheters mapping electrical signals inside the heart. For example, an ISO can capture 30% to 40% of the market if it is the only competitor, or 10% to 20% of the market if it is one of several competitors, besides the original manufacturer in providing intracardiac mapping catheters for use with a cardiac mapping system.

45.    The X/Xi EndoWrist Market is not disciplined by competition in the U.S. Surgical Robot Market. Intuitive has maintained monopoly power in the U.S.

**App.63**

Surgical Robot Market for two decades. Intuitive charges monopoly prices in the foremarket and the aftermarkets. Intuitive obtains more than twice as much annual revenue from the sale of instruments and accessories than the sale and lease of surgical robots. In addition, their instrument and accessories sales revenue is growing roughly 20% per year while their robot sales are flat.

## BARRIERS TO ENTRY INTO X/XI ENDOWRIST MARKET

46.    There are significant barriers to entry into X/Xi EndoWrist Market. In fact, no one had achieved the technological capabilities to compete in the market for ten years.

47.    Intuitive does not face competition from original manufacturers of instruments that can be used with the da Vinci X or Xi. Intuitive holds numerous patents blocking development of competing instruments for use on the da Vinci robot system. In addition, the standard sales contract prohibits the use of any instruments besides the X/Xi EndoWrists designed by Intuitive. The Food and Drug Administration has a rigorous process for clearing any surgical robot instruments for sale in the United States. In order to work with the Da Vinci Surgical System, the EndoWrist instrument must have a serial number to be recognized by the machine.

48.    The encryption on the memory chip has also been a barrier to entry into the X/Xi EndoWrist Market. For more than a decade, no one was able to achieve the technological capability to enter the X/Xi EndoWrist market to compete with

19

**App.64**

Intuitive. Intuitive installs an encrypted pre-programmed memory chip on the X/Xi EndoWrists to limit the number of uses for each instrument.

49.    Intuitive has claimed that the da Vinci X and Xi were "upgraded to a wireless connection for the communication of the instrument, calibration, and use count information between the EndoWrist and the rest of the system to improve consistency in the communication channel[.] [T]his required the chip to be encrypted for security purposes to avoid remote tampering or other types of wireless attacks." Intuitive has taken the position that "the antitrust laws cannot be used to challenge product improvements" like the encryption of the chip on the X/Xi EndoWrists. Restore has not alleged – and does not allege – that the encryption of the chip violated the antitrust laws.

50.    The encryption is proprietary. There is only one manufacturer of the chip. It had been unproven whether anyone would be able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for one or more additional cycle of uses on the robot.

51.    The memory chip prevents the instrument from being connected to the robot for more than a certain number of times regardless of whether the instrument is maintained at, or returned to, its original safety and effectiveness through service. The instruments do not display the number of remaining uses until there are no remaining uses. The robot will no longer engage with an instrument that has reached

**App.65**

the usage limit.  Intuitive itself can service the instrument and reset or replace the usage counter. It simply chooses not to do so.

52.    Intuitive imposes additional barriers to entry through its contractual restrictions. Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System. For more than twenty years, Intuitive has operated on a business model of extracting monopoly rents through recurring revenue from instruments with limited uses. Intuitive maintained the same 10 use limits for most instruments for almost two decades until Restore tried to enter the S/Si EndoWrist Market.

53.    The standard sales and lease contracts provide that the customer "purchases" any instruments for use with the robot system. The standard contract does not prohibit use of the system off label. Nevertheless, the standard contract requires that the customer only use the instruments for the maximum number of uses set forth in the instrument catalog. In addition, the standard contract requires that Intuitive must approve any repairs or service during or after that usage limit. Intuitive has never approved any third party to repair the instruments and has never set up a process for doing so.

**App.66**

## ANTICOMPETITIVE CONDUCT

54.    Intuitive contractually requires customers to deal exclusively with Intuitive for repairing or replacing their X/Xi EndoWrists. Intuitive sells and leases every robot with a Sales, License, and Service Agreement ("Agreement") that prohibits the customer from using its robot with instruments that have been reset for an additional cycle of uses.

55.    Intuitive has always sold the da Vinci X and Xi robots in the United States with the Agreement. Since September 19, 2020, Intuitive has continued to sell thousands of da Vinci X and Xi robots in the United States with the Agreement. Upon information and belief, Intuitive has also started to sell the da Vinci 5 in the United States with the Agreement.

56.    Customers have purchased and continue to purchase X/Xi EndoWrists from Intuitive instead of ISOs based on the restrictions in the Agreement, and Intuitive has collected and continues to collect payments for those purchases of X/Xi EndoWrists.

57.    The Agreement prohibits the customer from using the instruments beyond the usage limits set by Intuitive, which includes any resetting of the usage count for an additional cycle of uses by the customer or an ISO:

> Instruments and Accessories are subject to a limited license to use those Instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System. Customer is responsible for Reprocessing Instruments in accordance with the Documentation. Any

22

**App.67**

other use is prohibited, whether before or after the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive, and cleaning or sterilization inconsistent with the Documentation. This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory.

ECF No. 17 at 6 (§ 8).[2]

58.    Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service. The Agreement removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third party repairs the instruments. In addition, any third-party service on the EndoWrist instruments voids Intuitive's one-year warranty on the entire da Vinci Surgical System:

Customer will not, nor will Customer permit any third party to, modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and Accessories. . . If Customer fails to comply with the requirements of Section 3.4, Intuitive may terminate this Agreement immediately upon written notice, and any warranties applicable to the System will become void.

ECF No. 17 at 5 (§ 3.4).

59.    Intuitive remotely tracks the use of instruments by serial number. When Intuitive detects that a customer has used an instrument beyond the usage limits

---

[2] "Documentation" is defined as "related manuals, instructions for use, notifications, and other documentation." ECF No. 17 at 4 (§ 2.6).

**App.68**

prescribed by Intuitive, Intuitive sends a warning letter quoting the exact language above from Sections 3.4 and 8 from the Agreement and notifying the customer that "[u]sing instruments beyond the programmed number of uses is a material breach of the Agreement" and that Intuitive may not provide further service on the robot.

60.     Starting no later than February 2017, Intuitive has been engaged in an aggressive campaign to stamp out nascent competition from ISOs entering into the business of repairing and replacing EndoWrists. As part of this campaign, Intuitive has threatened dozens of hospitals and hospital systems around the country with possible termination of their agreements with Intuitive for "[u]sing instruments beyond the programmed number of uses" – and terminated their agreement if they did not heed the warning letter. The warning letters and contract terminations have a massive ripple effect across the industry because potential customers will usually review their contracts with Intuitive and ask the ISO whether Intuitive objects to the use of instruments for an additional cycle of uses. Of course, the answer is clearly yes. Whenever a hospital uses its da Vinci robot with an EndoWrist reset for an additional cycle of uses, Intuitive engages in the same pattern of behavior.

61.     Restore was one of several targets of the campaign. From around July 2018 to around October 2019, Intuitive gave verbal warnings and sent warning letters to hospitals around the country, including Panama City Surgery Center, that were using instruments repaired and reset for an additional cycle of uses by Restore.

**App.69**

As recently as 2022, Intuitive has instructed Panama City Surgery Center that they could not use EndoWrists that had been reset for an additional cycle of uses by Restore. If Intuitive continued to detect use of instruments reset for an additional cycle of uses, Intuitive terminated the agreement in its entirety, citing Sections 3.4 and 8 of the Agreement. As a result, customers have lost the ability to acquire new instruments or accessories or receive service on their robot, often with little or no notice, when Intuitive refused to deal with the customer due to violations of the contractual restrictions on repairing or remanufacturing the instruments with third parties. Many other hospitals asked Restore if Intuitive had taken any action against its customers using the instruments that had been reset for an additional cycle of uses and ended negotiations when Restore told them that Intuitive had done so. The customers continue to operate under that threat so long as those contractual restrictions remain in place.

62.    Notwithstanding the approval clause in Section 8 of the Agreement, customers did not and do not have a meaningful freedom of choice in the markets for instruments. Customers understand from their course of dealing in the market that Intuitive does not approve of the use of EndoWrists for an additional cycle of uses. Since entering the surgical robot market more than two decades ago, Intuitive has never approved any ISO to service instruments for hospitals "[u]sing instruments beyond the programmed number of uses."

25

**App.70**

63.    Intuitive continues to manipulate the approval clause. For the first time in or about March 2023, Intuitive embedded a statement on the third screen of a web page on its website regarding the use of repaired instruments ("Statement"):

> We are aware that certain third parties have sought to offer products or services to healthcare providers that would modify some of our instruments to extend their use. It is our understanding that such modifications constitute remanufacturing under FDA regulations and require 510(k) clearance from FDA.
>
> We recognize the role that third-party medical device servicers have come to play in the medical device ecosystem, and we support healthy, lawful competition in the marketplace. We also have a responsibility to protect patient safety and provide customers with proven, safe and effective tools and technologies. The remanufacturing of EndoWrists is performed by third parties that are not affiliated with Intuitive, and we are not privy to their testing protocols, verifications and validations, remanufacturing processes, or quality controls, among other things. Therefore, Intuitive will not bear responsibility for instruments that are remanufactured by a third party, or for harms or damages caused by the use of such instruments.
>
> However, Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA.
>
> As of March 1, 2023, Intuitive is not aware that FDA has granted 510(k) or equivalent clearance to any party to remanufacture any instruments for use with 4th generation da Vinci technology, including the da Vinci X, Xi and SP systems.

64.    The Statement reminds customers that Intuitive can and will "void its service contract with, cease doing business with, or consider it a breach of contract

26

**App.71**

by a customer in the United States" who chooses to use instruments that have been reset for an additional cycle of uses without 510(k) clearance from the FDA.

65.    The Statement did not and does not provide customers with any meaningful choice. No vendor has a 510(k) clearance to market and sell remanufactured X/Xi EndoWrists. No one had obtained the technological capability, or a 510(k) clearance from the FDA, to market and sell remanufactured X/Xi EndoWrists because Intuitive had repeatedly told customers that "[u]sing instruments beyond the programmed number of uses is a material breach of the Agreement." In fact, it would take an ISO more than a year to do so if they were even able to do it at all.

66.    The Statement has created confusion rather than clarity with customers regarding the use of repaired or remanufactured EndoWrists for an additional cycle of uses because Intuitive has not revised its Agreement or User Manual to conform with the Statement. The Agreement and User Manual continue to state that the customer has a limited license to use the EndoWrists up to the maximum number of uses specified by Intuitive and programmed on the instrument.

67.    Upon information and belief, Intuitive has added terms or conditions to its standard sales agreements prohibiting ISOs from collecting used instruments from the customers.

**App.72**

68.    Intuitive also informed at least one hospital consulting company that Intuitive will not cooperate with them if the consulting company or its clients deal with Restore.

## ANTICOMPETITIVE EFFECTS

69.    As a result of its exclusionary conduct, Intuitive has eliminated all competition in the X/Xi EndoWrist Market and has maintained a market share in the X/Xi EndoWrist Market of 100% for more than 10 years. By eliminating all competition, Intuitive is able to charge supracompetitive prices in the X/Xi EndoWrist Market.

70.    Intuitive has imposed usage limits on each instrument to extract consumer surplus, *i.e.*, monopoly profits, from its customers. Instead of simply buying the instruments, the customer is forced to pay a usage fee. Intuitive is charging a price that is independent, and far in excess, of the cost. When Intuitive has increased the number of uses on certain instruments, Intuitive has simply increased the price on those instruments to maintain or even increase their profit margins.

71.    Intuitive does not make up the difference to customers on supracompetitive prices in the X/Xi EndoWrist Market by charging subcompetitive prices on its surgical robots or its robot service. Intuitive has monopoly power in the primary market and the aftermarkets and is able to charge supracompetitive prices

28

**App.73**

across all markets. For example, Intuitive did not raise its monopoly prices for the system itself after modestly reducing the price per use on some instruments through the X/Xi Extended Use Program because Intuitive was already charging a monopoly price for the systems.

## THERE ARE NO PROCOMPETITIVE JUSTIFICATIONS

72.    There is no procompetitive justification for the usage limits. The usage limits are not necessary to protect the da Vinci or EndoWrist brand or preserve consumer demand in surgical robots generally or da Vinci specifically. The usage limits do not correspond with the wear and tear on the instrument, which varies widely depending on the type and length of procedure, the technique of the physician, and the complications with the patient. In fact, the FDA has previously cleared Restore to market and sell S/Si EndoWrists under its own label for a second cycle of uses based on performance testing demonstrating that they are as safe and effective as the new instruments.

73.    The physicians are simply left to their own devices, quite literally, because Intuitive does not disclose performance specifications to the public for the surgeon to have any manufacturer guidance for determining functionality and safety on the first or any subsequent use of the EndoWrist instrument. And Intuitive itself does not inspect every one of the hundreds of thousands of new instruments produced at its manufacturing plants.

**App.74**

74.    Intuitive could resolve any question regarding safety by disclosing performance specifications for the instruments, which would allow the surgeon to assess the safety of the new, used, or repaired instrument, rather than simply blocking the surgeon from using repaired instruments. In fact, the instruments do not even display the number of uses for the device.

75.    The usage limits are not based on any regulatory requirements from the FDA. Intuitive's standard contracts and instrument catalogs do not refer to any regulatory requirements imposing usage limits. The FDA has never taken enforcement action against any independent third party for repairing EndoWrists and resetting their usage counter. Intuitive recently marketed and sold X/Xi EndoWrists under its Extended Use Program for nearly two years without any new clearance from the FDA.

76.    In addition, the usage limits do not appear to be based on any scientific determination of the useful life of the instruments. There does not appear to be any clinical data in the public domain to support the limits on usage for the EndoWrist instruments. (Ex. 1 at 836.)  For instance, there are no usage limits on the smaller reusable instruments for the Senhance System from Asensus Surgical. Nor are there usage limits on reusable instruments for open surgery or laparoscopic surgery.

**RESTORE PREVIOUSLY ENTERED THE S/SI ENDOWRIST MARKET**

77.    Restore has developed a process for repairing EndoWrist instruments and resetting the usage count by replacing the programmed memory chip. After previously licensing technology from a third party to enter the market in July 2018, Restore was able to repair S/Si EndoWrists with its own technology and process by July 2020.

78.    The FDA has determined that the technology is safe for repairing EndoWrists and resetting their usage count for an additional cycle of uses: Performance testing demonstrated that Restore EndoWrists "are as safe and effective" as the predicate Intuitive S/Si EndoWrists. They "operate as originally intended" for an additional cycle of uses. The FDA has cleared Restore to remanufacture the S/Si EndoWrist under its own Iconocare label.

79.    On February 27, 2019, Restore filed an antitrust case for injury to its business repairing S/Si EndoWrists ("S/Si EndoWrist Litigation"). *Restore Robotics LLC, et. al v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55-TKW-MJF (N.D. Fl. filed February 27, 2019). At that time, Restore was unable to reset the usage count on the X/Xi EndoWrists and could not bring any claims for injury to business repairing X/Xi EndoWrists. S/Si EndoWrist Litigation, ECF No. 1 (Complaint) ¶ 60. The case was "about Plaintiff's alleged exclusion from the aftermarkets related to S/Si, not the X/Xi . . ." S/Si EndoWrist Litigation, ECF No. 192 at 3. After settlement by the

**App.76**

parties of the S/Si EndoWrist Litigation after the pretrial conference in the case, the action was dismissed with prejudice on joint stipulation of the parties on January 27, 2023. ECF No. 225.

## RESTORE INTENDED TO ENTER X/XI MARKET BY JULY 2020

80.    Restore would have also entered the X/Xi EndoWrist market by July 2020 if not for the anticompetitive conduct of Intuitive. Restore had entered the S/Si EndoWrist market in July 2018. Restore always intended to expand from the S/Si EndoWrist market into the X/Xi EndoWrist market. Restore had the background and experience necessary to compete in the X/Xi EndoWrist market from its experience in the S/Si EndoWrist market. The customer base is the same set of hospitals with robotic surgery programs. The repair process itself is virtually identical.  So is the process verification and validation for clearance from the FDA to remanufacture the devices under your own label.  Restore and its business partners also have prior experience in servicing and reprocessing a variety of medical devices from endoscopes to cardiac mapping catheters.

81.    Restore was capable of taking all the necessary steps to enter the X/Xi EndoWrist market by July 2020 and would have done so if not for the anticompetitive conduct of Intuitive restricting customers from using instruments that had been reset for an additional cycle of uses. The obstacles to full entry flowed from the anticompetitive conduct of Intuitive. Restore's inability to grow was a

**App.77**

direct result of Intuitive's restrictions on the use of instruments reset for additional cycle of uses. Since Intuitive was blocking any and all access to customers indefinitely, the expenditure of substantial resources on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture.

82.    Even in the face of this anticompetitive conduct, Restore took a series of affirmative steps over time to enter the X/Xi EndoWrist market by negotiating agreements with vendors and distributors, acquiring the necessary equipment, inventory, and facilities and developing the relevant tools:

- No later than June 2019, Restore executed an agreement with Medline, a medical supply company with more than $20 billion in annual sales, to sell Restore's repair services, which expressly included the X/Xi EndoWrists.

- No later than July 2019, Restore was negotiating an agreement with its business partner for preparing and filing for 510(k) clearances for remanufactured instruments, which expressly included the X/Xi EndoWrists.

- No later than December 2019, Restore was working with its engineering firm on options for developing the technological capability to reset the usage counter on the X/Xi EndoWrists and testing and validation protocols for a 510(k) submission for remanufactured X/Xi EndoWrists.

- No later than October 2020, Restore started development of a handheld wireless reader through its engineering firm to determine the remaining lives on an X/Xi instrument without connecting the instrument to the robot arm and expending one life.

33

**App.78**

- No later than June 2021, Restore completed development of a patented handheld wireless reader to determine the remaining lives on an X/Xi instrument without connecting the instrument to the robot arm and expending one life.

- No later than January 2022, Restore started to operate out of a new facility to handle the much larger demand for remanufacturing the X/Xi EndoWrists.

- No later than June 2022, Restore acquired a da Vinci Xi robot from a third party for regularly testing X/Xi EndoWrists.

- No later than February 2023, Restore started a program to collect used X/Xi EndoWrists from hospitals to build up an inventory for entering the market.

Restore would have taken those steps to expand into X/Xi EndoWrists much more quickly if not for the anticompetitive conduct of Intuitive restricting customers from using instruments that had been reset for an additional cycle of uses.

**RESTORE IS NOW ABLE TO ENTER THE X/XI ENDOWRIST MARKET**

83.   During the S/Si EndoWrist Litigation, Restore was not able to enter the X/Xi EndoWrist Market. The X/Xi EndoWrists are based on the S/Si EndoWrists. They have the same mechanical design. Restore has developed the processes and tools (*e.g.*, instrument reader and cap removal) for repairing the X/Xi EndoWrists. But there is one significant difference between the S/Si EndoWrists and the X/Xi EndoWrists: the difficulty in resetting the usage count on the pre-programmed memory chip. Intuitive switched to an encrypted memory chip on the X/Xi EndoWrists.

**App.79**

84.    Therefore, it was unknown whether anyone would be able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for any additional cycles of uses on the robot. Potential entry required significant time and expense with significant risk of failure to achieve the technological capability to reset the usage count on X/Xi EndoWrists. Restore did not attempt to acquire the ability to enter the X/Xi EndoWrist Market so long as Intuitive appeared to strictly enforce its contractual restrictions against repairing or remanufacturing its instruments. Without access to customers, it was futile to take that step to expand into X/Xi EndoWrists.

85.    As part of the settlement agreement in the S/Si EndoWrist Litigation executed on January 23, 2023, Intuitive agreed for the first time that it would not void the warranty or withhold service on a robot or refuse to sell a robot, instruments, or accessories if a customer used EndoWrists remanufactured by Restore under clearance from the FDA.

86.    On or about February 24, 2023, Restore restarted the process to evaluate options for trying to achieve the technological capability to reset the usage count on the X/Xi EndoWrists. On or about September 15, 2023, Restore launched the expensive and risky process to try to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for a one or more additional cycles of uses on the robot. On or about February 29, 2024, Restore

35

**App.80**

became the first and only ISO to achieve the technological capability to reset the pre-programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments.

87.    On or about August 16, 2024, Restore completed testing to submit its first 510(k) to market and sell remanufactured X/Xi EndoWrists for one additional cycle of uses. On or about August 30, 2024, Restore submitted its application for clearance by the FDA to market and sell X/Xi EndoWrists remanufactured for a second cycle of uses.

## RESTORE WOULD HAVE ENTERED THE X/XI MARKET BY JULY 2020

88.    As a result of Intuitive's anticompetitive conduct, Restore has lost significant sales in its business repairing and replacing X/Xi EndoWrists beginning as early as July 2020. But for the anticompetitive conduct of Intuitive, Restore would have started the expensive and risky process to achieve the technological capability to reset the usage count on the X/Xi EndoWrists as early as July 2019. On or about February 29, 2024, Restore established that it is possible to achieve the technological capability to reset the usage counter on the X/Xi EndoWrists and that it would have achieved that capability within one year – *i.e.*, as early as July 2020 – if not for the anticompetitive conduct of Intuitive. But for the anticompetitive conduct of Intuitive, Restore would have also sought and received clearance from the FDA to remanufacture X/Xi EndoWrists as early as January 2021.

36

**App.81**

89.    Due to the contractual restrictions, Restore continues to lose sales in the X/Xi EndoWrist Market. In fact, it is futile for Restore to offer to repair X/Xi EndoWrists and reset their usage limits because Intuitive continues to insist that it will enforce the various contractual restrictions against customers that repair their instruments with Restore. It is equally futile for Restore to sell or license the technology to hospitals or distributors for resetting the usage limits on X/Xi EndoWrists.

90.    In addition, Intuitive has never amended the language in the existing contracts for the da Vinci Surgical Systems to allow customers to use remanufactured instruments cleared by the FDA. Since Intuitive announced its position on remanufactured instruments on its website, customers have repeatedly informed Restore and its agents that they will still not buy remanufactured instruments from Restore because Intuitive has not changed the terms in their contracts. Moreover, Intuitive continues to incorporate the old terms and conditions into contracts with customers that traded in their older models of da Vinci Surgical System for the da Vinci X and Xi. Upon information and belief, Intuitive also uses the same or similar terms and conditions in contracts with new customers purchasing or leasing the da Vinci X and Xi and the da Vinci 5.

91.    The claims in this action for lost profits in the business of repairing and replacing X/Xi EndoWrists accrued no sooner than February 29, 2024. On or about

37

**App.82**

that date, Restore became the first and only ISO to achieve the technological capability to reset the usage count on the X/Xi EndoWrist instruments. Restore was unable to earlier prove with requisite certainty the existence and amount of damages to its business in repairing and replacing X/Xi EndoWrists going back to June 2020. "It would be too speculative for Restore to assert a claim . . . when it admittedly lacks the technology to circumvent X/Xi use limits." S/Si EndoWrist Litigation, ECF No. 190 at 6.

## COUNT ONE – MONOPOLIZATION

92.    The foregoing allegations are expressly incorporated.

93.    Intuitive has willfully acquired and maintained monopoly power in the domestic market for X/Xi EndoWrist instrument repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

94.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT TWO – ATTEMPTED MONOPOLIZATION

95.    The foregoing allegations are expressly incorporated.

96.    Intuitive has attempted to monopolize the domestic market for X/Xi EndoWrist instrument repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has the specific intent to monopolize the

38

**App.83**

domestic market for X/Xi EndoWrist instrument repair and replacement by engaging in predatory conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

97.     As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT THREE – TYING

98.     The foregoing allegations are expressly incorporated.

99.     Intuitive has tied X/Xi EndoWrist instrument replacement to its surgical robots and robot service, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Intuitive has forced customers to purchase X/Xi EndoWrist instrument replacements to get the da Vinci surgical robot and da Vinci robot service. Intuitive has sufficient economic power in the domestic surgical robot market and the domestic da Vinci robot service market to coerce customer acceptance of X/Xi EndoWrist instrument replacement. The tying arrangements have had anticompetitive effects in the domestic aftermarket for X/Xi EndoWrist repair and replacement, which involves a not insubstantial amount of interstate commerce.

