## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

RESTORE ROBOTICS REPAIRS LLC,

*Plaintiff-Appellant*,

v.

INTUITIVE SURGICAL INC.,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the Northern District of Florida
No. 3:24-cv-444-MCR-ZCB
Hon. M. Casey Rodgers

———————————

## APPENDIX OF APPELLANT
## RESTORE ROBOTICS REPAIRS LLC
## VOLUME II of II, pp. 229–314

———————————

Matthew D. Reade
Tiffany Pages-Sanchez
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
mreade@kellogghansen.com

*Counsel for Appellant Restore
Robotics Repairs LLC*

February 12, 2026

# INDEX TO APPENDIX

| Date | Document | Docket Tab No. | Page |
|------|----------|----------------|------|
| **VOLUME I** | | | |
| N/A | Docket Sheet, *Restore Robotics Repairs LLC v. Intuitive Surgical Inc.*, No. 3:24-cv-00444-MCR-ZCB (N.D. Fla.) | A | 1 |
| 09/18/2024 | Restore's Original Complaint | 1 | 8 |
| 09/18/2024 | Exhibit 1 – Christopher P. Childers & Melinda Maggard-Gibbons, *Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery*, 320 J. Am. Med. Ass'n 835 (Aug. 28, 2018), Dkt. 1-1 | | 40 |
| 09/18/2024 | Exhibit 2 – Summons in a Civil Action, Dkt. 1-2 | | 43 |
| 12/27/2024 | Restore's First Amended Complaint | 21 | 46 |
| 12/27/2024 | Exhibit 1 – Christopher P. Childers & Melinda Maggard-Gibbons, *Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery*, 320 J. Am. Med. Ass'n 835 (Aug. 28, 2018), Dkt. 21-1 | | 88 |
| 01/31/2025 | Intuitive's Dispositive Motion to Dismiss Amended Complaint for Failure to State a Claim and Memorandum of Law | 25 | 91 |
| 02/14/2025 | Restore's Opposition to Intuitive's Motion to Dismiss First Amended Complaint | 27 | 127 |

| Date | Document | Docket Tab No. | Page |
|---|---|---|---|
| 03/26/2025 | Intuitive's Reply Memorandum in Support of Its Dispositive Motion to Dismiss Amended Complaint for Failure to State a Claim | 33 | 148 |
| 04/07/2025 | Restore's Motion for Leave to Amend Complaint with Supporting Memorandum | 34 | 159 |
| 04/07/2025 | Restore's Second Amended Complaint | 35 | 176 |
| 04/07/2025 | Exhibit 1 – Christopher P. Childers & Melinda Maggard-Gibbons, *Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery*, 320 J. Am. Med. Ass'n 835 (Aug. 28, 2018), Dkt. 35-1 | | 223 |
| 04/07/2025 | Exhibit 2 – Letter from Clif Parker, CEO, Restore Robotics LLC, to David Rosa, President, Intuitive Surgical, Inc., dated March 21, 2025, Dkt. 35-2 | | 226 |
| **VOLUME II** | | | |
| 04/21/2025 | Intuitive's Memorandum in Opposition to Restore's Motion for Leave to File a Second Amended Complaint, Dkt. 36 | 36 | 229 |
| 04/21/2025 | Declaration of William B. Michael in Support of Intuitive's Opposition to Restore's Motion for Leave to File a Second Amended Complaint, Dkt. 36-1 | | 265 |

| Date | Document | Docket Tab No. | Page |
|---|---|---|---|
| 04/21/2025 | Exhibit A – Sales, License, and Service Agreement between Intuitive Surgical, Inc. and Valley Medical Center, dated August 31, 2018, Dkt. 36-1 | | 267 |
| 04/21/2025 | Exhibit B – Letter from David Rosa, President, Intuitive Surgical, Inc., to Clif Parker, CEO, Restore Robotics LLC, dated March 27, 2025, Dkt. 36-1 | | 276 |
| 04/21/2025 | Exhibit C – Excerpts of Transcript of Jury Trial Proceedings, *Surgical Instrument Serv. Co. v. Intuitive Surgical, Inc.*, No. C 21-03496 AMO (N.D. Cal. Jan. 22, 2025), Dkt. 36-1 | | 279 |
| 11/07/2025 | Order Granting Intuitive's Motion to Dismiss Restore's Second Amended Complaint | 42 | 295 |
| 11/29/2025 | Notice of Appeal | 43 | 314 |
| N/A | Certificate of Service | B | |

TAB 36

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC,

Plaintiff,

v.

INTUITIVE SURGICAL, INC.,

Defendant.

Civil Case No. 3:24-cv-444-MCR-ZCB

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR LEAVE TO FILE A
SECOND AMENDED COMPLAINT**

Defendant Intuitive Surgical, Inc. ("Intuitive") respectfully submits this
Memorandum of Law in Opposition to Plaintiff Restore Robotics Repair LLC's
("Restore") Motion for Leave to File a Second Amended Complaint.

**PRELIMINARY STATEMENT**

Intuitive moved to dismiss Restore's first two complaints, identifying multiple
reasons why Restore's claims fail as a matter of law. In response, Restore now seeks
leave to try, a third time, to plead a viable antitrust claim. Each successive version
of Restore's pleading has only worsened its position. Restore's proposed Second
Amended Complaint ("SAC"), ECF No. 35, confirms that further amendment is
futile. Restore's motion for leave to amend should be denied, and its claims should
be dismissed with prejudice.

**App.229**

For the Court's convenience, and because the futility of the proposed SAC is intertwined with the reasons the First Amended Complaint ("FAC") should be dismissed, Intuitive identifies here in a single brief the principal arguments for dismissal made in Intuitive's still-pending Motion to Dismiss, ECF No. 25, as well as why Restore's proposed amendments do not cure the fatal deficiencies in its prior pleadings.

Intuitive is the developer of da Vinci, the first FDA-cleared system for robotic-assisted, minimally invasive soft tissue surgery in the United States. Restore challenges as anticompetitive Intuitive's contracts with hospital customers which limit the use of <u>unauthorized</u> third-party products and services with the da Vinci. The contract terms that Restore complains about have been in place for many years. In a prior lawsuit, filed in 2019, Restore alleged that the same contract terms blocked Restore from remanufacturing Intuitive's "S/Si" generation EndoWrist instruments for use with the da Vinci. SAC ¶85. That case settled in 2023. *Id.* Restore's SAC attempts to reprise the same theory as to the subsequent "X/Xi" generation EndoWrists. But Restore's current claims are time-barred and legally baseless. And recent events confirm that Restore has no cognizable antitrust claim.

After filing its first lawsuit, Restore applied for and received 510(k) clearance from the FDA to remanufacture S/Si EndoWrists. *Id.* ¶¶83-84. Shortly thereafter, Intuitive published on its website a statement that:

Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA.

*Id.* ¶64.

In its current lawsuit, Restore admits that Intuitive's contracts have not stopped it from developing the technical ability to remanufacture X/Xi EndoWrists or from obtaining FDA clearance. Restore admits that—notwithstanding Intuitive's contracts—Restore submitted an application for FDA clearance "to market and sell X/Xi EndoWrists remanufactured for a second cycle of uses" on August 30, 2024, and that Restore obtained clearance from the FDA on March 11, 2025. *Id.* ¶95. Restore newly alleges in the SAC that after receiving FDA clearance, Restore asked Intuitive for written assurance that Restore's FDA-cleared products would be treated as authorized under Intuitive's contracts. *Id.* ¶72. And, while that request was hardly necessary given Intuitive's prior website statement, Restore admits that ***Intuitive promptly provided assurance of authorization***. *Id.*

In short, Restore's proposed SAC demonstrates that whatever antitrust complaint Restore may once have believed it had against Intuitive has collapsed like a house of cards. Accordingly, its motion for leave to file the SAC should be denied, and its claims should be dismissed with prejudice. Each independent reason for dismissal is summarized below.

**App.231**

*First*, Restore's complaint is time-barred.  The four-year statute of limitations on an antitrust claim resting on a vertical contract (such as Intuitive's contracts with hospitals) begins to run when the defendant first imposes the challenged term.  *See SaurikIT, LLC* v. *Apple, Inc*., 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023). Restore asserts that Intuitive has employed the contract terms it challenges for longer than four years, *and* that those terms caused injury to Restore more than four years ago.  Specifically, Restore alleges it would have begun selling remanufactured X/Xi EndoWrists as early as July 2020 (four years and three months before it filed this lawsuit) but-for Intuitive's contracts.  SAC ¶86.  By waiting more than four years to file this case, Restore has pled itself out of court.

*Second*, Restore challenges Intuitive's contracts as illegal tying or exclusive dealing arrangements.  But there is no tying or exclusive dealing as a matter of law where, as here, a defendant permits customers to buy a secondary product or service from an approved third party—unless the plaintiff can show the possibility of approval was illusory.  *Kentucky Fried Chicken* v. *Diversified Packaging Corp.*, 549 F.2d 368, 377-79 (5th Cir. 1977); *see also Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979).  Intuitive's hospital contracts, on their face, limit only the use of *unauthorized* products and services.  Restore acknowledges that Intuitive has made clear to the entire industry, via its website, that third parties who obtain FDA clearance for remanufactured EndoWrists automatically are "approved" under

**App.232**

those contracts. SAC ¶64. And Restore now admits—in the proposed SAC—that, once it obtained FDA clearance, ***Intuitive approved Restore*** to sell remanufactured X/Xi EndoWrists. *Id.* ¶72. Restore cannot plausibly claim that approval by Intuitive is illusory when Restore itself successfully obtained such approval.

*Third*, Restore has failed to plead causation of antitrust injury. Unable to allege it is currently blocked from selling remanufactured X/Xi EndoWrists, Restore instead claims that Intuitive's contracts somehow delayed Restore's entry into the alleged market. But that claim makes no sense. Restore concedes that it began investing in technology to remanufacture X/Xi EndoWrists well before Intuitive's March 2023 website statement. *Id.* ¶88. It made those same investments as to S/Si EndoWrists years before Intuitive's statement, and also obtained FDA clearance for S/Si remanufacturing before the statement. The SAC alleges no facts showing that Intuitive *ever* took the position that a company that obtained FDA clearance would not be "approved." Nor does the SAC allege that Intuitive ever refused approval to Restore (or anyone else) for an FDA-cleared remanufactured EndoWrist. Restore thus has no plausible explanation for how Intuitive's conduct—as opposed to Restore's own business decisions—prevented Restore from pursuing the X/Xi remanufacturing business sooner than it did.

*Finally*, the alleged "aftermarket" in which Restore claims that Intuitive restrained competition—Intuitive's X/Xi EndoWrists—is limited to a single brand.

Yet, Restore fails to allege the kinds of facts required to establish a single-brand aftermarket under controlling law. *See Maris Dist. Co.* v. *Anheuser Busch, Inc.*, 302 F.3d 1207, 1222-24 (11th Cir. 2002). Restore tries in the proposed SAC to allege an alternative aftermarket for robotic surgery instruments that is not limited exclusively to Intuitive's X/Xi EndoWrists, but pleads no facts showing that such a market is plausible.

For all these reasons, Restore's motion should be denied and its claims should be dismissed with prejudice.

## RESTORE'S ALLEGATIONS

**A.    Intuitive Offers Innovative, FDA-Cleared Surgery Products**.

This case concerns a "robotic revolution" in surgery led by Intuitive. SAC ¶6. Intuitive is the sole manufacturer of the da Vinci system, and has continually innovated and developed the da Vinci over the last 20 years. *Id.* ¶¶26-27. "As of September 30, 2024, Intuitive had an installed base of 5,627 da Vinci Surgical Systems in the U.S.," nearly all of which were Intuitive's X/Xi system. *Id.* ¶12. While other competitors sell robotic-assisted surgery systems, Intuitive sells a large percentage of such systems in the United States. *Id.* ¶16.

EndoWrists are surgical instruments developed by Intuitive specifically for use with the da Vinci. The FDA has cleared the da Vinci for use only with EndoWrist instruments. *Id.* ¶9. Intuitive is the only original manufacturer of X/Xi

EndoWrists. *Id.* ¶41. EndoWrists are cleared by the FDA to be reused up to a limited number of uses, and include a counter that tracks how many times each instrument has been used. *Id.* ¶51.

**B.    Intuitive Requires Hospitals to Use Authorized Providers for EndoWrist Service**.

"[T]o work with the Da Vinci Surgical System, the EndoWrist Instrument must have a serial number to be recognized by the machine." SAC ¶47. An encrypted memory chip prevents remote tampering or wireless attacks. *Id.* ¶49. Further, "[t]he memory chip prevents the instrument from being connected to the robot for more than a certain number of times." *Id.* ¶51. After the specified number of uses, the EndoWrist must be replaced—either with a new EndoWrist from Intuitive, or with a remanufactured EndoWrist from a provider that can "bypass or override the encrypted memory chip" to reset the usage count. *Id.* ¶90.

Restore does not challenge the encryption on X/Xi EndoWrists as anticompetitive. *Id.* ¶49. Rather, Restore alleges that "Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties)." *Id.* ¶52. But Restore's other allegations reveal that is not true. Restore admits that Intuitive's contracts require customers to obtain EndoWrist service or replacement *either* from Intuitive *or* from an authorized third party. *Id.* ¶53. Restore also admits that Intuitive made clear on its website in March 2023 that Intuitive will not consider it a breach of contract for a customer to purchase

**App.235**

remanufactured instruments from third parties with FDA clearance. *Id.* ¶64. Thus, Intuitive's contracts do *not* "force" customers to purchase EndoWrist instrument replacements from Intuitive; rather, they allow purchases from authorized third parties which, as discussed below, include Restore itself.

**C.    Restore Is Authorized to Offer Modified EndoWrists to Customers**.

Restore initially modified S/Si EndoWrists by "replacing the programmed memory chip" to reset the usage limit on the instruments. SAC ¶83. The FDA cleared Restore to remanufacture one type of S/Si EndoWrist under its "Iconocare" label in September 2022. *Id.* ¶84.[1]

Restore achieved the "technological capability" to reset the usage counter on an X/Xi EndoWrist for "one or more additional cycles of use" on or about February 29, 2024. *Id.* ¶94. Restore then submitted an application to the FDA for clearance to market and sell its remanufactured X/Xi EndoWrist on August 30, 2024, and received that clearance on March 11, 2025. *Id.* ¶95.

Restore alleges that it has begun offering remanufactured X/Xi EndoWrists to customers and that customers have asked for confirmation that Intuitive approves Restore to remanufacture EndoWrists. *Id.* ¶¶69-70. The SAC acknowledges that,

---

[1] FDA, 510(k) K210478 Premarket Notification, https://tinyurl.com/4624sx2z. The Court may take notice of the content of records on FDA's website at the pleading stage. *Sullivan* v. *Bos. Sci. Corp.*, 2020 WL 4558303, at *1 (N.D. Fla. June 23, 2020).

**App.236**

in response to Restore's request, Intuitive promptly sent Restore a letter confirming "that Intuitive 'has granted approval' under its contracts for Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA and authorized Restore to provide copies of the letter to its customers." *Id.* ¶¶71-72; *see also* Ex. B.[2]

Restore's case boils down to the assertion that, but for Intuitive's contracts, Restore would have started work on resetting X/Xi EndoWrists "as early as July 2019" and achieved that capability "as early as July 2020." *Id.* ¶96.  In other words, Restore is seeking damages on the theory that Intuitive somehow delayed Restore's ability to provide service for X/Xi EndoWrists.  But as discussed below, Restore pleads no facts to support that theory and instead makes admissions in the SAC that conclusively refute it.

**D.    Restore Is Challenging Contracts That Restore Has Known About for More Than Four Years**.

Restore previously challenged Intuitive's contracts in an antitrust case filed in this Court in February 2019.  SAC ¶85 (citing *Restore Robotics, LLC, et al.* v. *Intuitive Surgical, Inc.*, No. 19-cv-00055 (N.D. Fla.) ("*Restore I*")).  Restore alleged in that case that Intuitive's contracts with customers "force[d] customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service

---

[2] References to "Ex." refer to exhibits to the Declaration of William B. Michael.

from third parties)." *Restore I*, ECF No. 14 ¶85.[3]  Restore asserts nearly identical allegations in this case.  SAC ¶¶52, 58.