100.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT FOUR – EXCLUSIVE DEALING

101.   The foregoing allegations are expressly incorporated.

102.   Intuitive has entered agreements with its customers to provide X/Xi EndoWrist instrument repair and replacement on an exclusive basis that have foreclosed competition in substantially all of the domestic aftermarket for repair and replacement of X/Xi EndoWrist instruments and have resulted in higher prices and lower service in the domestic X/Xi EndoWrist repair and replacement aftermarket, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

103.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## PRAYER FOR RELIEF

Plaintiff respectfully asks that this Court:

(a)   conduct a jury trial of all claims and issues as to which there is a right to jury trial;

(b)   enter judgment awarding damages to Plaintiff in an amount to be determined, and trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a), on its federal antitrust claims;

(c)   enter injunctive relief in favor of Plaintiff to prevent the threat of loss or injury by violation of the antitrust laws as provided in Section 16 of

**App.85**

the Clayton Act, 15 U.S.C. § 26;

(d)    award Plaintiff the cost of this suit, including a reasonable attorney's fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 16 of the Clayton Act, 15 U.S.C. § 26, on its federal antitrust claims; and

(e)    order such other and further relief as this Court deems proper and just.

41

**App.86**

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of its claims by jury to the extent authorized by

law.

Respectfully submitted on December 27, 2024.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

* Admitted Pro Hac Vice

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.

42

**App.87**

# EXHIBIT 1

# Letters

RESEARCH LETTER

## Estimation of the Acquisition and Operating Costs for Robotic Surgery

Despite evidence questioning the clinical benefit,[1] the use of the robotic platform for surgical procedures is increasing.[2] No benchmark exists for the cost of acquiring and operating robotic systems, and previous cost evaluations have either omitted key expenses[1] or utilized billing records that do not itemize costs with sufficient granularity.[2] Because 1 company supplies most robotic technology, and all their revenue comes from system, service, and instrument sales, the minimum cost to hospitals can be estimated by examining the revenue in this company's financial statements. Establishing a cost benchmark can inform future cost-effectiveness evaluations.

**Methods** | The financial statements of Intuitive Surgical Inc (Form 10-K annual reports) from January 1999 to December 2017 were retrieved online.[3] The Form 10-K is an annual report required by the US Securities and Exchange Commission that provides a summary of a company's finances. Filings are independently audited and verified by the chief executive officer. Data were extracted and summarized for robot system sales, revenue sources (systems, service, instruments and accessories; rounded to the nearest $100 000) and approximate procedure volumes by specialty (gynecology, general surgery, urology). Procedure information is entered into the robotic platform for each case and is transmitted to the company. "Robot systems" refer to the sale or lease of the platform. "Service" refers to the maintenance and training con-

tract. "Instruments and accessories" include finite-lifetime parts, endoscopes, simulators, and supplies (eg, drapes). To hospitals, system revenue is an acquisition cost with service and instrument and accessory revenue as fixed and variable operating expenses, respectively.

**Results** | By the end of 2017, the company shipped 5770 robot systems; after accounting for trade-ins and returns, 4409 platforms were installed globally including 2862 (65%) in the United States (**Figure**, A). The estimated annual procedure volume increased from 136 000 in 2008 to 877 000 in 2017. In 2017, 644 000 procedures (73%) were performed in the United States (**Table**). From 2010 to 2017, general surgery procedure volume increased the fastest (10 000 to 246 000) followed by gynecology (123 000 to 252 000) and urology (85 000 to 118 000) (Figure, B).

Total revenue in 2017 was $3.1 billion, with $2.3 billion (73%) domestically (Table). In 2017, 52% of revenue was derived from instruments and accessories, 29% from robot systems, and 19% from service. Dividing the total spending on robotic technology by the total number of robotic procedures performed in 2017 yielded a cost per procedure of $3568, with $1866 for instruments and accessories, $1038 for robot systems, and $663 for the service contract.

**Discussion** | The robotic surgical procedure market is large and increasing; in 2017, hospitals paid the primary supplier more than $3 billion, equating to $3568 per procedure.

Before robotic surgery, total operating room costs for common general surgery procedures ranged from $3000 (cholecystectomy) to $7000 (pancreatectomy).[4] Instruments account



**Figure. Robot System Shipments and Installations and Procedure Volume Data, 2010-2017**



A Robot systems shipped and installed

B Robotic surgical procedure volume

Installed base indicates units shipped minus trade-ins and returns. Although the overall structure of each financial statement is similar, some individual data points were not reported for the entire study period. For example,

US procedure volume was introduced in 2010. To avoid introducing unsubstantiated assumptions, data are only presented when continuous elements are available for all years until 2017.

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Jeff Berhold on 05/02/2019

**App.89**

Table. Robot System Sales, Robotic Procedure Volume, and Revenue Data in 2017[a]

| Characteristic | Value |
|---|---|
| **Robot System Sales, No.[b]** | |
| Units shipped | |
|   Global | 684 |
|   United States | 417 |
|   Non-United States | 267 |
| Installed base | |
|   Global | 4409 |
|   United States | 2862 |
|   Non-United States | 1547 |
| **Robotic Procedure Volume, No.[c]** | |
| Global | 877 000 |
| United States[d] | 644 000 |
|   Gynecology | 252 000 |
|   General surgery | 246 000 |
|   Urology | 118 000 |
| **Revenues, $** | |
| United States | 2 279 800 000 |
| Total revenue | 3 128 900 000 |
|   Robot systems | 910 200 000 |
|   Instrument and accessory[e] | 1 636 900 000 |
|   Service[f] | 581 800 000 |

[a] Except for the installed base, all values represent data for the period from January 1, 2017, to December 31, 2017. The installed base reflects as of December 31, 2017, and reflects the total number of units shipped minus trade-ins and returns since company inception.

[b] Systems refer to the sale or lease of the platform.

[c] Procedure data are estimated by the company and ascertained through the platform's operative logs.

[d] Gynecology, general surgery, and urology data do not add to overall US data because of other, low-volume surgical procedures that are not itemized in the financial statements (eg, ear, nose, and throat; thoracic).

[e] Instruments and accessories include finite-lifetime parts, endoscopes, simulators, and disposable supplies (eg, staplers, drapes).

[f] Service refers to the maintenance and training contract.

for less than 20% of this cost[5] because they are relatively inexpensive. For example, the marginal cost of a reusable instrument set is less than a few hundred dollars per procedure and disposable instruments, although more expensive, still cost less than $1000 for common laparoscopic procedures.[6]

In this study, the instruments and accessories used in robotic surgery cost an average of $1866 per procedure. In part, this reflects a limitation imposed by the company because of specifications to not use most instruments for more than 10 procedures. To our knowledge, no clinical data support this limit. In addition, $1701 per procedure was dedicated to purchasing and maintaining the system, costs that are novel to robotic surgical procedures.

The primary limitation of this study is the ability to estimate only the hospital costs imposed by the manufacturer. Because robotic surgery increases operating room time,[1,2] and there are other hospital expenses such as staff training, infrastructure upgrades, and marketing, this study's estimate represents the lower bound for the total cost of this technology. Reductions in downstream expenses, such as reduced

length of stay, may offset these costs. However, especially in robotic vs laparoscopic comparisons, there are few data supporting this assertion.[1,2]

The continued use of the robotic platform in surgery requires demonstrating the superior clinical benefit of these devices while considering the full set of costs for these systems.

Christopher P. Childers, MD
Melinda Maggard-Gibbons, MD, MSHS

**Author Affiliations:** Department of Surgery, David Geffen School of Medicine at University of California, Los Angeles.

**Accepted for Publication:** June 11, 2018.

**Corresponding Author:** Christopher P. Childers, MD, Department of Surgery, David Geffen School of Medicine at University of California, Los Angeles (UCLA), Ronald Reagan UCLA Medical Center, 10833 Le Conte Ave, CHS 72-247, Los Angeles, CA 90095 (cchilders@mednet.ucla.edu).

**Author Contributions:** Dr Childers had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Concept and design:* Childers.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* Childers.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* Childers.
*Obtained funding:* Childers.
*Supervision:* Maggard-Gibbons.

**Conflict of Interest Disclosures:** All authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest.

**Funding/Support:** This work was funded by grant F32HS025079 from Agency for Healthcare Research and Quality (Dr Childers).

**Role of the Funder/Sponsor:** The funder had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**Reproducible Research Statement:** All data used for this study are available on request from the corresponding author.

**Additional Contributions:** We thank Gerald Kominski, PhD (University of California, Los Angeles), for his invaluable economic assistance in preparing the manuscript, for which he was not compensated.

1. Jayne D, Pigazzi A, Marshall H, et al. Effect of robotic-assisted vs conventional laparoscopic surgery on risk of conversion to open laparotomy among patients undergoing resection for rectal cancer: the ROLARR randomized clinical trial. *JAMA.* 2017;318(16):1569-1580. doi:10.1001/jama.2017.7219

2. Jeong IG, Khandwala YS, Kim JH, et al. Association of robotic-assisted vs laparoscopic radical nephrectomy with perioperative outcomes and health care costs, 2003 to 2015. *JAMA.* 2017;318(16):1561-1568. doi:10.1001/jama.2017.14586

3. US Securities and Exchange Commission. EDGAR company filings. https://www.sec.gov/edgar/searchedgar/companysearch.html. Accessed February 22, 2018.

4. Stey AM, Brook RH, Needleman J, et al. Hospital costs by cost center of inpatient hospitalization for medicare patients undergoing major abdominal surgery. *J Am Coll Surg.* 2015;220(2):207-217.

5. Childers CP, Maggard-Gibbons M. Understanding costs of care in the operating room. *JAMA Surg.* 2018;153(4):e176233. doi:10.1001/jamasurg.2017.6233

6. Siu J, Hill AG, MacCormick AD. Systematic review of reusable versus disposable laparoscopic instruments: costs and safety. *ANZ J Surg.* 2017;87(1-2):28-33. doi:10.1111/ans.13856

## COMMENT & RESPONSE

### Sepsis as a Cause of Infectious Disease Mortality

**To the Editor** Dr el Bcheraoui and colleagues reported a decreasing trend over time and large geographical variability in mortality from infectious diseases in the United States

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Jeff Berhold on 05/02/2019

**App.90**

TAB 25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC,

                Plaintiff,

    v.

INTUITIVE SURGICAL, INC.,

                Defendant.

Civil Case No. 3:24-cv-444-MCR-ZCB

## DEFENDANT'S DISPOSITIVE MOTION TO DISMISS
## AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

Defendant Intuitive Surgical, Inc. ("Intuitive") moves to dismiss the Amended Complaint of Plaintiff Restore Robotics Repair LLC ("Restore") with prejudice for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and submits the following memorandum of law in support of its motion.

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

Despite an opportunity to amend its complaint in light of the defects noted in Intuitive's Motion to Dismiss the original complaint, Restore has come no closer to asserting a viable claim. Its Amended Complaint is a legally defective attempt to reprise claims it previously asserted in this Court in 2019 and settled in 2023. Restore admits that Intuitive—the company that developed the first FDA-cleared

1

**App.91**

system for robotic-assisted, minimally invasive soft tissue surgery in the United States—imposes no restraint on Restore's ability to remanufacture Intuitive's EndoWrist instruments, and alleges that Restore is on the cusp of gaining FDA clearance to do so for the X/Xi generation of EndoWrists. Restore also admits that in 2023, Intuitive announced to the world that Intuitive would not enforce its contracts to prevent *any* third party, including Restore, from marketing and selling FDA-cleared remanufactured EndoWrists to Intuitive customers. Restore complains that but for Intuitive's contracts—which limit the use of *unauthorized* third-party products and services with Intuitive's da Vinci system—Restore would have developed the technical ability to remanufacture X/Xi EndoWrists and would have applied for FDA clearance sooner. But in the same breath Restore admits that these same contracts have not stopped it from either developing the technical ability to remanufacture X/Xi EndoWrists or applying for FDA clearance to do so. Restore utterly fails to state an antitrust claim.

The contract terms that Restore complains about have been in place for many years, and were the subject of Restore's prior lawsuit. Its attempt to reassert claims relating to these same terms is time-barred. Further, the complaint admits that Restore's failure to invest in the remanufacturing of X/Xi EndoWrists earlier than 2023 was solely the result of Restore's own business choices. Restore fails to allege facts showing that Intuitive did anything to prevent Restore from seeking FDA

**App.92**

clearance to remanufacture any EndoWrists, including X/Xi, or that Intuitive did anything to preclude Restore (or anyone else) from selling remanufactured EndoWrists with FDA clearance at any time. That, along with other independent and fatal legal deficiencies, renders Restore's complaint dead on arrival.

This is not the first time Restore has sued Intuitive on antitrust claims relating to EndoWrists. It brought claims regarding an earlier generation of EndoWrists (S/Si) in a 2019 lawsuit. ECF No. 21 ¶79. That case was resolved through settlement. *Id.* At the time Restore filed the initial lawsuit, Restore had not yet received clearance from the Food and Drug Administration ("FDA") to remanufacture EndoWrists. Subsequently, Restore applied for and received FDA 510(k) clearance to remanufacture one model of S/Si EndoWrist. *Id.* ¶¶77–78. Shortly thereafter, Intuitive published on its website a statement that "Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA." *Id.* ¶63.

Restore's current complaint relates to the next generation of EndoWrists— X/Xi. Restore alleges that it achieved the technological capability "to reset the pre-programmed usage limits on the [X/Xi] EndoWrist instruments" in February 2024,

"completed testing to submit its first 510(k) to market and sell remanufactured X/Xi EndoWrists" on August 16, 2024, and submitted its application for FDA clearance "to market and sell X/Xi EndoWrists remanufactured for a second cycle of uses" on August 30, 2024.  *Id.* ¶¶86–87.  Restore thus alleges it will soon be able to market and sell remanufactured X/Xi EndoWrists with FDA clearance, and that Intuitive is not doing anything to stop it.

So why is Restore suing again?  It alleges that, but for the challenged provisions in Intuitive's contracts, it would have begun the process to achieve the capability of resetting the X/Xi EndoWrist use counters "as early as July 2019" and achieved the capability of servicing EndoWrists "as early as July 2020."  *Id.* ¶88.  In other words, Restore seeks damages because Intuitive allegedly delayed Restore from entering the alleged market earlier.

Restore's claims fail as a matter of law for several, independent reasons.

*First*, its complaint is time-barred.  The four-year statute of limitations on an antitrust claim resting on a vertical contract (such as Intuitive's contracts with hospitals) begins to run when the defendant first imposes the challenged term.  *See SaurikIT, LLC* v. *Apple, Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023).  Restore asserts that Intuitive has employed the contractual term it challenges for far longer than four years.  Its claims are therefore untimely.

*Second*, Restore challenges Intuitive's contracts as illegal tying or exclusive dealing arrangements.  But there is no tying or exclusive dealing where the defendant permits customers to buy a secondary product or service from an approved third party in which the defendant does not have a financial interest.  *Kentucky Fried Chicken* v. *Diversified Packaging*, 549 F.2d 368, 377–78 (5th Cir. 1977); *see also Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979).  While tying or exclusive dealing may be shown if the plaintiff pleads facts establishing that third-party approval process is illusory, Restore's own allegations preclude any such inference here.  Restore acknowledges that Intuitive has made clear to the entire industry—in a public statement still on the company's website—that third parties who obtain FDA clearance for remanufactured EndoWrists automatically are "approved" within the meaning of its hospital contracts.  It does not allege that Intuitive has ever denied contractual approval to any third party, that Restore itself sought and was denied such approval, or that there is any objective basis for believing that Intuitive would not grant third-party authorization in good faith.  Accordingly, Restore fails to allege facts showing that contractual authorization was "illusory," and its tying and exclusive dealing claims fail.

*Third*, Restore has failed to demonstrate causation of antitrust injury.  Restore alleges no facts showing that it could not have entered the alleged X/Xi EndoWrist market earlier.  Nor does Restore allege facts showing that Intuitive enforced its

contracts to preclude its customers from purchasing remanufactured EndoWrists from companies that obtained FDA clearance.  To the contrary, Restore's own pleading refutes the assumption that it needed to wait for Intuitive's March 2023 statement about third-party FDA clearance to begin investing in the technology to remanufacture X/Xi EndoWrists—Restore made those same investments as to S/Si EndoWrists *years before* Intuitive's announcement.  The complaint also alleges no facts showing that Intuitive *ever* took the position that a company that obtained FDA clearance would not be "approved."  Nor does the complaint allege that Intuitive ever refused approval to Restore (or anyone else) for an FDA-cleared remanufactured EndoWrist.  In short, there are no facts alleged to show that Restore's failure to develop the technology to remanufacture X/Xi EndoWrists, or obtain FDA clearance, was the result of anything other than Restore's own business choices.

*Fourth*, to the extent Restore challenges Intuitive's EndoWrist use limits themselves, Restore fails to allege facts showing that the use limits have an anticompetitive effect or caused Restore antitrust injury.  In fact, the use limits enable the business opportunity Restore allegedly seeks to pursue with regard to EndoWrists.

*Finally*, the alleged "aftermarket" in which Restore claims that Intuitive restrained competition—Intuitive's X/Xi EndoWrists, *see* ECF No. 21 ¶41—is

**App.96**

limited to a single brand.  Restore fails to allege the kinds of facts required to establish a single-brand aftermarket under controlling law.  In particular, Restore fails to allege facts showing that the alleged market power that Intuitive supposedly has over servicing of X/Xi EndoWrists derives from anything other than hospitals' conscious contractual undertakings, which precludes Restore's antitrust claims.  *See Maris Dist. Co.* v. *Anheuser Busch, Inc.*, 302 F.3d 1207, 1222–24 (11th Cir. 2002).

Restore's complaint should be dismissed with prejudice.

## ALLEGATIONS ASSERTED IN THE COMPLAINT

### A.    Intuitive Offers FDA-Cleared Products That Have Revolutionized Surgery.

This case concerns a "robotic revolution" in surgery led by Intuitive.  ECF No. 21 ¶6.  Robotic surgery has practical advantages over laparoscopic surgery, including better visibility from high-definition cameras, an additional arm for the surgeon to hold a third instrument, wrist joints for expanded range of motion, scalability to allow for small movements in the arms and instruments, and an ergonomic console design to minimize surgeon fatigue.  *Id.* ¶¶6–7.  Intuitive's da Vinci robotic surgical system was used in 2.2 million procedures worldwide in 2023, nearly double the amount of procedures just four years earlier.  *Id.* ¶11.  "As of September 30, 2024, Intuitive had an installed base of 5,627 da Vinci Surgical Systems in the U.S.," nearly all of which were Intuitive's X/Xi generation.  *Id.* ¶12.

While other competitors sell robotic-assisted surgery systems, Intuitive sells a large percentage of such systems in the United States. *Id.* ¶16.

Intuitive is the sole manufacturer of the da Vinci robotic surgical system, and has been continually innovating and developing the da Vinci over the last 20 years. *Id.* at 2, ¶¶26–27. The Xi model is the fourth generation da Vinci system. *Id.* at 2. Earlier this year, after engaging in the FDA's "rigorous process for clearing any surgical robot in the United States," Intuitive secured FDA clearance to market its fifth generation system—da Vinci 5 or "dV5." *Id.* ¶¶15, 25.

EndoWrists are instruments that articulate to mimic a human wrist. The FDA has cleared the da Vinci surgical system for use only with EndoWrist instruments. *Id.* ¶9. Intuitive sells instruments and accessories for the da Vinci system, including EndoWrists. *Id.* Intuitive offers roughly 80 different instruments, including forceps, retractors, and scissors, under the EndoWrist brand. *Id.* Intuitive is the only original manufacturer of X/Xi EndoWrists (the instruments compatible for use with X, Xi, and dV5 da Vinci models). *Id.* ¶¶15, 41, 43. EndoWrist instruments are cleared by the FDA to be reused up to a limited number of uses, and include a usage counter to track how many times each instrument has been used. *See id.* ¶48.

**B.    Restore Has Yet to Offer Modified X/Xi EndoWrists to Any Customers**.

Unlike Intuitive, Restore has not invented anything involving robotic surgery. Instead, Restore services and remanufactures surgical instruments. *Id.* ¶1. Restore

initially licensed "technology from a third party" to modify EndoWrists for the third generation da Vinci system—known as S and Si models—by "replacing the programmed memory chip" to reset the usage limit on the instruments.  *Id.* ¶77. Restore then developed "its own technology and process" by July 2020.  *Id.*  The FDA cleared Restore to remanufacture one type of S/Si EndoWrist under its "Iconocare" label.  *Id.* ¶78.

Restore alleges that modifying the usage counter on the newer generation X/Xi EndoWrists requires "significant time and expense with significant risk of failure to achieve the technological capability."  *Id.* ¶84.  It was "unproven" and "unknown" whether anyone would achieve the technological capability to modify X/Xi instruments.  *Id.* ¶¶50, 84.  Restore admits it did not begin this process until September 15, 2023, and achieved the "technological capability" to reset the usage counter on an X/Xi EndoWrist for "one or more additional cycles of use" only on or about February 29, 2024.  *Id.* ¶86.  Restore then submitted an application to the FDA for clearance to market and sell its X/Xi EndoWrist "remanufactured for a second cycle of uses" on August 30, 2024.  *Id.* ¶87.

Restore does not allege that FDA has cleared its remanufactured X/Xi instrument.  Nor does Restore allege it has sold—or even tried to sell—a remanufactured X/Xi instrument to a customer.  Restore asserts it is "futile" to "offer" its modified X/Xi instruments to customers, *id.* ¶89—even though Restore

9

**App.99**

did offer its modified S/Si EndoWrists to hospitals based on its then-view (disputed by Intuitive) that FDA clearance was not required to do so, and has since offered its FDA-cleared remanufactured S/Si EndoWrist to hospitals. *See Restore Robotics LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55-TKW-MJF (N.D. Fl. filed February 27, 2019) ("*Restore I*"), Am. Compl., ECF No. 14, ¶¶68–69 (alleging that "FDA permits servicing of approved medical devices by third parties" and that "Restore began to offer repair services for EndoWrist instruments in 2018").

**C.    Intuitive Requires Hospitals to Use Authorized Providers for EndoWrist Service**.

"[T]o work with the Da Vinci Surgical System, the EndoWrist Instrument must have a serial number to be recognized by the machine." ECF No. 21 ¶47. The memory chip that controls this function is encrypted to prevent remote tampering or wireless attacks. *Id.* ¶49. Further, "[t]he memory chip prevents the instrument from being connected to the robot for more than a certain number of times." *Id.* ¶51. After the specified number of uses, the EndoWrist must be replaced—either with a new EndoWrist from Intuitive, or with a remanufactured EndoWrist from a provider that can "bypass or override the encrypted memory chip" to reset the usage count. *Id.* ¶84.

Restore does not challenge the encryption on X/Xi EndoWrists as anticompetitive, *id.* ¶49, and alleges that it has been able to create technology to bypass the memory chip and reset the use counter. *Id.* ¶86. Restore obtained FDA

**App.100**

clearance to remanufacture one type of S/Si EndoWrist, and has applied for FDA clearance as to the X/Xi generation. *Id.* ¶¶78, 87. Its complaint arises not from Intuitive's technology, but from Intuitive's contracts with customers.

Restore alleges that "Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System." *Id.* ¶52. But Restore's other allegations reveal that is not true. Restore admits—as it must—that Intuitive's contracts require customers to obtain EndoWrist service or replacement *either* from Intuitive *or* from an authorized third party. *See id.* ¶53. Restore also admits that Intuitive made clear on its website in March 2023 that Intuitive will not consider it a breach of contract for a customer to purchase remanufactured instruments from third parties who have obtained FDA clearance. *Id.* ¶63. Restore does not allege it is anticompetitive for Intuitive to require FDA clearance as the condition for a third party to be authorized under its customer contracts. Nor does Restore allege that Intuitive ever took the position that it would require FDA clearance as a condition for contractual authorization in all cases.

Restore's antitrust case boils down to the assertion that, but for the challenged provisions in Intuitive's contracts, it would have begun the process of achieving the capability of resetting the X/Xi EndoWrist use counters "as early as July 2019" and achieved the capability of servicing EndoWrists "as early as July 2020." *Id.* ¶88. In

**App.101**

other words, Restore is seeking damages on the theory that Intuitive somehow

delayed Restore's ability to provide service for X/Xi EndoWrists.