Restore alleges that Intuitive's contracts have not changed since it filed the prior case.  Rather, Intuitive incorporates "the old terms and conditions into contracts with customers that traded in their older models of da Vinci Surgical System for the da Vinci X and Xi." *Id.* ¶98.  Restore alleges that Intuitive has adhered to and enforced its contractual authorization provisions since February 2019. *Id.* ¶¶61-62.

## LEGAL STANDARD

Leave to amend a complaint should be denied when amendment would be futile because the amended complaint would be subject to dismissal under Rule 12(b)(6). *L.S. ex rel. Hernandez* v. *Peterson*, 982 F.3d 1323, 1332 (11th Cir. 2020). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).

## ARGUMENT

### I.   RESTORE'S CLAIMS ARE TIME-BARRED UNDER THE CLAYTON ACT'S FOUR-YEAR STATUTE OF LIMITATIONS

Antitrust claims must be asserted "within four years after the cause of action accrued."  15 U.S.C. §15b.  An antitrust cause of action accrues "when [the]

---

[3] The Court can take judicial notice of Plaintiff's allegations in *Restore I*.  *Lozman* v. *City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013).

**App.238**

defendant commits an act which injures the plaintiff's business." *Morton's Mkt., Inc.* v. *Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999) (quoting *Zenith Radio Corp.* v. *Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)).

Restore's claims are time-barred. Restore challenges the same "contractual restrictions" it challenged in its February 2019 complaint. *See Restore I*, ECF No. 14 ¶85. Restore alleges the contracts have never changed. SAC ¶98.

Where an antitrust challenge is directed to a contract, the statute of limitations begins to run at the time of the contract's formation. *See Amey, Inc.* v. *Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1501-02 (11th Cir. 1985). If a competitor challenges as exclusionary a contractual term that appears in all of the defendant's customer contracts, the statute begins to run when that term is introduced, and does not restart each time the defendant repeats that term in a new contract or each time the contract is performed or enforced. *See, e.g.*, *SaurikIT*, 2023 WL 8946200, at *1 (competitor's claims accrued when iOS warranty term was introduced, not each time Apple sold a new iOS device with the warranty term); *US Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43, 68-69 (2d Cir. 2019) (similar). Just like the competitor in *SaurikIT*, Restore is challenging as exclusionary the terms of a customer contract that Restore admits have been in place without modification longer than four years.

The complaint does not identify any anticompetitive acts by Intuitive in the last four years. At most, Restore alleges that Intuitive has enforced its contracts

since February 2017. SAC ¶¶61-63. Restore admits it was aware of the challenged contracts at least as early as 2019, and claims it would have had the ability to modify X/Xi EndoWrists by July 2020. *Id.* ¶96. Yet Restore did not file this case until September 2024. Restore thus brought suit more than four years after it claims to have been excluded from the market.

Restore argues its claims did not accrue until 2024 when it obtained the technical ability to reset the X/Xi EndoWrists because it could not "prove the fact of damage" until then. ECF No. 34 at 8 n.2. That argument is incorrect. The statute of limitations began running as soon as Restore suffered injury, *Morton's Mkt.*, 198 F.3d at 827, which Restore admits was no later than July 2020. Restore concedes it knew of its alleged exclusion from X/Xi EndoWrists by July 2020, when it says it would have entered the X/Xi business but-for Intuitive's conduct—conduct of which Restore was aware at the time. SAC ¶86. The limitations clock began to run as of that moment.

Restore alleges it had no basis to assert claims based on X/Xi EndoWrists at any earlier point because Judge Wetherell granted Intuitive's motion *in limine* to exclude X/Xi damages evidence in *Restore I. Id.* ¶¶91-92. But Judge Wetherell did not decide whether claims based on Restore's alleged exclusion from the X/Xi EndoWrist business had accrued by July 2020 or earlier—the issue here. And the fact that Restore was trying to bring X/Xi damages into *Restore I* confirms that it

**App.240**

knew of its alleged injury years ago.  Even if Restore was uncertain of the exact measure of its alleged damages, the limitations clock nevertheless began to run. *Pace Indus., Inc.* v. *Three Phoenix Co.*, 813 F.2d 234, 240 (9th Cir. 1987).

Restore alternatively resorts to the "continuing violation" doctrine to argue, contrary to *SaurikIT*, that the statute of limitations restarted every time Intuitive signed a new hospital contract containing the challenged terms.  ECF No. 34 at 8-10.  It bizarrely claims that Intuitive conceded this in a hospital class action pending in California, *id.* at 9, but the language it references from Intuitive's brief says just the opposite—that the hospitals identified ***no*** proof of new conduct that would restart the running of the statute.  *Id.* at 9 n.3.[4]

Restore cites *Poster Exchange, Inc.* v. *National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), ECF No. 34 at 8, for the proposition that an alleged monopolist can be subject to the continuing violation doctrine.  But *Poster Exchange* makes clear that there is no liability for "assertedly exclusive agreements entered into" before the limitations period, unless the defendant takes some specific exclusionary action during the limitations period—rather than merely adhering to a

---

[4] In any event, the hospital class action is distinguishable because that case (filed in 2021, and involving allegations going back to 2017) is brought by Intuitive's *customers*, who claim they were overcharged and thus injured each time they purchased replacement EndoWrists at a supracompetitive price.  Here, Restore's injury was complete when it was allegedly excluded as *competitor* by no later than July 2020.

prior anticompetitive policy (*e.g.*, a refusal to deal with competitors). *Id.* at 128-29. Here, Restore concedes that Intuitive's contract terms have been the same for years—including back in 2019 and 2020 when Restore alleges those contracts excluded it from the X/Xi business. This is thus *not* a case where Intuitive has engaged in new or expanded anticompetitive conduct.

Finally, Restore argues, citing *Morton's Market*, that the statute of limitations "begins to run anew with each sale." ECF No. 34 at 8. But *Morton's Market* concerns claims by *buyers* harmed by an overcharge, not *competitors* excluded from a market. As discussed above, a *competitor's* cause of action accrues when it is first excluded from the market by the defendant's contract terms, and does not restart anew each time the defendant enters into a new customer agreement containing the same terms. *SaurikIT*, 2023 WL 8946200, at *1; *CSX Transp. Inc.* v. *Norfolk S. Ry. Co.*, 114 F.4th 280, 290-91 (4th Cir. 2024) (explaining that "a *customer* . . . suffers a new and accumulating injury each time a subsequent supracompetitive price is paid," but "an excluded *rival* [] is injured as soon as the exclusion begins" (emphasis in original)). Restore's claims are thus all time-barred, and the proposed SAC pleads no facts to establish otherwise.

**App.242**

## II.   RESTORE FAILS TO PLEAD FACTS SHOWING UNLAWFUL TYING OR EXCLUSIVE DEALING

### A.   All Four Counts of the Complaint Hinge on the Same Alleged Conduct.

Restore's Monopolization, Attempted Monopolization, Tying, and Exclusive Dealing claims are based on the same conduct—namely, that "Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service." SAC ¶58.  Courts assess Section 1 and 2 tying arrangements and exclusive dealing arrangements under similar standards.  *Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992); *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012).  Where a tying and exclusive dealing claim rest on the same allegations, the failure of the tying claim dooms the exclusive dealing claim.  *Dream Big Media Inc.* v. *Alphabet Inc.*, 2024 WL 3416509, at *5 (N.D. Cal. July 15, 2024).

### B.   Restore Fails to Allege Facts Showing That Intuitive's Third-Party Authorization Clause Is "Illusory."

A crucial element of any tying or exclusive dealing claim is the forcing of customers to buy a product or service *exclusively* from the defendant.  *See Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2, 12 (1984) ("essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere"); 18A

**App.243**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶1800a (5th ed. 2024) ("[A]n exclusive-dealing arrangement is a contract between a manufacturer and a buyer that forbids the buyers from purchasing the contracted good from any other seller or that requires the buyer to take all of its needs in the contracted good from that manufacturer."). Restore cannot allege forcing or exclusivity. To the contrary, Intuitive's contracts with hospitals expressly allow for third parties to service EndoWrists with Intuitive's authorization, and Restore alleges no facts showing that the possibility of obtaining such authorization was "illusory," as required by law. In its proposed SAC, Restore admits the opposite—that authorization not only was not illusory, but Restore has actually obtained it. SAC ¶95; Ex. B.

1. **There Is No Tying or Exclusive Dealing Where the Contract Allows for Purchase from Authorized Third Parties, Unless Authorization Is Illusory**.

Where a supplier's "contractual language [] at least provides for the possibility of purchasing" a secondary product from third-party sources, the courts are "reluctant to find a tying arrangement without some evidence that [the defendant] applied the contract language so restrictively as to constitute a de facto tying clause." *Photovest*, 606 F.2d at 722. In a case still binding here, the Fifth Circuit acknowledged the "fundamental distinction" between "coercing [customers] to purchase from [the defendant] and coercing [customers] to purchase from approved sources." *Kentucky Fried Chicken*, 549 F.2d at 377. Where the defendant permits

customers to purchase from third parties in which it has no interest and from which it receives no commission, but which it has to approve, there is no illegal tie. *Id.* at 377-78; *see also Pullos* v. *All. Laundry Sys., LLC*, 2009 WL 10708625, at *13 (D. Nev. July 29, 2009) (rejecting tying claim where customers were permitted to purchase from third parties that met the defendant's specifications).

The only exception to this rule applies when, despite a contractual third-party authorization clause, the possibility of authorization is "illusory" because the defendant refuses to authorize third parties in good faith. *Kentucky Fried Chicken*, 549 F.2d at 377-79 (no tie where franchisor's approval of suppliers not "unreasonably withheld").

### 2. Intuitive's Contracts Allow for Authorized Third Parties.

The SAC repeatedly refers to Intuitive's Sales, License, and Service Agreement. The Court may therefore consider that contract's terms on a motion to dismiss. *Day* v. *Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Feaz* v. *Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104-06 (11th Cir. 2014) (interpretation of a contract is a matter of law). Intuitive submitted its customer contract with its prior Motion to Dismiss, ECF Nos. 16, 17, and reattaches it here as Exhibit A.

Three provisions of the contract concern potential third-party servicing of da Vinci robots or EndoWrists. Section 3.4 prohibits any third party to "modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and

Accessories," including "reconfiguring any of the Intuitive equipment, Hardware, firmware, or Software … ***without Intuitive's express written <u>permission</u>***." Ex. A at 2 (emphasis added). Section 5.2(A) provides that "Intuitive does not have an obligation to provide Services (1) on any System where installation, repair, or adjustments have been made by an individual other than an Intuitive technician ***or an individual <u>approved</u> by Intuitive*** or (2) which are either necessary or desired as a direct or indirect result, in whole or in part, of ***<u>unauthorized</u> repair, modification, disassembly, alteration, addition to, subtraction from, reconfiguration***, or misuse of the System, or negligence or recklessness on the part of Customer." *Id.* at 3 (emphases added). Finally, Section 8 prohibits "repair, refurbishment, or reconditioning ***<u>not approved by Intuitive</u>***." *Id.* (emphases added).

The SAC selectively quotes §3.4, SAC ¶58, but omits the language about Intuitive giving permission for third-party activities. Even standing alone, §3.4 makes clear that the third-party activities otherwise prohibited may be done with Intuitive's permission. And, if that was not already clear from §3.4, it is made abundantly clear in §§5.2(A) and 8, which expressly contemplate authorized third-party repairs. *See Caron* v. *NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1367-68 (11th Cir. 2018) (contracts must be read "as a whole").

Restore argues that these contractual authorization provisions are meaningless because EndoWrists are sold pursuant to a limited license that expires after the

instrument has been used up to its maximum number of uses. ECF No. 34 at 9. But that argument fails because (in addition to all the other language about authorization discussed above) Intuitive's contracts clearly state that EndoWrist "use is prohibited, whether before *or after* the Instrument or Accessory's license expiration," if it is "not approved by Intuitive." SAC ¶57 (emphasis added); *id.* ¶53 ("[T]he standard contract requires that Intuitive must approve any repairs or service during or after that usage limit.").

Thus, contrary to Restore's assertion, the plain language of the challenged contracts expressly contemplates third-party authorization.

### 3. Restore Does Not Allege that Intuitive Has Ever Refused Third-Party Authorization.

Restore alleges that Intuitive "tracks the use of instruments by serial number," threatens termination of agreements for breaches of contract, and has given "verbal warnings and sent warning letters" to customers about the use of *unauthorized* third parties, including Restore before it obtained FDA clearance. SAC ¶¶60-62. It further alleges that, despite the possibility of contractual authorization, "customers did not and do not have a meaningful freedom of choice in the markets for instruments," and that "Intuitive continues to manipulate the approval clause." *Id.* ¶¶63-64.

None of these allegations establishes that obtaining approval was "illusory." *Kentucky Fried Chicken*, 549 F.2d at 377; *Photovest*, 606 F.2d at 722.

*First*, Restore does not allege that any of Intuitive's contractual enforcement concerned third parties that had sought or obtained third-party approval from Intuitive.  It is not unlawful tying or exclusive dealing for a contract to prohibit third-party servicing except with authorization, and then to enforce the contract when the third party does not have authorization and does not seek it.

*Second*, Restore alleges that Intuitive "never approved any ISO to service instruments for hospitals '[u]sing instruments beyond the programmed number of uses.'"  SAC ¶63.  That is false, as the SAC itself demonstrates.  Restore acknowledges that Intuitive told the industry in March 2023 that it would not

> void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA.

*Id.* ¶64.  That policy, which remains on Intuitive's website,[5] does not distinguish between S/Si and X/Xi EndoWrists.  And Restore's proposed SAC admits, as it must, that when requested, Intuitive wrote to Restore to confirm Restore's approval after Restore obtained 510(k) clearance to remanufacture X/Xi EndoWrists.  *Id.* ¶72;

---

[5] *See* Da Vinci Instruments, Intuitive.com, https://tinyurl.com/3ne4jz3r.  The Court may take notice of the content of a website in considering a motion to dismiss.  *U.S. ex rel. Jacobs* v. *JP Morgan Chase Bank, NA*, 113 F.4th 1294, 1300 (11th Cir. 2024).

**App.248**

Ex. B.[6]  Restore fails to allege that any third party ever sought such approval and was denied.

Where a contract contains a third-party authorization clause, the plaintiff must demonstrate that the approval clause was applied to withhold approval unreasonably. *Photovest*, 606 F.2d at 722; *see also Tic-X-Press, Inc.* v. *Omni Promotions Co.*, 815 F.2d 1407, 1416-18 (11th Cir. 1987) (favorably citing *Photovest* and allowing tying claim where—unlike here—defendant had never approved a third party and had no process for doing so, and plaintiff showed that "the approval clause was somewhat bogus").  Restore does not allege that it or any other third party applied for authorization and was turned down, or told it would be turned down. *Cf. Photovest*, 606 F.2d at 722.  To the contrary, Restore was expressly authorized, and Intuitive's website statement confirms that third parties with FDA clearance are authorized.

*Third*, Restore alleges that Intuitive "has never approved any third party to repair the instruments and has never set up a process for doing so." SAC ¶53.  That allegation is false and contradicted by Restore's own pleading, for the reasons discussed above.  Intuitive has authorized third parties that remanufacture EndoWrists pursuant to FDA clearance, including Restore.  To the extent Restore

---

[6] When, as here, "a complaint quotes part of a document[,] . . . the full text . . . is [] properly considered in deciding a Rule 12 motion."  *Lewis* v. *Governor of Alabama*, 944 F.3d 1287, 1298 n.7 (11th Cir. 2019) (internal quotation marks and citation omitted).