**D.    Restore Is Challenging Contracts That Restore Has Known About for More than Four Years**.

Restore previously challenged Intuitive's contracts in an antitrust case filed in

this Court in February 2019.  ECF No. 21 ¶79 (citing *Restore I*).  Restore based its

claims in that case on Intuitive's allegedly anticompetitive contracts with customers:

> Intuitive also forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service.  The standard contract removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third parties repair the instruments.  In addition, any third-party service on the EndoWrist instruments voids Intuitive's one-year warranty on the entire da Vinci robot system.

*Restore I*, Am. Compl., ECF No. 14, ¶85.[1]  Restore asserts nearly identical

allegations in this case:

> Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System…. Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service.  The [standard sales contract] removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third party repairs the instruments.  In addition, any third-party service on the EndoWrist instruments voids Intuitive's one-year warranty on the entire da Vinci Surgical System.

---

[1] The Court can take judicial notice of Plaintiff's statements in its pleadings in *Restore I*.  *Lozman* v. *City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013).

ECF No. 21 ¶¶52, 58.

Restore alleges that Intuitive's contracts have not changed. Rather, Intuitive incorporates "the old terms and conditions into contracts with customers that traded in their older models of da Vinci Surgical System for the da Vinci X and Xi." *Id.* ¶90. Restore claims that "Intuitive has never amended the language in the existing contracts for the da Vinci Surgical Systems to allow customers to use remanufactured instruments cleared by the FDA" and that customers "will still not buy remanufactured instruments from Restore because Intuitive has not changed the terms in their contracts." *Id.* The complaint does not allege any new anticompetitive acts by Intuitive. At most, Plaintiff alleges Intuitive's enforcement of its contracts as the only anticompetitive acts since February 2019. *See, e.g.*, *id.* ¶¶88–89.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Though well-pleaded factual allegations must be accepted as true, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted).

**App.103**

## ARGUMENT

## I.    RESTORE'S CLAIMS ARE TIME-BARRED UNDER THE CLAYTON ACT'S FOUR-YEAR STATUTE OF LIMITATIONS

The statute of limitations governing antitrust claims requires the claim to be asserted "within four years after the cause of action accrued."  15 U.S.C. § 15b.  An antitrust cause of action accrues "when [the] defendant commits an act which injures the plaintiff's business."  *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)).

Restore's claims are facially time-barred.  Restore challenges the same "contractual restrictions" it challenged in its February 2019 complaint.  *See Restore I*, Am. Compl., ECF No. 14, ¶85.  Restore alleges here that the contracts have never changed.  ECF No. 21 ¶90.

Where an antitrust challenge is directed to a contract, the statute of limitations begins to run at the time of the contract's formation.  *See Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1501–02 (11th Cir. 1985).  If a competitor challenges as exclusionary a contractual term that the defendant embeds in all of its customer contracts, the statute begins to run when that term is introduced, and does not restart each time the defendant repeats that term in a new contract or each time the contract is performed or enforced.  *See, e.g., SaurikIT*, 2023 WL 8946200, at *1 (competitor's claims arising from iOS warranty term accrued when the term was introduced, not

**App.104**

each time Apple sold a new iOS device with the warranty term); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) (similar).  Just like the competitor in *SaurikIT*, Restore is challenging as exclusionary the terms of a customer contract that has been in place without modification far longer than four years.

The complaint does not identify any anticompetitive acts by Intuitive in the last four years.  At most, Restore alleges that Intuitive has enforced its contracts since February 2019.  *See, e.g.*, ECF No. 21 ¶89.  Restore admits it was aware of all the challenged conduct as early as 2019, and claims it would have had the ability to modify X/Xi EndoWrists by July 2020.  *Id.* ¶88.  Yet Restore did not file this case until September 2024.  Restore thus brought suit more than four years after it claims to have been excluded from the market.

Attempting to distract from the statute of limitations bar, Restore cites Intuitive's opposition to Restore's motion to compel discovery in the prior litigation, in which Intuitive argued that it would be too speculative for Restore to make a claim regarding the X/Xi because it did not yet have the technology to circumvent the use limits.  ECF No. 21 ¶91.  Restore's argument is unavailing.  The Court rejected Intuitive's position and compelled discovery regarding the X/Xi.  *Restore I*, ECF No. 192, at 3.  More importantly, Restore now alleges that, but for contracts of which it was fully aware in 2019, it would have entered the relevant market in July of 2020.

ECF No. 21 ¶88.  Restore alleges that it was fully aware more than four years ago of all of the allegedly anticompetitive conduct it now challenges, and that Intuitive's conduct since then has consisted only of enforcing the same contractual provisions that were in place in 2019.  Restore's claims are thus facially time-barred.

## II.    RESTORE FAILS TO PLEAD FACTS SHOWING UNLAWFUL TYING OR EXCLUSIVE DEALING

### A.    All Four Counts of the Complaint Hinge on the Same Alleged Conduct.

Restore asserts the same conduct as the basis for its claims for Monopolization, Attempted Monopolization, Tying, and Exclusive Dealing. Restore's principal allegation of anticompetitive conduct is that "Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service," ECF No. 21 ¶58, which allegedly constitutes both tying and exclusive dealing, *id.* ¶¶99, 102.  Courts assess Section 1 and 2 tying arrangements and exclusive dealing arrangements under similar standards.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012).

The "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to

purchase elsewhere on different terms." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361 (11th Cir. 1999) (citation omitted).  "'Exclusive dealing' is similar [to tying]: it refers to a monopolist's conditioning the sale of a product on the buyer's agreement not to deal with its competitors." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 32 (D.D.C. 2021), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023).  Where a tying and exclusive dealing claim rest on the same factual allegations, the failure of the tying claim dooms the exclusive dealing claim.  *Dream Big Media Inc. v. Alphabet Inc.*, 2024 WL 3416509, at *5 (N.D. Cal. July 15, 2024).

**B.    Restore Fails to Allege Facts Showing That Intuitive's Third-Party Authorization Clause Is "Illusory."**

Restore fails to allege facts showing a crucial element of any tying or exclusive dealing claim: the forcing or coercion of customers to buy a product or service *exclusively* from the defendant.  To the contrary, Intuitive's contracts with hospitals expressly allow for third parties to service EndoWrists with Intuitive's authorization, and Restore alleges no facts showing that the possibility of obtaining such authorization was "illusory," as required by law.

**1.    There Is No Tying or Exclusive Dealing Where the Contract Allows for Purchase from Authorized Third Parties, Unless Authorization Is Illusory.**

Where a supplier's "contractual language at least provides for the possibility of purchasing" a secondary product from third-party sources, the courts are "reluctant to find a tying arrangement without some evidence that [the defendant]

**App.107**

applied the contract language so restrictively as to constitute a de facto tying clause." *Photovest*, 606 F.2d at 722.  In a case still binding here, the Fifth Circuit acknowledged the "fundamental distinction" between "coercing [customers] to purchase from [the defendant] and coercing [customers] to purchase from approved sources." *Kentucky Fried Chicken*, 549 F.2d at 377.  Where the defendant permits customers to purchase the supposedly tied product from third parties in which it has no interest and from which it receives no commission, but which it has to approve, there is no illegal tie.  *Id.* at 377–78; *see also Pullos v. All. Laundry Sys.*, 2009 WL 10708625, at *13 (D. Nev. July 29, 2009) (rejecting tying claim where customers were permitted to purchase from third parties that met the defendant's specifications).

The only exception to this rule applies when the defendant's contract contains a third-party authorization clause for the purchase of an aftermarket product or service, but the possibility of authorization is "illusory" because the defendant refuses to authorize third parties in good faith.  *Mozart Co. v. Mercedes-Benz of N. Am.*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citation omitted).

### 2. Repair, Resetting of Use Counters, and Remanufacturing of EndoWrists Can All Be Done by Authorized Third Parties.

In its original Complaint, Restore acknowledged that Intuitive's customer contracts do not require hospitals to obtain aftermarket service or refurbished EndoWrists exclusively from Intuitive, but only from companies Intuitive has

**App.108**

approved.    ECF No. 1 ¶52.    Restore's Amended Complaint continues to acknowledge that Intuitive's contracts provide for third-party approval as to EndoWrist remanufacturing, but Restore now asserts that the contracts flatly prohibit third-party servicing of EndoWrists, including resetting the use counters, without provision for approval of third parties to provide those services.  ECF No. 21 ¶¶ 62–66.  Restore is simply wrong.

The Amended Complaint repeatedly refers to Intuitive's Sales, License, and Service Agreement which Intuitive submitted with its prior Motion to Dismiss, ECF No. 17.  The Court may therefore consider the terms of Intuitive's customer contract on a motion to dismiss.  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).  The interpretation of a contract is a question of law that a court may determine on a motion to dismiss.  *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1105–06 (11th Cir. 2014).

Three provisions of the contract concern potential third-party servicing of da Vinci robots or EndoWrists.  Section 3.4 prohibits any third party to "modify, disassemble, reverse engineer, alter, or misuse the System, Instruments, or Accessories," including "reconfiguring any of the Intuitive equipment, Hardware, firmware, or Software … ***without Intuitive's express written <u>permission</u>***."  ECF No. 17 at 5.  Section 5.2(A) provides that "Intuitive does not have an obligation to provide Services (1) on any System where installation, repair, or adjustments have

been made by an individual other than an Intuitive technician ***or an individual approved* by Intuitive** or (2) which are either necessary or desired as a direct or indirect result, in whole or in part, of ***unauthorized* repair, modification, disassembly, alteration, addition to, subtraction from, reconfiguration**, or misuse of the System, or negligence or recklessness on the part of Customer.") (emphases added). *Id.* at 6. And Section 8 prohibits "repair, refurbishment, or reconditioning ***not approved by Intuitive*.**" *Id.*

The Amended Complaint selectively quotes Section 3.4, *see* ECF No. 21 ¶58, but omits the language concerning Intuitive giving permission for third-party activities. Even standing alone, Section 3.4 makes clear that the third-party activities otherwise prohibited may be done with Intuitive's permission. And, if that was not already clear from Section 3.4, it is made abundantly clear in Sections 5.2(A) and 8, which expressly contemplate that third-party repairs may be done when authorized by Intuitive. *See Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1368 (11th Cir. 2018) (contracts must be read "as a whole").

Contrary to Restore's assertion, the challenged contracts expressly contemplate that Intuitive may provide third-party authorization for the activities that Restore purportedly wishes to do, whether those involve repair, servicing, re-setting use counters, or remanufacturing. Unless the possibility of obtaining such authorization is "illusory," there is no unlawful tying or exclusive dealing.

### 3. Restore Does Not Allege that Intuitive Has Ever Refused Third-Party Authorization for Repair or Remanufacturing.

Restore alleges that Intuitive "tracks use of instruments by serial number," "sends a warning letter" when customers violate the terms of its contracts, threatens termination of agreements for breaches of contract, and has given "verbal warnings and sent warning letters" to Restore's customers.  ECF No. 21 ¶¶59–61.  It further alleges that, despite the possibility of contractual authorization, "customers did not and do not have a meaningful freedom of choice in the markets for instruments," and that "Intuitive continues to manipulate the approval clause."  *Id.* ¶¶62–63.

None of these allegations establishes what the law requires Restore to plead: that, despite the presence of the contractual approval clauses, actually obtaining approval was "illusory" because Intuitive refused to grant such approval in good faith.  *Kentucky Fried Chicken*, 549 F.2d at 377; *Photovest*, 606 F.2d at 722.

*First*, Restore does not allege that any of Intuitive's contractual enforcement concerned third parties that had sought or obtained third-party approval from Intuitive.  It is not unlawful tying or exclusive dealing for a contract to prohibit third-party servicing except with authorization, and then to enforce the contract when the third party does not have authorization and does not seek it.

*Second*, although asserting that Intuitive has never approved any ISO to service instruments for hospitals "[u]sing instruments beyond the programmed number of uses," ECF No. 21 ¶65, Restore fails to allege that any third party ever

21

**App.111**

sought such approval and was denied.  As the Seventh Circuit explained in *Photovest*, where a contract contains a third-party authorization clause, it is not enough for the plaintiff to allege that no third party was approved.  The plaintiff must demonstrate that the approval clause was applied restrictively to *preclude* third-party approval:

> Photovest did not show that Fotomat unreasonably withheld approval. Indeed, it appears that Photovest never submitted a processor to Fotomat for approval during this time period. Photovest contends that the tie was nevertheless sufficiently established because Fotomat did not provide a list of approved processors. This does not in our opinion establish the requisite condition for illegal tying. Given the contractual language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause.

606 F.2d at 722; *see also Tic-X-Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407, 1418 (11th Cir. 1987) (favorably citing *Photovest*).  Consistent with *Photovest*, the mere fact that Intuitive has not explicitly granted third-party approval does not make its approval process "illusory."  Restore does not allege that it or any other third party applied for authorization and was turned down, or told it would be turned down.  *Cf. Photovest*, 606 F.2d at 722.

*Third*, while Restore asserts that Intuitive "has never approved any third party to repair the instruments and has never set up a process for doing so," ECF No. 21 ¶53, its own pleading refutes this allegation.  Restore acknowledges that, after Restore obtained FDA clearance to remanufacture one type of the prior generation

of S/Si EndoWrists, Intuitive issued a "public statement" that it "will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with 510(k) clearance or equivalent granted by the FDA."  ECF No. 21 ¶63.  That policy, which remains on Intuitive's website,[2] does not distinguish between the S/Si and the X/Xi generations of EndoWrists.  Thus, not only did Restore obtain the contractual authorization for its FDA-cleared remanufactured S/Si EndoWrist that it denies Intuitive has ever granted, Intuitive made known to the market that *any other company* that obtains FDA clearance has the same authorization.

To the extent Restore means that Intuitive has never granted contractual approval for any third party that engages in EndoWrist servicing and use counter resetting that does *not* constitute "remanufacturing," any such allegation cannot save its complaint.[3]  Again, Restore does not allege that it or any third party has sought

---

[2] *See* Da Vinci Instruments, Intuitive.com, https://tinyurl.com/3ne4jz3r (hereafter "Authorization Announcement").  The Court may take notice of the content of a website in considering a motion to dismiss.  *U.S. ex rel. Jacobs* v. *JP Morgan Chase Bank, NA*, 113 F.4th 1294, 1300 (11th Cir. 2024).

[3] Intuitive disputes Restore's assumption that when it services an EndoWrist and resets the use counter, that is not "remanufacturing" for purposes of FDA clearance. However, that dispute is not relevant to the resolution of this motion.  Since Restore has alleged no facts showing that Intuitive ever failed to grant contractual approval

such approval and been denied, and hence cannot establish that Intuitive has withheld, or would withhold, approval. *Photovest*, 606 F.2d at 722. In any event, according to Restore's own Amended Complaint, "remanufacturing" and "repair" are part of the same market. *See, e.g.*, ECF No. 21 at 2, ¶ 82. Restore cannot claim that Intuitive violated the antitrust laws by not granting third-party approval on precisely the terms that Restore preferred.

Restore asserts that Intuitive's announcement that FDA-cleared remanufacturers are contractually approved "has created confusion rather than clarity," because Intuitive "has not revised its Agreement or User Manual to conform to the Statement." *Id.* ¶66. But that vague allegation is legally irrelevant. The law does not require Intuitive to change its "authorized servicer" terms, which are facially lawful. *Kentucky Fried Chicken*, 549 F.2d at 377; *Photovest*, 606 F.2d at 722. Restore bears the burden of showing that those terms are "illusory" insofar as Intuitive refuses to grant third-party authorization. Its own allegations refute any such inference, and its claims fail accordingly.

---

for *anything*, it has failed to meet its burden of alleging facts showing that the possibility of authorization was illusory.

III.   **RESTORE FAILS TO ALLEGE FACTS SHOWING THAT INTUITIVE'S ENFORCEMENT OF ITS CONTRACTS CAUSED RESTORE ANTITRUST INJURY**

To assert a claim under the antitrust laws, Restore must plead antitrust injury—"injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).   Moreover, an antitrust plaintiff must allege facts showing that the challenged conduct caused antitrust injury to the plaintiff's own "business or property." 15 U.S.C. § 15(a); *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1272–73 (11th Cir. 2015).

Courts routinely dismiss antitrust claims for failure to plead antitrust injury when a plaintiff does not adequately allege that its purported injury is directly attributable to anticompetitive conduct by the defendant. *See, e.g., Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns*, 376 F.3d 1065, 1076 (11th Cir. 2004); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010).   Further, a nascent competitor lacks antitrust injury unless they can demonstrate an existing capability to compete. *See Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1272–73 (11th Cir. 2013).

Restore does not allege any conduct by Intuitive that has prevented Restore from competing.  There is no allegation that Intuitive or its contracts blocked Restore

from pursuing the ability to compete. Rather, Restore concedes the opposite, because Restore developed its alleged capability to compete while Intuitive's contracts allegedly remained in force and unchanged. ECF No. 21 ¶77. Restore concedes it did not even begin developing the capability to offer modified X/Xi EndoWrists until September 2023, and allegedly achieved the capability only a few months ago. *Id.* ¶¶86–87. Restore does not allege it has offered its X/Xi product to any customers, much less actually made any sales.

Restore fails to allege facts showing that Intuitive's conduct caused Restore's delayed entry into the X/Xi market and hence the damages that it seeks for 2021 to the present. Restore admits that it obtained clearance for one S/Si EndoWrist and has applied for clearance to remanufacture X/Xi EndoWrists. *Id.* ¶¶78, 87–88. Its damages claim for delayed entry therefore hinges on the assumption that Intuitive did something to prevent Restore from developing the technology to service X/Xi EndoWrists and applying for FDA clearance in 2020, rather than in 2024, even though Restore had begun the same process with respect to the S/Si EndoWrists years earlier and subject to the same Intuitive contracts with hospitals.

Attempting to cure this obvious problem, Restore asserts there is a difference between the S/Si and X/Xi—namely, that "Intuitive switched to an encrypted memory chip on the X/Xi EndoWrists," that Restore did not know whether it would be able to bypass that encryption, and that it "was futile to take that step to expand

into X/Xi EndoWrists" before Intuitive's 2023 announcement that companies with FDA clearance were contractually cleared. *Id.* ¶¶83–84. For two reasons, this effort to blame Intuitive for Restore's delay in developing X/Xi capability is unavailing.

*First*, far from alleging facts showing that investing in X/Xi capability before 2023 was "futile," Restore asserts it took ***many*** steps to achieve X/Xi capability starting in 2019. *Id.* ¶82. These included "execut[ing] an agreement with Medline"; "filing for 510(k) clearances for remanufactured instruments, which expressly included the X/Xi EndoWrists"; "working with its engineering firm on options for developing the technological capability to reset the usage counter on the X/Xi EndoWrists and testing and validation protocols"; "development of a handheld wireless reader through its engineering firm"; "development of a patented handheld wireless reader to determine the remaining lives on an X/Xi instrument"; beginning to operate "out of a new facility to handle the much larger demand for manufacturing the X/Xi EndoWrists"; and acquiring "a da Vinci robot from a third party for regularly testing X/Xi EndoWrists." *Id.* The allegations that Restore spent considerable resources on X/Xi technology before 2023 contradict and render implausible its conclusory assertion that "the expenditure of substantial resources on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture." *Id.* ¶81.

**App.117**

*Second*, Restore alleges no facts showing that Intuitive's website statement was a change of policy—*i.e.*, that before March 2023, Intuitive said or did anything that suggested it was not open to authorizing third parties.  There is a reason Restore does not make any such allegation: it would be false.  As Restore knows, Intuitive has consistently communicated to the market, including to Restore itself, that it would be willing to consider authorization upon a showing of FDA clearance or clinical evidence that third-party activities were safe and effective.  That Restore did not take advantage of that offer until 2023 was the result of its own business choice.

## IV.    RESTORE FAILS TO ALLEGE FACTS SHOWING THAT INTUITIVE'S ENDOWRIST USE LIMITS VIOLATE THE ANTITRUST LAWS OR CAUSE INJURY TO RESTORE

Restore makes clear it is not challenging Intuitive's chip encryption on its X/Xi EndoWrists.  ECF No. 21 ¶49.  However, it is not clear if Restore means to challenge the use limits on EndoWrists, independently from the contract provisions requiring authorization of third parties.  If it does, it has not asserted a viable claim.  There is nothing anticompetitive about a medical device manufacturer setting a limit on how many times its device can be used—indeed, the FDA cleared Intuitive's EndoWrists *with programmed use limits*.  Restore's assertion that EndoWrist use limits "extract consumer surplus, *i.e.* monopoly profits, from [] customers," *id.* ¶70, amounts at most to an assertion that Intuitive uses its alleged monopoly power to charge monopoly prices, which is not an antitrust claim.  *See Verizon Comm'ns Inc.*

*v. Trinko*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."). Restore makes no allegation that EndoWrist use limits exclude competitors, and therefore has no antitrust claim even if it were true—which it is not—that the use limits result in higher prices. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2013) ("higher consumer prices can result from pro-competitive conduct").

Moreover, Restore has no standing to challenge the use limits because Restore alleges no facts showing that the limits cause injury to Restore's "business or property." *See Duty Free Ams.*, 797 F.3d at 1273. The entire premise of Restore's complaint is that, absent the contractual restrictions on third-party service, hospitals would come to Restore to reset their use-limited EndoWrists. ECF No. 21 ¶89. When and if Restore begins providing this service, Intuitive's programmed use limit will *help*, not hurt, Restore economically. If there were no use limits on the EndoWrists, then under Restore's own theory, hospitals would need its services less often (if at all), and Restore would earn *fewer* profits, not more.

## V.    RESTORE FAILS TO ALLEGE A PROPER SINGLE-BRAND AFTERMARKET

Proper definition of a relevant market is a necessary threshold step in any challenge to a vertical agreement, including Intuitive's customer agreements. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018). Whether a plaintiff's relevant

market definition is adequate is properly determined on a motion to dismiss. *Jacobs*, 626 F.3d at 1336–37.

Restore asserts that Intuitive caused harm in the alleged aftermarket for "repairing and replacing EndoWrist instruments." ECF No. 21 ¶30. In antitrust parlance, Restore has alleged a "single-brand" aftermarket—*i.e.*, a market confined to parts or service (EndoWrists) necessary only in conjunction with Intuitive's own branded surgical robot (the da Vinci).[4] "It is an understatement to say that single-brand markets are disfavored. From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) (collecting cases). "'Absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market.'" *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998) (quoting *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984)); *see also Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1283

---

[4] In a footnote, Restore asserts that Intuitive would have a market share of 99.9% "even if the aftermarkets were more broadly defined to include all brands of surgical robots." ECF No. 21 ¶30 n.1. Restore does not define an alternative relevant aftermarket for "all brands of surgical robots" nor assert any facts from which the plausibility of such a relevant market could be tested. *See Jacobs*, 626 F.3d at 1338 (holding that plaintiff has "responsibility under *Twombly* to plead facts 'plausibly suggesting'" a relevant market). The Amended Complaint's sufficiency must be tested based on the relevant market actually asserted.

**App.120**

(10th Cir. 2004). Restore has not pled the exceptional facts necessary to establish a single-brand aftermarket.

The rare exception to the general rule prohibiting single-brand aftermarkets arises from the Supreme Court's decision in *Eastman Kodak*, where the Court permitted a claim that Kodak had restrained competition in the aftermarkets for parts and service for Kodak copiers based on the unique facts of that case. 504 U.S. at 481–82. Drawing on *Kodak* and its progeny, the Ninth Circuit recently distilled the requirements for demonstrating a single-brand aftermarket: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023). *Epic* is consistent with Eleventh Circuit precedent, which has similarly interpreted *Kodak* and related cases to require distinguishing "between contract power and market power," including when customers knowingly contract to make aftermarket purchases from the seller's single brand. *Maris*, 302 F.3d at 1222.

Restore recognizes it needs to plead exceptional factors to establish a single-brand market, but fails to plead the most important one—that the relevant contract

provision was "not generally known" at the time the hospitals make their purchase decisions. *Epic*, 67 F.4th at 977. Restore makes a weak and implausible effort to plead the second two *Epic* factors—inability to anticipate life-cycle pricing and high switching costs, *see* ECF No. 21 ¶¶37–38—but it does not and cannot allege that the challenged contractual provisions were unknown to hospitals when they purchased their da Vincis. To the contrary, Restore's entire case is premised on explicit terms in Intuitive's customer contracts—including contract language that (according to Restore) provides that customers that purchase a da Vinci must thereafter purchase EndoWrist instruments from Intuitive. *See id.* ¶54.