**App.249**

means that Intuitive has never approved any third party that engages in EndoWrist servicing that does *not* constitute "remanufacturing," any such allegation cannot save its complaint. Again, Restore does not allege that it or any third party has sought such approval and been denied. *Photovest*, 606 F.2d at 722. Moreover, according to the proposed SAC, "remanufacturing" and "repair" are part of the same market. SAC ¶62. Restore cannot claim that Intuitive violated the antitrust laws by not granting third-party approval on precisely the terms that Restore preferred, as opposed to demonstrating that third-party approval was illusory.

In the proposed SAC, Restore alleges that two hospital executives asserted that they would need "a statement in writing from Intuitive" or "assurance" that purchasing from Restore would not impair their contractual standing with Intuitive. SAC ¶70. It further asserts that, on March 23, 2025, Restore sent a letter to Intuitive demanding that Intuitive "revise its User Manual and amend its Agreements with customers to state that its instruments are not subject to a limited license based on the number of uses," "notify customers in writing that Intuitive approves Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA," and "provide Restore" with a letter stating "that simply states that Intuitive approves Restore Robotics to remanufacture and sell EndoWrists in compliance with a 510(k) clearance." *Id.* ¶71.

These proposed allegations do not establish that obtaining authorization from Intuitive was illusory—just the opposite. If hospital customers were unaware of Intuitive's website statement on authorization, Restore simply had to show it to them. Restore makes no allegation that any hospital ever reached out to Intuitive for clarification on the implications of its website statement and was denied such clarification or given incorrect information. Nor does Restore provide any basis for its demand that Intuitive modify its customer contracts or User Manual, or plead any facts to suggest that such a change was necessary for Restore to be able to compete. There is no inconsistency between the contracts, which allow for use of authorized third parties, and the website statement, which grants authorization to third parties who have FDA clearance. Finally, Restore admits that Intuitive responded to its March 23 letter by *again* providing a clear statement that third parties (including Restore) who have received FDA clearance are authorized. SAC ¶72; Ex. B. If Restore believes that any potential customers have any remaining doubts, it can show them this letter.

Unable to dispute the content of Intuitive's March 2023 website statement,[7] Restore tries to shift the focus to the period before that date. That effort fails too.

---

[7] Restore further admits that in the parties' January 2023 settlement agreement, Intuitive agreed that it would not prevent customers from purchasing FDA-cleared remanufactured products from Restore. ECF No. 34 at 12. Restore pleads no facts suggesting that Intuitive ever breached that agreement.

**App.251**

Restore falsely asserts that "Intuitive's President (Dave Rosa) testified that he was not aware of any policy for ISOs to get authorized by Intuitive to remanufacture EndoWrists before the Statement in March 2023." SAC ¶65. Restore does not attach Mr. Rosa's testimony, but the Court may consider it in determining whether Restore has stated a cause of action.[8] Far from testifying that Intuitive had no process for approving third-party devices to work with da Vinci robots, Mr. Rosa testified without contradiction that: Intuitive has long had such a process; it has approved dozens of third parties; Intuitive never refused to authorize any third party for modified EndoWrists; Intuitive specifically informed third parties that they could submit clinical evidence about their remanufactured EndoWrists but they did not respond; and, later, Intuitive did approve third parties to sell modified EndoWrists. Ex. C at 1841:19-1851:13. That Intuitive did not make a public announcement regarding its policy for FDA-cleared remanufactured instruments before any third party had received FDA clearance is of no moment. What matters is that third parties were always free to seek approval, as Restore ultimately did, and that, when they did, Intuitive approved them. Mr. Rosa's testimony confirms that Restore cannot plead illusoriness.

---

[8] By (inaccurately) citing Mr. Rosa's testimony, Restore has incorporated *all* of Mr. Rosa's actual testimony into the SAC, and the Court may consider what Mr. Rosa actually testified in determining whether Restore has stated a claim. *South Jersey Gas Co.* v. *Muller Co.*, 2012 WL 12898818, at *3 (D.N.J. 2012); *Wittaker* v. *West Virginia Div. of Corrections*, 2022 WL 16702741, at *3 n.3 (S.D. W. Va. 2022).

In sum, Restore has failed to plead facts showing that third-party authorization is illusory. Such authorization is not only possible, it has been granted to Restore. Restore therefore cannot state a claim for tying or exclusive dealing.

## III. RESTORE FAILS TO ALLEGE FACTS SHOWING THAT INTUITIVE'S ENFORCEMENT OF ITS CONTRACTS CAUSED RESTORE ANTITRUST INJURY

To assert a claim under the antitrust laws, Restore must plead antitrust injury—"injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Fla. Seed Co.* v. *Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (quotation omitted).

Courts dismiss antitrust claims for failure to plead antitrust injury when a plaintiff does not adequately allege that its purported injury is directly attributable to anticompetitive conduct by the defendant. *See, e.g.*, *Spanish Broad. Sys. of Fla., Inc.* v. *Clear Channel Commc'ns*, 376 F.3d 1065, 1076 (11th Cir. 2004); *Jacobs* v. *Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010).

Restore does not allege any conduct by Intuitive that has prevented Restore from competing. There is no allegation that Intuitive or its contracts blocked Restore from pursuing the ability to compete. Rather, Restore concedes the opposite, by alleging that Restore developed its alleged capability to compete while Intuitive's contracts allegedly remained in force and unchanged. SAC ¶88. Restore's admitted ability to develop the technology to reset X/Xi EndoWrists, obtain FDA clearance,

and begin offering remanufactured EndoWrists to customers—all while Intuitive's contracts remained in effect—refutes any claim that Intuitive's contracts precluded Restore from competing.

Restore also fails to allege facts showing that Intuitive's conduct caused Restore's delayed entry into the X/Xi market. Restore admits that it received FDA clearance for both the S/Si and X/Xi, even while Intuitive's contracts remained unchanged. Its damages claim for delayed entry therefore hinges on the assumption that Intuitive did something to prevent Restore from developing the technology to service X/Xi EndoWrists and applying for FDA clearance in 2020, rather than in 2024, even though Restore had begun the same process with respect to the S/Si EndoWrists years earlier and subject to the same Intuitive contracts with hospitals.

Attempting to cure this obvious problem, Restore asserts there is a difference between the S/Si and X/Xi—namely, that "Intuitive switched to an encrypted memory chip on the X/Xi EndoWrists," that Restore did not know whether it would be able to bypass that encryption, and that it "was futile to take that step to expand into X/Xi EndoWrists" before Intuitive's 2023 announcement that companies with FDA clearance were contractually cleared. *Id.* ¶¶89-90. For two reasons, this effort to blame Intuitive for Restore's delay in developing X/Xi capability is unavailing.

*First*, far from alleging facts showing that investing in X/Xi capability before 2023 was "futile," Restore asserts it took ***many*** steps to achieve X/Xi capability

starting in 2019. *Id.* ¶88. The allegations that Restore spent considerable resources on X/Xi technology before 2023 contradict and render implausible its conclusory assertion that "the expenditure of substantial resources on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture." *Id.* ¶87.

*Second*, Restore alleges no facts showing that Intuitive's website statement was a change of policy—*i.e.*, that before March 2023, Intuitive suggested it would not authorize third parties. There is a reason Restore does not make any such allegation: it would be false. As Restore knows, Intuitive has consistently communicated to the market, including to Restore itself, that it would be willing to consider authorization upon a showing of FDA clearance or clinical evidence that third-party activities were safe and effective. Restore alleges no facts to the contrary. That Restore did not take advantage of the option to seek FDA clearance for X/Xi, or otherwise seek approval from Intuitive, before 2023 was its own business choice.

Restore further asserts that "Intuitive already lost this exact same argument on antitrust injury" in litigation with another competitor—Rebotix. ECF No. 34 at 10. Not so. *Rebotix* involved a different question of antitrust injury—whether Rebotix was sufficiently "prepared" to enter the market in light of the fact that it had not yet determined how to break the encryption on the X/Xi EndoWrists. *Rebotix Repair, LLC* v. *Intuitive Surgical, Inc.*, 2022 WL 3272538, at *9-10 (M.D. Fla. Aug. 10,

27
**App.255**

2022). That is not an issue here, because Restore alleges that it has obtained the means of bypassing the X/Xi encryption. SAC ¶94. Unlike Rebotix, Restore alleges it has done everything necessary to enter the market. Restore's own pleading thus makes clear that Restore has been able to enter and that Intuitive has not stopped that from happening. Restore therefore fails to allege antitrust injury.

## IV.    RESTORE FAILS TO ALLEGE A PROPER SINGLE-BRAND AFTERMARKET

Proper definition of a relevant market is a necessary threshold step in any challenge to a vertical agreement, including Intuitive's customer agreements. *Ohio* v. *Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018). Whether a plaintiff's relevant market definition is adequately pleaded is properly determined on a motion to dismiss. *Jacobs*, 626 F.3d at 1336-37.

Restore asserts that Intuitive caused harm in the alleged aftermarket for "repairing and replacing EndoWrist instruments." SAC ¶30. In antitrust parlance, Restore has alleged a "single-brand" aftermarket—*i.e.*, a market confined to parts or service (EndoWrists) necessary only in conjunction with Intuitive's own branded surgical robot (the da Vinci). "It is an understatement to say that single-brand markets are disfavored. From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) (collecting cases). "'Absent exceptional market conditions, one brand in a

market of competing brands cannot constitute a relevant product market.'" *Metzler* v. *Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998) (cleaned up) (quoting *Domed Stadium Hotel, Inc.* v. *Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984)); *see also Green Country Food Mkt., Inc.* v. *Bottling Grp., LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004).   Restore has not pled the exceptional facts necessary to establish a single-brand aftermarket.

The rare exception to the general rule prohibiting single-brand aftermarkets arises from the Supreme Court's decision in *Eastman Kodak*, where the Court permitted a claim that Kodak had restrained competition in the aftermarkets for parts and service for Kodak copiers based on the unique facts of that case.   504 U.S. at 481-82.  Drawing on *Kodak*, the Ninth Circuit recently distilled the requirements for demonstrating a single-brand aftermarket: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023).  *Epic* is consistent with Eleventh Circuit precedent, which has similarly interpreted *Kodak* and related cases to require distinguishing "between contract power and market power," including when customers knowingly contract

to make aftermarket purchases from the seller's single brand. *Maris*, 302 F.3d at 1222.

Restore cannot establish a single-brand market because it fails to plead that the relevant contract provision was "not generally known" at the time the hospitals made their purchase decisions. *Epic*, 67 F.4th at 977. Restore makes a weak and implausible effort to plead the second two *Epic* factors—inability to anticipate life-cycle pricing and high switching costs, *see* SAC ¶¶37-38—but it does not and cannot allege that the challenged contractual provisions were unknown to hospitals. To the contrary, Restore's entire case is premised on explicit terms in Intuitive's customer contracts—including contract language that (according to Restore) requires customers that purchase a da Vinci to purchase EndoWrist instruments from Intuitive. *Id.* ¶54.

But "contracts always restrain and affect a party's available choices." *Maris*, 302 F.3d at 1222. Unless, as in *Kodak*, the challenged contract provision was implemented only after customers had *already* purchased a Kodak copier and were therefore "locked in," the contract does not "raise the same antitrust concerns." *Metzler*, 19 F. Supp. 2d at 1356. Thus, the Seventh Circuit has recognized that the critical issue in *Kodak* was "whether the *change* in policy enabled Kodak to exact supracompetitive prices from customers who had *already* purchased its machines." *Digit. Equip. Corp.* v. *Uniq Digit. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996)

(emphases added).  Similarly, in *Queen City, Inc.* v. *Domino's Pizza, Inc.*—adopted by the Eleventh Circuit in *Maris*, 302 F.3d at 1222—the Third Circuit held that "the *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies" imposed after customers had already made their primary market purchases.  124 F.3d 430, 440 (3d Cir. 1997); *see also PSI Repair Servs, Inc.* v. *Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) ("*change in policy* in *Kodak* was the crucial factor in the Court's decision." (emphasis added)); *Clark Mem'ls of Ala.* v. *SCI Ala. Funeral Servs., Inc.*, 991 F. Supp. 2d 1151, 1164 (N.D. Ala. 2014) ("[A]n essential element of a lock-in claim is a change in policy in the after-markets after a consumer has made a purchase in the initial market.").  Restore alleges the opposite—that Intuitive has made no change in policy.  SAC ¶98.

Restore argues that the "lock-in" factors for single-brand aftermarkets do not apply in a case in which the defendant has market power in the foremarket.  ECF No. 34 at 6.  Restore has invoked the recent trial in the Northern District of California involving another competitor's (SIS) claims against Intuitive, also premised on an alleged single-brand aftermarket, but has failed to inform this Court of how that trial ended.  Like Restore, SIS argued that it did not have to satisfy the lock-in factors for proving a single-brand aftermarket since Intuitive allegedly has market power in the foremarket.  The court rejected plaintiff's argument and held that SIS would have to satisfy the lock-in factors.  Plaintiff then conceded that it could not meet those

factors, and the court entered judgment for Intuitive. *Surgical Instrument Service Co.* v. *Intuitive Surgical, Inc.*, No. 21-cv-03496, ECF No. 445 at 1 (N.D. Cal. Jan. 28, 2025). Restore is in the same posture. It cannot plead facts showing lock-in, and cannot escape the lock-in requirement by asserting that Intuitive has market power in the foremarket.

In a footnote to its proposed SAC, Restore asserts that Intuitive would have a market share of 99.9% "even if the aftermarkets were more broadly defined to include all brands of surgical robots." SAC ¶30 n.2. But Restore does not define an alternative relevant aftermarket for "all brands of surgical robots" nor assert any facts from which the plausibility of such a relevant market could be tested. *See Jacobs*, 626 F.3d at 1338 (holding that plaintiff has "responsibility under *Twombly* to plead facts 'plausibly suggesting'" a relevant market). Restore suggests that aftermarket purchases of replacement wrists for Intuitive and Asensus surgical robots might be in the same relevant market, SAC ¶30 n.2, but provides no factual basis for this facially implausible conjecture. Two products are only in the same relevant market if there is "cross-elasticity of demand between them," meaning that an increase in the price of one will lead to increase in demand for the other. *U.S.* v. *Engelhard Corp.*, 126 F.3d 1302, 1305 (11th Cir. 1997). Restore does not allege that an Intuitive surgical wrist is compatible with an Asensus robot, or vice versa, and therefore offers no factual basis for concluding that replacement wrists for

different brands of surgical robot are reasonable substitutes in the same relevant market.  In short, neither Restore's actual aftermarket allegation nor the alternative aftermarket it speculates about but does not actually allege meets the requirements for pleading facts demonstrating a plausible relevant aftermarket.  Without a properly pled relevant aftermarket, all of Restore's claims fail.

## V.    THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

A complaint should be dismissed with prejudice if granting leave to amend would be futile because "the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant."  *Cockrell* v. *Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).  Although all of the fatal deficiencies discussed above were present in both its original complaint and its amended complaint, Restore did not cure them in its SAC.  Accordingly, further amendment of the complaint would be futile, and dismissal should be with prejudice.  *U.S. ex rel 84Partners* v. *Nuflo, Inc.*, 79 F.4th 1353, 1363 (11th Cir. 2023) (affirming dismissal with prejudice of second amended complaint where plaintiff failed to show how it could cure deficiencies of prior complaints); *Eiber Radiology, Inc.* v. *Toshiba Am. Med. Sys.*, 673 F. App'x 925, 930 (11th Cir. 2016) (dismissal with prejudice was appropriate where "Plaintiff—and its counsel—was offered ample opportunity to state a claim on which relief could be granted").

33

**App.261**

**CONCLUSION**

Restore's Motion for Leave to Amend should be denied as futile, and its claims should be dismissed with prejudice.