As the Eleventh Circuit noted in *Maris*, "contracts always restrain and affect a party's available choices," so the terms of a contract are not the appropriate focus for defining a relevant single-brand market. *Maris*, 302 F.3d at 1222. Unlike in *Kodak*, where the challenged contract provision was implemented only after customers had *already* purchased a Kodak copier and were therefore "locked in," when the challenged provision is disclosed to customers "up-front," it does not "raise the same antitrust concerns." *Metzler*, 19 F. Supp. 2d at 1356. Thus, the Seventh Circuit has recognized that the critical issue in *Kodak* was "whether the *change* in policy enabled Kodak to exact supracompetitive prices from customers who had *already* purchased its machines." *Digit. Equip. Corp. v. Uniq Digit. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir.1996) (emphases added). Similarly, in *Queen City, Inc. v.*

*Domino's Pizza, Inc.*—adopted by the Eleventh Circuit in *Maris*, 302 F.3d at 1222—
the Third Circuit held that "the Kodak case arose out of concerns about unilateral
changes in Kodak's parts and repairs policies" imposed after customers had already
made their primary market purchases.  124 F.3d 430, 440 (3d Cir. 1997).  The Sixth
Circuit agrees, as well, holding that the "*change in policy* in *Kodak* was the crucial
factor in the Court's decision."  *PSI Repair Servs, Inc. v. Honeywell, Inc.*, 104 F.3d
811, 820 (6th Cir. 1997) (emphasis added); s*ee also Clark Mem'ls of Ala. v. SCI Ala.
Funeral Servs., Inc.*, 991 F. Supp. 2d 1151, 1164 (N.D. Ala. 2014) ("[A]n essential
element of a lock-in claim is a change in policy in the after-markets after a consumer
has made a purchase in the initial market.").  Restore acknowledges that Intuitive
has made no change in policy.  ECF No. 21 ¶90.

Because Restore does not and cannot allege that the contractual provisions it
challenges were unknown to the hospitals who bought da Vinci robots, it cannot
establish a single-brand aftermarket and all of its antitrust claims fail accordingly.

## VI.  THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

A complaint should be dismissed with prejudice if granting leave to amend
would be futile because "the complaint as amended would still be properly dismissed
or be immediately subject to summary judgment for the defendant."  *Cockrell v.
Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).  Restore's allegations make clear its
complaint is time-barred and that the challenged provisions of Intuitive's hospital

contracts do not foreclose competition under the applicable legal standards. Although all of these deficiencies were present in its original complaint, Restore did not cure them in its Amended Complaint. Accordingly, further amendment of the complaint would be futile, and dismissal should be with prejudice. *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys.*, 673 F. App'x 925, 930 (11th Cir. 2016) (dismissal with prejudice was appropriate where "Plaintiff—and its counsel—was offered ample opportunity to state a claim on which relief could be granted").

## CONCLUSION

Restore's complaint should be dismissed with prejudice.

Dated January 31, 2025                    Respectfully submitted,

                                          /s/ *Andrew Lazerow*

                                          Bruce D. Partington
                                          CLARK PARTINGTON
                                          125 East Intendencia Street, 4th Floor
                                          Pensacola, Florida 32502
                                          T: (850) 432-1399
                                          E: bpartington@clarkpartington.com

                                          Andrew Lazerow (*pro hac vice*)
                                          COVINGTON & BURLING LLP
                                          One CityCenter, 850 Tenth Street, NW
                                          Washington, DC 20001
                                          T: 202-662-6000
                                          E: alazerow@cov.com

                                          Kenneth A. Gallo (*pro hac vice*)
                                          PAUL, WEISS, RIFKIND, WHARTON &
                                          GARRISON LLP
                                          2001 K Street, NW
                                          Washington, DC 20006
                                          T: 202-223-7300
                                          E: kgallo@paulweiss.com

                                          William B. Michael (*pro hac vice*)
                                          PAUL, WEISS, RIFKIND, WHARTON &
                                          GARRISON LLP
                                          1285 Avenue of the Americas
                                          New York, NY 10019
                                          T: 212-373-3000
                                          E: wmichael@paulweiss.com

**App.125**

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

Intuitive certifies that its Memorandum in support of its Motion to Dismiss For Failure To State A Claim complies with the word count limitation set forth in Local Rule 7.1(F) because it contains 7890 words, excluding the parts exempted by the Local Rule.

**App.126**

# TAB 27

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIRS LLC,

              Plaintiff,

v.                                                    Case No. 3:24-cv-444-MCR-ZCB

INTUITIVE SURGICAL, INC.,

              Defendant.

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT</u>**

Jeffrey L. Berhold
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309

**App.127**

Plaintiff Restore Robotics Repairs LLC ("Restore") hereby opposes the motion to dismiss its First Amended Complaint (ECF No. 21 or "Complaint") for monopolizing and restraining trade in the nationwide market for service and replacement of X/Xi EndoWrist instruments for use with the Da Vinci Surgical Systems ("X/Xi EndoWrist Market"). For more than two decades, Intuitive has maintained a market share of more than 99% of the sales and installed base for surgical robots for minimally-invasive soft-tissue surgery ("Surgical Robots") in the United States. Complaint ¶ 16. In addition to selling each robot for as much as $2.5 million, Intuitive sells billions of dollars per year in instruments for use with the robot. Id. ¶ 14.

Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use their robot. Complaint ¶ 52. For more than twenty years, Intuitive has operated on a business model of extracting monopoly rents through recurring revenue from instruments with limited uses. Id. Intuitive kept the same 10 use limits for most instruments for almost two decades. Id.

Restore previously filed an antitrust case for injury to its business repairing the prior generation of instruments, *i.e.*, S/Si EndoWrists. *Restore Robotics LLC, v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55-TKW-MJF (N.D. Fl. filed February 27, 2019) ("S/Si EndoWrist Litigation"). At that time, Restore was unable to reset the

1

**App.128**

usage count on the X/Xi EndoWrists and could not bring any claims for injury to business repairing X/Xi EndoWrists. S/Si EndoWrist Litigation, ECF No. 1 (Complaint) ¶ 60. Intuitive took the position throughout the S/Si EndoWrist Litigation that the usage limits were necessary because a second cycle of uses would diminish product quality and patient safety. *E.g.*, S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16.[1]

In this action, Restore alleges Intuitive has used its Sales, License, and Service Agreement ("Agreement") for the sale and service of the robots to block and delay the entry of competitors into the market for replacement of X/Xi EndoWrist instruments. Intuitive agrees to provide new EndoWrist instruments for use with the robot under a "limited license" based on usage limits set by Intuitive. Complaint ¶ 57. "This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory." Id. Intuitive will void the contract and cease providing new

---

[1] After settlement by the parties of the S/Si EndoWrist Litigation after the pretrial conference in the case on January 27, 2023, S/Si EndoWrist Litigation, ECF No. 225, Intuitive publicly reversed its position on the safety of instruments remanufactured for an additional cycle of uses, issuing a statement on its website on March 1, 2023 that it would not "not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States" who uses an instrument remanufactured by Restore under its own label for an additional cycle of uses. Complaint ¶ 63.

instruments if the hospital uses any instruments for a second cycle of uses. Id. ¶¶ 60-62.

On or about February 29, 2024, Restore became the first and only independent service organization ("ISO") to achieve the technological capability to reset the pre-programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments. Restore brings this action for injury to its business repairing and remanufacturing X/Xi EndoWrists. If Intuitive had not imposed the contractual restrictions on da Vinci X and Xi users and vigorously enforced those terms, Restore would have sought and achieved the technological capability to reset the usage count on the encrypted memory chip to allow for an additional cycle of uses and entered the X/Xi EndoWrist market as early as July 2020. Restore also continues to suffer harm and the threat of future harm to its X/Xi EndoWrist business because Intuitive maintains contractual restrictions on the use of X/Xi EndoWrists for an additional cycle of uses in its existing and new contracts for sale and lease of the Da Vinci X and Xi Surgical System.

The X/Xi EndoWrist claims were not part of the S/Si EndoWrist Litigation. The X/Xi EndoWrist claims did not arise until February 29, 2024 at the earliest.[2]

---

[2] "On or about that date, Restore became the first and only ISO to achieve the technological capability to reset the usage count on the X/Xi EndoWrist instruments. Restore was unable to earlier prove with requisite certainty the existence and amount

During the S/Si EndoWrist Litigation, Restore was unable to reset the usage count on the X/Xi EndoWrists. Complaint ¶ 79 (citing S/Si EndoWrist Litigation Complaint). Therefore, its X/Xi EndoWrist claims had not accrued because it was not able to ascertain the fact or amount of damages without proof if and when it would have acquired the technological capability to break the instrument encryption and enter that market. *E.g.*, S/Si EndoWrist Litigation, ECF No. 218 at 3 (granting motion in limine to exclude evidence and argument relating to X/Xi business).[3]

## I.    THE X/XI ENDOWRIST CLAIMS WERE TIMELY FILED.

The motion to dismiss omits two fundamental tenets of antitrust law:

- The claims do not accrue until damages can be reasonably established.

- A claim accrues with each lost sale resulting from the restraint of trade.

The complaint here survives on either basis. This opposition brief discusses each principle below in that order.

---

of damages to its business in repairing and replacing X/Xi EndoWrists going back to June 2020." Complaint ¶ 91.

[3] *See also* S/Si EndoWrist Litigation ECF No. 192 at 3 (referring to ECF No. 190 at 6: "It would be too speculative for Restore to assert a claim alleging harm to its currently non-existent X/Xi EndoWrist business—when it admittedly lacks the technology to circumvent X/Xi use limits."). Litigants can be estopped from asserting inconsistent legal positions. In re 3M Combat Arms Earplug Prods. Liab. Litig., No. 3:19MD2885, 2022 WL 3345969, at *3 (N.D. Fla. Aug. 14, 2022) (Rodgers, J.).

4

**App.131**

**A. Damages Could Not Be Reasonably Established Until February 2024.**

The Supreme Court has explained that "it is hornbook law" that antitrust claims accrue when the fact and amount of damages is provable. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971). Thus, the plaintiff can commence suit more than four years after defendant committed the act causing injury "where the defendant committed the act causing injury more than four years before plaintiff commenced suit, but where damages resulting from the act could not have been proven with the requisite certainty until more than four years after commission of the act." *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1034 n.14 (5th Cir. 1977); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985) (customer's damages became provable when customer signed agreement binding it to pay overcharge).

The S/Si EndoWrist Litigation was limited to the S/Si EndoWrist business because Restore's damages to its X/Xi EndoWrist business were speculative so long as Restore did not have the technological capability to get into the X/Xi EndoWrist business. S/Si EndoWrist Litigation*, ECF No. 218 (Order on Motions in Limine) at 3.

> The claims in this action for lost profits in the business of repairing and replacing X/Xi EndoWrists accrued no sooner than February 29, 2024. On or about that date, Restore became the first and only ISO to achieve the technological capability to reset the usage count on the X/Xi EndoWrist instruments. Restore was unable to earlier prove with

5

**App.132**

requisite certainty the existence and amount of damages to its business
in repairing and replacing X/Xi EndoWrists going back to June 2020.

Complaint ¶ 91. Thus, Restore timely filed the complaint in this action within four

years of acquiring the technological capability to reset the X/Xi EndoWrists and

establish the fact and amount of damages to its X/Xi EndoWrist business.

### B.    Restore Alleges Continuing Harm from Continuing Violation.

In the alternative, it is also hornbook law that an antitrust claim accrues each

time that a plaintiff is injured by a "continuing violation" that results in continuing

and accumulating harm to the plaintiff. *Hanover Shoe, Inc. v. United Shoe
Machinery Corp.*, 392 U.S. 481, 502 n. 15 (1968). "As a cause of action accrues with

each sale, the statute of limitations begins to run anew." *Morton's Mkt., Inc. v.
Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999).[4] Otherwise, no new

competitor could bring an action to break up a long-standing monopoly based on

locking customers into exclusive dealing indefinitely to block ISOs from ever selling

to them. Restore alleges that it has continued to lose sales as a result of the

---

[4] Intuitive touts an unpublished decision purportedly to the contrary from another
circuit: *SaurikIT, LLC v. Apple, Inc.*, No. 22-16527, 2023 WL 8946200, at *1 (9th
Cir. Dec. 28, 2023). That decision has not been followed by any subsequent decision
in that circuit or elsewhere. Moreover, Intuitive has continued to engage in
anticompetitive conduct to prevent customers from using their EndoWrists for a
second cycle of uses. "As recently as 2022, Intuitive has instructed Panama City
Surgery Center that they could not use EndoWrists that had been reset for an
additional cycle of uses by Restore." Complaint ¶ 61. Intuitive has continued to
manipulate any opportunity for customers to get approval to reuse their instruments
for a second cycle of uses. Id. ¶¶ 62-66.

**App.133**

Agreement imposed on every customer and its enforcement and manipulation by Intuitive. Complaint ¶¶ 60-68. Intuitive enforced the limited license against all customers to prevent them from using their instruments for an additional cycle of uses and defended that policy in litigation against ISOs through 2022. Id. But for the anticompetitive conduct of Intuitive, Restore would have entered the market for replacing X/Xi EndoWrists as early as June 2020 and has lost significant sales since that time. Complaint ¶ 88.

### C. Intuitive Has Continued To Restrain Trade in X/Xi EndoWrists.

Restore's X/Xi EndoWrist business has also been harmed by Intuitive's anticompetitive conduct after September 19, 2020. "The commencement of the statute of limitations is a question of fact." *Morton's Mkt.*, 198 F.3d at 828. Within the four years before the filing of this action, Intuitive sold thousands of robots with the Agreement. FAC ¶¶ 55-59. Intuitive continued to enforce the Agreement. Id. ¶¶ 60-61. Intuitive has continued to manipulate the terms of the Agreement. Id. ¶¶ 63-66. Therefore, the complaint alleges facts that give rise to a scheme to violate the antitrust laws that has continued within the last four years – and continues to this day – and harmed Restore in its X/Xi EndoWrist business.

## II.    INTUITIVE HAS ENGAGED IN ANTICOMPETITIVE CONDUCT.

Judge Wetherell previously ruled in the S/Si EndoWrist Litigation that actual coercion and exclusive dealing can be plausibly inferred from the restrictions

**App.134**

requiring approval from Intuitive for any repairs during or after the usage limit on the EndoWrists. *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-MJF, 2019 WL 8063989, at *3 (N.D. Fla. Sept. 16, 2019).[5] Intuitive omits that decision from its motion to dismiss.

In fact, the Agreement provides the customer with a limited license for each instrument that "expires once an [i]nstrument is used up to its maximum number of uses." Complaint ¶ 57. There is no qualification on the expiration of that license. Intuitive routinely enforced that limited license without qualification in its dealings with customers. Complaint ¶¶ 60-62. Intuitive maintained that position – that the usage limits were absolute and could not be extended without jeopardizing product quality and patient safety – in the S/Si EndoWrist Litigation.[6]

Now that Intuitive has been forced through settlement of the S/Si EndoWrist Litigation to modify restrictions on the use of instruments reset for an additional cycle of uses, Intuitive has embraced the idea in the present motion that customers

---

[5] *See also Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-MJF, 2022 WL 1495005, at *5 (N.D. Fla. Apr. 11, 2022) (denying summary judgment on robot service aftermarket claims "because the SLSA states that Intuitive has no obligation to provide services on a system that has been serviced by someone other than Intuitive and that any unauthorized service will void the system's warranty).

[6] *E.g.*, S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16.

8

**App.135**

always had meaningful freedom of choice for turning to ISOs for an additional cycle of uses on their instruments. Motion at 18-24. Despite its prior objections to any resetting of the usage limits for an additional cycle of uses, Intuitive now points to language in the Agreement regarding approval of repair, refurbishment, or reconditioning of the robot, the instruments, or accessories. Motion at 19-20.

On its face, however, the language about the expiration of the license is unqualified.[7] Complaint ¶ 57. "This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory." Id. Moreover, Intuitive did not qualify the limited license in its dealings with customers. Id. ¶ 60-61. In fact, Intuitive underscored that customers should not be using the instruments "beyond the programmed number of uses" and terminated customers that used the instruments for a second cycle of uses. Id.

Even if the approval clause modified the limited license on the instruments, Restore only needs to show at trial that the approval clause was "somewhat bogus" under the circumstances and customers did not have meaningful freedom of choice. *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1416 (11th Cir. 1987). For example, Restore can raise a genuine dispute of fact by showing a

_____

[7] "This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory." Complaint ¶ 57.

9

**App.136**

course of dealing between Intuitive and its customers that Intuitive would not permit customers to use the instruments for a second cycle of uses. *Id.* at 1417. Here, Intuitive has threatened dozens of hospitals and hospital systems around the country as recently as 2022 with possible termination of their agreements with Intuitive for "[u]sing instruments beyond the programmed number of uses" – <u>and</u> terminated their agreement if they did not heed the warning letter. Complaint ¶¶ 60-61. Intuitive also publicly and aggressively defended its opposition to a second cycle of uses in litigation with ISOs. So it is plausible that Intuitive did engage in a course of dealing showing that Intuitive would not permit customers to use their instruments for a second cycle of uses.

In the alternative, Restore can raise a genuine dispute of fact by showing Intuitive had never approved anyone or showing that Intuitive had never established written standards and procedures for approving vendors. *Tic-X-Press*, 815 F.2d at 1417. Since entering the surgical robot market more than two decades ago, Intuitive has never approved any ISO to service instruments for hospitals "[u]sing instruments beyond the programmed number of uses." Complaint ¶ 62. Intuitive did not issue any written policy – much less standards or procedures – on the use of instruments for an additional cycle of uses until March 2023. Id. ¶ 63. Even then, customers do not have a meaningful choice until ISOs have notice of the policy and have sufficient time to meet the requirements. Id. ¶ 65.

10

**App.137**

Finally, the statement itself is "somewhat bogus." Intuitive has not revised its Agreement or User Manual to conform with the Statement. Complaint ¶ 66. The Agreement and User Manual continue to state that the customer has a limited license to use the EndoWrists up to the maximum number of uses specified by Intuitive and programmed on the instrument. Id.

## III.   INTUITIVE FORECLOSED ALL ENTRY INTO MARKET.

Restore has been willing and able to enter the X/Xi EndoWrist market *but for* the exclusionary conduct of Intuitive. Complaint ¶¶ 77-91. "[T]he plaintiff must prove the existence of a competitor willing and able to enter the relevant market, but for the exclusionary conduct of the incumbent monopolist." *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013). Intuitive already lost this exact same argument on antitrust injury – at summary judgment no less – in related litigation against a potential competitor Rebotix that had not achieved the technological capability to reset the usage limits on the X/Xi EndoWrists. *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL 3272538, at *9–10 (M.D. Fla. Aug. 10, 2022).

"Rebotix points out that it has not completed the X/Xi Interceptor because expending the resources to do so would be futile in light of Intuitive's ongoing anticompetitive conduct." Id. at *9. So has Restore: "Since Intuitive was blocking any and all access to customers indefinitely, the expenditure of substantial resources

11

**App.138**

on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture." Complaint ¶ 81.

Moreover, "Rebotix point[ed] to the following affirmative steps it has taken: (1) Rebotix 'was and is operational' and 'it remains ready to repair EndoWrists'; and (2) it has already staffed a team for its business, spent millions of dollars on research and development, and obtained two patents on its method for resetting the usage counter." Id.

Here, Restore has done far more: (1) validating its repair process, (2) building a customer base, (3) obtaining the first ever clearance with the FDA, (4) lining up a large distributor, (5) retaining encryption specialists, (6) developing proprietary technology, (7) patenting its proprietary technology, (8) leasing a larger facility for the increased demand for the X/Xi EndoWrists, (9) acquiring an Xi robot for testing products, and (10) building out inventory of used X/Xi EndoWrists for remanufacturing. Complaint ¶¶ 80, 82.

"Restore would have taken those steps to expand into X/Xi EndoWrists much more quickly if not for the anticompetitive conduct of Intuitive restricting customers from using instruments that had been reset for an additional cycle of uses." Complaint ¶ 82. The Agreement – along with its enforcement – has prevented ISOs from entering the market for replacing X/Xi EndoWrists. For nearly a decade, no

12

**App.139**

ISO was willing to undertake the costly and risky attempt to try to bypass or override the proprietary encryption on the memory chip installed on the X/Xi EndoWrists–until Intuitive agreed that it would not block ISOs from remanufacturing the instruments for an additional cycle of uses. Contrary to the argument in the motion to dismiss, Intuitive had always aggressively enforced the limited license in its dealings with customers and litigation with ISOs. Complaint ¶¶ 60-62; S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16.

## IV.    THE LIMITED LICENSE HARMS COMPETITION AND RESTORE.

Restore is challenging the limited license in the Agreement, which prevents customers from using the instruments for an additional cycle of uses. E.g., Complaint ¶¶ 54, 57, 60, 61, 62, 64, 66. Nevertheless, Intuitive complains that Restore is instead challenging the usage limit on the initial cycle of uses. Motion at 28. But the claims are clearly based on preventing ISOs from resetting the instruments for an *additional cycle of uses*:

- Intuitive sells and leases every robot with a Sales, License, and Service Agreement ("Agreement") that prohibits the customer from using its robot with instruments that have been reset for an *additional cycle of uses*. Complaint ¶ 54.
- The Agreement prohibits the customer from using the instruments beyond the usage limits set by Intuitive, which includes any resetting of the usage count for an *additional cycle of uses* by the customer or an ISO. Id. ¶ 57.
- The warning letters and contract terminations have a massive ripple effect across the industry because potential customers will usually

13

**App.140**

review their contracts with Intuitive and ask the ISO whether Intuitive objects to the use of instruments for an *additional cycle of uses*. Id. ¶ 60.

- Whenever a hospital uses its da Vinci robot with an EndoWrist reset for an *additional cycle of uses*, Intuitive engages in the same pattern of behavior. Id.

- From around July 2018 to around October 2019, Intuitive gave verbal warnings and sent warning letters to hospitals around the country, including Panama City Surgery Center, that were using instruments repaired and reset for an *additional cycle of uses* by Restore. Id. ¶ 61.

- As recently as 2022, Intuitive has instructed Panama City Surgery Center that they could not use EndoWrists that had been reset for an *additional cycle of uses* by Restore. Id.

- If Intuitive continued to detect use of instruments reset for an *additional cycle of uses*, Intuitive terminated the agreement in its entirety, citing Sections 3.4 and 8 of the Agreement. Id.

- Many other hospitals asked Restore if Intuitive had taken any action against its customers using the instruments that had been reset for an *additional cycle of uses* and ended negotiations when Restore told them that Intuitive had done so. Id.

- Customers understand from their course of dealing in the market that Intuitive does not approve of the use of EndoWrists for an *additional cycle of uses*. Id. ¶ 62.

- The Statement reminds customers that Intuitive can and will "void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States" who chooses to use instruments that have been reset for an *additional cycle of uses* without 510(k) clearance from the FDA. Id. ¶ 64.

- The Statement has created confusion rather than clarity with customers regarding the use of repaired or remanufactured EndoWrists for an *additional cycle of uses* because Intuitive has not revised its Agreement or User Manual to conform with the Statement. Id. ¶ 66.

So the harm to competition generally and Restore specifically is the elimination of competition for the replacement of X/Xi EndoWrists by blocking ISOs from resetting the instruments for an *additional cycles of uses* instead of buying

**App.141**

a new instrument from Restore. In other words, customers would be able to replace their instrument by hiring Restore to reset the usage limit for an *additional cycle of uses*. Intuitive has prevented customers from being able to make that choice instead of paying Intuitive for a new instrument at a higher price. Thus, customers have paid higher prices for new instruments from Intuitive instead of remanufactured instruments from Restore. Restore has lost sales as a result. Complaint ¶¶ 88, 89.

## V.   THE X/XI ENDOWRIST AFTERMARKET IS PLAUSIBLE.

Judge Wetherell previously ruled in the S/Si EndoWrist Litigation that it was plausible that there is a primary product market for surgical robots and aftermarkets for service of the da Vinci robots and replacement of the EndoWrist instruments. *Restore Robotics*, 2019 WL 8063989, at \*5-6. Specifically, Intuitive uses its dominant position in robots (99% of the surgical robot market) to eliminate competition in the aftermarkets and its robot and instruments are so unique or dominant in the market "any action by the manufacturer to increase his control over that product virtually assures that competition in the market will be destroyed." *Id.* (quoting *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978) and citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 479 n.29 (1992)).[8] Intuitive omits this decision from its motion to dismiss.