Dated April 21, 2025                    Respectfully submitted,

                                        /s/ *William B. Michael*
                                        William B. Michael (*pro hac vice*)
                                        PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP
                                        1285 Avenue of the Americas
                                        New York, NY 10019
                                        T: 212-373-3000
                                        E: wmichael@paulweiss.com

                                        Kenneth A. Gallo (*pro hac vice*)
                                        PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP
                                        2001 K Street, NW
                                        Washington, DC 20006
                                        T: 202-223-7300
                                        E: kgallo@paulweiss.com

                                        Andrew Lazerow (*pro hac vice*)
                                        COVINGTON & BURLING LLP
                                        One CityCenter, 850 Tenth Street, NW
                                        Washington, DC 20001
                                        T: 202-662-6000
                                        E: alazerow@cov.com

                                        Bruce D. Partington
                                        CLARK PARTINGTON
                                        125 East Intendencia Street, 4th Floor
                                        Pensacola, Florida 32502
                                        T: (850) 432-1399
                                        E: bpartington@clarkpartington.com

**App.263**

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Intuitive certifies that its Opposition to Plaintiff's Motion for Leave to File a Second Amended Complaint complies with the word count limitation set forth in Local Rule 7.1(F) because it contains 7,810 words, excluding the parts exempted by the Local Rule.

/s/ *William B. Michael*
William B. Michael (*pro hac vice*)

**App.264**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC,

                Plaintiff,

v.

INTUITIVE SURGICAL, INC.,

                Defendant.

Civil Case No. 3:24-cv-444-MCR-ZCB

## DECLARATION OF WILLIAM B. MICHAEL
## IN SUPPORT OF DEFENDANT'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR LEAVE TO FILE A
## SECOND AMENDED COMPLAINT

I, WILLIAM B. MICHAEL, declare as follows:

1.      I am an attorney licensed to practice in New York and am admitted *pro hac vice* to practice before this Court. I am a partner with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), counsel for Intuitive Surgical, Inc. ("Intuitive") in this matter. I have personal knowledge of the facts set forth herein, and if called to testify, I could and would testify competently hereto.

2.      Attached to this declaration as **Exhibit A** is a true and correct copy of a Sales, License, and Service Agreement between Intuitive and one of its customers (Valley Medical Center). This document was previously filed on the public docket in a case pending in federal district court in California.

**App.265**

3.     Attached to this declaration as **Exhibit B** is a true and correct copy of a letter from David Rosa to Clif Parker dated March 27, 2025.

4.     Attached to this declaration as **Exhibit C** is a true and correct copy of excerpts of the January 22, 2025 trial transcript from a case in federal district court in California.

Dated April 21, 2025                    /s/ *William B. Michael*
                                        WILLIAM B. MICHAEL

# Exhibit A

# SALES, LICENSE, AND SERVICE AGREEMENT

Agreement No.: MA-517-2018 (407056)

This Sales, License, and Service Agreement ("Agreement") is dated **August 31, 2018** (the "Effective Date") and is between **Intuitive Surgical, Inc.**, a Delaware corporation ("Intuitive"), located at 1266 Kifer Road, Sunnyvale, California 94086, and **Valley Medical Center** located at 400 S. 43rd Street, Renton, WA 98055 ("Customer").

The parties agree as follows:

**1.    Introduction**

Customer agrees to purchase the Hardware and license the Software and Documentation from Intuitive, and Intuitive agrees to respectively sell and license the same to Customer, as well as provide Service for the System all according to the terms and conditions of this Agreement.

**2.    Definitions**

2.1    **"Acceptance"** means Customer's acceptance of the System as specified in **Exhibit A**.

2.2    **"Delivery Date"** means the estimated scheduled date for delivery of the System to Customer specified in **Exhibit A**.

2.3    **"Instruments and Accessories"** means those instruments or accessories made or approved by Intuitive for use with the System.

2.4    **"Proctoring"** means the assistance, coaching, or surgical training provided by a surgeon (the "Proctor") who is familiar with the System to another surgeon (the "Proctee") on how to perform a particular surgical procedure (or procedures) using the System.

2.5    **"Services"** means the support and maintenance of the System described in Section 5 for the Service fees designated in **Exhibit A**.

2.6    **"System"** means the items comprising the da Vinci® Surgical System specified in **Exhibit A** consisting of certain hardware components ("Hardware"), software program elements ("Software") and related manuals, labeling, instructions for use, notifications or other documentation ("Documentation"), that Customer may receive, purchase and license under this Agreement. If Customer purchases multiple Systems under this Agreement, all references to "System" or "System(s)" apply to each System sold and licensed. Each System purchased is a separate transaction to be delivered, accepted, and paid for separately.

2.7    **"Taxes"** means any taxes, levies, or similar governmental charges, now in force or enacted in the future, and however designated, including related penalties and interest, imposed by any governmental authority on, or measured by, the activities described.

2.8    **"Customer's Access Requirements"** means any reasonably applicable requirements designated by Customer that Intuitive personnel must meet to gain access to Customer's facility. Such requirements may include, but are not limited to, compliance with Customer's site policies and vendor credentialing requirements, such as vaccination, immunization, background investigation, training, hospital orientation, and liability insurance coverage.

2.9    **"Reprocess" or "Reprocessing"** means Customer's process for cleaning, disinfection, and sterilization of Instruments and Accessories, including testing to validate cleaning, disinfection and sterilization process as may be required by applicable law and/or regulation.

**3.    System Delivery, Use, Disposal**

3.1    **Delivery and Installation.** Subject to credit approval of Customer by Intuitive, Intuitive will use commercially reasonable efforts to deliver the System on or before the Delivery Date. Each party will provide the other party with thirty (30) days notice, or if this Agreement is executed within thirty (30) days before the Delivery Date, a reasonable advance notice of any change in the Delivery Date. Customer will fully cooperate with Intuitive to permit Intuitive to install the System. Intuitive will use commercially reasonable efforts to install the System in an efficient and expeditious manner. Customer will also provide Intuitive with information, consultation, and advice reasonably necessary to permit installation.

3.2    **Delivery Terms.** Intuitive will deliver the System to Customer's designated location noted as the "Ship-to" in **Exhibit A** using a carrier selected by Intuitive. Fees for shipping the System are specified in **Exhibit A**. Risk of loss or damage to the System passes to the Customer upon delivery of the System to Customer. Title to the System passes to the Customer upon Acceptance.

3.3    **On-Site Support.** At no charge to Customer, Intuitive will provide periodic on-site support to Customer's designated personnel on the proper operation and upkeep of the System in order for Customer to operate the System as further described

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                              VMC-00020652

**App.268**

in Section 3.4. To clarify, this support includes, but is not necessarily limited to, training on draping the System for use in surgery, proper attachment of Instruments and Accessories, cleaning of parts of the System, the Instruments and Accessories and discussing opportunities to improve cost efficiencies. The cleaning to be performed regularly by Customer is described in the Documentation.

3.4 **Use of System.** Customer will ensure the proper use of the System consistent with the Documentation, and Customer will ensure the proper management and supervision of the System. Customer will not, nor will Customer permit any third party to, modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and Accessories. Prohibited actions include, but are not limited to: (1) adding or subtracting any Customer or third party equipment, hardware, firmware, or software to or from the System, or (2) reconfiguring any of the Intuitive equipment, Hardware, firmware, or Software as originally provided to Customer as part of the System without Intuitive's express written permission. Customer will ensure that the System is moved and operated only by trained personnel in accordance with the Documentation and Intuitive's instructions. If Customer fails to comply with the requirements of this Section 3.4, Intuitive may terminate this Agreement immediately upon written notice, and any warranties applicable to the System will become void.

3.5 **Reprocess and Disposal.** Customer is responsible for properly Reprocessing and/or disposing of all medical instruments, devices, and systems related to the operation and function of the System, including Instruments and Accessories, in accordance with the Documentation and the then current local environmental and safety laws and standards.

**4. Software License and Restrictions**

Software embedded within the System is provided under license and is not sold to Customer. Subject to the terms and conditions of this Agreement, Intuitive grants to Customer a non-exclusive, non-transferable, fully paid, restricted use license to use the Software solely as incorporated in the System in machine-executable object code form and solely in connection with the operation of the System as described in the Documentation. Customer must not use, copy, modify, or transfer the Software or any copy thereof, in whole or in part, except as expressly provided in this Agreement. In addition, Customer must not reverse engineer, decompile, disassemble, attempt to derive the source code for, or otherwise manipulate the Software, except that manipulation of the Software is permitted if, and then only to the extent that, the foregoing prohibition on manipulation is required to be modified by applicable law. In that case, Customer must first request from Intuitive the information to be sought from the Software, and Intuitive may, in its discretion, provide information to Customer under good faith restrictions and impose reasonable conditions on use of the Software. The structure and organization of the Software are valuable trade secrets of Intuitive and Customer will protect the Software as Intuitive's Proprietary Information (as defined in Section 13). Intuitive reserves all rights to the Software not expressly granted to Customer. Some components of the Software may be provided to Customer under a separate license, such as an open source license. In the event of a conflict between this Agreement and any such separate license, the separate license will prevail with respect to the component that is the subject of such separate license.

**5. Services**

5.1 **Services Included.** If Customer is current in payment to Intuitive of the Service fees specified in **Exhibit A**, Intuitive, directly or through one of its designated service providers, will provide Services to Customer as listed below. Intuitive will use parts sourced by Intuitive, which may, at Intuitive's discretion, include reconditioned parts, ("Equivalent to New" or "ETN"). ETN parts are components, assemblies, or partial products which have had prior usage, but have been inspected, reworked, and tested as required so that their function, performance, and appearance will be essentially equivalent to that of new parts. Regardless of whether parts are new or ETN, Intuitive's appropriate warranties under Section 10.1(A) apply. Customer may contact Intuitive to upgrade its Service Plan to **dv Complete Care Plan Plus**. A $15,000/year uplift fee to annual Service fees set forth in Exhibit A will be charged; a detailed Service plan description will be provided to Customer for its acceptance and signature.

Intuitive will provide Services under the **_dv Complete Care Plan_**, with benefits and limitations as follows:

(A)     Adjust parts on the System from time to time;
(B)     Replace defective or malfunctioning System parts (excludes Instruments and Accessories; and any items contained in the Instrument Starter Kit, Camera Starter Kit, and Training Instrument Starter Kit set forth in Exhibit A);
(C)     Repair System operational malfunctions;
(D)     Replace and install Software, Hardware, and mechanical equipment for safety and reliability;
(E)     Provide twenty four (24) hours per day, seven (7) days per week (24 x 7) telephone support by qualified service personnel;
(F)     Provide and install Software upgrades for feature enhancements. Software upgrades and Service with respect to additional equipment not included on **Exhibit A** may be subject to separate terms to be agreed upon by the parties;
(G)     Provide preferred pricing and next day service repairs or replacement due to accidental damage on endoscopes and camera heads;
(H)     Respond to Customer's request for Services described in Section 5.1(B)-(C) by phone, e-mail, or an on premise visit, during normal business hours (excluding Intuitive holidays) promptly as is reasonable after Intuitive's receipt of Customer's request, but not later than twenty-four (24) hours after Intuitive's receipt. Normal business hours are Monday through Friday, 8:00 a.m.- 5:00 p.m. Customer's local time. Billable rates are applicable for service outside of normal business hours, and for reasons defined below in Section 5.2 (Limitations of Service). Intuitive's current Billable rates are attached as Exhibit C.
(I)     Perform System preventative maintenance inspections as necessary to maintain factory specifications.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                              VMC-00020653

**App.269**

(J)    Provide on-site visits for support of advanced training of Customer's personnel on sterile Reprocessing process.

(K)    When the system is connected to OnSite®, remotely monitor system to diagnose potential issues and proactively dispatch a Field Service Engineer to make repairs when needed.

(L)    Provide access to the da Vinci Surgery Customer Portal.

5.2    **Limitations on Services**.

(A)    **General**. Intuitive does not have an obligation to provide Services (1) on any System where installation, repair, or adjustments have been made by an individual other than an Intuitive technician or an individual approved by Intuitive or (2) which are either necessary or desired as a direct or indirect result, in whole or in part, of unauthorized repair, modification, disassembly, alteration, addition to, subtraction from, reconfiguration, or misuse of the System, or negligence or recklessness on the part of Customer.

(B)    **Cleaning**. Regular daily cleaning of the System as described in the Documentation is not included in the Services.

(C)    **Additional Equipment**. Intuitive's Services obligations do not include the provision to Customer of any hardware developed by Intuitive that is not contained in the initial System purchased by Customer, and which Intuitive offers as a separate product or for an additional fee.

(D)    **Time and Materials**. If the System needs repair or maintenance services due to any of the circumstances described in Section 5.2(A)-(B) above, Intuitive may, at its sole election, provide repair services at Customer's expense and at Intuitive's then current time and material rates. Intuitive is not obligated to provide Services on any System for which any applicable warranty has been voided, or for which the performance of Services is otherwise excused by the terms of this Agreement.

(E)    **Unauthorized Instruments and Accessories**. The System is designed for use only with the Instruments and Accessories. If Customer uses the System with any surgical instrument or accessory not made or approved by Intuitive, Intuitive may discontinue Services, and any warranties applicable to any Services provided prior to any discontinuance will be void.

5.3    **Customer's Obligations.**

(A)    **Notice, Access, and Cooperation**. Customer will notify Intuitive or Intuitive's designated service provider of any requests for Services. Customer will fully cooperate with and assist Intuitive in the provision of Services.

(B)    **Clinical Liaison**. Customer will designate one of its employees, agents, or representatives as a "Clinical Liaison." The Clinical Liaison will be the point of contact with Intuitive for installation, Services, use of the System, and other related issues. Nothing in this Section 5.3 authorizes Customer or the Clinical Liaison to perform Services or to perform any act otherwise prohibited by this Agreement.

6.    **Training**

Intuitive offers training to surgical personnel on the use and operation of the System. At Customer's request, at mutually agreed times and at mutually agreed locations, Intuitive will provide training in the use of the System to Customer's surgical personnel in accordance with the terms specified in **Exhibit A**.

7.    **Proctoring**

At Customer's request, and upon Customer's issuance of a purchase order, Intuitive will arrange for Proctoring at Customer's location in accordance with the terms specified in **Exhibit A**. Each Proctor is an independent contractor, is not an agent or employee of Intuitive, and is not authorized to act on behalf of, or legally bind, Intuitive. Intuitive is not responsible for Proctoring services provided by Proctors. The decision to utilize a Proctor is solely that of the Customer. Customer is responsible for ensuring that each Proctor meets Customer's credentialing requirements.

8.    **Instruments and Accessories**

Instruments and Accessories will be made available to Customer from Intuitive pursuant to separate orders placed by Customer to Intuitive from time to time in accordance with the terms and conditions contained in the then current Instrument and Accessory Catalog. Intuitive's current Instruments and Accessories Ordering terms are attached as Exhibit D. Instruments and Accessories are subject to a limited license to use those Instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System. Customer is responsible for Reprocessing Instruments in accordance with the Documentation. Any other use is prohibited, whether before or after the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive, and cleaning or sterilization inconsistent with the Documentation. This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory. Customer may purchase Instruments and Accessories for the purpose of Customer's Reprocessing requirements. The cost of Instruments and Accessories used in Customer's Reprocessing, including Instrument and Accessories used or involved in destructive testing, will be the responsibility of the Customer. Customer may contact Intuitive's Customer Support Department if, during the Reprocessing, Customer experiences results unacceptable under applicable law and/or regulation. Intuitive will provide commercially

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    VMC-00020654

**App.270**

reasonable assistance in such investigations and remediation efforts but shall not be obligated to conduct or pay for such studies or provide materials at no cost or reduced cost as a condition of purchase or continued use.

**9.    Pricing and Payment Terms**

9.1    **System.**

(A)    **Price.**  Customer will pay to Intuitive the price specified in **Exhibit A** for the System acquired under this Agreement according to the payment terms in Section 9.1(B).