_____

[8] *See also Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2021 WL 1227593, at \*7 (M.D. Fla. Mar. 8, 2021) ("Both exceptions apply to the current case.")

15

**App.142**

Judge Wetherell noted the Supreme Court in *Kodak* took the same approach: "[P]ower gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next." *Restore Robotics*, 2019 WL 8063989, at *5 & n.8. So did the Ninth Circuit in *Epic Games*: The court only undertakes an analysis of whether competition in the aftermarket is adequately disciplined by competition in the foremarket to defeat the ability to "lock in" customers *after* the purchase in the foremarket *if and only if* the defendant does not have market power in the foremarket in the first place.[9]

Even if a single-brand aftermarket were not plausible on the facts alleged in the complaint, it is plausible that Intuitive has market power in a broader aftermarket for surgical robot instruments generally. *Restore Robotics*, 2019 WL 8063989, at *6

---

[9] "In *Kodak*, the Supreme Court considered the question of whether a *lack of market power in the foremarket* (photocopier machines, generally) categorically precludes a finding of market power in the aftermarket (replacement parts for and servicing of Kodak-brand photocopiers), which Kodak had allegedly achieved by contractually limiting customers to Kodak-provided parts and services." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024), and *cert. denied*, 144 S. Ct. 682 (2024). The Court of Appeals in *Kodak* believed that respondents did "not dispute Kodak's assertion that it lacks market power in the [equipment] markets." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466 & n.10 (1992). Thus, the Supreme Court developed *Kodak*-style aftermarkets based on "locking in" customers after their purchase in the foremarket *when the defendant does not have market power in the foremarket for the original purchase of the equipment*.

16

**App.143**

(N.D. Fla. Sept. 16, 2019). Surgical robot instruments generally – like surgical robots – are a plausible relevant product market. *See id.* at *5 (describing peculiar characteristics of robotic surgery).[10] Judge Wetherell explained that there is essentially no practical difference between defining the aftermarket as EndoWrists specifically or robotic instruments generally because Intuitive necessarily has such a large market share in a broader aftermarket for surgical robot instruments. *Id.* at *6.

## VI.    AMENDMENT WOULD NOT BE FUTILE.

Intuitive argues that the complaint does not meet the "applicable legal standards" and that "Restore did not cure them in its Amended Complaint." Motion at 34. But Intuitive itself omitted the applicable legal standards. Therefore, Restore has never had a full opportunity to correct any purported deficiency.

---

[10] "A court should pay particular attention to evidence of the cross-elasticity of demand and reasonable substitutability of the products, because if consumers view the products as substitutes, the products are part of the same market." *Restore Robotics*, 2019 WL 8063989, at *5 (citations and quotation marks omitted). Here, Restore alleges "a very low cross-elasticity of demand between robotic and laparoscopic surgery" because customers are switching to robotic surgery despite much higher prices per procedure. *See id.* and Complaint ¶¶ 20-21.

"For product submarkets, other factors considered include industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Restore Robotics*, 2019 WL 8063989, at *5 (citations and quotation marks omitted). Robotic surgery has all of those practical indicia. *See id.* and Complaint ¶ 22.

17

**App.144**

Moreover, Restore continues to discover facts from related litigation, such as deposition testimony revealed at trial in related litigation, that bolster its claims. For example, a district court recently released deposition testimony from Intuitive's President admitting that Intuitive did not have any policy for approving EndoWrists for an additional cycle of uses before their March 2023 statement on the website:

> **"QUESTION:** What was Intuitive's policy in this regard before this statement came -- comes out in and around early March of 2023? What was Intuitive's policy about shutting down or whether people could get authorized?"
> And the answer was:
> **"ANSWER:** You know, when I think about it, our conversations, I don't know that we had a clear sort of an agreed-to policy within the company. So I'm actually not sure if I could have said, 'Here is our policy for our cleared instruments.'"

*Surgical Instrument Service Co. v. Intuitive Surgical, Inc.*, No. C-21-03496 (N.D. Ca.), Trial Transcript (Vol. 11) at 1780 (January 22, 2025).

For those reasons, Restore respectfully requests the Court provide an opportunity to amend in the unlikely event that the complaint does not meet the applicable legal standards.

## VII.  CONCLUSION

For all the foregoing reasons, the motion to dismiss should be denied.

18

**App.145**

Respectfully submitted on February 14, 2025.


/s Jeff Berhold_____
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

* Admitted Pro Hac Vice

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.

**App.146**

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

Pursuant to Local Rule 7.1(F), the undersigned hereby certifies that this memorandum contains 4,704 words.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

* Admitted Pro Hac Vice

20

**App.147**

TAB 33

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC,

              Plaintiff,

    v.

INTUITIVE SURGICAL, INC.,

              Defendant.

Civil Case No. 3:24-cv-444-MCR-ZCB

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS DISPOSITIVE MOTION TO DISMISS AMENDED COMPLAINT FOR <u>FAILURE TO STATE A CLAIM</u>**

## I.  RESTORE'S CLAIMS ARE TIME-BARRED.

Restore's Amended Complaint challenges the same contract terms Restore sued over in 2019, as to a business (X/Xi EndoWrists) from which Restore says it was excluded by no later than July 2020 due to those contracts.  ECF No. 21, ¶ 88. Restore did not file this lawsuit until September 2024, more than four years later.  Its claims are time-barred.

Restore argues it was precluded in the prior litigation from presenting evidence of "damages to its X/Xi business" because it lacked "the technological capability to get into the X/Xi EndoWrist business."  ECF No. 27 ("Opp.") at 5–6. But the *in limine* ruling Restore cites has no bearing on whether its current X/Xi claims are timely.  Judge Wetherell precluded Restore from putting evidence about

1

**App.148**

hypothetical X/Xi damages before the jury. *Restore Robotics, LLC* v. *Intuitive Surgical, Inc.*, 5:19-cv-555 (N.D. Fla.), ECF No. 218 at 3. He did not decide whether such claims had accrued by July 2020 or earlier—the issue here.

Restore next insists that its injury did not accrue until February 29, 2024, because before then it was unable to "prove with requisite certainty the existence and amount of damages to its business . . . going back to June 2020." Opp. 5–6. This is self-defeating. The statute of limitations began running as soon as Restore suffered injury. *Morton's Mkt., Inc.* v. *Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999). And Restore claims it was injured "going back to June of 2020." Where a plaintiff has been injured, the statute of limitations begins to run even if there is "difficulty in ascertaining the scope or extent of injury." *Pace Indus., Inc.* v. *Three Phoenix Co.*, 813 F.2d 234, 240 (9th Cir. 1987). Restore continues to ignore the distinction between the plaintiff ignorant of the fact of its injury and the plaintiff aware of its injury but not the quantum of damages. *Id.*; *see also Winnemucca Indian Colony* v. *United States*, 167 Fed. Cl. 396, 416 (Fed. Ct. Cl. 2023) (where plaintiff has been injured and "simply is uncertain of the quantum of damages . . . the statute of limitations has begun to run"). Restore concedes it knew of its alleged exclusion from X/Xi EndoWrists by July 2020, when it says it would have entered the X/Xi business but-for Intuitive's conduct. ECF No. 21 ¶ 88. The deposition testimony Restore cited in its Opposition to Intuitive's Motion for Leave to File a Reply, ECF

No. 31 at 3, further confirms this: Restore believed it suffered "harm to [its] business" because Intuitive's conduct allegedly deprived it of revenue to fund its X/Xi business. Because that alleged harm occurred more than four years before Restore filed its complaint, Restore has pled itself out of court.

Finally, the "continuing violation doctrine" has no application here. An antitrust claim directed at contract terms accrues when the terms are introduced, not each time they are repeated. ECF No. 30 at 2–3; *SaurikIT, LLC* v. *Apple, Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023). Restore relies on *Morton's Market*, 198 F.3d at 828, but that case involved a horizontal price-fixing conspiracy in which customers were injured by overcharges each time they purchased. Restore is not a customer, but an alleged competitor. It is not challenging price-fixing, but Intuitive's unilaterally-determined policies. It is not suing for overcharges, but for alleged exclusion. Its injury thus accrued no later than June/July 2020, when Restore alleges it lost X/Xi sales due to Intuitive's policies, ECF No. 21 ¶¶ 88, 91, and its claims are time-barred.

## II.  RESTORE FAILS TO PLEAD UNLAWFUL TYING OR EXCLUSIVE DEALING.

Restore does not dispute the controlling law that when, as here, a defendant's contracts allow for the purchase of a product from either defendant or third parties approved by defendant, there is no unlawful tying or exclusive dealing unless

plaintiff can show that approval was a sham or "illusory."  ECF No. 25 at 17–18; Opp. 9.  Restore has not pled illusoriness.

Restore asserts that Judge Wetherell previously ruled that "coercion and exclusive dealing can plausibly be inferred from the restrictions requiring approval from Intuitive."  Opp. 7–8.  But neither the issue of Intuitive granting third-party approval nor the law on "illusoriness" was presented to Judge Wetherell; he therefore did not rule on these issues.

Next, Restore asserts that the challenged terms of Intuitive's contracts are "unqualified," Opp. 9, but Restore omits key language from the referenced contract provisions, which addresses actions "without Intuitive's express written permission."  ECF No. 17 at 5.  Intuitive's contracts make clear that repair and servicing of EndoWrists may be done by third parties who obtain Intuitive's authorization.  *Id.* at 6.  Restore's self-serving assertions contradicting the contracts' plain text cannot change their meaning.  *Galindo* v. *ARI Mut. Ins. Co.*, 203 F.3d 771, 774–76  (11th Cir. 2000).

Restore also argues it alleged illusoriness by a "course of dealing . . . that Intuitive would not permit customers to use the instruments for a second cycle of uses."  Opp. 9–10.  But Restore does *not* allege that Intuitive ever refused to grant third-party authorization or enforced its contracts against authorized third parties. Restore simply claims that Intuitive adhered to a policy of not supporting

4

**App.151**

*unauthorized* third-party services.  That in no way establishes that authorization was illusory.

Restore further asserts it can demonstrate illusoriness "by showing Intuitive had never approved anyone."  Opp. 10.  First, that is false:  Restore's allegations show that Intuitive approved Restore for S/Si EndoWrists with FDA clearance, and granted blanket approval for third parties who remanufacture EndoWrists with FDA clearance.  ECF No. 21 at ¶¶ 63, 85.  Even if (contrary to these admitted facts) Intuitive had never approved anyone, that would not establish illusoriness.  *Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979).  "When approvals are practicable in principle, the defendant still cannot be faulted for the mere absence of numerous (or even any) such approvals.  Customers or rivals may not have sought approvals, or no rival product may be good enough."  Areeda & Hovenkamp, *Antitrust Law* ¶ 1716e2 (2024).  Restore makes no allegation that any third party ever sought approval and was denied, or that it was not "practicable in principle" to gain approval—including by seeking and obtaining FDA clearance, as Restore did.  This is fatal to its claims.  *See Photovest*, 606 F.2d at 722 (rejecting tying claim because "Photovest never submitted a processor to Fotomat for approval").

Finally, Restore complains that "Intuitive has not revised its Agreement or User Manual" to conform to the blanket permission for FDA-approved third-party

**App.152**

remanufacturers on its website.  Opp. 11.  That misses the point.  The contracts require approval.  The website gave approval.  There is no inconsistency that would require the contracts to be modified.

### III.    RESTORE FAILS TO ALLEGE ANTITRUST INJURY.

Restore developed its alleged capability to compete as to S/Si EndoWrists while Intuitive's contracts—containing the same terms challenged here—remained in force and unchanged.  Restore therefore cannot plausibly allege that the same contracts excluded Restore from the alleged X/Xi market.  ECF No. 25 at 25–28. Restore argues "futility."  Opp. 11–13.  But if it was not "futile" for Restore to invest in S/Si in 2019, or in X/Xi after 2023, why was it "futile" for Restore to make such investments in 2020?  The end of the "futility" cannot have been Intuitive's 2023 website statement, since Restore describes that as "somewhat bogus."  Opp. 11.[1] Moreover, Restore has now received FDA clearance for an X/Xi EndoWrist[2] despite claiming that Intuitive is engaged in all the same conduct as in 2019.  Restore has no plausible explanation for how Intuitive prevented it from making the necessary

---

[1] As noted, Restore has pled no facts to show the website statement was "bogus." Regardless, Restore cannot have it both ways.  Either the website was not "bogus," and thus approval was not "illusory," or Restore had just as much incentive to invest in X/Xi before and after the website statement, and thus is responsible for its own alleged injury.

[2] U.S. FDA, 510(k) K242610 Premarket Notification, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K242610

**App.153**

investments to enter the alleged market, and therefore has not alleged causation of antitrust injury.

## IV. RESTORE FAILS TO ALLEGE A SINGLE-BRAND AFTERMARKET.

Restore fails to allege the elements necessary to establish a single-brand aftermarket. ECF No. 25 at 29–33. In particular, Restore failed to allege the first element identified in *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023), which is consistent with Eleventh Circuit precedent—*i.e.*, that Intuitive changed its policy after hospitals purchased da Vinci systems or that hospitals were unaware of the challenged policies when they made their da Vinci purchases. ECF No. 25 at 33. This is fatal to a single-brand aftermarket. *Id.* at 32–33 (citing cases).

Instead, Restore relies entirely on Judge Wetherell's allowance for a single-brand aftermarket in 2019. Opp. 15–17. But Judge Wetherell ruled on a different complaint, with different allegations, without the benefit of *Epic*. Restore references the trial transcript from the recent SIS trial, Opp. 18, but fails to mention that the court granted a directed verdict for Intuitive because SIS could not prove the *Epic* factors to establish a single-brand aftermarket. *SIS*, ECF No. 445.

Finally, Restore asserts "it is plausible that Intuitive has market power in a broader aftermarket for surgical robot instruments generally." Opp. 16. But Restore has not alleged a market for "surgical robot instruments generally." Intuitive raised the single-brand aftermarket issue in its Motion to Dismiss Restore's original

**App.154**

complaint.  ECF No. 16 at 29–33.  Restore chose not to try to cure this defect in its Amended Complaint, and has not alleged facts showing that an alternative market definition would be plausible.

## V.    THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

Intuitive's Motion to Dismiss the original complaint raised every ground on which Intuitive now moves to dismiss the Amended Complaint.  Despite notice of these legal defects, Restore chose not to cure them in the Amended Complaint because Restore cannot cure them.

Restore instead claims it is still "discover[ing] facts from related litigation," citing to the SIS trial transcript.  Opp. 18.  Restore does not say how it might amend its complaint again based on the SIS litigation.  And Restore fails to mention that the SIS trial resulted in a directed verdict in Intuitive's favor because SIS failed to prove a single-brand aftermarket, just as Restore fails to allege one here.

Further, the one out-of-context snippet Restore cites from the SIS trial (which was never presented to the jury) does *not* establish that authorization was illusory.[3] To the contrary, the witness testified that Intuitive had a well-developed system for

---

[3] The testimony cited refers to a policy for "cleared instruments."  Opp. 18.  Before the fall of 2022, there were no FDA-cleared remanufactured EndoWrists.  Once there were, Intuitive stated on its website how such instruments would be treated under its contracts.  This demonstrates the opposite of illusoriness.

**App.155**

third-party approvals and had authorized dozens of third-party products for use with da Vinci. *SIS*, ECF No. 463, at 1841–47 (January 22, 2025).

Restore has informed Intuitive that it plans to file a motion for leave to amend, adding allegations about the X/Xi-instrument 510(k) clearance Restore recently obtained from the FDA. That development further confirms why dismissal with prejudice is the right result. Intuitive will respond separately to any motion for leave to explain why further amendment would be futile, but in brief: Intuitive's policies did not prevent Restore from obtaining FDA clearance for an X/Xi EndoWrist; customers are free to buy FDA-cleared instruments from third-party remanufacturers, including Restore, without breaching their contracts, as Intuitive has stated publicly; thus, Restore has not been blocked from competing by Intuitive's policies.

## **CONCLUSION**

Restore's Amended Complaint should be dismissed with prejudice.

Dated March 26, 2025                    Respectfully submitted,

                                        /s/ *William B. Michael*
                                        William B. Michael (*pro hac vice*)
                                        PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP
                                        1285 Avenue of the Americas
                                        New York, NY 10019
                                        T: 212-373-3000
                                        E: wmichael@paulweiss.com

                                        Kenneth A. Gallo (*pro hac vice*)
                                        PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP
                                        2001 K Street, NW
                                        Washington, DC 20006
                                        T: 202-223-7300
                                        E: kgallo@paulweiss.com

                                        Andrew Lazerow (*pro hac vice*)
                                        COVINGTON & BURLING LLP
                                        One CityCenter, 850 Tenth Street, NW
                                        Washington, DC 20001
                                        T: 202-662-6000
                                        E: alazerow@cov.com

                                        Bruce D. Partington
                                        CLARK PARTINGTON
                                        125 East Intendencia Street, 4th Floor
                                        Pensacola, Florida 32502
                                        T: (850) 432-1399
                                        E: bpartington@clarkpartington.com

**App.157**

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

Intuitive certifies that its Reply Memorandum in Support of Its Dispositive Motion to Dismiss Amended Complaint for Failure to State a Claim complies with the word count limitation set forth in Local Rule 7.1(F) and in this Court's order, ECF No. 32, because it contains 1,960 words, excluding the parts exempted by the Local Rule.

*/s/ William B. Michael*

TAB 34

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIRS LLC,

              Plaintiff,

    v.                              Case No. 3:24-cv-444-MCR-ZCB

INTUITIVE SURGICAL, INC.,

              Defendant.

**PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT
WITH SUPPORTING MEMORANDUM**

Jeffrey L. Berhold
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309

**App.159**

Pursuant to Fed. R. Civ. Proc. 15(a)(2), Plaintiff Restore Robotics Repairs LLC ("Restore") hereby moves for leave to amend its complaint alleging antitrust claims for injury to its business of repairing and remanufacturing X/Xi EndoWrists. Pursuant to N.D. Fla. Loc. R. 15.1(B), Restore is simultaneously filing the proposed amended pleading itself at ECF No. 35 ("Second Amended Complaint" or "SAC").

The complaint has always alleged that Intuitive has a 99% share in annual sales and installed base in the U.S. Surgical Robot Market and uses its monopoly power in the robot market and the robot service and instrument replacement aftermarkets to restrain and monopolize trade in the repair and replacement of X/Xi EndoWrists for use with its surgical robot. ECF No. 1 at 1-3 (summarizing allegations). The proposed amended complaint alleges additional facts occurring after the filing of the First Amended Complaint on December 27, 2024.

This Court retains "broad discretion to grant leave to amend and 'should freely give leave when justice so requires.'" In Re 3M Combat Arms Earplug Prods. Liab. Litig., No. 3:19MD2885, 2021 WL 8533256, at *3 (N.D. Fla. Oct. 8, 2021) (Rodgers, J.) (quoting Fed. R. Civ. P. 15(a)(2)). Under this standard, leave to amend will be granted absent a finding of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

1

**App.160**

amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962);

*see also* In Re 3M, 2021 WL 8533256, at *3.

## AMENDMENTS

Here, Restore seeks to amend its complaint to allege additional facts occurring after the filing of its First Amended Complaint. Specifically, Restore received clearance from the FDA to market and sell remanufactured X/Xi EndoWrists on March 11, 2025. SAC ¶ 95.

At that time, Restore started to market its remanufactured X/Xi EndoWrists to customers who continued to be restrained by the terms of Intuitive's Sales, License, and Service Agreement ("Agreement") that Intuitive requires with each new purchase of its surgical robots. Id. ¶¶ 69-72. "Customers have indicated that they need written notice from Intuitive that the EndoWrists are not subject to a limited license based on the number of uses under their Agreements with Intuitive and that Intuitive approves Restore Robotics to remanufacture EndoWrists." Id. ¶ 69.

The amendment alleges specific examples of such conversations with hospitals, which support the core allegation that the contracts at issue – Intuitive's Agreements – continue to restrain trade and harm competition in the repair and replacement of the X/Xi EndoWrists specifically and surgical robot instruments

2

generally and injure the business of Restore in repairing and remanufacturing X/Xi EndoWrists. ¶¶ 70-71.

The amendment further alleges that Restore notified Intuitive in writing on March 23, 2025 that Intuitive's Agreements are continuing to restrain trade in the market. SAC ¶ 71. The letter asks that:

> (a) Intuitive revise its User Manual and amend its Agreements with customers to state that its instruments are not subject to a limited license based on the number of uses, (b) Intuitive notify customers in writing that Intuitive approves Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA, and (c) Intuitive provide Restore with a letter signed by Mr. Rosa that "simply states that Intuitive approves Restore Robotics to remanufacture and sell EndoWrists in compliance with a 510(k) clearance."

Id. The amendment also sets out the response from Intuitive indirectly in an updated website statement and directly by letter. Id. ¶ 72.

The proposed complaint also expands on the language in the First Amendment Complaint ("FAC") putting Intuitive on *further* notice how the complaint plausibly alleges facts that Intuitive would still be liable under its broader definition of the product market that includes all surgical robot instruments:

> While the complaint defines a da Vinci Service Market and an X/Xi EndoWrist Market, the claims in this action also apply to a surgical robot service aftermarket and a surgical robot instrument aftermarket. Even if the aftermarkets were more broadly defined to include all brands of surgical robots, *i.e.*, Intuitive and Asensus, Intuitive has market shares of 99.9% for surgical robot service and surgical robot instruments with the same barriers to entry into the

3

**App.162**

aftermarkets and the same ability to charge inflated prices and exclude
competition in the aftermarkets described below at ¶¶ 31-94.

SAC ¶ 30 n.1. The complaint adds language to each count so that there is no
misunderstanding that Restore maintains the claims for an X/Xi EndoWrist Market,
or a surgical robot instrument market in the alternative.[1] Id. ¶¶ 101, 104, 107, 110.

Restore requested written consent from Intuitive under Rule 15(a)(2) and
provided a copy of the proposed amendment to Intuitive at its request. Shortly after
receiving the proposed amended complaint on March 24, 2025, Intuitive said that it
would "oppose a motion for leave to amend, principally on the ground that further
amendment would be futile." Restore has since updated the amendment with events
occurring after March 24 and provided the amendment to Intuitive. Intuitive
maintains its position on the motion.

## THE AMENDMENTS ARE NOT FUTILE

In its opposition to the motion to dismiss the FAC, Restore already set forth
all the reasons why the claims here survive a motion to dismiss. (ECF No. 27.) The

---

[1] Judge Wetherell previously ruled that such language was not necessary in the S/Si
EndoWrist Litigation. *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No.
5:19CV55-TKW-MJF, 2019 WL 8063989, at *6 (N.D. Fla. Sept. 16, 2019). Judge
Wetherell explained that there is essentially no practical difference between defining
the aftermarket as EndoWrists specifically or robotic instruments generally because
Intuitive necessarily has such a large market share in a broader aftermarket for
surgical robot instruments. *Id.* Nevertheless, Intuitive has argued that the claims here
must necessarily fail if there is no single-brand aftermarket for X/Xi EndoWrists.
ECF No. 25 at 33.

**App.163**

motion to dismiss raises questions of fact: (1) has Intuitive engaged in "continuing antitrust behavior" during the limitations period by continuing to require the Agreement with the sale of the robot and continuing to enforce the Limited License during the limitations period, (2) is the purported "approval" clause "somewhat bogus" because Intuitive admits that it had no policy regarding the authorization of third parties to remanufacture EndoWrists for an additional cycle of uses before March 2023 and continued to sell the robot with the limited license prohibiting a second cycle of uses after March 2023, (3) was Restore able and willing to enter the X/Xi EndoWrist market if Intuitive had not blocked Restore from repairing any EndoWrists before the settlement of the S/Si EndoWrist Litigation, (4) did and does Intuitive prevent competition in X/Xi EndoWrists by preventing customers from using their EndoWrists for a second cycle of uses, and (5) is it plausible that Intuitive has market power and monopoly power in X/Xi EndoWrists specifically or surgical robotic instruments generally with a durable market share of 99.9% and high barriers to entry.