(B)    **Payment Terms.** Upon Acceptance, Intuitive will deliver an invoice to Customer for amounts due under this Agreement for the System. Customer agrees and acknowledges payment for the System shall not be excused by any contingencies including, but not limited to, Customer's internal practices, policies, or any state approvals. Customer will pay the invoiced amount not later than thirty (30) days after the date of invoice. Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable law, whichever is lower. If there is a dispute as to any invoice the parties will work in good faith to resolve said dispute.

(C)    **Security Interest.** Intuitive will retain a security interest in the System until payment of the full System purchase price has been received by Intuitive.  Customer will perform all acts Intuitive reasonably determines are necessary or appropriate to perfect and maintain the security interest.  If Customer defaults in its payments for the System, Intuitive has the right, without liability to Customer, to reclaim the System.

9.2    **Services.**

(A)    **Price.**  Customer will pay for the Services at the price specified in **Exhibit A.**

(B)    **Payment Terms**.  Intuitive will deliver to Customer an invoice for the annual Services fee forty-five (45) days prior to the first anniversary of Acceptance and each subsequent anniversary of Acceptance throughout the Initial Term of the Agreement. Customer will pay the invoice for Services not later than forty-five (45) days after the date of invoice. If there is a dispute as to any invoice the parties will work in good faith to resolve said dispute. In the event Customer requires a purchase order to be referenced on a Service invoice to facilitate payment, Customer will provide Intuitive with a purchase order number sixty (60) days prior to each anniversary of Acceptance.  Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable law, whichever is lower.  After the Initial Term of the Agreement, and subject to mutual written agreement, annual Services may be renewed at Intuitive's then current list price.

9.3    **Funding Entity.**

A funding entity ("Funding Entity") may provide the funding for Customer to purchase the System defined herein, provided however, Customer remains responsible for payment in full according to the terms of this Agreement if Funding Entity fails to pay.  A Funding Entity will have no rights or obligations whatsoever under this Agreement, except as specified in this Agreement. Customer acknowledges and agrees that once Acceptance has occurred and title of the System has passed to the Customer, if Customer subsequently enters into an arrangement with a Funding Entity, then Customer will enter into an agreement (such as a sale and lease-back agreement) directly with the Funding Entity that does not involve Intuitive. Intuitive will not reverse the sale of the System to Customer in order to sell it to another entity, including but not limited to a Funding Entity.

9.4    **Taxes.**

Customer will pay any Taxes in addition to the prices invoiced.  Customer will pay, or reimburse Intuitive for the payment of all Taxes, including related penalties and interest, except Taxes for which Customer has provided a certificate of exemption acceptable to both Intuitive and the appropriate taxing authority prior to delivery of the System.  Customer will also pay, or reimburse Intuitive for, all Taxes, related penalties, or interest resulting from Customer's use of a Funding Entity.

**10.    Warranty and Disclaimer**

10.1    **System Warranty.**

(A)    Intuitive warrants to Customer that:

(1)    the System as delivered will be free and clear of all liens and encumbrances (except as otherwise specified in this Agreement), and

(2)    for the period specified in **Exhibit A,** will be free from defects in material and workmanship and will conform in all material respects to the Documentation when used in accordance with the Documentation and Intuitive's instructions.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    VMC-00020655

**App.271**

(B)      Intuitive's obligations under this Section 10.1 are limited to the repair (as further described in Section 5.1(B)-(C)) or, at Intuitive's option, replacement of all or part of the System.

(C)      This warranty is void with respect to any claims:

         (1)      due to any installation, repair, adjustment, modification, disassembly, alteration, reconfiguration, addition to, subtraction from, or misuse of the System by Customer or any third party without the express written permission of Intuitive; or

         (2)      to the extent Customer has not operated, repaired, or maintained the System in accordance with the Documentation or any reasonable handling, maintenance, or operating instructions supplied by Intuitive; or

         (3)      to the extent Customer has used the System with surgical instruments or accessories that are not Instruments or Accessories; or

         (4)      to the extent Customer or Customer's employee, agent, or contractor has subjected the System to unusual physical or electric stress, misuse, abuse, negligence, or accident.

(D)      The foregoing expresses Customer's sole and exclusive remedy, and Intuitive's sole and exclusive liability, for any breach of warranty with respect to the System by Intuitive.

10.2      **Services Warranty.** Intuitive warrants that the Services will be performed consistent with generally accepted industry standards. If Intuitive breaches this warranty, Customer's sole and exclusive remedy will be to require Intuitive to re-perform the Services.

10.3      **No Other Warranties. INTUITIVE MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SYSTEM OR SERVICES PROVIDED HEREUNDER AND THIS TRANSACTION, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, AND NON-INFRINGEMENT. SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF IMPLIED WARRANTIES; THEREFORE, THE ABOVE LIMITATION WILL APPLY ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.**

11.      **Indemnification**

11.1      **Intuitive's Indemnification Obligations.**

(A)      **Intellectual Property Indemnification.** Intuitive will indemnify Customer against all liabilities, expenses, or damages in connection with any third party claim that the System infringes any third party patent, trade secret, or copyright. If Customer is enjoined from the use of the System due to any such third party claim, Intuitive will promptly, at its option and expense, either (1) substitute the System or any part thereof with non-infringing material that will perform substantially in accordance with the Documentation; or (2) obtain the right of Customer to continue to use the System; or (3) remove the System and refund to Customer the purchase price of the System less reasonable depreciation.

(B)      **Indemnification Limitations.** Intuitive has no obligation under this Section 11.1 to the extent any claim of infringement is based upon or arises out of: (1) any modification to the System if the modification was not made directly by Intuitive or through its designated service provider; or (2) the use or combination of the System with any hardware, software, products, data or other materials not specified, provided or approved by Intuitive.

(C)      **THE PROVISIONS OF THIS SECTION 11 STATE THE SOLE AND EXCLUSIVE OBLIGATIONS OF INTUITIVE FOR ANY PATENT, COPYRIGHT, TRADEMARK, TRADE SECRET OR OTHER INTELLECTUAL PROPERTY RIGHTS INFRINGEMENT.**

11.2      **By Intuitive.** To the extent allowable by law, Intuitive hereby assumes all liability for, and agrees to indemnify, defend and hold harmless Customer, its successors, permitted assigns, medical staff, agents and employees from and against, any and all liabilities, losses, damages, claims and expenses to the extent that they arise from third party claims, actions or demands including without limitation, claims arising in contract or tort (including negligence), strict liability or otherwise (collectively, "Claims") in any way relating to or arising from (a) Intuitive's breach of any of its representations or warranties or any other obligation hereunder, or (b) Intuitive's negligence or willful misconduct; provided that Intuitive's indemnification obligations under this Section 11.2 shall not apply to the extent that (i) such Claims arise from Customer's negligence or willful misconduct or breach of any of its obligations hereunder.

11.3      **By Customer.** To the extent allowable by law, Customer hereby assumes all liability for, and agrees to indemnify, defend and hold harmless Intuitive and its successors, permitted assigns, agents and employees from and against, any and all Claims by third parties to the extent that they arise from: (a) Customer's or its employees', medical staff's, agents', affiliates' or representatives' negligence or willful misconduct in the use, possession, or operation of the System, including without limitation, (i) use of the System by individuals who have not completed appropriate training or whose training was not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      VMC-00020656

conducted by Intuitive, (ii) use of the System with any surgical instrument or accessory that is not made or approved by Intuitive for use with the System, or (iii) the conduct of surgical procedures on cadavers used in training; or (b) Customer's breach of any of its representations or warranties or any other obligation hereunder, including without limitation Customer's failure to comply with the requirements of Section 3.4 (Use of System) and 3.5 (Reprocess and Disposal). Notwithstanding the foregoing, Customer's indemnification obligations under this Section 11.3 shall not apply to the extent that such claims arise from Intuitive's negligence or willful misconduct or breach of any of its obligations hereunder.

11.4   **Claim Notification Requirement.**  A party's indemnification obligations under this Section 11 will not apply unless the indemnified party promptly notifies the indemnifying party of the claim as soon as the indemnified party became aware of it. The indemnifying party will have the right to control the defense or settlement of any claim at its cost and with its choice of counsel.  The indemnified party will provide all reasonable cooperation to assist the indemnifying party in the defense or settlement of the claim.

**12.   Limitation of Liability**

Except for a breach of the obligations in Sections 3.4 (Use of System), 4 (Software License and Restrictions), 8 (Instruments and Accessories), 9 (Pricing and Payment Terms), the indemnification obligations of Section 11, 13 (Proprietary Information), and any HIPAA obligations to the extent permitted by applicable law, each party's aggregate liability to the other for claims relating to this Agreement, whether for breach in contract or tort (including negligence), is limited to an amount equal to the sum of amounts paid by Customer under this Agreement for the activity (such as procurement of the System, Service, or training) giving rise to the claim. Except for a breach of the obligations in Sections 3.4, 4, 8, or 13, neither party will be liable for any indirect, punitive, special, incidental, or consequential damages in connection with or arising out of this Agreement (including loss of business, revenue, profits, use, data, or other economic advantage), even if that party has been advised of the possibility of damages. Some jurisdictions do not allow the limitation of liability for incidental or consequential damages; therefore in those jurisdictions, the foregoing limitation of liability applies only to the extent permitted by law.

**13.   Proprietary Information**

"Proprietary Information" includes, but is not limited to, all non-public information (1) of the disclosing party ("Disclosing Party") that relates to past, present, or future research, development, or business activities or the results of those activities and (ii) that the Disclosing Party has received from others and is obligated to treat as confidential and proprietary.  In addition, Intuitive's Proprietary Information includes the terms and conditions of this Agreement and all information derivable from the System, but excluding information that can be learned simply through observation of the System and its operation.  Proprietary Information does not include information previously known by the receiving party ("Receiving Party") as demonstrated by the Receiving Party's contemporaneous written records, or information publicly disclosed without breach of an obligation of confidentiality, either before or after the Receiving Party's receipt of the information.  The Receiving Party will hold all Proprietary Information of the Disclosing Party in strict confidence and must not use for any purpose, or disclose to any third party, any Proprietary Information, except (1) as expressly authorized in this Agreement or in writing by the Disclosing Party, and (2) as required by law or by court order.  Notwithstanding any provision of this Agreement, the Recipient shall be permitted to disclose the Disclosing Party's Confidential Information solely to the extent that such disclosure is required by law or by order of any court or governmental authority, provided, however, that the Recipient shall first have given advance notice to the Disclosing Party, so as to permit the Disclosing Party as owner of the information an opportunity to review such information for confidentiality and privilege preservation and/or to attempt to obtain a protective order or similar administrative or legal remedy requiring that the Confidential Information so disclosed be used only for the purposes for which the order was issued or for such other legal requirement, and that the Recipient shall cooperate with the Disclosing Party in such efforts. The Receiving Party will use the same degree of care to protect the Proprietary Information as Receiving Party uses to protect its own information of like kind, but not less than all reasonable steps to maintain the confidentiality of the Proprietary Information.

**14.   Term**

14.1   **Initial Term.** The Initial Term is specified in **Exhibit A**.

14.2   **Termination and Survival.** Either party may terminate this Agreement if the other party breaches a material term or condition of this Agreement and fails to cure the breach following thirty (30) days' written notice from the non-breaching party. Sections 3.4, 3.5, 4, 9.1, 9.3, 11, 12, 13, 14.2, 15, and any other provision which by its nature will survive, will remain in effect notwithstanding the expiration or termination of this Agreement.

**15.   Miscellaneous**

15.1   **Assignment.** This Agreement will be binding upon the permitted successors and assigns of the parties. Neither party may assign this Agreement without the prior written consent of the other party, except pursuant to a transfer of all or substantially all of a party's assets and business relating to the subject of this Agreement, whether by merger, re-organization, sale of assets, sale of stock, or otherwise.  Customer may not assign or transfer the Software license granted to it under this Agreement to any third party without Intuitive's prior written consent.  Any attempt by either party to assign this Agreement or any rights or duties hereunder contrary to the foregoing provision is void.  Intuitive consents to Customer's assignment of this Agreement to a Funding Entity as part of Customer's financing arrangement with the Funding Entity.  If Customer assigns this Agreement to a Funding Entity, Customer retains its right to all benefits under this Agreement, including without limitation all warranties, representations, and indemnification provided by Intuitive, and may independently enforce any obligation, warranty, or representation, including without limitation Intuitive's obligations under Section 5 (Services).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    VMC-00020657

**App.273**

15.2  **Costs.**  Except as otherwise specifically provided herein, each party will bear its own costs and expenses incurred in connection with the performance of its obligations hereunder.

15.3  **Debarment.**  Intuitive warrants and represents that individuals of its organization involved in providing Services under this Agreement have not been convicted of any criminal offense relating to health care and are not debarred, excluded, or otherwise ineligible for participation in any federal or state health care program.  If at any time before completion of this Agreement, Intuitive or any individual in its organization involved in providing Services under this Agreement is so convicted or is debarred, excluded or otherwise determined to be ineligible, Intuitive will notify Customer in writing, the individual will immediately cease providing Services under this Agreement, and Intuitive will replace the individual with a replacement employee reasonably suitable to Customer, and, if it is Intuitive, this breach will be considered a material breach by Intuitive.

15.4  **Federal Audit.**  Until the expiration of four (4) years after furnishing Services under this Agreement, Intuitive will make available upon written request of the Secretary of the Department of Health and Human Services (the "Secretary") or upon request of the U.S. Comptroller General, or any of their duly authorized representatives, this Agreement and the books, documents, and records of Intuitive that are necessary to certify the nature and extent of costs for which Customer may properly seek reimbursement.  If Intuitive carries out any of the duties of this Agreement through a subcontract with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period, the subcontract will contain a clause to the effect that until the expiration of four (4) years after furnishing of services under the subcontract, the subcontracting party will make available, upon written request of the Secretary, or upon request of the U.S. Comptroller General or any of their duly authorized representatives, the subcontract, and the books, documents, and records of the organization that are necessary to verify the nature and extent of the costs.  Intuitive will promptly notify Customer of any requests for information made under this provision.

15.5  **Force Majeure.**  Neither party will be liable for any loss, damage, detention, delay, or failure to perform in whole or in part resulting from causes beyond that party's control including, but not limited to, acts of terrorism, fire, flood, earthquake, war, riots, labor disputes, shortage of components, or any governmental law, order, regulation, or ordinance.

15.6  **Insurance.**  Intuitive has obtained, and will maintain throughout the term of the Agreement, (i) Commercial General Liability Insurance including coverage for contractual liability, product liability, personal injury and bodily injury in an amount not less than $1,000,000 per occurrence/$3,000,000 aggregate (or as may be aggregated by the excess liability policy on the General Liability policy); or (ii) a self-insurance program of equivalent protection.  Intuitive will furnish the Customer with a certificate of insurance evidencing the coverage as outlined above, or comparable evidence of self-insurance, on Customer's request.  Intuitive carries, and will continue to carry, Workers' Compensation Insurance as required by law.

15.7  **Interpretation.**  Headings used in this Agreement are provided for convenience only and do not in any way affect the meaning or interpretation hereof. The terms "sale", "purchase", "acquire", "procure" and variations of such terms, as used in this Agreement with respect to the System, do not imply that the Software and Documentation aspect of the System are sold or purchased; the Software and Documentation are licensed under this Agreement and only the Hardware is sold.  Neither party is the drafter of this Agreement.  Accordingly, the language of this Agreement will not be construed for or against either Party.

15.8  **Notices.**  Any notices given under this Agreement must be in writing and will be deemed given and received five (5) days after the date of mailing, one (1) day after dispatch by overnight courier service or electronic mail, or upon receipt if by hand delivery, or upon completion of confirmed transmission if by facsimile.  Any notices under this Agreement must be sent to Intuitive or the Customer at the address shown in the preamble above, in both cases to the Contracts Dept/General Counsel's office. Each party may change its address for receipt of notices by giving the other party notice of the new address.

15.9  **Relationship of the Parties.**  The parties' relationship is one of contract, and they are not, and will not be construed as partners, joint venturers, or agent and principal.  Neither party is authorized to act for, or on behalf of, the other party.