### 1. Intuitive Has Monopoly Power.

The FAC more than plausibly alleges that Intuitive uses its dominant position in robots (99% market share in the surgical robot market) to exercise market power in the aftermarket for X/Xi EndoWrists. *See Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-MJF, 2019 WL 8063989, at *5-6 (N.D. Fla.

**App.164**

Sept. 16, 2019) ("S/Si EndoWrist Litigation") (quoting *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978) and citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 479 n.29 (1992)). There is no need to show anything else because competition in the foremarket cannot discipline competition in single-brand aftermarkets if the defendant has market power in the foremarket in the first place:

> [T]he crux of the entire amended complaint is that the vertically integrated Defendant has used its monopoly power in the primary market of surgical robots to eliminate competition in the related aftermarkets. Moreover, as alleged, Defendant's products occupy a position unique and dominant enough in the markets to warrant one-brand market definition.

*Restore Robotics*, 2019 WL 8063989, at *6 (cleaned up); *see also Kodak*, 504 U.S. at 455 (1992) (explaining that *Kodak*-style lock-in analysis of single-brand aftermarket is premised on a "lack of market power in the primary equipment market").

In any event, it is also plausible that Intuitive has monopoly power in a broader market for surgical robot instruments. Monopoly power is the ability "to control prices or exclude competition." *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 830 (11th Cir. 2015). Surgical robot instruments is a plausible market definition. Surgical robot instruments have unique attributes and practical advantages. SAC ¶¶ 6-7. Surgical robot instruments have all of the practical indicia of a distinct market: industry recognition, peculiar characteristics and uses, unique production facilities, distinct

6

**App.165**

customers, distinct prices, sensitivity to price changes, and specialized vendors. *See McWane*, 783 F.3d at 828. Robotic surgery is considered unique. SAC ¶¶ 6, 22. The robots and their instruments are manufactured by specialized vendors. Id. ¶ 22. The instruments are specially designed for robotic surgery with wrist joints and scalability. Id. ¶ 7. They are only sold to hospitals with a robotic surgery practice. They cost roughly twice as much as laparoscopic instruments. Id. ¶ 20.

Within that broader market, Intuitive still has a market share of nearly 100%. Id. ¶ 41. There are significant barriers to entry – blocking patents from Intuitive, clearance requirements from the FDA, and encryption technology on the memory chips. Id. ¶¶ 47-53. In fact, there was no history of successful entry until Restore decrypted the X/Xi EndoWrists. Id. ¶ 46.

Restore also has direct evidence of monopoly power because Intuitive has the "ability to profitably raise prices substantially above the competitive level." *McWane*, 783 F.3d at 830. "Intuitive makes, rather than takes, prices on instruments. Intuitive has maintained the exact same list prices and adhered to them for every customer in the United States for several years at a time." SAC ¶ 41. Intuitive is able to unilaterally set usage limits on the instruments and charge inflated prices for them. Id.

7

**App.166**

**2.  Intuitive Continued to Engage in Antitrust Behavior.**

In addition to alleging facts that plausibly give rise to antitrust violations, the complaint plainly alleges facts that Intuitive continued its monopolistic conduct well within the four years before the filing of the complaint.[2] Dismissal is not appropriate on the affirmative defense of the statute of limitations unless "the defense clearly appears on the face of the complaint." *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984). Furthermore, the statute of limitations "begins to run anew" with each sale under the continuing violation doctrine. *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) (citing *Zenith*).

Restore brought its claims "based on continuing antitrust behavior, not merely the continuing damage it feels from a single day's monopoly and refusal to deal." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 125 (5th Cir. 1975) (applying continuing violations doctrine to competitor's monopolization claims). Contrary to the references in the motion to dismiss, the courts of other circuits also restart the limitations period with each action taken under a pre-limitations contract. *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203 (9th Cir. 2014).

---

[2] For purposes of the limitations period, it is "hornbook law" that a claim only accrues when the plaintiff can prove the fact of damage. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971); *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1034 n.14 (5th Cir. 1977). Restore did not have a basis to assert a claim for injury to its X/Xi EndoWrist until Restore had the technical ability to reset the memory chip on the instruments. SAC ¶¶ 91-92.

8

**App.167**

In fact, Intuitive has conceded in other litigation that the sale of the robots with the Agreement restarts the statute of limitations. IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION, No. 21-CV-03825-AMO, 2025 WL 964879, at *11 (N.D. Cal. Mar. 31, 2025).[3] The complaint plainly alleges such facts here:

> Upon information and belief, Intuitive has placed more than 50% of the da Vinci installed base with the Agreement since September 19, 2020. Since September 19, 2020, Intuitive has continued to sell thousands of da Vinci X and Xi robots in the United States with the Agreement. Upon information and belief, Intuitive has also started to sell the da Vinci 5 in the United States with the Agreement.

SAC ¶ 55.

Moreover, the limited license plainly prevents customers from using EndoWrists for an additional cycle of uses. the Agreement provides the customer with a limited license for each instrument that "expires once an [i]nstrument is used up to its maximum number of uses." SAC ¶ 57. There is no qualification on the expiration of that license. Intuitive routinely enforced that limited license without qualification in its dealings with customers. Id. ¶¶ 60-70. Intuitive maintained that

---

[3] "Intuitive reasons that, because almost 550 hospitals signed contracts with Intuitive before May 21, 2017, predominance cannot be met because Hospital Plaintiffs have identified no class-wide proof of conduct after that date that would restart the statute of limitations period for those contracts.' Opp. at 3; see also id. at 18-19." Id.

9

**App.168**

position – that the usage limits were absolute and could not be reset without jeopardizing product quality and patient safety – in the S/Si EndoWrist Litigation.[4]

Finally, Intuitive has admitted in sworn testimony that it had no policy for authorizing third parties to repair or remanufacture EndoWrists. SAC ¶ 65; *see Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1417 (11th Cir. 1987). Since entering the surgical robot market more than two decades ago, Intuitive had never approved any ISO to service instruments for hospitals "[u]sing instruments beyond the programmed number of uses." SAC ¶ 63. Intuitive did not issue any written policy on the use of instruments for an additional cycle of uses until March 2023. Id. ¶ 63. It was only on March 27, 2025 that Intuitive "granted approval" to any ISO to remanufacture any EndoWrist. Id. ¶ 72.

### 3. Restore was Able and Willing to Enter the Market.

Intuitive already lost this exact same argument on antitrust injury – at summary judgment no less – in related litigation against a potential competitor Rebotix that had not achieved the technological capability to reset the usage limits on the X/Xi EndoWrists. *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL 3272538, at *9–10 (M.D. Fla. Aug. 10, 2022). "Rebotix points out that it has not completed the X/Xi Interceptor because expending

---

[4] *E.g.*, S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16.

10

**App.169**

the resources to do so would be futile in light of Intuitive's ongoing anticompetitive conduct." Id. at *9. So has Restore: "Since Intuitive was blocking any and all access to customers indefinitely, the expenditure of substantial resources on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture." SAC ¶ 87.

Moreover, "Rebotix point[ed] to the following affirmative steps it has taken: (1) Rebotix 'was and is operational' and 'it remains ready to repair EndoWrists'; and (2) it has already staffed a team for its business, spent millions of dollars on research and development, and obtained two patents on its method for resetting the usage counter." Id.

Here, Restore has done far more: (1) validating its repair process, (2) building a customer base, (3) obtaining the first ever clearance with the FDA, (4) lining up a large distributor, (5) retaining encryption specialists, (6) developing proprietary technology, (7) patenting its proprietary technology, (8) leasing a larger facility for the increased demand for the X/Xi EndoWrists, (9) acquiring an Xi robot for testing products, and (10) building out inventory of used X/Xi EndoWrists for remanufacturing. SAC ¶¶ 86, 88.

"Restore would have taken those steps to expand into X/Xi EndoWrists much more quickly if not for the anticompetitive conduct of Intuitive restricting customers from using instruments that had been reset for an additional cycle of uses." SAC ¶

11

**App.170**

88. In fact, "Restore had been counting on the revenues from the S/Si business to fund research, development, and ultimately production for the X/Xi business." Id. ¶ 87.

The Agreement – along with its enforcement – has prevented ISOs from entering the market for replacing X/Xi EndoWrists. For nearly a decade, no ISO was willing to undertake the costly and risky attempt to try to bypass or override the proprietary encryption on the memory chip installed on the X/Xi EndoWrists – until Intuitive agreed that it would not block ISOs from remanufacturing the instruments for an additional cycle of uses.

Contrary to the argument in the motion to dismiss, Intuitive had always aggressively enforced the limited license in its dealings with customers and litigation with ISOs. Complaint ¶¶ 61-63; S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16. It only made sense to take the final – and most expensive and risky steps – to decrypt the X/Xi memory chip and then seek clearance from the FDA after the settlement of the S/Si EndoWrist Litgation. It was only in the settlement in January 2023 that Intuitive agreed for the first time that it would not void the warranty or withhold service on a robot or refuse to sell a robot, instruments, or accessories if a customer used EndoWrists remanufactured by Restore under clearance from the FDA.

12

**App.171**

### <u>CONCLUSION</u>

In sum, Intuitive raises questions of fact in its motion to dismiss. Restore adequately alleges antitrust violations in an X/Xi EndoWrist aftermarket, or a broader robotic surgery instrument aftermarket, because Intuitive has a 99% market share with high barriers to entry under either definition of the relevant market. Intuitive uses that market power to secure and enforce agreements that prohibit customers from using the instruments for an additional cycle of uses. Furthermore, the agreements provide no exception to the limited license capping the number of uses. In any event, any approval clause was illusory: Intuitive lacked any policy for authorizing third parties *at least* until March 1, 2023. Furthermore, it remains a question of fact whether the clause in practice provides meaningful choice after the March 2023 announcement or the March 2025 announcement. Finally, Restore was able and willing to enter the market but for the anticompetitive conduct of Intuitive. Therefore, the motion to amend should be granted.

13

**App.172**

Respectfully submitted on April 7, 2025.

/s Jeff Berhold_____

Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

\* Admitted Pro Hac Vice

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.

**App.173**

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

Pursuant to Local Rule 7.1(F), the undersigned hereby certifies that this memorandum contains 3,087 words.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

* Admitted Pro Hac Vice

15

**App.174**

## <u>LOCAL RULE 7.1(C) CERTIFICATE</u>

Pursuant to Local Rule 7.1(C), Restore hereby confirms that it complied with the attorney-conference requirement of Local Rule 7.1(B) and that Intuitive informed Restore that it opposed the motion.


_____s/ Jeff Berhold_____

Jeffrey L. Berhold
**COUNSEL FOR PLAINTIFF**

16

**App.175**

TAB 35

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIRS LLC,

Plaintiff,

v.                                              Case No. 3:24-cv-444-MCR-ZCB

INTUITIVE SURGICAL, INC.,          JURY TRIAL DEMANDED

Defendant.

## SECOND AMENDED COMPLAINT

Pursuant to Fed. R. Civ. Proc. 15(a)(2), Plaintiff Restore Robotics Repairs LLC ("Restore") hereby files its Second Amended Complaint against Defendant Intuitive Surgical, Inc. ("Intuitive") for monopolizing and restraining trade in the nationwide market for service and replacement of X/Xi EndoWrist instruments for use with the Da Vinci X and Xi Surgical Systems ("X/Xi EndoWrist Market").[1] Plaintiff alleges the following upon personal knowledge as to its own acts and information and belief and investigation by counsel as to all other allegations.

For more than two decades, Intuitive has had a monopoly in the manufacture and sale of surgical robots for minimally-invasive soft-tissue surgery ("Surgical

---

[1] Pursuant to N.D. Fla. Loc. R. 15.1(B), this proposed amended pleading is simultaneously filed with the motion for leave to amend. ECF No. 34.

**App.176**

Robots"). During that time, Intuitive has maintained a market share of more than 99% of the sales and installed base for Surgical Robots in the United States. Intuitive is the sole manufacturer of Da Vinci X and Xi Surgical Systems and X/Xi EndoWrists. The Xi is the fourth generation of the Da Vinci Surgical System. Intuitive no longer supports the prior generation (da Vinci Si) with parts, service, or instruments. Intuitive is also the sole provider of service for the da Vinci X and Xi.

Intuitive uses its contracts for the sale and service of the robots to block and delay the entry of competitors into the service and replacement of the instruments for use with the robot. In contracts for the sale and lease of the Da Vinci Xi, Intuitive prohibits customers from using the Xi EndoWrists beyond the usage limits set by Intuitive. Intuitive contractually prohibits its customers from using X/Xi EndoWrists repaired or remanufactured by third parties as part of the sale or lease of the da Vinci X and Xi. The contracts provide that Intuitive can withhold the necessary robot parts, robot service, and new X/Xi EndoWrists to use the da Vinci Surgical System if the robot owner uses X/Xi EndoWrists repaired or remanufactured by third parties.

For roughly ten years, no one entered the X/Xi EndoWrist market to compete with Intuitive. It was unproven whether anyone willing to enter the market would be able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for additional cycles of uses on the robot. On or about February 29, 2024, Restore became the first and only independent

service organization ("ISO") to achieve the technological capability to reset the pre-programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments. On or about March 11, 2025, Restore received the first and only clearance from the FDA to market and sell remanufactured X/Xi EndoWrist instruments (K242610).

Restore brings this action for injury to its business repairing and remanufacturing X/Xi EndoWrists. If Intuitive had not imposed the contractual restrictions on da Vinci X and Xi users and vigorously enforced those terms, Restore would have sought and achieved the technological capability to reset the usage count on the encrypted memory chip and entered the X/Xi EndoWrist market as early as July 2020. Restore also continues to suffer harm and the threat of future harm to its X/Xi EndoWrist business because Intuitive maintains contractual restrictions on the use of repaired or remanufactured X/Xi EndoWrists in its existing and new contracts for sale and lease of the Da Vinci X and Xi Surgical System.

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Restore Robotics Repairs LLC ("Restore") is a Florida limited liability company with its principal address at 7543 Holley Circle, Panama City Beach, Florida. Restore is in the business of servicing robotic surgical instruments for hospitals for an additional cycle of uses and selling remanufactured robotic

3

**App.178**

surgical instruments, directly and through distributors to hospitals, to use for an additional cycle of uses.

2.      Defendant Intuitive Surgical, Inc. ("Intuitive") is a Delaware corporation with its principal place of business at 1020 Kifer Road, Sunnyvale, California. Intuitive provides surgical robots, along with related parts, instruments, accessories, and services, to hospitals and surgical centers in Escambia County in the Pensacola Division of the Northern District of Florida and elsewhere. Intuitive can be served with process through its registered agent C T Corporation System at 1200 South Pine Island Road, Plantation, FL 33324.

3.      Defendant is subject to the personal jurisdiction of this Court.

4.      This action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 22. The Defendant has been engaged in interstate commerce during all relevant times of the complaint.

5.      Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c)(2). The Defendant is transacting and carrying on business in this District.

**App.179**

**ROBOTIC SURGERY**

6.    Intuitive's Chief Medical Officer has publicly described a "robotic revolution" in surgery. With traditional open surgery, the surgeon uses one large incision to perform a procedure. With laparoscopic surgery, the surgeon makes several small incisions and inserts small tools, including a video camera, to perform the procedure. Robotic surgery also uses several incisions for the insertion of small tools, including a magnified, high-definition 3D video camera. The surgeon sits at a console and uses hand controls to manipulate the instruments, which are attached to the system by robotic arms with joints.



7.    Robotic surgery has a variety of practical advantages over laparoscopic surgery:

- stereoscopic high-definition cameras for 3-D visibility

- additional arm for the surgeon to hold a third instrument

- wrist joints for expanded range of motion compared to human

- scalability to allow for small movements in the arms and instruments

- ergonomic console design to minimize surgeon fatigue.

5

**App.180**

**DA VINCI ROBOT**

8.      Intuitive specializes in the manufacture and sale of the da Vinci surgical system (image below).



9.      Intuitive sells all necessary instruments and accessories for the da Vinci robot system. Intuitive offers roughly eighty different instruments, including a variety of forceps, retractors, and scissors, under the EndoWrist brand. The da Vinci Surgical System is only cleared for use with EndoWrist instruments.

10.     The da Vinci robot system is generally used for minimally invasive soft tissue surgery for areas of the body between the pelvis and the neck – primarily in general surgery, gynecologic surgery, urologic surgery, cardiothoracic surgery, and head and neck surgery. The da Vinci robot system is indicated for adult and pediatric use.

11.     In its latest annual report, Intuitive estimated that surgeons using the da Vinci robot system completed roughly 2,286,000 surgical procedures of various

**App.181**

types in hospitals throughout the world during the year ended December 31, 2023. The number of estimated annual surgical procedures nearly doubled in four years.

12.   As of September 30, 2024, Intuitive had an installed base of 5,627 da Vinci Surgical Systems in the U.S. Nearly all customers are currently using the da Vinci X or Xi, which works with the X/Xi EndoWrist instruments.

13.   In its most recent annual report, Intuitive acknowledged that "[t]he initial system sale into an account is a major capital equipment purchase by our customers and typically has a lengthy sales cycle." The average sales price is more than $1 million.

14.   For the calendar year 2023, Intuitive reported more than $3 billion in Instruments and Accessories Revenue in the United States. Intuitive is on pace for more than $3.5 billion in Instruments and Accessories Revenue in the United States for 2024.

15.   On March 14, 2024, Intuitive announced that it had received clearance from the FDA to market and sell the next generation of the robot – da Vinci 5 – in the United States. The existing X/Xi EndoWrists are compatible with – and cleared for use with – the da Vinci 5. At that time, Intuitive stated that "Da Vinci 5 will initially be available to a small number of customers in the U.S. who collaborated with Intuitive during the development period and those with mature robotic surgery

7

**App.182**

programs. Intuitive will work with surgeons at these initial sites to generate additional data on the system's use before a wider commercial introduction."

### SURGICAL ROBOT MARKET

16.    Intuitive has monopoly power in the U.S. market for Surgical Robots ("U.S. Surgical Robot Market"). In the U.S. Surgical Robot Market, Intuitive is able to exclude competition and maintain prices for the da Vinci robot system at supracompetitive levels. For nearly 20 years, Intuitive was the only manufacturer of Surgical Robots in the United States. Intuitive currently has a 99.9% share in annual sales and installed base in the U.S. Surgical Robot Market. There is only one other manufacturer selling Surgical Robots in the U.S.: Asensus Surgical. Asensus placed one (1) system in the United States in 2023. Intuitive placed 666 da Vinci systems in the United States in 2023.

17.    There is a relevant product market or submarket for surgical robots. Surgical robots have no practical substitute. Even though robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery, hospitals are expected to offer robotic surgery. Moreover, certain procedures, such as prostatectomies, are increasingly performed now by surgeons operating exclusively with surgical robots.

18.    Due to the unique attributes of surgical robots, many hospitals believe that robotic surgery leads to shorter hospital stays and greater patient satisfaction.

8

**App.183**

Many surgeons strongly prefer robotic surgery and require it to work at a given hospital. As a result of perceptions about the reduced pain and scarring and increased safety and effectiveness associated with robotic surgery, many patients insist on robotic surgery and will travel to the closest hospital offering robotic surgery.

19.    There are distinct prices for surgical robots. The da Vinci Surgical System has an average sales price of more than $1 million. By comparison, a laparoscopic tower has an average sales price of roughly $100,000.

20.    There is a very low cross-elasticity of demand between robotic and laparoscopic surgery. The estimated cost per procedure of equipment, instruments, and service is $1,866 for robotic surgery versus less than $1,000 for laparoscopic surgery. (Exhibit 1 (Christopher P. Childers and Melinda Maggard-Gibbons, Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery, 320 Journal of American Medical Association 835, 836 (August 28, 2018)).) In addition, the estimated cost per procedure of acquiring and servicing the surgical robot is an additional $1,701 for robotic surgery. Id. Nevertheless, the estimated procedure volume for robotic surgery increased from 136,000 in 2008 to 877,000 in 2017 for a compounded annual growth rate of 23%. Id.

21.    In response to much higher prices for the use of surgical robots, customers are <u>not</u> switching to use of laparoscopic equipment. Id. In fact, they are replacing their laparoscopic equipment with surgical robots at much higher prices.

9

**App.184**

Id. In other words, customers in the surgical robot market strongly prefer surgical robots over laparoscopic surgery and are not sensitive to prices in the laparoscopic equipment market.

22.    The industry and the public recognize surgical robots as a separate economic entity. The financial and healthcare press refer specifically to the market for surgical robots and competition in surgical robots. There are several professional and trade associations focused on robotic surgery – *e.g.*, the Society for Robotic Surgery and the Clinical Robotic Surgery Association. Surgical robots have very peculiar characteristics. Supra at ¶¶ 6-7. In addition, surgical robots have very distinct prices. Supra at ¶ 19. Intuitive and Asensus both specialize in surgical robots and instruments. Surgeons specialize in robotic surgery. Robotic surgery requires specialized training and experience.

23.    Orthopedic robots are not part of the surgical robot market. Orthopedic robots are not a practical substitute for surgical robots. They are designed for assisting in removal of bone and aligning prosthetics for knee and hip replacement. They are not indicated for use in minimally invasive soft tissue surgery.

24.    There are significant barriers to entry into the surgical robot market. In fact, Restore is not aware of any new entrants into this lucrative market in the last seven (7) years at least.

**App.185**

25.    The Food and Drug Administration has a rigorous process for clearing any surgical robot for sale in the United States. New entrants require five to ten years and several hundred million dollars from design concept to regulatory clearance or approval by the FDA. The FDA is now reportedly requiring new entrants to obtain premarket approval, which is much more difficult than 510(k) premarket clearance. The relevant regulatory agencies must also approve any surgical robot for sale in the European Union and elsewhere outside the United States.

26.    Intuitive holds numerous patents blocking development of competing robot systems: "As of December 31, 2023, we owned more than 4,800 patents granted and still in force." Intuitive has multiple unexpired patents issued by the United States, covering each of the following features on its current models of the da Vinci Surgical System for sale:  highly-magnified 3DHD vision, true depth perception, intuitive instrument controls, wristed instruments, and tremor reduction.

27.     The da Vinci Surgical System has been widely accepted in the United States. The da Vinci has been the subject of twenty years of clinical data and studies. Surgeons already have significant training and extensive experience invested in the da Vinci robot system. That specialized training often begins in fellowship programs. In addition, the large hospital systems with significant demand for robot surgery already have a sizable installed base of da Vinci robots. Intuitive secures

11

**App.186**

agreements with customers that they will not purchase any competing robots from other manufacturers.

28.    As a result of its monopoly power in surgical robots, Intuitive is able to, and does, charge supracompetitive prices for its da Vinci robots. Intuitive has maintained gross margins of 66% to 72%, which far exceed median gross margins in the healthcare sector generally. Those gross margins are not explained by lagging or current research and development expenses, which pale in comparison. For the most recent calendar year 2023, Intuitive had a gross profit of $4.73 billion and research and development expenses of $999 million.

29.    For calendar year 2023, Intuitive had a net margin of 25%. By comparison, GE Healthcare Technologies, which is also a major manufacturer of capital-intensive medical equipment like MRI and CT machines, had a net margin of 12% for the same time period.

**AFTERMARKETS: PARTS, SERVICE, AND INSTRUMENTS**

30.    Intuitive has also used its monopoly power in the primary market for surgical robots to acquire and maintain monopoly power in the aftermarkets for servicing the da Vinci Surgical System ("da Vinci Service Market") and repairing and replacing X/Xi EndoWrist instruments ("X/Xi EndoWrist Market"). [2] Intuitive

_____

[2] While the complaint defines a da Vinci Service Market and an X/Xi EndoWrist Market, the claims in this action also apply to a surgical robot service aftermarket

has monopolies in the primary market and the aftermarkets and is able to extract

monopoly prices and profits from each of those markets by charging separate prices

for the robot, the service, and the instruments.

31.    There is a relevant aftermarket for the service of da Vinci Surgical

Systems in the United States. Intuitive represents that it is the "sole provider" of

service for the da Vinci Surgical System. The standard sales contract prohibits third

parties from repairing the robot. Intuitive has a market share of 100%. Intuitive is

able to charge supracompetitive prices. Intuitive charges an hourly rate of $995

(including travel time) for repairs. In addition, Intuitive charges fees exceeding

$100,000 to replace parts like the instrument or camera arm. Their service contracts

have an average price of more than $100,000 per year.