15.10  **Severability.**  If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, then that provision will not affect the validity of the remaining provisions of the Agreement, and the parties will substitute a valid provision for the invalid provision that most closely approximates the intent and economic effect of the invalid provision.

15.11  **Access to Customer's Facilities.**  Intuitive agrees that any Intuitive personnel who routinely provide Services at Customer's facilities will use commercially reasonable efforts to comply with Customer's Access Requirements, provided that Customer provides Customer's Access Requirements in writing prior to execution of this Agreement.  Customer's need for Service may be unplanned and urgent with patient safety at stake.  Therefore, if Customer denies access to its facilities to any Intuitive personnel for performance of Services (Section 5) or warranty (Section 10) obligations in connection with a surgical procedure because such personnel have not met Customer's Access Requirements, Intuitive's Services and warranty obligations in this Agreement will be suspended during such denial of access, provided that Intuitive uses commercially reasonable efforts to find replacement Intuitive personnel who comply with Customer's Access Requirements.  Customer will indemnify and hold harmless Intuitive from any losses, claims, liabilities or causes of action arising from such denial of access.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                           VMC-00020658

**App.274**

15.12 **Data Use.** Customer agrees that Intuitive and its affiliates within the Intuitive Surgical group of companies (collectively, "Intuitive") may collect data relating to the use of Intuitive products ("Data"). In some instances Data may be communicated via data gathering or transmission technology to Intuitive. In other instances, Intuitive may require Customer and Customer agrees to provide Data to Intuitive. Such Data may be used for a variety of purposes, including, but not limited to (1) providing support and preventative maintenance of Intuitive products, (2) improving Intuitive products or services, (3) ensuring compliance with applicable laws and regulations, and (4) providing a general resource for Intuitive's research and business development. Intuitive does not intend to collect protected health information (PHI) as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or analogous foreign patient privacy laws or regulations, as may be amended from time to time. In the event any Data communicated to Intuitive identifies an entity or individual, Intuitive will not share such Data with any third parties without the entity's or individual's consent, unless required by law or regulatory authorities.

15.13 **Waivers.** No waiver of any right by either party under this Agreement will be of any effect unless the waiver is in writing and signed by the waiving party. Any purported waiver not consistent with the foregoing is void.

15.14 **Counterparts.** This Agreement may be executed by facsimile or in multiple copies, each of which is an original, and all of which taken together will constitute one single agreement.

15.15 **Entire Agreement; Amendment.** This Agreement is the entire agreement between Intuitive and Customer and supersedes any prior agreements, understandings, promises, and representations made either orally or in writing by either party to the other party concerning the subject matter herein, pricing, and the applicable terms. Any terms or conditions in Customer's (or as applicable, Funding Entity's) purchase order that are different from, inconsistent with, or in addition to, the terms and conditions of this Agreement will be void and of no effect, unless otherwise mutually agreed to in writing by the parties. This Agreement may be amended only in writing, signed by both parties. Any purported oral modification intended to amend the terms and conditions of this Agreement is void.

**BOTH PARTIES HAVE READ, UNDERSTOOD, AND AGREED TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT AND EXECUTE THIS AGREEMENT AS OF THE EFFECTIVE DATE.**

**IF THIS AGREEMENT IS NOT SIGNED BY BOTH PARTIES AND RETURNED TO INTUITIVE ON OR BEFORE AUGUST 31, 2018 THE TERMS WILL BE SUBJECT TO CHANGE.**

ACCEPTED BY:                                     ACCEPTED BY:

**Intuitive Surgical, Inc.**                     **Valley Medical Center**

                                                 By: _Jeannine Grannell_

Signature: _M Giuffrida_                         Name: _Jeannine Grannell_
Marc Giuffrida (Aug 31, 2018)

  Email: marc.giuffrida@intusurg.com             Title: _SVP CFO_

  Title: Director, Contract Administration       e-mail: _Jeannine_Grannell@valleymed.org_

Company: Intuitive Surgical, Inc                 Date: _8/31/18_

_BC_
BC

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          VMC-00020659

# Exhibit B

INTUITIVE

1020 Kifer Road
Sunnyvale, CA 94086

T. 408-523-2100
F. 408-523-1390

intuitive.com

March 27, 2025

Mr. Clif Parker
Chief Executive Officer
Restore Robotics
7543 Holley Circle
Panama City Beach, FL  32408

Dear Clif:

I received your letter regarding the 510(k) clearance recently granted to Iconocare Health for remanufactured 8mm Monopolar Curved Scissors (470179) EndoWrist instruments.  Your letter requests that Intuitive Surgical grant approval under its contracts for "Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA." This request is unnecessary because as you know Intuitive has already granted such approval.

Since March 2023, Intuitive has stated on its website that Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party under a 510(k) clearance or equivalent granted by the FDA.  To be very clear: Intuitive's policy concerning FDA-cleared remanufactured instruments remains in effect, and we stand by it with respect to any existing or future products for which Restore Robotics, Iconocare Health or any other third party obtains 510(k) clearance.  This includes but is not limited to the 8mm Monopolar Curved Scissors (470179) for which FDA clearance was recently granted.

Intuitive has long made clear on our public website that we will not consider it a breach of contract for any customer to purchase any FDA-cleared remanufactured instrument from Restore Robotics or anyone else.  To the extent you believe there are any customers who do not understand this policy (as I understand you allege in your most recent complaint), please feel free to refer them to me and/or to share a copy of this letter with them.

I also take this opportunity to reiterate an offer that has always been available to Restore Robotics, which is to work with Intuitive directly to validate the safety and compatibility of your

**App.277**

remanufactured instruments with the da Vinci system.  While remanufactured instruments that have been cleared by the FDA are treated as approved under our contracts, as indicated above, Intuitive nevertheless believes patients will be best served if our organizations engage directly as part of our quality and validation process—as we have done for many years with dozens of other third parties.

Given the "commitment to transparency and collaboration" stated in your letter, I hope you will consider the option of sharing safety and performance information with Intuitive so that we can work together directly to validate product safety and compatibility.  I also hope that you will be willing to engage with Intuitive to address postmarket and labeling processes and ensure that any mutual customers of our organizations understand how product complaints or other servicing issues are to be handled—as, again, we routinely do with third parties who participate in our validation processes.

Please let me know if Restore Robotics would be interested in pursuing this path of direct engagement with Intuitive.  If so, we would be happy to propose a framework for moving forward.