32.    There are no practical substitutes for the specialized parts, equipment,

and training required to service the da Vinci Surgical System.  Service requires

access to a proprietary service laptop and toolkit owned and controlled by Intuitive.

The service laptop is necessary to remove warning messages from the screen on the

system console and input the serial number for the system to recognize replacement

---

and a surgical robot instrument aftermarket. Even if the aftermarkets were more
broadly defined to include all brands of surgical robots, *i.e.*, Intuitive and Asensus,
Intuitive has market shares of 99.9% for surgical robot service and surgical robot
instruments with the same barriers to entry into the aftermarkets and the same ability
to charge inflated prices and exclude competition in the aftermarkets described
below at ¶¶ 31-94.

13

**App.188**

parts like the robot arms. Intuitive does not provide third parties with access to the service laptop.

33.    Service requires access to proprietary parts like robot arm assemblies that are specially designed and built for the da Vinci robot system. There are no substitutes for most da Vinci robot parts. Intuitive only provides the parts with the service and only provides the service directly to customers.

34.    Intuitive does not disclose the performance specifications for the da Vinci Surgical System. Intuitive provides its field service engineers with the parts and toolkit, along with specialized training on the performance specifications for the da Vinci Surgical System, to maintain, troubleshoot, and repair the system.

35.    There is a relevant aftermarket for the repair and replacement of X/Xi EndoWrist instruments in the United States. There are no substitutes for X/Xi EndoWrist instruments. They are specially designed and built for the latest generation of the da Vinci Surgical System. Intuitive provides X/Xi EndoWrist instrument replacement to all customers inside the United States.

36.    The da Vinci robot service aftermarket and X/Xi EndoWrist instrument aftermarket are separate from the surgical robot market. Intuitive sets separate prices for each type of service and instrument separately from the original purchase price for the system, and customers purchase the service and instruments a la carte on an ongoing basis throughout the lifecycle of the system. The prices for instruments are

14

**App.189**

not fixed for the lifetime of the robot. Since Intuitive had and has monopoly power in the surgical robot market, Intuitive has not been, and is not, prevented from acting anticompetitively in the aftermarkets. The average system price does not respond to changes in service or instrument prices.

37.    In addition, Intuitive has an installed base of more than 5,600 da Vinci robot systems. Those customers purchased their robot in a monopolistic market and face significant switching costs. Surgical robot systems have an average sales price of more than $1 million. The customer takes a massive risk in spending more than $1 million on a robot that is not supported by Intuitive. Their physicians have already been trained on the da Vinci robot system. Furthermore, no other manufacturer has anything approaching a critical mass of installed systems to provide timely field service. It is unclear whether competing systems will even be supported over the lifecycle of the robot.

38.    Even now, customers are unable to calculate lifecycle costs at the time of purchase because they have little or no information for projecting the costs of robot parts and service or instruments. Assuming the customer has a complete service agreement at a flat rate, it is still very difficult to project costs on a per use or life cycle basis. Major repairs are not included in the service agreements. In order to forecast the cost per use, the customer would also need to know how often the robot will be used. In order to project the cost over the lifecycle, the customer must

15

know how often the instruments will be used and replaced. Yet the customer

typically cannot forecast demand for a surgical robot. Surgeons may have varying

degrees of adaption to a surgical robot at a new location or for a new procedure. The

product mix and usage costs vary dramatically by procedure. Competing hospitals

may or may not acquire their own robots. The FDA may or may not add new

indications for use of the robot system.

39.    The costs for instruments are also unpredictable. The customer cannot

predict the timing for replacing instruments: Intuitive has complete control over the

usage limits on the X/Xi EndoWrist instruments and has changed the usage limits

unilaterally without notice. As the sole original manufacturer of EndoWrist

instruments, Intuitive also has complete control over the prices for new EndoWrist

instruments.

40.    If the customer is paying for service based on time and materials after

the expiration of the service agreement, the customer also faces unpredictable repair

costs. The need for repairs on the robot system is unpredictable. So is the price.

Intuitive is the only manufacturer of the da Vinci robot parts. Intuitive does not

publish the prices for da Vinci robot parts. There has never been a competitive

market with multiple vendors able to provide anything resembling the full array or

parts or services. Intuitive also retains control of the decision to repair or replace a

16

**App.191**

part. For example, a customer may face an unexpected cost of more than $100,000 to replace a da Vinci robot arm.

## X/XI ENDOWRIST INSTRUMENT AFTERMARKET

41.    Intuitive has monopoly power in the relevant market or submarket for the repair and replacement of X/Xi EndoWrist instruments ("X/Xi EndoWrist Market"). Intuitive is able to exclude competition and maintain prices for the repair and replacement of X/Xi EndoWrist instruments at supracompetitive levels: Intuitive is the only original manufacturer for the X/Xi EndoWrists, has a market share of 100%, and has prevented Restore and other ISOs from entering the market through its contractual restrictions. Intuitive makes, rather than takes, prices on instruments. Intuitive has maintained the exact same list prices and adhered to them for every customer in the United States for several years at a time. Intuitive has maintained gross margins for the EndoWrists that far exceed median gross margins in the healthcare sector generally. Intuitive is able to unilaterally set usage limits on the instruments because of its market power in the X/Xi EndoWrist Market.

42.    The X/Xi EndoWrist instruments are necessary to perform surgery with the da Vinci X or Xi and are only available new from Intuitive. The customers do not have the option of turning to the S/Si EndoWrist Market because the S/Si EndoWrists do not work on the da Vinci X or Xi and Intuitive has stopped sale of, and support for, the da Vinci Si.

17

**App.192**

43.    The X/Xi EndoWrist Market includes any ISO with the ability to reset the usage count and enter the market by repairing X/Xi EndoWrists for hospitals directly or through distribution or selling or licensing the technology for distributors or hospitals to do it themselves. The FDA permits servicing of approved medical devices by hospitals and third parties. The ISO repairs instruments to meet their original intended use. Third-party service does not affect the safety and effectiveness of the instrument or affect the indications for use. The instrument is maintained at, or returned to, its original safety and effectiveness. Intuitive has never tested its instruments to failure. As an alternative to servicing a hospital's instrument for a second cycle of uses, or licensing or selling the technology to the hospital, an ISO can also obtain regulatory clearance from the FDA through a 510(k) clearance to market and sell the "remanufactured" instrument for a second cycle of uses for sale under its own brand name.

44.    In fact, hospitals prefer to have the option of servicing their medical devices with third parties to enhance patient safety and reduce healthcare costs. The device has already been shown to be safe and effective without any manufacturing defect in its first cycle of uses. The service typically has significantly lower cost than the purchase of a new device. ISOs are a recognized and accepted part of the healthcare industry for everything from powerful scanning machines to electrophysiology catheters mapping electrical signals inside the heart. For example,

18

**App.193**

an ISO can capture 30% to 40% of the market if it is the only competitor, or 10% to 20% of the market if it is one of several competitors, besides the original manufacturer in providing intracardiac mapping catheters for use with a cardiac mapping system.

45.    The X/Xi EndoWrist Market is not disciplined by competition in the U.S. Surgical Robot Market. Intuitive has maintained monopoly power in the U.S. Surgical Robot Market for two decades. Intuitive charges monopoly prices in the foremarket and the aftermarkets. Intuitive obtains more than twice as much annual revenue from the sale of instruments and accessories than the sale and lease of surgical robots. In addition, their instrument and accessories sales revenue is growing roughly 20% per year while their robot sales are flat.

## BARRIERS TO ENTRY INTO X/XI ENDOWRIST MARKET

46.    There are significant barriers to entry into X/Xi EndoWrist Market. In fact, no one had achieved the technological capabilities to compete in the market for ten years.

47.    Intuitive does not face competition from original manufacturers of instruments that can be used with the da Vinci X or Xi. Intuitive holds numerous patents blocking development of competing instruments for use on the da Vinci robot system. In addition, the standard sales contract prohibits the use of any instruments besides the X/Xi EndoWrists designed by Intuitive. The Food and Drug

19

**App.194**

Administration has a rigorous process for clearing any surgical robot instruments for sale in the United States. In order to work with the Da Vinci Surgical System, the EndoWrist instrument must have a serial number to be recognized by the machine.

48.     The encryption on the memory chip has also been a barrier to entry into the X/Xi EndoWrist Market. For more than a decade, no one was able to achieve the technological capability to enter the X/Xi EndoWrist market to compete with Intuitive. Intuitive installs an encrypted pre-programmed memory chip on the X/Xi EndoWrists to limit the number of uses for each instrument.

49.     Intuitive has claimed that the da Vinci X and Xi were "upgraded to a wireless connection for the communication of the instrument, calibration, and use count information between the EndoWrist and the rest of the system to improve consistency in the communication channel[.] [T]his required the chip to be encrypted for security purposes to avoid remote tampering or other types of wireless attacks." Intuitive has taken the position that "the antitrust laws cannot be used to challenge product improvements" like the encryption of the chip on the X/Xi EndoWrists. Restore has not alleged – and does not allege – that the encryption of the chip violated the antitrust laws.

50.     The encryption is proprietary. There is only one manufacturer of the chip. It had been unproven whether anyone would be able to bypass or override the

20

**App.195**

encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for one or more additional cycle of uses on the robot.

51.     The memory chip prevents the instrument from being connected to the robot for more than a certain number of times regardless of whether the instrument is maintained at, or returned to, its original safety and effectiveness through service. The instruments do not display the number of remaining uses until there are no remaining uses. The robot will no longer engage with an instrument that has reached the usage limit.  Intuitive itself can service the instrument and reset or replace the usage counter. It simply chooses not to do so.

52.     Intuitive imposes additional barriers to entry through its contractual restrictions. Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System. For more than twenty years, Intuitive has operated on a business model of extracting monopoly rents through recurring revenue from instruments with limited uses. Intuitive maintained the same 10 use limits for most instruments for almost two decades until Restore tried to enter the S/Si EndoWrist Market.

53.     The standard sales and lease contracts provide that the customer "purchases" any instruments for use with the robot system. The standard contract does not prohibit use of the system off label. Nevertheless, the standard contract

21

**App.196**

requires that the customer only use the instruments for the maximum number of uses set forth in the instrument catalog. In addition, the standard contract requires that Intuitive must approve any repairs or service during or after that usage limit. Intuitive has never approved any third party to repair the instruments and has never set up a process for doing so.

## ANTICOMPETITIVE CONDUCT

54.    Intuitive contractually requires customers to deal exclusively with Intuitive for repairing or replacing their X/Xi EndoWrists. Intuitive sells and leases every robot with a Sales, License, and Service Agreement ("Agreement") that prohibits the customer from using its robot with instruments that have been reset for an additional cycle of uses.

55.    Intuitive has always sold the da Vinci X and Xi robots in the United States with the Agreement. Upon information and belief, Intuitive has placed more than 50% of the da Vinci installed base with the Agreement since September 19, 2020. Since September 19, 2020, Intuitive has continued to sell thousands of da Vinci X and Xi robots in the United States with the Agreement. Upon information and belief, Intuitive has also started to sell the da Vinci 5 in the United States with the Agreement.

56.    Customers have purchased and continue to purchase X/Xi EndoWrists from Intuitive instead of ISOs based on the restrictions in the Agreement, and

**App.197**

Intuitive has collected and continues to collect payments for those purchases of X/Xi EndoWrists.

57.    The Agreement prohibits the customer from using the instruments beyond the usage limits set by Intuitive, which includes any resetting of the usage count for an additional cycle of uses by the customer or an ISO:

> Instruments and Accessories are subject to a limited license to use those Instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System. Customer is responsible for Reprocessing Instruments in accordance with the Documentation. Any other use is prohibited, whether before or after the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive, and cleaning or sterilization inconsistent with the Documentation. This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory.

ECF No. 17 at 6 (§ 8).[3]

58.    Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service. The Agreement removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third party repairs the instruments. In addition, any third-party service on the EndoWrist

---

[3] "Documentation" is defined as "related manuals, instructions for use, notifications, and other documentation." ECF No. 17 at 4 (§ 2.6).

**App.198**

instruments voids Intuitive's one-year warranty on the entire da Vinci Surgical System:

> Customer will not, nor will Customer permit any third party to, modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and Accessories. . . If Customer fails to comply with the requirements of Section 3.4, Intuitive may terminate this Agreement immediately upon written notice, and any warranties applicable to the System will become void.

ECF No. 17 at 5 (§ 3.4).

59.    "Any notice given under this Agreement must be in writing and will be deemed given and received five (5) days after the date of mailing, one (1) day after dispatch by overnight courier service or electronic mail, or upon receipt if by hand delivery, or upon completion of confirmed transmission if by facsimile." ECF No. 17 at 10 (¶ 15.8). Upon information and belief, Intuitive has never sent notice under the Agreement to any customer that Intuitive has approved the customer to use an Instrument that has been repaired, refurbished, or reconditioned under Section 8 of the Agreement. Upon information and belief, Intuitive has never sent notice under the Agreement to any customer that Instruments are not subject to a license that expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory.

60.    Intuitive remotely tracks the use of instruments by serial number. When Intuitive detects that a customer has used an instrument beyond the usage limits prescribed by Intuitive, Intuitive sends a warning letter quoting the exact language

24

**App.199**

above from Sections 3.4 and 8 from the Agreement and notifying the customer that "[u]sing instruments beyond the programmed number of uses is a material breach of the Agreement" and that Intuitive may not provide further service on the robot.

61.    Starting no later than February 2017, Intuitive has been engaged in an aggressive campaign to stamp out nascent competition from ISOs entering into the business of repairing and replacing EndoWrists. As part of this campaign, Intuitive has threatened dozens of hospitals and hospital systems around the country with possible termination of their agreements with Intuitive for "[u]sing instruments beyond the programmed number of uses" – and terminated their agreement if they did not heed the warning letter. The warning letters and contract terminations have a massive ripple effect across the industry because potential customers will usually review their contracts with Intuitive and ask the ISO whether Intuitive objects to the use of instruments for an additional cycle of uses. Of course, the answer is clearly yes. Whenever a hospital uses its da Vinci robot with an EndoWrist reset for an additional cycle of uses, Intuitive engages in the same pattern of behavior.

62.    Restore was one of several targets of the campaign. From around July 2018 to around October 2019, Intuitive gave verbal warnings and sent warning letters to hospitals around the country, including Panama City Surgery Center, that were using instruments repaired and reset for an additional cycle of uses by Restore. As recently as 2022, Intuitive has instructed Panama City Surgery Center that they

**App.200**

could not use EndoWrists that had been reset for an additional cycle of uses by Restore. If Intuitive continued to detect use of instruments reset for an additional cycle of uses, Intuitive terminated the agreement in its entirety, citing Sections 3.4 and 8 of the Agreement. As a result, customers have lost the ability to acquire new instruments or accessories or receive service on their robot, often with little or no notice, when Intuitive refused to deal with the customer due to violations of the contractual restrictions on repairing or remanufacturing the instruments with third parties. Many other hospitals asked Restore if Intuitive had taken any action against its customers using the instruments that had been reset for an additional cycle of uses and ended negotiations when Restore told them that Intuitive had done so. The customers continue to operate under that threat so long as those contractual restrictions remain in place. Intuitive maintained its position – that the usage limits were absolute and could not be reset without jeopardizing product quality and patient safety – throughout the S/Si EndoWrist Litigation. [4]

63.    Notwithstanding the approval clause in Section 8 of the Agreement, customers did not and do not have a meaningful freedom of choice in the markets for instruments. Intuitive had no policy to authorize the use of remanufactured instruments. Infra ¶ 64. Moreover, customers understand from their course of dealing

---

[4] *E.g.*, S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16.

**App.201**

in the market that Intuitive does not approve of the use of EndoWrists for an additional cycle of uses. Since entering the surgical robot market more than two decades ago, Intuitive has never approved any ISO to service instruments for hospitals "[u]sing instruments beyond the programmed number of uses."

64.    Intuitive continues to manipulate the approval clause. For the first time in or about March 2023, Intuitive embedded a statement on the third screen of a web page on its website regarding the use of repaired instruments ("Statement"):

> We are aware that certain third parties have sought to offer products or services to healthcare providers that would modify some of our instruments to extend their use. It is our understanding that such modifications constitute remanufacturing under FDA regulations and require 510(k) clearance from FDA.
>
> We recognize the role that third-party medical device servicers have come to play in the medical device ecosystem, and we support healthy, lawful competition in the marketplace. We also have a responsibility to protect patient safety and provide customers with proven, safe and effective tools and technologies. The remanufacturing of EndoWrists is performed by third parties that are not affiliated with Intuitive, and we are not privy to their testing protocols, verifications and validations, remanufacturing processes, or quality controls, among other things. Therefore, Intuitive will not bear responsibility for instruments that are remanufactured by a third party, or for harms or damages caused by the use of such instruments.
>
> However, Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA.
>
> As of March 1, 2023, Intuitive is not aware that FDA has granted 510(k) or equivalent clearance to any party to remanufacture any instruments

**App.202**

for use with 4th generation da Vinci technology, including the da Vinci X, Xi and SP systems.

65.    On January 22, 2025, Intuitive's President testified that he was not aware of any policy for ISOs to get authorized by Intuitive to remanufacture EndoWrists before the Statement in March 2023.

66.    The Statement reminds customers that Intuitive can and will "void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States" who chooses to use instruments that have been reset for an additional cycle of uses without 510(k) clearance from the FDA.

67.    The Statement did not and does not provide customers with any meaningful choice. No vendor had a 510(k) clearance to market and sell remanufactured X/Xi EndoWrists. No one had obtained the technological capability, or a 510(k) clearance from the FDA, to market and sell remanufactured X/Xi EndoWrists because Intuitive had repeatedly told customers that "[u]sing instruments beyond the programmed number of uses is a material breach of the Agreement." In fact, it would take an ISO more than a year to do so if they were even able to do it at all.

68.    The Statement has created confusion rather than clarity with customers regarding the use of repaired or remanufactured EndoWrists for an additional cycle of uses because Intuitive has not revised its Agreement or User Manual to conform with the Statement. The Agreement and User Manual continue to state that the

28

**App.203**

customer has a limited license to use the EndoWrists up to the maximum number of uses specified by Intuitive and programmed on the instrument.

69.    As a result of this ongoing course of conduct, customers continue to adhere to the terms of the limited license in their Agreements with Intuitive. Since receiving clearance on March 11, 2025, Restore has started to market to customers interested in buying its remanufactured EndoWrists. Customers have indicated that they need written notice from Intuitive that the EndoWrists are not subject to a limited license based on the number of uses under their Agreements with Intuitive and that Intuitive approves Restore Robotics to remanufacture EndoWrists.

70.    For example, the Chief Supply Chain Officer for Orlando Health (which has more than 25 hospitals in Florida, Alabama, and Puerto Rico), told Restore Robotics that he was interested in purchasing remanufactured EndoWrists to reduce costs and needed a statement in writing from Intuitive that it would not enforce the limited license in the Agreements because they could "make my life a living hell." The Chief Executive Officer of Panama City Surgery Center, told Restore Robotics that his facility was interested in taking advantage of using remanufactured instruments for the "huge impact on the cost of care to our patients" but wanted assurance that (1) the hospital would not be violating any Agreements with Intuitive by doing so and (2) Intuitive approved that the hospital could use

**App.204**

EndoWrists remanufactured by Restore, because he did not "want to go through that fight again."

71.    On or about March 23, 2025, Restore sent a letter from Clif Parker, Chief Executive Officer of Restore, through counsel to David Rosa, President of Intuitive, requesting that: (a) Intuitive revise its User Manual and amend its Agreements with customers to state that its instruments are not subject to a limited license based on the number of uses, (b) Intuitive notify customers in writing that Intuitive approves Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA, and (c) Intuitive provide Restore with a letter signed by Mr. Rosa that "simply states that Intuitive approves Restore Robotics to remanufacture and sell EndoWrists in compliance with a 510(k) clearance." (Exhibit 2.)

72.    Sometime after March 20, 2025, Intuitive revised the Statement to acknowledge that Intuitive was aware that Restore Robotic's subsidiary Iconocare Health had received clearance from the FDA to market and sell remanufactured S/Si EndoWrists and X/Xi EndoWrists. On or about March 27, 2025, Intuitive stated in writing to Restore for the first time that Intuitive "has granted approval" under its contracts for Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA and authorized Restore to provide copies of the letter to its customers. Upon information and belief, Intuitive has not

**App.205**

revised its User Manual or amended its Agreements with customers to state that its instruments are not subject to a limited license based on one cycle of uses.

73.    Upon information and belief, Intuitive has added terms or conditions to its standard sales agreements prohibiting ISOs from collecting used instruments from the customers.

74.    Intuitive also informed at least one hospital consulting company that Intuitive will not cooperate with them if the consulting company or its clients deal with Restore.

## ANTICOMPETITIVE EFFECTS

75.    As a result of its exclusionary conduct, Intuitive has eliminated all competition in the X/Xi EndoWrist Market and has maintained a market share in the X/Xi EndoWrist Market of 100% for more than 10 years. By eliminating all competition, Intuitive is able to charge supracompetitive prices in the X/Xi EndoWrist Market.

76.    Intuitive has imposed usage limits on each instrument to extract consumer surplus, *i.e.*, monopoly profits, from its customers. Instead of simply buying the instruments, the customer is forced to pay a usage fee. Intuitive is charging a price that is independent, and far in excess, of the cost. When Intuitive has increased the number of uses on certain instruments, Intuitive has simply

31

**App.206**

increased the price on those instruments to maintain or even increase their profit margins.

77.     Intuitive does not make up the difference to customers on supracompetitive prices in the X/Xi EndoWrist Market by charging subcompetitive prices on its surgical robots or its robot service. Intuitive has monopoly power in the primary market and the aftermarkets and is able to charge supracompetitive prices across all markets. For example, Intuitive did not raise its monopoly prices for the system itself after modestly reducing the price per use on some instruments through the X/Xi Extended Use Program because Intuitive was already charging a monopoly price for the systems.

## THERE ARE NO PROCOMPETITIVE JUSTIFICATIONS

78.     There is no procompetitive justification for the usage limits. The usage limits are not necessary to protect the da Vinci or EndoWrist brand or preserve consumer demand in surgical robots generally or da Vinci specifically. The usage limits do not correspond with the wear and tear on the instrument, which varies widely depending on the type and length of procedure, the technique of the physician, and the complications with the patient. In fact, the FDA has previously cleared Restore to market and sell S/Si and X/Xi EndoWrists under its own label for a second cycle of uses based on performance testing demonstrating that they are as safe and effective as the new instruments.

**App.207**

79.    The physicians are simply left to their own devices, quite literally, because Intuitive does not disclose performance specifications to the public for the surgeon to have any manufacturer guidance for determining functionality and safety on the first or any subsequent use of the EndoWrist instrument. And Intuitive itself does not inspect every one of the hundreds of thousands of new instruments produced at its manufacturing plants.

80.    Intuitive could resolve any question regarding safety by disclosing performance specifications for the instruments, which would allow the surgeon to assess the safety of the new, used, or repaired instrument, rather than simply blocking the surgeon from using repaired instruments. In fact, the instruments do not even display the number of uses for the device.

81.    The usage limits are not based on any regulatory requirements from the FDA. Intuitive's standard contracts and instrument catalogs do not refer to any regulatory requirements imposing usage limits. The FDA has never taken enforcement action against any independent third party for repairing EndoWrists and resetting their usage counter. Intuitive recently marketed and sold X/Xi EndoWrists under its Extended Use Program for nearly two years without any new clearance from the FDA.

82.    In addition, the usage limits do not appear to be based on any scientific determination of the useful life of the instruments. There does not appear to be any

33

**App.208**

clinical data in the public domain to support the limits on usage for the EndoWrist instruments. (Ex. 1 at 836.)  For instance, there are no usage limits on the smaller reusable instruments for the Senhance System from Asensus Surgical. Nor are there usage limits on reusable instruments for open surgery or laparoscopic surgery.

**RESTORE PREVIOUSLY ENTERED THE S/SI ENDOWRIST MARKET**

83.    Restore has developed a process for repairing EndoWrist instruments and resetting the usage count by replacing the programmed memory chip. After previously licensing technology from a third party to enter the market in July 2018, Restore was able to repair S/Si EndoWrists with its own technology and process by July 2020.