Sincerely,

Dave Rosa
President
Intuitive Surgical

INTUITIVE

**App.278**

# Exhibit C

```
                                        Volume 11

                                        Pages 1770 - 1984

                 UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

           BEFORE THE HONORABLE ARACELI MARTÍNEZ-OLGUÍN

SURGICAL INSTRUMENT SERVICE          )
COMPANY, INC., et al.,               )
                                     )
            Plaintiffs,              )
                                     )
   vs.                               )  No. C 21-03496 AMO
                                     )
INTUITIVE SURGICAL, INC.,            ) San Francisco, California
                                     ) Wednesday
            Defendant.               ) January 22, 2025
----------------------------------   ) 8:00 a.m.
AND RELATED COUNTERCLAIMS.           )
_____    )
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**                    MCCAULLEY LAW GROUP
                                       180 N. Wabash Avenue
                                       Suite 601
                                       Chicago, Illinois 60601
                                **BY:  RICHARD McCAULLEY JR., ESQ.**


                                       HALEY GUILIANO LLP
                                       111 Market Street
                                       Suite 900
                                       San Jose, California 95113
                                **BY:  JOSHUA V. VAN HOVEN, ESQ.**


              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

<u>**APPEARANCES**</u>:  **(CONTINUED)**

**For Defendant:**

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
2001 K Street NW
Washington, D.C. 20006
BY:  **KENNETH A. GALLO, ESQ.**
     **PAUL D. BRACHMAN, ESQ.**

PAUL WEISS RIFKIND WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
BY:  **WILLIAM MICHAEL, ESQ.**

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
535 Mission Street
24th Floor
San Francisco, California 94105
BY:  **JOSHUA HILL, JR., ESQ**.

**Also Present:**          **Bobby Cox**
                      **Ryan Lee**
                      **Greg Posdal**

- - -

<u>I N D E X</u>

Wednesday, January 22, 2025 - Volume 11

| <u>DEFENDANT'S WITNESSES</u> | <u>PAGE</u> | <u>VOL.</u> |
|---|---|---|
| <u>ROSA, DAVID</u> | | |
| (PREVIOUSLY SWORN) | 1793 | 11 |
| Direct Examination Resumed by Mr. Michael | 1793 | 11 |
| Cross-Examination by Mr. McCaulley | 1937 | 11 |

- - -

<u>E X H I B I T S</u>

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| TX-602-R | | 1813 | 11 |
| TX-616-R | | 1843 | 11 |
| TX-1314 | | 1918 | 11 |
| TX-1323 | | 1917 | 11 |
| TX-1325 | | 1921 | 11 |
| TX-1389 | | 1906 | 11 |
| TX-1394 | | 1929 | 11 |
| TX-1585-R | | 1872 | 11 |
| TX-1632.022-R | | 1902 | 11 |
| 1633.003-R | | 1832 | 11 |
| TX-1634.323 | | 1839 | 11 |
| TX-1642 | | 1869 | 11 |

—   —   —

1           without the express written permission of Intuitive."

2           Do you see all that?

3    **A.**    I do.

4    **Q.**    To your knowledge, was Intuitive's purpose for including

5    the provisions that we just looked at in its contracts the same

6    or different in 2020 as it was in the year 2000?

7    **A.**    These are -- these are largely the same between the two

8    contracts.

9    **Q.**    And did Intuitive, in your experience, have the power to

10   force customers to accept terms in 2020 any more than it did in

11   2000?

12   **A.**    No.  You know, we are -- this is a contract that is

13   negotiated between the two entities, between Intuitive and the

14   purchaser or the hospital.  There's not a forcing of terms

15   here.

16           **MR. MICHAEL:**  You can take that down, Mr. Lee.

17           (Document removed from display.)

18   **BY MR. MICHAEL:**

19   **Q.**    So, Mr. Rosa, we just saw a number of references in

20   Intuitive's contracts to authorization or approval of third

21   parties.  And I now want to ask you:  Has Intuitive, over the

22   years, actually authorized or approved any third-party products

23   to be used with the da Vinci?

24   **A.**    We have, actually.

25   **Q.**    And let me ask you to turn to Tab 3 in your binder,

1    please.

2        (Witness complied.)

3    Q.    This is, for the record, a document that has been stamped

4    TX-616-R.  And if I could ask you to identify this document,

5    again generally, without talking yet about its specific

6    contents?

7    A.    Sure.  So this -- this is a document that has a listing of

8    third-party devices that have been approved for use with a

9    da Vinci system.

10   Q.    And is this a document that Intuitive keeps and maintains

11   in the ordinary course of its business?

12   A.    It is.

13   Q.    Did you have access to this document in the ordinary

14   course of your business at Intuitive?

15   A.    Yes.

16   Q.    And is this document, to your knowledge, updated

17   regularly?

18   A.    One or one like this.  And so this is specific to IS2000

19   and IS3000, which are S/Si.

20   Q.    Do you recognize this as an example from in and around

21   2017?

22   A.    I do, yes.

23        **MR. MICHAEL:**  Your Honor, I offer TX-616-R.

24        **MR. McCAULLEY:**  No objection.

25        **THE COURT:**  It's admitted.

1    (Trial Exhibit 616-R received in evidence.)

2        **THE COURT:**  Would you like to publish it?

3        **MR. MICHAEL:**  Yes, please.

4        **THE COURT:**  Go ahead.

5        **MR. MICHAEL:**  Thank you.

6    (Document displayed.)

7  **BY MR. MICHAEL:**

8  **Q.**   So, Mr. Rosa, if you could start by just explaining how is

9  this document used at Intuitive?

10  **A.**   Sure.  So this is -- again, it's a compilation, a record

11  of the devices that have been approved for use with the system.

12  And so this is -- probably not this document, but it would --

13  it would be the foundation of information that's provided to

14  customers about which products are approved for use with the

15  da Vinci system.

16  **Q.**   What kinds of products are included on this list, just

17  generally?

18  **A.**   Just generally, there's a number.  There's -- on the first

19  page, there are a group of products that are called "cannula"

20  that are the ports for -- that go into the body at the

21  beginning of the case for instruments to move in and out of.

22       There's a group of electrosurgical generators that are

23  compatible with the system.

24       There's a section for chemicals that have been approved

25  for use for cleaning da Vinci instruments and accessories, a

1    variety of other cleaning devices, like ultrasonic and washer

2    disinfectors, that sort of thing.  And then there's a group of

3    instrument trays as well.  So it's a variety of accessories.

4    **Q.**    There are a number of columns in the document.

5        Do you see, I think it's the fourth one over, the column

6    that's entitled "Validated Third-Party Device"?

7    **A.**    I do.

8    **Q.**    What does it mean for a third-party device to be validated

9    for use with the da Vinci system?

10   **A.**    So what it means is that the two companies have worked

11   together to ensure that the device that is being -- that wants

12   to be proven compatible have done two things.  That

13   Intuitive -- we've done a lot of the testing that's required to

14   ensure it will work appropriately with our system or

15   instrument, whatever it is that the compatibility is associated

16   with.  So there's a set of testing there that can include

17   mechanical testing, electrical testing, sterilization, and

18   disinfection testing.  It just really depends on the device.

19   So there's -- there's that sort of work that gets done.

20       And then there's also a -- basically an agreement between

21   the companies that helps to lay out a couple of things that

22   include -- one is how the companies will work together to

23   inform each other if a change is made that may impact the

24   compatibility of the third-party device.  So if we make a

25   change that may impact, that we contact that company.  If they

1   make a change, they contact us.  And so that's in kind of the

2   normal course of business.

3       And then, importantly, we also want to make sure that we

4   know who at that company -- how do the two companies interact

5   if there's an issue that's reported by the customer or by

6   somebody else that says, you know, something didn't work.

7       For example, if on this page, on the very top that's being

8   shown, it's Ethicon endosurgery.  And let's say that device,

9   this endopathic cell, something went wrong with it.  Customer

10  contacts us.  We want to make sure Ethicon knew about it.  So

11  we would have a contact and kind of a process laid out by which

12  the two companies would work together.

13  **Q.**   In order to validate a third-party device or approve it

14  for use with the da Vinci system, does Intuitive require any

15  information regarding the safety of that product?

16  **A.**   We do.  So, again, it really depends on the device.  But

17  because there can be complex interactions, we will get

18  specifications and testing and other documentation from that

19  third-party company so that we can inform the validation and

20  the testing that we want to do.  It's just how the two

21  companies work together, and it really depends on what it is

22  we're testing on what kind of data are provided between the

23  companies.

24  **Q.**   Does Intuitive, under the policy and process you have been

25  discussing, approve any third-party products for which

1  Intuitive has not received some form of clinical proof of

2  safety?

3  **A.**   I can't think of any that would be on this list, where we

4  haven't worked to understand how that third-party device is

5  going to -- needs to work safely and effectively.  How does

6  that happen and what kind of data are exchanged?  I don't --

7  I'd have to look through this carefully, but I can't think of

8  any examples.

9  **Q.**   Now, you said earlier that this particular list refers

10 only to the S and Si da Vinci system; is that correct?

11 **A.**   That's -- that's what it looks like from kind of the top

12 description here.

13 **Q.**   Did Intuitive also, to your knowledge, validate

14 third-party products for use with its X and Xi systems?

15 **A.**   Yes, definitely.

16 **Q.**   If a third party wants to be validated or approved, in

17 your experience, do you approach them or do they approach you?

18 **A.**   It can --

19          **MR. McCAULLEY:**  Objection.  Speculation, Your Honor.

20          **THE COURT:**  Mr. Rosa, can you answer that in your

21 experience?

22          **THE WITNESS:**  I can.

23          **THE COURT:**  Overruled.  You can answer.

24 **A.**   So in my experience, I have been approached by third-party

25 companies to say:  Hey, we would like our device to potentially

1    be used with da Vinci.  What's the process?

2         It's also true that there are times where we may approach

3    a third party to ask some questions and talk about

4    compatibility as well.

5    **BY MR. MICHAEL:**

6    **Q.**    And based on what you've seen and you've experienced

7    through your work at Intuitive, could you estimate, at least

8    roughly, around how many different third-party companies had

9    products validated or approved by Intuitive, say, between 2000

10   and 2020?

11   **A.**    Probably range -- it may be in the dozens number.

12          **MR. MICHAEL:**  Thank you, Mr. Lee.  You can take that

13   document down.

14       (Document removed from display.)

15   **BY MR. MICHAEL:**

16   **Q.**    Now, Mr. Rosa, the third-party validation list we just

17   looked at from 2017, did that include any third-party modified

18   EndoWrists?

19   **A.**    It did not.

20   **Q.**    And at that time had any third party, to your knowledge,

21   applied to become authorized or approved by Intuitive to modify

22   EndoWrists and reset their use counters?

23   **A.**    No.  To my knowledge, no one had approached us and asked.

24   **Q.**    To your knowledge, did SIS ever ask Intuitive to become

25   authorized or approved to perform services on EndoWrists?

ROSA - DIRECT / MICHAEL

1   **A.**    No, not to my knowledge.

2   **Q.**    Did SIS, to your knowledge, ever offer to show Intuitive

3   any form of clinical evidence that the service it wanted to

4   offer on EndoWrists was safe and effective?

5   **A.**    No, they have not.

6   **Q.**    By 2019 had Intuitive, to your knowledge, become aware

7   that a company called Rebotix was performing services to modify

8   EndoWrists without Intuitive's authorization?

9   **A.**    We had become aware of that.

10  **Q.**    And in 2019 or 2020 did Rebotix, to your knowledge, show

11  Intuitive any clinical evidence that the changes it was making

12  to EndoWrists at that time were safe?

13  **A.**    No, I'm not aware of anything they showed us.

14  **Q.**    Let me ask you to turn to Tab 10 in your binder, please.

15      (Witness complied.)

16      **MR. MICHAEL:**  And for the record, this is a document

17  that's been stamped TX-1441-R.

18      Mr. Rosa, do you recognize this document based on your

19  work and your experience at Intuitive as being a letter on

20  Intuitive's letterhead?

21  **A.**    I do.

22  **Q.**    And do you recognize it as a letter that was sent to

23  Rebotix in April of 2019?

24  **A.**    I do.

25  **Q.**    At the time, you were Intuitive's Chief Business Officer

ROSA - DIRECT / MICHAEL

1   or Chief Commercial Officer?

2   **A.**   It's hard for me to remember when that -- when that title

3   changed.  I'm not sure.

4   **Q.**   Okay.  Is it fair to say that at this time, April of 2019,

5   you had responsibility for leading the sales and marketing

6   organization of Intuitive?

7   **A.**   That is fair.

8   **Q.**   Okay.

9          **MR. MICHAEL:**  So, Your Honor, this is a document

10  that's already in evidence, and I'd ask permission to publish

11  it to the jury.

12         **THE COURT:**  You may.

13         **MR. MICHAEL:**  Thank you.

14     (Document displayed.)

15  **BY MR. MICHAEL:**

16  **Q.**   Mr. Rosa, if you could turn to the last page of this

17  document.  The jury has already seen this document, but I just

18  want to ask you a question about the last page of it.

19     In this letter to Rebotix, do you see where it says at the

20  top of the last page [as read]:

21         "If you allege that you or your service centers

22     possess clinical proof that your service process

23     returns the modified instruments to a production

24     equivalent qualification and/or that additional use

25     does not affect the safety or performance of the

1           instruments, please provide proof of the same no later

2           than April 30, 2019."

3           Do you see that?

4      A.   I do.

5      Q.   And as far as you know, did Rebotix in 2019 or 2020

6      provide the clinical proof that was requested in this letter?

7      A.   No, they did not.

8      Q.   At that time, 2019 or 2020, had any third party offering

9      to modify EndoWrists provided that kind of clinical proof of

10     safety and performance to Intuitive?

11     A.   They had not.

12     Q.   And in 2019 or 2020 had Intuitive approved any third party

13     to modify EndoWrists under its policy?

14     A.   We had not.

15     Q.   To your knowledge, had any third party asked Intuitive to

16     be approved to modify EndoWrists as of 2019 or 2020?

17     A.   No, not to my knowledge.

18     Q.   And had Intuitive, to your knowledge, rejected any

19     application for approval by a third party?

20     A.   No.

21     Q.   Now, some years later, did Rebotix and Restore, to your

22     knowledge, each qualify for approval under Intuitive's policy

23     to offer modified EndoWrists?

24     A.   They did.

25           MR. McCAULLEY:  Objection, Your Honor.

1          **THE COURT:**  Overruled.

2      Keep going, Mr. Michael.

3  **BY MR. MICHAEL:**

4  **Q.**   Your answer, Mr. Rosa?

5  **A.**   They did.

6  **Q.**   And did Intuitive approve them?

7  **A.**   We did.

8  **Q.**   For how many different models of EndoWrists, to your

9  knowledge, did Restore and Rebotix each qualify for approval?

10  **A.**   They each -- one each.

11  **Q.**   Has Intuitive rejected any application for approval on any

12  other model?

13  **A.**   We have not.

14          **MR. MICHAEL:**  And, Mr. Lee, you can take down that

15  document.

16      (Document removed from display.)

17  **BY MR. MICHAEL:**

18  **Q.**   Now, when Intuitive started marketing and selling the

19  da Vinci system in the United States, which I believe you said

20  was around the year 2000, was SIS at that time, to your

21  knowledge, offering any product or service having to do with

22  EndoWrists?

23  **A.**   No, not to my knowledge.

24  **Q.**   At that time, was there any third party you knew of

25  offering to reset the use counter on EndoWrists?

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Debra L. Pas*

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, January 22, 2025

TAB 42

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC

      Plaintiff,

v.                              CASE NO. 3:24-cv-444-MCR-ZCB

INTUITIVE SURGICAL, INC.,

      Defendant.

_____/

## ORDER

     Defendant Intuitive Surgical, Inc. has moved to dismiss Plaintiff Restore Robotics Repair LLC's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 25. Restore Robotics opposes the motion, ECF No. 27, and also requests leave to amend its pleading a second time, ECF Nos. 34 & 35. After due consideration, the Court will grant the motion to dismiss and deny the request for leave to amend as futile because Restore Robotics' antitrust claims, as pleaded, are barred by the applicable statute of limitations.

## I.    Background

     At the turn of the millennium, Intuitive pioneered a "robotic revolution" in minimally invasive soft-tissue surgery. Intuitive's da Vinci robot surgical system, now on its fourth generation (referred to as "da Vinci X/Xi"), allows surgeons to sit behind an ergonomic console and, using the system's hand controls and high-

definition three-dimensional camera, navigate surgical instruments through small incisions on the patient. Under its EndoWrist brand, Intuitive also sells surgical instruments, such as forceps, retractors, and scissors, that attach to its da Vinci system. Intuitive's EndoWrist instruments, too, are on their fourth generation (broadly referred to as "X/Xi EndoWrist instruments"), and are the only instruments cleared by the Food and Drug Administration (FDA) for use on the da Vinci system during surgery. By virtue of its patented technology and the high barriers to entry, Intuitive allegedly possesses near complete monopoly power in the robot surgical systems market in the United States.[1] The present action, though, principally involves a different, related market: the so-called "aftermarket" for repairing X/Xi EndoWrist instruments.

For two decades, Intuitive has allegedly required hospitals and surgical centers purchasing or leasing its da Vinci systems to use EndoWrist instruments only a certain number of times, typically ten. When an EndoWrist instrument reaches its usage limit, Intuitive supposedly forces its customers to purchase a new replacement

---

[1] The mere possession of monopoly power is not itself an antitrust violation, rather "it is an important element of the free market system" and is not unlawful unless "accompanied by an element of anticompetitive *conduct*." *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis in original). In fact, the allure of ultimately charging "monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." *Id.* (citation modified).

instrument—instead of allowing the existing instrument to simply be repaired and reset for additional cycles of use. Both requirements are enshrined in Intuitive's standard da Vinci system sales and lease contracts, which has purportedly been in place for multiple product generations.

As a third-party servicer of robotic surgical instruments, Restore Robotics has long claimed that Intuitive's terms prevent it from offering safe, effective, and cheaper repairs to EndoWrist instruments. This, in turn, allegedly ensures that Intuitive will continue to reap monopoly rents from its beholden hospital and surgical center customers through a perpetual stream of EndoWrist instrument replacement orders.

Indeed, there's some déjà vu here. In 2019, Restore Robotics brought a virtually identical lawsuit in this District alleging that Intuitive's standard terms excluded it from repairing and replacing the third generation of EndoWrist instruments ("S/Si EndoWrist instruments"). *See Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19-cv-55-TKW-MJF (N.D. Fla.) (hereinafter, the "*S/Si EndoWrist Litigation*"). The *S/Si EndoWrist Litigation* settled in 2023, with Intuitive agreeing, subject to FDA clearance, to allow its customers to purchase repair and replacement services for S/Si EndoWrist instruments from Restore Robotics.

**App.297**

Now, Restore Robotics is challenging Intuitive's allegedly anticompetitive contract terms as applied to the X/Xi EndoWrist instruments since their release in 2014. Unlike previous generations, the Xi/Xi EndoWrist instruments come equipped with an encrypted memory chip that tracks the number of uses for each instrument. Before any independent service organization can enter the aftermarket for repairing X/Xi EndoWrist instruments and compete with Intuitive, they first need to develop the technological capability to bypass or override the encrypted memory chip.[2] Restore Robotics obtained that capability on February 29, 2024. Notwithstanding that Leap Day breakthrough, Restore Robotics claims that it would have cracked the encryption and entered the putative aftermarket by July 2020 if not for Intuitive's anticompetitive contract terms that blocked "any and all access to customers indefinitely." *See* ECF No. 21 at ¶ 81.

On September 18, 2024, Restore Robotics filed the instant lawsuit claiming that Intuitive violated (i) Section 2 of the Sherman Act by monopolizing, or attempting to monopolize, the aftermarket for repairing X/Xi EndoWrist instruments, 15 U.S.C. § 2; and (ii) Section 1 of the Sherman Act by unlawfully tying the sale of the da Vinci X/Xi system to the replacement X/Xi EndoWrist

---

[2] Restore Robotics does not allege that the encryption of the X/Xi EndoWrist memory chip is anticompetitive. *See* ECF No. 21 at ¶ 49.

instruments (thereby forcing customers to purchase replacements from Intuitive rather than repairs from independent service organizations) and through exclusive dealing, 15 U.S.C. § 1.  Among other things, Restore Robotics seeks treble damages for the alleged harm to its business beginning in July 2020 and an order enjoining Intuitive's allegedly anticompetitive contract terms.[3]

## II.    Legal Standard

Motions under Rule 12(b)(6) of the Federal Rules of Civil Procedure seek dismissal of a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In considering a Rule 12(b)(6) motion, the courts accept factual allegations as true and construe them in the light most favorable to the plaintiff.  *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008).  Rule 12(b)(6) requires that the allegations of a complaint "state a claim to relief that is plausible on its face."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief is . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*,

---

[3] Sections 4 and 16 of the Clayton Act (which amended the Sherman Act) grants private parties the power to enforce and recovery under the federal antitrust laws.  *See* 15 U.S.C. §§ 15, 26.

556 U.S. at 679 (citation modified).  A court may dismiss a complaint for failure to state a claim if it is apparent from the face of the complaint that the applicable statute of limitations bars the claim.  *United States v. Henco Holding Corp.*, 985 F.3d 1290, 1296 (11th Cir. 2021).