84.    The FDA has determined that the technology is safe for repairing EndoWrists and resetting their usage count for an additional cycle of uses: Performance testing demonstrated that Restore EndoWrists "are as safe and effective" as the predicate Intuitive S/Si EndoWrists. They "operate as originally intended" for an additional cycle of uses. The FDA has cleared Restore to remanufacture the S/Si EndoWrist under its own Iconocare label.

85.    On February 27, 2019, Restore filed an antitrust case for injury to its business repairing S/Si EndoWrists ("S/Si EndoWrist Litigation"). *Restore Robotics LLC, et. al v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55-TKW-MJF (N.D. Fl. filed February 27, 2019). At that time, Restore was unable to reset the usage count on the

34

**App.209**

X/Xi EndoWrists and could not bring any claims for injury to business repairing X/Xi EndoWrists. S/Si EndoWrist Litigation, ECF No. 1 (Complaint) ¶ 60. The case was "about Plaintiff's alleged exclusion from the aftermarkets related to S/Si, not the X/Xi . . ." S/Si EndoWrist Litigation, ECF No. 192 at 3. After settlement by the parties of the S/Si EndoWrist Litigation after the pretrial conference in the case, the action was dismissed with prejudice on joint stipulation of the parties on January 27, 2023. ECF No. 225.

## RESTORE INTENDED TO ENTER X/XI MARKET BY JULY 2020

86.    Restore would have also entered the X/Xi EndoWrist market by July 2020 if not for the anticompetitive conduct of Intuitive. Restore had entered the S/Si EndoWrist market in July 2018. Restore always intended to expand from the S/Si EndoWrist market into the X/Xi EndoWrist market. Restore had the background and experience necessary to compete in the X/Xi EndoWrist market from its experience in the S/Si EndoWrist market. The customer base is the same set of hospitals with robotic surgery programs. The repair process itself is virtually identical.  So is the process verification and validation for clearance from the FDA to remanufacture the devices under your own label.  Restore and its business partners also have prior experience in servicing and reprocessing a variety of medical devices from endoscopes to cardiac mapping catheters.

35

**App.210**

87.    Restore was capable of taking all the necessary steps to enter the X/Xi EndoWrist market by July 2020 and would have done so if not for the anticompetitive conduct of Intuitive restricting customers from using instruments that had been reset for an additional cycle of uses. The obstacles to full entry flowed from the anticompetitive conduct of Intuitive. Restore's inability to grow was a direct result of Intuitive's restrictions on the use of instruments reset for additional cycle of uses. Restore had been counting on the revenues from the S/Si business to fund research, development, and ultimately production for the X/Xi business. Since Intuitive was blocking any and all access to customers indefinitely, the expenditure of substantial resources on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture.

88.    Even in the face of this anticompetitive conduct, Restore took a series of affirmative steps over time to enter the X/Xi EndoWrist market by negotiating agreements with vendors and distributors, acquiring the necessary equipment, inventory, and facilities and developing the relevant tools:

- No later than June 2019, Restore executed an agreement with Medline, a medical supply company with more than $20 billion in annual sales, to sell Restore's repair services, which expressly included the X/Xi EndoWrists.

- No later than July 2019, Restore was negotiating an agreement with its business partner for preparing and filing for 510(k) clearances for

36

**App.211**

remanufactured instruments, which expressly included the X/Xi EndoWrists.

- No later than December 2019, Restore was working with its engineering firm on options for developing the technological capability to reset the usage counter on the X/Xi EndoWrists and testing and validation protocols for a 510(k) submission for remanufactured X/Xi EndoWrists.

- No later than October 2020, Restore started development of a handheld wireless reader through its engineering firm to determine the remaining lives on an X/Xi instrument without connecting the instrument to the robot arm and expending one life.

- No later than June 2021, Restore completed development of a patented handheld wireless reader to determine the remaining lives on an X/Xi instrument without connecting the instrument to the robot arm and expending one life.

- No later than January 2022, Restore started to operate out of a new facility to handle the much larger demand for remanufacturing the X/Xi EndoWrists.

- No later than June 2022, Restore acquired a da Vinci Xi robot from a third party for regularly testing X/Xi EndoWrists.

- No later than February 2023, Restore started a program to collect used X/Xi EndoWrists from hospitals to build up an inventory for entering the market.

Restore would have taken those steps to expand into X/Xi EndoWrists much more quickly if not for the anticompetitive conduct of Intuitive restricting customers from using instruments that had been reset for an additional cycle of uses.

**App.212**

**RESTORE IS NOW ABLE TO ENTER THE X/XI ENDOWRIST MARKET**

89.     During the S/Si EndoWrist Litigation, Restore was not able to enter the X/Xi EndoWrist Market. The X/Xi EndoWrists are based on the S/Si EndoWrists. They have the same mechanical design. Restore has developed the processes and tools (*e.g.*, instrument reader and cap removal) for repairing the X/Xi EndoWrists. But there is one significant difference between the S/Si EndoWrists and the X/Xi EndoWrists: the difficulty in resetting the usage count on the pre-programmed memory chip. Intuitive switched to an encrypted memory chip on the X/Xi EndoWrists.

90.     Therefore, it was unknown whether anyone would be able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for any additional cycles of uses on the robot. Potential entry required significant time and expense with significant risk of failure to achieve the technological capability to reset the usage count on X/Xi EndoWrists. Restore did not attempt to acquire the ability to enter the X/Xi EndoWrist Market so long as Intuitive appeared to strictly enforce its contractual restrictions against repairing or remanufacturing its instruments. Without access to customers, it was futile to take that step to expand into X/Xi EndoWrists.

91.     In the S/Si EndoWrist Litigation, Judge Wetherell denied a motion by Restore to compel Intuitive to produce sales data for the X/Xi EndoWrists. Dkt. 192

38

**App.213**

at 2-3. Intuitive argued that Restore was "seek[ing] to assert a theory alleging harm to its contemplated (but currently non-existent) business of extending X/Xi EndoWrists beyond their FDA-cleared limits, even though [Plaintiff] admittedly lacks the technological capability to circumvent the X/Xi use counter—a prerequisite to extending EndoWrist use limits." Id. at 2. Judge Wetherell denied the motion "for the reasons articulated by Defendant in its response." Id. at 3.

92.    Judge Wetherell later granted a motion by Intuitive to exclude any evidence at trial regarding the harm to Restore's X/Xi EndoWrist business. S/Si EndoWrist Litigation, Dkt. 218 at 3. In its motion, Intuitive argued that the technical ability to reset the memory chip on the X/Xi EndoWrists was "hoped-for" but "still apparently non-existent." Dkt. 204 at 1-2. Intuitive argued the case had not included claims for harms to "Restore's hypothetical new X/Xi business" and that Restore did not have a "basis to *assert* such a claim." Id. at 9.

93.    As part of the settlement agreement in the S/Si EndoWrist Litigation executed on January 23, 2023, Intuitive agreed for the first time that it would not void the warranty or withhold service on a robot or refuse to sell a robot, instruments, or accessories if a customer used EndoWrists remanufactured by Restore under clearance from the FDA.

94.    On or about February 24, 2023, Restore restarted the process to evaluate options for trying to achieve the technological capability to reset the usage count on

**App.214**

the X/Xi EndoWrists. On or about September 15, 2023, Restore launched the expensive and risky process to try to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for a one or more additional cycles of uses on the robot. On or about February 29, 2024, Restore became the first and only ISO to achieve the technological capability to reset the pre-programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments.

95.    On or about August 16, 2024, Restore completed testing to submit its first 510(k) to market and sell remanufactured X/Xi EndoWrists for one additional cycle of uses. On or about August 30, 2024, Restore submitted its application for clearance by the FDA to market and sell X/Xi EndoWrists remanufactured for a second cycle of uses. On or about March 11, 2025, Restore received clearance through its subsidiary Iconocare Health from the FDA to market and sell remanufactured X/Xi EndoWrists (K242610). Restore has transferred the clearance from Iconocare to Restore to sell the instruments under the Restore label.

**RESTORE WOULD HAVE ENTERED THE X/XI MARKET BY JULY 2020**

96.    As a result of Intuitive's anticompetitive conduct, Restore has lost significant sales in its business repairing and replacing X/Xi EndoWrists beginning as early as July 2020. But for the anticompetitive conduct of Intuitive, Restore would have started the expensive and risky process to achieve the technological capability

**App.215**

to reset the usage count on the X/Xi EndoWrists as early as July 2019. On or about February 29, 2024, Restore established that it is possible to achieve the technological capability to reset the usage counter on the X/Xi EndoWrists and that it would have achieved that capability within one year – *i.e.*, as early as July 2020 – if not for the anticompetitive conduct of Intuitive. But for the anticompetitive conduct of Intuitive, Restore would have also sought and received clearance from the FDA to remanufacture X/Xi EndoWrists as early as January 2021.

97.    Due to the contractual restrictions, Restore continues to lose sales in the X/Xi EndoWrist Market. In fact, it is futile for Restore to offer to repair X/Xi EndoWrists and reset their usage limits because Intuitive continues to insist that it will enforce the various contractual restrictions against customers that repair their instruments with Restore. It is equally futile for Restore to sell or license the technology to hospitals or distributors for resetting the usage limits on X/Xi EndoWrists.

98.    In addition, Intuitive has never amended the language in the existing contracts for the da Vinci Surgical Systems to allow customers to use remanufactured instruments cleared by the FDA. Since Intuitive announced its position on remanufactured instruments on its website, customers have repeatedly informed Restore and its agents that they will still not buy remanufactured instruments from Restore because Intuitive has not changed the terms in their

41

**App.216**

contracts. Moreover, Intuitive continues to incorporate the old terms and conditions into contracts with customers that traded in their older models of da Vinci Surgical System for the da Vinci X and Xi. Upon information and belief, Intuitive also uses the same or similar terms and conditions in contracts with new customers purchasing or leasing the da Vinci X and Xi and the da Vinci 5.

99.    The claims in this action for lost profits in the business of repairing and replacing X/Xi EndoWrists accrued no sooner than February 29, 2024. On or about that date, Restore became the first and only ISO to achieve the technological capability to reset the usage count on the X/Xi EndoWrist instruments. Restore was unable to earlier prove with requisite certainty the existence and amount of damages to its business in repairing and replacing X/Xi EndoWrists going back to June 2020. "It would be too speculative for Restore to assert a claim . . . when it admittedly lacks the technology to circumvent X/Xi use limits." S/Si EndoWrist Litigation, ECF No. 190 at 6.

## COUNT ONE – MONOPOLIZATION

100.    The foregoing allegations are expressly incorporated.

101.    Intuitive has willfully acquired and maintained monopoly power in the domestic market for X/Xi EndoWrist instrument repair and replacement (or the domestic market for repair and replacement of instruments for use with Surgical

**App.217**

Robots in the alternative) in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

102.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT TWO – ATTEMPTED MONOPOLIZATION

103.   The foregoing allegations are expressly incorporated.

104.   Intuitive has attempted to monopolize the domestic market for X/Xi EndoWrist instrument repair and replacement (or the domestic market for repair and replacement of instruments for use with Surgical Robots in the alternative) in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has the specific intent to monopolize the domestic market for X/Xi EndoWrist instrument repair and replacement by engaging in predatory conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

105.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT THREE – TYING

106.   The foregoing allegations are expressly incorporated.

43

**App.218**

107.   Intuitive has tied X/Xi EndoWrist instrument replacement to its surgical robots and robot service, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Intuitive has forced customers to purchase X/Xi EndoWrist instrument replacements to get the da Vinci surgical robot and da Vinci robot service. Intuitive has sufficient economic power in the domestic surgical robot market and the domestic da Vinci robot service market to coerce customer acceptance of X/Xi EndoWrist instrument replacement. The tying arrangements have had anticompetitive effects in the domestic aftermarket for X/Xi EndoWrist repair and replacement (or the domestic market for repair and replacement of instruments for use with Surgical Robots in the alternative), which involves a not insubstantial amount of interstate commerce.

108.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

### COUNT FOUR – EXCLUSIVE DEALING

109.   The foregoing allegations are expressly incorporated.

110.   Intuitive has entered agreements with its customers to provide X/Xi EndoWrist instrument repair and replacement on an exclusive basis that have foreclosed competition in substantially all of the domestic aftermarket for repair and replacement of X/Xi EndoWrist instruments (or the domestic market for repair and

**App.219**

replacement of instruments for use with Surgical Robots in the alternative) and have resulted in higher prices and lower service in the domestic X/Xi EndoWrist repair and replacement aftermarket (or the domestic market for repair and replacement of instruments for use with Surgical Robots in the alternative), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

111.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## PRAYER FOR RELIEF

Plaintiff respectfully asks that this Court:

(a)    conduct a jury trial of all claims and issues as to which there is a right to jury trial;

(b)    enter judgment awarding damages to Plaintiff in an amount to be determined, and trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a), on its federal antitrust claims;

(c)    enter injunctive relief in favor of Plaintiff to prevent the threat of loss or injury by violation of the antitrust laws as provided in Section 16 of the Clayton Act, 15 U.S.C. § 26;

(d)    award Plaintiff the cost of this suit, including a reasonable attorney's fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, and

**App.220**

Section 16 of the Clayton Act, 15 U.S.C. § 26, on its federal antitrust

claims; and

(e)    order such other and further relief as this Court deems proper and just.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of its claims by jury to the extent authorized by

law.

Respectfully submitted on April 7, 2025.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

\* Admitted Pro Hac Vice

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.

47

**App.222**

# EXHIBIT 1

# Letters

RESEARCH LETTER

## Estimation of the Acquisition and Operating Costs for Robotic Surgery

Despite evidence questioning the clinical benefit,[1] the use of the robotic platform for surgical procedures is increasing.[2] No benchmark exists for the cost of acquiring and operating robotic systems, and previous cost evaluations have either omitted key expenses[1] or utilized billing records that do not itemize costs with sufficient granularity.[2] Because 1 company supplies most robotic technology, and all their revenue comes from system, service, and instrument sales, the minimum cost to hospitals can be estimated by examining the revenue in this company's financial statements. Establishing a cost benchmark can inform future cost-effectiveness evaluations.

**Methods** | The financial statements of Intuitive Surgical Inc (Form 10-K annual reports) from January 1999 to December 2017 were retrieved online.[3] The Form 10-K is an annual report required by the US Securities and Exchange Commission that provides a summary of a company's finances. Filings are independently audited and verified by the chief executive officer. Data were extracted and summarized for robot system sales, revenue sources (systems, service, instruments and accessories; rounded to the nearest $100 000) and approximate procedure volumes by specialty (gynecology, general surgery, urology). Procedure information is entered into the robotic platform for each case and is transmitted to the company. "Robot systems" refer to the sale or lease of the platform. "Service" refers to the maintenance and training con-

tract. "Instruments and accessories" include finite-lifetime parts, endoscopes, simulators, and supplies (eg, drapes). To hospitals, system revenue is an acquisition cost with service and instrument and accessory revenue as fixed and variable operating expenses, respectively.

**Results** | By the end of 2017, the company shipped 5770 robot systems; after accounting for trade-ins and returns, 4409 platforms were installed globally including 2862 (65%) in the United States (**Figure**, A). The estimated annual procedure volume increased from 136 000 in 2008 to 877 000 in 2017. In 2017, 644 000 procedures (73%) were performed in the United States (**Table**). From 2010 to 2017, general surgery procedure volume increased the fastest (10 000 to 246 000) followed by gynecology (123 000 to 252 000) and urology (85 000 to 118 000) (Figure, B).

Total revenue in 2017 was $3.1 billion, with $2.3 billion (73%) domestically (Table). In 2017, 52% of revenue was derived from instruments and accessories, 29% from robot systems, and 19% from service. Dividing the total spending on robotic technology by the total number of robotic procedures performed in 2017 yielded a cost per procedure of $3568, with $1866 for instruments and accessories, $1038 for robot systems, and $663 for the service contract.

**Discussion** | The robotic surgical procedure market is large and increasing; in 2017, hospitals paid the primary supplier more than $3 billion, equating to $3568 per procedure.

Before robotic surgery, total operating room costs for common general surgery procedures ranged from $3000 (cholecystectomy) to $7000 (pancreatectomy).[4] Instruments account



Figure. Robot System Shipments and Installations and Procedure Volume Data, 2010-2017



Installed base indicates units shipped minus trade-ins and returns. Although the overall structure of each financial statement is similar, some individual data points were not reported for the entire study period. For example,

US procedure volume was introduced in 2010. To avoid introducing unsubstantiated assumptions, data are only presented when continuous elements are available for all years until 2017.

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Jeff Berhold on 05/02/2019

**App.224**

Letters

Table. Robot System Sales, Robotic Procedure Volume, and Revenue Data in 2017[a]

| Characteristic | Value |
|---|---|
| **Robot System Sales, No.[b]** | |
| Units shipped | |
|   Global | 684 |
|   United States | 417 |
|   Non-United States | 267 |
| Installed base | |
|   Global | 4409 |
|   United States | 2862 |
|   Non-United States | 1547 |
| **Robotic Procedure Volume, No.[c]** | |
| Global | 877 000 |
| United States[d] | 644 000 |
|   Gynecology | 252 000 |
|   General surgery | 246 000 |
|   Urology | 118 000 |
| **Revenues, $** | |
| United States | 2 279 800 000 |
| Total revenue | 3 128 900 000 |
|   Robot systems | 910 200 000 |
|   Instrument and accessory[e] | 1 636 900 000 |
|   Service[f] | 581 800 000 |

[a] Except for the installed base, all values represent data for the period from January 1, 2017, to December 31, 2017. The installed base is data as of December 31, 2017, and reflects the total number of units shipped minus trade-ins and returns since company inception.

[b] Systems refer to the sale or lease of the platform.

[c] Procedure data are estimated by the company and ascertained through the platform's operative logs.

[d] Gynecology, general surgery, and urology data do not add to overall US data because of other, low-volume surgical procedures that are not itemized in the financial statements (eg, ear, nose, and throat; thoracic).

[e] Instruments and accessories include finite-lifetime parts, endoscopes, simulators, and disposable supplies (eg, staplers, drapes).

[f] Service refers to the maintenance and training contract.

for less than 20% of this cost[5] because they are relatively inexpensive. For example, the marginal cost of a reusable instrument set is less than a few hundred dollars per procedure and disposable instruments, although more expensive, still cost less than $1000 for common laparoscopic procedures.[6]

In this study, the instruments and accessories used in robotic surgery cost an average of $1866 per procedure. In part, this reflects a limitation imposed by the company because of specifications to not use most instruments for more than 10 procedures. To our knowledge, no clinical data support this limit. In addition, $1701 per procedure was dedicated to purchasing and maintaining the system, costs that are novel to robotic surgical procedures.

The primary limitation of this study is the ability to estimate only the hospital costs imposed by the manufacturer. Because robotic surgery increases operating room time,[1,2] and there are other hospital expenses such as staff training, infrastructure upgrades, and marketing, this study's estimate represents the lower bound for the total cost of this technology. Reductions in downstream expenses, such as reduced

length of stay, may offset these costs. However, especially in robotic vs laparoscopic comparisons, there are few data supporting this assertion.[1,2]

The continued use of the robotic platform in surgery requires demonstrating the superior clinical benefit of these devices while considering the full set of costs for these systems.

Christopher P. Childers, MD
Melinda Maggard-Gibbons, MD, MSHS

**Author Affiliations:** Department of Surgery, David Geffen School of Medicine at University of California, Los Angeles.

**Accepted for Publication:** June 11, 2018.

**Corresponding Author:** Christopher P. Childers, MD, Department of Surgery, David Geffen School of Medicine at University of California, Los Angeles (UCLA), Ronald Reagan UCLA Medical Center, 10833 Le Conte Ave, CHS 72-247, Los Angeles, CA 90095 (cchilders@mednet.ucla.edu).

**Author Contributions:** Dr Childers had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Concept and design:* Childers.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* Childers.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* Childers.
*Obtained funding:* Childers.
*Supervision:* Maggard-Gibbons.

**Conflict of Interest Disclosures:** All authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest.

**Funding/Support:** This work was funded by grant F32HS025079 from Agency for Healthcare Research and Quality (Dr Childers).

**Role of the Funder/Sponsor:** The funder had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**Reproducible Research Statement:** All data used for this study are available on request from the corresponding author.

**Additional Contributions:** We thank Gerald Kominski, PhD (University of California, Los Angeles), for his invaluable economic assistance in preparing the manuscript, for which he was not compensated.

1. Jayne D, Pigazzi A, Marshall H, et al. Effect of robotic-assisted vs conventional laparoscopic surgery on risk of conversion to open laparotomy among patients undergoing resection for rectal cancer: the ROLARR randomized clinical trial. *JAMA.* 2017;318(16):1569-1580. doi:10.1001/jama.2017.7219

2. Jeong IG, Khandwala YS, Kim JH, et al. Association of robotic-assisted vs laparoscopic radical nephrectomy with perioperative outcomes and health care costs, 2003 to 2015. *JAMA.* 2017;318(16):1561-1568. doi:10.1001/jama.2017.14586

3. US Securities and Exchange Commission. EDGAR company filings. https://www.sec.gov/edgar/searchedgar/companysearch.html. Accessed February 22, 2018.

4. Stey AM, Brook RH, Needleman J, et al. Hospital costs by cost center of inpatient hospitalization for medicare patients undergoing major abdominal surgery. *J Am Coll Surg.* 2015;220(2):207-217.

5. Childers CP, Maggard-Gibbons M. Understanding costs of care in the operating room. *JAMA Surg.* 2018;153(4):e176233. doi:10.1001/jamasurg.2017.6233

6. Siu J, Hill AG, MacCormick AD. Systematic review of reusable versus disposable laparoscopic instruments: costs and safety. *ANZ J Surg.* 2017;87(1-2):28-33. doi:10.1111/ans.13856

## COMMENT & RESPONSE

### Sepsis as a Cause of Infectious Disease Mortality

**To the Editor** Dr el Bcheraoui and colleagues reported a decreasing trend over time and large geographical variability in mortality from infectious diseases in the United States

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Jeff Berhold on 05/02/2019

**App.225**

# EXHIBIT 2



March 21, 2025

David Rosa
President
Intuitive Surgical, Inc.
1020 Kifer Road
Sunnyvale, CA 94086

Dear David:

Subject: Request for Approval Letter to Sell Remanufactured Monopolar Scissor EndoWrist Instruments

Restore Robotics is pleased to inform you and your colleagues at Intuitive Surgical that Restore Robotics' subsidiary Iconocare Health received FDA 510(k) clearance to remanufacture the Monopolar Scissor EndoWrist instruments originally manufactured by Intuitive Surgical for use with the da Vinci Xi robotic surgical system on March 11, 2025 (K242150). This clearance represents a significant milestone in our mission to provide hospitals and surgical centers with high-quality, cost-effective, and sustainable solutions for robotic-assisted surgery. By driving down the costs per procedure for hospitals, we seek to expand the number of healthcare providers and patients that can get access to the da Vinci Surgical System and the unique benefits of robotic-assisted surgery.

As part of our commitment to transparency and collaboration within the surgical robotics community, we are reaching out to you to request that Intuitive revise its User Manual and amend its Sales, License, and Service Agreements to state that your instruments are not subject to a limited license based on the number of uses and that Intuitive approves Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA. In addition, we ask that you provide a letter signed by you to Restore Robotics that simply states that Intuitive approves Restore Robotics to remanufacture and sell EndoWrists in compliance with a 510(k) clearance.

Our remanufacturing program, supported by our partnership with Encore Medical Device Repair, adheres to rigorous quality and safety standards, as validated by the FDA's 510(k) clearance. We are dedicated to extending the lifecycle of these instruments, offering the performance and reliability that surgeons expect from the da Vinci Surgical System.

We would greatly appreciate your support in providing this clarification in the User Manual, along with notification to each da Vinci Surgical System user of the amendment to their contract and the written notice of approval directly to Restore Robotics.



Please feel free to contact me directly at 678-619-0011 or info@restorerobotics.net if you have any questions or concerns.

We look forward to your response and to fostering a positive and cooperative relationship with you and your team.

Thank you for your time and consideration.

Sincerely,

Clif Parker
Chief Executive Officer
Restore Robotics LLC