## III.    Discussion

By deputizing civil plaintiffs to play the role of "private attorneys general," *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972), Congress intended that "private actions serve as a bulwark of antitrust enforcement and that the antitrust laws fully protect the victims of the forbidden practices as well as the public." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 340 (1971) (internal quotation marks and citations omitted).  For that reason, Congress authorized private plaintiffs to recover treble damages to "penalize wrongdoers and deter wrongdoing," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977) (citation modified), as well as "to further the overriding public policy in favor of competition," *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968).  *See also Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010).  The only catch to obtaining "the carrot of treble damages," *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151 (1987), is that private claims brought under the antitrust laws are subject to a four-

**App.300**

year statute of limitations from the date "the cause of action accrued," *see* 15 U.S.C. § 15b.

"Statutes of limitations are not simply technicalities," rather "they have long been respected as fundamental to a well-ordered judicial system." *Board of Regents of the University of the State of New York v. Tomanio*, 446 U.S. 478, 487 (1980). Indeed, a "federal cause of action 'brought at any distance of time' would be 'utterly repugnant to the genius of our laws,'" *Wilson v. Garcia*, 471 U.S. 261, 271 (1985) (quoting *Adams v. Woods*, 6 U.S. 336, 342 (1805)), as "even wrongdoers are entitled to assume that their sins may be forgotten," *Gabelli v. SEC*, 568 U.S. 442, 449 (2013). Professors Areeda and Hovenkamp, perhaps our Nation's foremost competition scholars, observe that "[r]epose is especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations, where liability doctrines change and expand, where damages are punitively trebled, and where duplicate treble damages for the same offense may be threatened." *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320a (5th ed. 2022). Moreover, because the antitrust laws "bring to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate," *Malley-Duff*, 483 U.S. at 151, it

would be "strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit [private antitrust enforcement] might realize," *Rotella v. Wood*, 528 U.S. 549, 558 (2000).  Simply put, when it comes to private antitrust enforcement, "the sooner the better."  *Id.*

In *Zenith Radio*, the Supreme Court established the basic accrual rule under the federal antitrust laws: the statute of limitations "begins to run when a defendant commits an act that injures a plaintiff's business."  401 U.S. at 338.  Intuitive contends that Restore Robotics' antitrust challenge to its standard X/Xi contract terms came two months too late.  As Intuitive tells it, the clock began to run on Restore Robotics' claims no later than July 2020, the month Restore Robotics alleges it would have achieved the technological capability to repair X/Xi EndoWrist instruments and enter the aftermarket "if not for the anticompetitive conduct of Intuitive."  ECF No. 21 at ¶ 88.  Since Restore Robotics was aware of the standard contract terms since at least 2019 (and previously challenged identical terms in *the S/Si EndoWrist Litigation*), alleges that it has been excluded from the aftermarket for repairing X/Xi EndoWrist instruments since July 2020, and failed to file this action by July 2024, Intuitive says that Restore Robotics' antitrust claims are time-barred.  That argument is, well, intuitive.  So much so that Restore Robotics doesn't necessarily quarrel with it, instead contending that two of *Zenith Radio*'s exceptions

bring its claims within the limitations period.  First, Restore Robotics invokes *Zenith Radio*'s speculative damages exception and reasons that, because it did not actually possess the technological capability to enter the X/Xi EndoWrist business until February 29, 2024, its claims did not accrue until that point.  Second, Restore Robotics asserts that Intuitive's conduct amounted to a "continuing violation" of the antitrust laws because Intuitive routinely enforced, or threatened to enforce, the challenged contract terms on its customers—ensuring that Restore Robotics remained excluded from the putative after market for repairing X/Xi EndoWrists. Neither argument has any merit.

*Zenith Radio*'s exception for speculative damages provides that an antitrust cause of action does not accrue until the claimant's damages are ascertainable.  *See Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 456 F.2d 662, 666 (5th Cir. 1972).[4] Under this exception, the defendant's anticompetitive conduct outside the limitations period is "revived" as a basis for damages, because when the act originally occurred, the plaintiff's damages were speculative or unprovable.  *Id.* at

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.  *See also Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th Cir. 2000) ("Of course, pre-split or 'Old Fifth' decisions . . . are binding on us, and where two prior panel decisions conflict we are bound to follow the oldest one." (citation omitted))

667.  Therefore, a plaintiff may recover for damages when its injuries are no longer speculative, even if the anticompetitive conduct took place more than four years earlier.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 191 (1997).  But to avail itself of this exception, Restore Robotics must plausibly allege that it was unclear whether it would suffer damages *at all* due to Intuitive's alleged conduct, not simply that the *degree* of harm to its business was speculative.  *See Perrigo Co. v. AbbVie Inc.*, 2022 WL 2870152, at *5 (3d Cir. July 21, 2022); Areeda & Hovenkamp ¶ 320d (noting that "courts . . . distinguish the uncertainty that prevents any recovery and shows that no cause of action has yet arisen from the mere uncertainty in damage measurement"); *see also Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 276 (8th Cir. 2004) ("Refusing to extend the statute of limitations" to a case where "the scope and extent" of "future damages may have been speculative, but the fact that [the plaintiff] had suffered a quantifiable injury was not" "ensures that the statute continues to have meaning"); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984) (Posner, J.) (absent "excessively speculative" damages, "the statute of limitations is not tolled simply in order to wait and see just how well the defendant does in the market from which he excluded the plaintiff"); *Aurora Enterprises, Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982) ("Mere uncertainty as to the extent or amount of damage will not bar recovery under the

**App.304**

antitrust laws." (citing *Story Parchment Co. v. Paterson Paper Co.*, 282 U.S. 555, 562 (1931))).

Although Restore Robotics only gained the technological capability to repair X/Xi EndoWrist instruments in February 2024, the Amended Complaint's allegations reveal that Restore Robotics was excluded from the putative aftermarket long before then. And there is nothing speculative about that competitive injury to Restore Robotics' X/Xi EndoWrist business. "Exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs," even though "the victim's losses lie mostly in the future." *Brunswick*, 752 F.2d at 271. According to Restore Robotics, Intuitive imposed the challenged contract terms since its X/Xi EndoWrist instruments were released in 2014 (and were imposed across previous generations even before then) and shut out all competition by insurgent firms for over a decade. *See* ECF No. 21 at ¶¶ 46, 55. Restore Robotics says it "always intended" to enter the X/Xi EndoWrist aftermarket and possessed "the background and experience necessary to compete" in that market by virtue of its experience in repairing the previous S/Si generation of EndoWrist instruments. *See id.* at ¶ 80. The Amended Complaint claims that—"even in the face of [Intuitive's] anticompetitive conduct"—Restore Robotics began "negotiating agreements with vendors and distributors" and "acquiring the necessary equipment,

inventory, and facilities" to compete in the X/Xi EndoWrist aftermarket "no later than June 2019." *See id.* at ¶ 82 (citation modified). However, Restore Robotics shied away from expending the "substantial resources" required to actually enter the X/Xi EndoWrist aftermarket because it believed doing so "would have been a clearly futile competitive gesture" due to Intuitive's contract terms "blocking any and all access to customers indefinitely." *See id.* at ¶ 81. Taken together, those allegations demonstrate that Restore Robotics knew about the exclusionary contract terms since at least 2019, made considered business judgments accounting for those terms for many years, and, "if not for the anticompetitive conduct of Intuitive," would have entered the market by July 2020. *See id.* at ¶ 88. As a sophisticated and experienced industry player, Restore Robotics' competitive injury—exclusion from the putative aftermarket—has always been "specific and calculable." *Klehr*, 521 U.S. at 191. *Zenith Radio*'s speculative damages exception accordingly offers no refuge to Restore Robotics.[5] *See Brunswick*, 752 F.2d at 271 ("*Zenith* has not been understood

---

[5] At various times in its Opposition to the Motion to Dismiss, Restore Robotics suggests that its X/Xi claims were deemed to be speculative in the *S/Si EndoWrist Litigation*. *See, e.g.*, ECF No. 27 at 4. But Restore Robotics cannot restore what never existed; in that case, Judge Wetherell never found Restore Robotics' X/Xi claims speculative. Instead, as relevant here, Judge Wetherell denied Restore Robotics discovery into the X/Xi technology, stating that he failed to see the relevance of the X/Xi technology to the issues "framed by the pleadings"—which concerned the S/Si technology, not the X/Xi technology. *Id.*, ECF No. 192 at 2 (expressing "serious reservations" that Restore Robotics could "expand this case" to encompass damages for anticompetitive conduct relating to the X/Xi aftermarket). While Judge Wetherell did previously

to toll the antitrust statute of limitations in every case where the plaintiff is seeking damages for being excluded from a market the profitability of which will be revealed only in the fullness of time."); *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 573 (4th Cir. 1976) (future damage claim of potential, but thus far excluded, competitor was not speculative).[6]

---

remark at a hearing that it appeared "speculative" whether Restore Robotics could even assert an antitrust claim relating to the X/Xi technology, *see id.*, ECF No. 185 at 31-34, it's clear he never made any finding in regard to speculation. So, although Restore Robotics ultimately sought further discovery into the X/Xi technology, the issue before Judge Wetherell concerned threshold determinations of relevancy, not whether its claim was speculative. *Id.*, ECF No. 192.

[6] Many courts have noted that *Zenith Radio*'s speculative damages exception seldom applies. *See, e.g.*, *Kabealo v. Huntington Nat. Bank*, 17 F.3d 822, 826 (6th Cir. 1994) (observing that "the parties have not cited, nor have we found, a case . . . in which the statute of limitations was tolled by applying the *Zenith* speculative damages rule" nearly a quarter century after it was announced); *Higgins v. New York Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991) (noting that the exception is reserved for "rare cases" (citation modified)); *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 648 F. Supp. 3d 679, 695 (E.D. Va. 2023), *aff'd*, 114 F.4th 280 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1921 (2025) ("The concept of 'speculative' damages . . . must not be extended too far, lest it swallow the otherwise applicable accrual rule."). The only case that the Court has identified applying the exception as Restore Robotics requests, *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014), is easily distinguishable. There, when the defendants allegedly conspired and entered into an anticompetitive agreement, no one "could have known for certain" that the plaintiff would even enter the relevant market. *Id.* at 1204–05. Here, the Amended Complaint portrays Restore Robotics as waiting in the wings of the putative aftermarket for X/Xi EndoWrist instruments—with only Intuitive's exclusionary contract terms keeping Restore Robotics at bay. *See* ECF No. 21 at ¶¶ 80–82. And, years ago, another potential entrant challenged much of the same anticompetitive conduct alleged here—before it achieved the technological capability to enter the aftermarket for X/Xi EndoWrist repairs; yet the court ultimately found that mere non-achievement of the technological capability to enter the aftermarket was not a *per se* bar to bringing suit. *See Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, 2022 WL 3272538, at *9-10 (M.D. Fla. Aug. 10, 2022) (denying Intuitive's motion for summary judgment, which argued that a potential new entrant lacked antitrust standing because it lacked the capability to "override use limits on X/Xi EndoWrists").

Alternatively, Restore Robotics insists that the "continuing violation" doctrine set out in *Zenith Radio* saves its claims from repose. Under that doctrine, even if "the events that initially created the cause of action" occurred outside the statute of limitations, a new cause of action accrues "after the defendant commits (1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a 'continuing antitrust violation.'" *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) (citing *Zenith*, 401 U.S. at 338). However, "a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975).

Restore Robotics' leading argument on this score is that Intuitive's unrelenting enforcement of the purportedly exclusionary contract terms—which, again, were allegedly in place for decades—over the last four years suffices to keep its antitrust claims alive.[7] The question, then, is whether Intuitive's enforcement of

---

[7] Restore Robotics also contends that each sale of the da Vinci X/Xi system with the challenged contract terms restarted the statute of limitations. But this argument elides the distinction between consumers (*e.g.*, surgical centers and hospitals) and competitors (*e.g.*, independent service organizations like Restore Robotics). "This distinction matters because although a *purchaser* is injured each time it must pay an anticompetitive price, and thus a cause of action accrues to it, the same can't be said of a *competitor*—whose antitrust injury is its exclusion from the relevant market." *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 291 (4th

those terms were "new and independent acts" that "inflicted new and accumulating injury on the plaintiff" or a mere "reaffirmation of a previous act" that imposed "the same injuries previously alleged to have been suffered" outside the limitations period? *Pilkington v. United Airlines*, 112 F.3d 1532, 1537–38 (11th Cir. 1997) (adopting, in the civil RICO context, the Ninth Circuit's articulation of the continuing violation doctrine set forth in *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)) (citation modified);[8] *see also* Areeda & Hovenkamp ¶ 320c1 (crediting *Poster Exchange*'s "somewhat awkward but nevertheless helpful language" articulating the distinction "between 'independent predicate acts' that are sufficient to keep the claim alive from actions that are merely 'reaffirmations' of the initial act").

The conduct pleaded here fits comfortably within the latter category, rendering *Zenith Radio*'s continuing violation exception inapplicable.[9] Outside the

---

Cir. 2024), *cert. denied*, 145 S. Ct. 1921 (2025) (citations omitted); *see also SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023) (holding that "permitting . . . unchanged warranty agreements" accompanying each "new iOS device" sold "to establish continuing violations would vitiate the purpose of the statute of limitations")

[8] In *Klehr*, the Supreme Court noted that "Congress consciously patterned civil RICO after the Clayton Act." *See* 521 U.S. at 189. The Ninth Circuit's decision in *Pace* itself dealt with the continuing violation doctrine as applied in the antitrust context.

[9] Restore Robotics' resort to hyperbole betrays the weakness of its continuing violation argument. Contrary to Restore Robotics' protestations, the Court's conclusion does not mean that no new entrant could ever "bring an action to break up a long-standing monopoly." ECF No. 27 at 6. New entrants eager and sufficiently prepared to enter a monopolized market, of course, may

limitations period, Intuitive's contract terms allegedly excluded Restore Robotics

from the X/Xi EndoWrist aftermarket—and Intuitive's putative enforcement of

those terms within the limitations period changed nothing about the competitive

landscape. *See Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004)

(holding that defendants' "enforcement of the initial contracts," did not "toll the

four-year statutes of limitations"); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868,

884–85 (N.D. Cal. 2015) (dismissing antitrust claim as untimely because plaintiffs

alleged "only that Microsoft maintained and reaffirmed its preexisting non-

solicitation agreements after 2009," which did not plead a continuing violation that

restarted the limitations period); *see also CSX Transportation*, 114 F.4th at 288–91

(maintaining exclusionary policy did not restart statute of limitations because the

policy was "final in its impact" and preserving it did not inflict "*new* harm causing

*new* injury" (citation modified) (emphasis in original)); *GovernmentGPT Inc. v.*

---

challenge the dominant firm's anticompetitive practices—they simply need to do so within four
years from the time at which they are excluded. *Cf. Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802
F.3d 732, 740 (5th Cir. 2015) (to demonstrate antitrust standing, "nascent competitors need not
pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly
futile competitive gesture.") (internal citations and marks omitted). Restore Robotics has only
itself to blame for sleeping on its rights. Much of the damage to Restore Robotics' X/Xi EndoWrist
business (if, in fact, Intuitive acted in violation of the antitrust laws) could have been avoided
entirely had Restore Robotics acted sooner—as it did in the *S/Si EndoWrist Litigation*. And
hospitals and surgical centers across the country, the customers actually footing the bill, would not
have been subjected to Intuitive's allegedly supracompetitive prices for nearly as long.

*Axon Enter. Inc.*, 769 F. Supp. 3d 959, 981 (D. Ariz. 2025) ("Pleading a continuing violation requires more than bald assertions that a defendant adhered to, enforced, and reaffirmed the alleged anticompetitive agreements." (citation modified)).  By Restore Robotics' telling, it has always been on the outside of the X/Xi EndoWrist aftermarket looking in due to Intuitive's anticompetitive contract terms.  Intuitive's sale and lease terms for its fourth generation of robotic surgery products have been fixed since 2014 and Restore Robotics claims to have been excluded from the putative aftermarket since July 2020.  *Cf. City of El Paso v. Darbyshire Steel Co.*, 575 F.2d 521, 523 (5th Cir. 1978) (noting that "the rights and liabilities of the parties were finalized by the contract" on the date it was signed and, because the plaintiff "felt an adverse impact" on that date, the statute of limitations began to run (citation modified)); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2nd Cir. 2019) ("Like the Sixth, Eighth, and Ninth Circuits, we think of the performance of a contract as a manifestation of the 'overt act,'  . . . rather than an independent overt act of its own.").  Intuitive's continued and unwavering enforcement of the challenged terms plainly imposed the same competitive injury—exclusion—that Restore Robotics allegedly suffered outside the limitations period, *Pilkington*, 112 F.3d at 1537–38, and reflects the "abatable but unabated inertial consequences" of Intuitive's original decision to incorporate the putatively anticompetitive contract

terms in 2014, *Poster Exch.*, 517 F.2d at 128.  *Cf. DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467–68 (6th Cir. 1996) (observing, in dicta, that defendant's representations to service customers that their warranties would be voided if they used unauthorized third-party repair services only amounted to "mere reaffirmations" that "inflicted no new and accumulating injury").[10]

Accordingly, neither exception to the four-year statute of limitations applies. Intuitive's motion to dismiss, ECF No. 25, is therefore **GRANTED**, the Amended Complaint is **DISMISSED**, and Restore Robotics' motion for leave to file a Second Amended Complaint, ECF Nos. 34 & 35, is **DENIED** as futile.[11]  The Clerk is directed to close the file.

---

[10] Restore Robotics does not allege that Intuitive, for example, only began enforcing its earlier-adopted exclusionary practices within the limitations period, *DXS*, 100 F.3d at 467–68, broadened its exclusionary practices to further entrench its monopoly, *Samsung*, 747 F.3d at 1204–05 (expanding a license agreement to include products not covered by the previous license agreement was an overt act restarting limitations period), or that Intuitive's decades-old contract terms, uniformly imposed across product generations, was anything other than a final, permanent policy, *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714–15 (11th Cir. 1984) (per curiam) (if the initial refusal to deal is not final, each time the excluded plaintiff requests to deal with the defendant and is rejected, a new cause of action accrues; however, no new cause of action accrues when excluded plaintiff makes subsequent futile efforts to deal with the defendant and is rebuffed).

[11] Although there is no limitations period for injunctive relief claims under the Sherman Act, *see* 15 U.S.C. § 26, those claims are still subject to the equitable defense of laches.  *See Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 2014 WL 1329359, at *14 (S.D. Fla. Mar. 31, 2014), *aff'd*, 797 F.3d 1248 (11th Cir. 2015).  Neither Restore Robotics nor Intuitive explicitly discussed this nuance in their briefing.  Still, because courts generally look to the same principles

**DONE AND ORDERED** this 7th day of November 2025.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

that animate the four-year statute of limitations for antitrust damages actions when computing the laches period, Restore Robotics' claims for injunctive relief are likewise time-barred. *Id.* Moreover, Restore Robotics' proposed Second Amended Complaint avers that on March 27, 2025, Intuitive "granted approval" for Restore Robotics to repair X/Xi EndoWrist instruments. *See* ECF No. 35 at ¶ 72. Restore Robotics is therefore no longer excluded from the putative aftermarket and its claims for injunctive relief are moot. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("A plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (citation modified)); *cf. Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (injuries no longer remediable by a court generally render a case moot and deprive a party of Article III standing).

CASE NO. 3:24-cv-444-MCR-ZCB

TAB 43

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIRS LLC,

                Plaintiff,

    v.

INTUITIVE SURGICAL, INC.,

                Defendant.

Case No. 3:24-cv-444-MCR-ZCB

## <u>NOTICE OF APPEAL</u>

Plaintiff Restore Robotics Repairs LLC hereby appeals to the United States

Court of Appeals for the Eleventh Circuit the final decision (ECF No. 42) entered in

this action on November 7, 2025.

Respectfully submitted on November 29, 2025.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

* Admitted Pro Hac Vice

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.

**App.314**

TAB B

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Matthew D. Reade*
Matthew D. Reade